**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MARVIN PEARLSTEIN, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BLACKBERRY LIMITED (formerly known as RESEARCH IN MOTION LIMITED), THORSTEN HEINS and BRIAN BIDULKA,<br><br>Defendants. | File No. 1:13-CV-7060-TPG<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

1.     Lead Plaintiffs Todd Cox and Mary Dinzik ("Plaintiffs") and additional Plaintiffs Yong M. Cho and Batuhan Ulug bring this federal securities class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the purchasers of BlackBerry Limited ("BlackBerry" or the "Company") common stock between March 28, 2013 and September 20, 2013 (the "Class Period"), against BlackBerry, its former Chief Executive Officer Thorsten Heins, and its former Chief Financial Officer Brian Bidulka (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise from a series of materially false and misleading statements and omissions concerning BlackBerry, its new BlackBerry 10 smartphones, its recognition of revenue, and compliance with Generally Accepted Accounting Principles ("GAAP") that Defendants made during the Class Period.

2.      Plaintiffs allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by BlackBerry, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company and its executives, media reports about BlackBerry, and interviews with witnesses with knowledge of the allegations herein and consultation with industry experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## OVERVIEW

3.      BlackBerry, formerly Research In Motion,[1] revolutionized the mobile communication industry in 1999 with its unique portable email device, which utilized a thumb-based keyboard and a track wheel for scrolling through menus and messages.  The technology was immensely popular in the business world, where email was quickly becoming the primary form of communication.  Then, in 2002, when the Company integrated its messenger capabilities into cellular phones, BlackBerry became a household name.  BlackBerry saw its subscriber base grow from around 500,000 in 2003 to nearly 5 million in 2006, as the Company kept improving its handsets with color displays, Wi-Fi, Bluetooth, predictive typing and more.

4.      By 2007, BlackBerry was valued at over $40 billion and more than 1 out of every 3 new smart device purchases in the United States was a BlackBerry.  BlackBerry owned the market.  However, 2007 was a pivotal year for BlackBerry and the mobile communications world, as in July of that year Apple released the first iPhone.

5.      Although BlackBerry still dominated the industry at the time of the iPhone's introduction, the iPhone was a technologically superior product that utilized two processors and,

---

[1] On July 10, 2013, the Company changed its name from Research in Motion Limited ("RIM") to BlackBerry Limited.

unlike the BlackBerry products, had a fully internet-capable browser.  BlackBerry still enjoyed a healthy market share, but the Company and its devices were not positioned well for the future. Over the next couple years, BlackBerry struggled to keep pace with Apple and, subsequently, the introduction of Android-based system.  The Company would either cobble together technologies and rush poorly designed products to market, or it would experience long delays in launching new products that would render its devices stale by the time they reached the market.

6.     Over the next several years, BlackBerry started losing its market share and with it, the Company's torrid revenue growth began to slow.  Between the fourth quarter of fiscal 2011 (Feb. 26, 2011) and the third quarter fiscal 2012 (Nov. 26, 2011), BlackBerry reported revenues between $4.2 billion and $5.6 billion per quarter.  However, signs of a diminishing brand and market share were starting to manifest themselves in BlackBerry's financial results, because although revenues were averaging approximately $5 billion per quarter, net income was dropping precipitously each and every quarter.

(USD in millions)

|  | FY 2011 | FY 2012 | | |
|---|---|---|---|---|
|  | 4th Quarter | 1st Quarter | 2nd Quarter | 3rd Quarter |
| Quarter Ended: | Feb. 26, 2011 | May 28, 2011 | Aug. 27, 2011 | Nov. 26, 2011 |
| Revenues | $5,556 | $4,908 | $4,168 | $5,169 |
| Net income (loss) | 934 | 695 | 329 | 265 |

7.     Things were about to get worse.  Starting in the fourth quarter of fiscal 2012 (March 3, 2012), prior to the start of the Class Period, Blackberry reported losses in 3 out of 4 quarters with cumulative net losses approximating $869 million, resulting from the Company's plummeting revenue stream.  For example, BlackBerry reported revenue of $2.8 billion for the

first quarter of fiscal 2013 (June 2, 2012), a decrease of approximately $2.1 billion, or 42.7%, from $4.9 billion in the first quarter of fiscal 2012 (May 28, 2011).  In fact, BlackBerry's quarterly revenues in fiscal 2013 dropped significantly each and every quarter, as compared to fiscal 2012.

(USD in millions)

|  | FY 2012 | FY 2013 | | |
|---|---|---|---|---|
|  | 4th Quarter | 1st Quarter | 2nd Quarter | 3rd Quarter |
| Quarter Ended: | Mar. 3, 2012 | June 2, 2012 | Sept. 1, 2012 | Dec. 1, 2012 |
| Revenues | $4,190 | $2,814 | $2,873 | $2,727 |
| Net income (loss) | (125) | (518) | (235) | 9 |

8.     As the Company fell further and further behind its competitors, it became clear BlackBerry needed something new, different and superior to existing products to attract new customers and retain its current users and re-capture its lost customers.  In April 2010, BlackBerry announced a deal to acquire QNX Software ("QNX"), a cutting edge software engineering firm that would help create the operating system for the BlackBerry 10, a new smartphone that the Company hoped would save it from ruin.  The Company would strip away its former, Java-based applications and build the BlackBerry 10 entirely from scratch.  In addition to the newly acquired QNX team, BlackBerry pulled its resources off of its failed BlackBerry 7 phones and dedicated all its time, money and personnel to the new BlackBerry 10 project.

9.     Mounting delays on the BlackBerry 10 and another product flop—the PlayBook, a failed tablet intended to compete with Apple's iPad—combined to push BlackBerry into full decline.  BlackBerry 7 phones were not selling, the Company's revenues were tumbling, and its

stock plunged from $69 (Canadian) in February 2011 to less than $15 by the year's end.  In January 2012, the failures of the PlayBook and BlackBerry 7 phones drove Jim Balsillie and Mike Lazaridis to step down as co-CEOs of BlackBerry in favor of Defendant Thorsten Heins, a German executive who had run the Company's handset division.  As opposed to Lazaridis, who felt that the physical keyboard was vital to the success of BlackBerry, Defendant Heins' management team believed the market wanted full touchscreen, and therefore pushed to launch the all-touchscreen Z10 phone and continue developing the Q10 keyboard phone.

10.     2012 turned out to be the most challenging year in the Company's history.  The 2012 fiscal fourth quarter (three months ended March 3, 2012), marked the first time that BlackBerry recorded a net loss (-$128 million) for the quarter.  The BlackBerry 7 smartphones' weak sell-through also resulted in a $355 million charge for the impairment of goodwill and a $267 million inventory write-down of those devices in the quarter, and necessitated the introduction of aggressive customer incentive programs to improve sales throughout FY 2013.  That trend continued through the year (1Q:13 (three months ended June 2, 2012) loss of $518 million, 2Q:13 (three months ended September 1, 2012) loss of $142 million, 3Q:13 (three months ended December 1, 2012) loss of $114 million), for a cumulative net loss of $869 million.  For example, BlackBerry reported revenue of $2.8 billion for the first quarter of fiscal 2013 (three months ended June 2, 2012), a decrease of approximately $2.1 billion, or 42.7%, from $4.9 billion in the first quarter of fiscal 2012 (three months ended May 28, 2011).   In fact, BlackBerry's quarterly revenues in fiscal 2013 dropped significantly each and every quarter, as compared to fiscal 2012.  BlackBerry needed to stop the bleeding.

11.     Further evidencing BlackBerry's dramatic fall from grace and the desperate situation Defendants found themselves in necessitating success of the BlackBerry 10 line, a

5

December 14, 2012 THE WALL STREET JOURNAL article entitled "A Swedish Tribe Aids BlackBerry Rescue Bid" reports that in 1999 BlackBerry had a whopping 50% of smartphone market. By 2011 it had just 9.5% of that market. In 2012, BlackBerry was holding onto a paltry 4.7% share of the smartphone market. Even shipments of BlackBerry's to the Company's hardcore target market -- corporations and the government -- were expected to be surpassed by iPhones by 2013.

12.     The delays in production for the Z10 had proven costly.  By December 20, 2012, a month before introduction of the BlackBerry 10 device, the Company reported revenues for its fiscal third quarter ended December 1, 2012 had fallen 48% from the previous year's third quarter, and that after adjusting for a charges and a tax gain, the Company had a loss of $114 million, or $0.22 per share compared with earnings of $265 million, or $0.51 per share in the prior year's third quarter.  As *The New York Times* reported on December 20, 2012, "[t]he [C]ompany has pinned all of its hopes on the BlackBerry 10 to win back customers who may have defected to iPhones or phones using Google's Android operating system."  Defendant Heins, during an analyst conference call on December 20, 2012, stated that "[w]e believe the company has stabilized and will turn the corner in the next year," and that the introduction of the 10 would bring an end to the Company's cash hoarding and it would dig into its cash reserves during its fiscal fourth quarter to stockpile BlackBerry 10 phones in advance of their release and to finance advertising and other marketing campaigns for the devices.

13.     The Company also reported it shipped slightly over 7 million current BlackBerry models during its fiscal third quarter; BlackBerry officials conceded those products were being heavily discounted.

14.     Based on the lack of market acceptance of the BlackBerry 7, it was critical that Defendant Heins condition the market to believe that the launch of the BlackBerry 10 was running according to plan and, during the December 2012 analyst conference call reported by *The New York Times,* stated that, "[w]e are realistic about our competitors, but we know that customers in the industry demand and respond to innovation." In fact, however, as Defendant Heins and the other Defendants were aware, when the Company finally unveiled the upcoming BlackBerry 10 smartphones, the technology was two years behind what was already on the market.

15.     Although the long-awaited BlackBerry 10 debuted at a flashy launch event in January 2013 featuring Alicia Keys, BlackBerry's "global creative director," the launch fizzled. Indeed, soon after the launch, a scandal emerged as Alicia Keys was caught tweeting from her iPhone when she had publicly sworn allegiance to the new BlackBerry 10.

16.     As the Z10 rolled out to consumers across the globe, the response to the new phones was tepid.  Despite vigorous assurances from BlackBerry that the phones were selling well and any reports to the contrary were untrue, in reality, inventory was piling and BlackBerry was forced to offer its carrier and distributor partners costly sales incentives to move bloated inventories of the Z10s off the shelves.  For example:

      a.     On January 30, 2013, BerryReview reported that Rogers, a major Canadian wireless communications provider, confirmed it would offer the white BlackBerry Z10 for up to $100 off.

      b.     On February 6, 2013, Telegraph.co.uk reported that shops in the UK were denying claims by defendant Heins that Z10 phones were selling out.

      c.     On March 5, 2013, BGR reported that the UK's leading mobile phone retailer, Carphone Warehouse, had cut the monthly package price of the BlackBerry Z10 from £36 to £29, which amounted to a £160 price drop over the life of a 24-month contract.  BGR also reported that Vodafone was offering a package deal for the Z10 that was £72 cheaper than its previous one.

d.    On March 4, 2013, Telegraph.co.uk reported that UK-based Carphone Warehouse had cut the price of the Z10 by about £139 over a two-year contract period.

e.    On March 17, 2013, Softpedia.com reported:  "The Z10 was launched at all Canadian carriers, including TELUS, Rogers and Bell, for $150/€110 with a new three-year agreement.  Well, it appears at least three Canadian carriers dropped the phone's price one more time.  As MobileSyrup points out, Rogers, Bell and Virgin Mobile are now offering the BlackBerry Z10 for only $100/€75 on a 3-year term."    Softpedia.com added:  "Even though only three carriers discounted the BlackBerry Z10, we expect more Canadian operators to add to the initiative."

f.    On March 19, 2013, Know Your Mobile India related that BlackBerry had decided to slash the price of its Z10 smartphone in India, from Rs 43,490 to Rs 39,990.  According to NerdBerry.com, a site focused on BlackBerry news,  "[t]here was a lot of controversy over the price tag of the Z10 in India …"

g.    On March 25, 2013, Emirates 24/7 in Dubai published a report with the headline "BlackBerry Z10 sales & prices are sinking:  Blame Samsung Galaxy S4."  The report noted that, with "the unveiling of newer offerings from rivals, including the HTC One, the Sony Xperia Z and the Samsung Galaxy," "[i]t might come as no surprise, then, that the device that showed a lot of promise during its not-so-distant launch, seems to be now headed downhill – including its price."  "Online deals on the BlackBerry Z10 are getting hotter by the day across the UAE, with group buying websites jumping in on the frenzy – the best bargain yet, Dh2,170 for the handset that is officially priced at Dh2,599."   The Emirates 24/7 report also noted: "A new research note from Citigroup analyst Jim Suva states that sales of the BlackBerry Z10 smartphones have 'dramatically slowed' after an initial 'honeymoon' and that carriers 'have already shifted promotions to other products [read:  Samsung Galaxy S4] and moved the Z10 to less favourable in-store locations.'"  Emirates 24/7 further noted that "[t]he Z10 has been officially available in the UAE since February 10, and today, within a month-and-a-half since then, prices seem to have slipped more than 16 per cent" and that "the price-slash is not limited to the UAE – retail price of the Z10 has reportedly been slashed elsewhere in the world too."

h.    On March 26, 2013, the *International Business Times* reported:  "Despite Heins' confident assertions that stock of the BlackBerry Z10 had run low in several stores and shops – 'White is sold out already,' he said – many retailers have pointed to the contrary, saying the BlackBerry Z10 handsets haven't sold too well at all.  In fact, according to the *Daily Telegraph*, many British stores said they had 'loads left' and 'plenty left,' while Phones 4U, the exclusive UK supplier of the white BlackBerry Z10, said it

didn't sell out of the handsets, contrary to Heins' statement." The *International Business Times* went on: UK "retailers are reportedly slashing prices for the BlackBerry Z10 to spur along sales of the struggling handset."

i.      On April 5, 2013, BBin, a blog for BlackBerry users in India, reported that Junglee.com, an online shopping site, was offering the Z10 at a discounted price of Rs 37,990, and that Rediff.com, an India-based shopping portal, was selling the phone at an even more discounted price of Rs 37,500.

j.      On April 10, 2013, CrackBerry.com reported that in the United States, Amazon had dropped the price of the Z10 on both AT&T and Verizon to just $99 with a two-year contract and that those who already had purchased a Z10 from Amazon could claim a $50 credit.

k.      According to an April 13, 2013 *New York Post* article, "Blackberry is in the bargain bin. Retailers [in the United States] are turning to steep discounts on the newest Blackberry Z10 smartphone in an effort to move millions stockpiled on store shelves." "A number of retailers -- some of whom said they were having trouble moving their Z10s -- have begun discounting from the initial $200 price with a two-year contract. A Verizon store in Bayside [in Queens, New York] is selling the Z10 for $100 -- or half price -- with a two-year contract. And it wasn't the only seller cutting prices. Amazon was offering the same cut-rate deal for the phone. A manager at the Bayside store said the Z10 was not selling well."

l.      On May 23, 2013, Cheap-Phones.com, an online provider of phones at discounted prices based in New York, announced it was offering the BlackBerry Z10 on its site at "a fraction" of the retail price.

17.    BlackBerry had very recent experience with a product failure, as both the PlayBook and the BlackBerry 7 seriously underperformed. Familiar with the mechanics of a product failure, BlackBerry was desperate to hide the BlackBerry 10 catastrophe, and thus the failure of Defendant Heins' BlackBerry 10 strategy as well as its broader implications of that failure on future sales of BlackBerry 10s.[2]

18.    As a result of their desperation, BlackBerry began issuing false and misleading financial reports. Notwithstanding Defendants' knowledge by the time BlackBerry filed its 40-F

---

[2] As the more the 10s failed to sell through, the fewer 10s would be sold as consumers feared either that providers would cease supporting the product or BlackBerry itself would cease to exist.

for its fiscal year ended March 2, 2013, that the BlackBerry 10s were failing commercially and steep discounting was and would in the future be required to sell, if at all possible, the outstanding inventory of BlackBerry 10s, BlackBerry, reported its fiscal year revenues based on shipments of BlackBerry 10s rather than end-user sales of the product.   Consequently, BlackBerry's revenue recognition was not compliant with Generally Accepted Accounting Principles ("GAAP"), as it was recognizing revenues despite the Company's inability to reasonably and reliably estimate price concessions to carriers and retailers, and thus the price was neither fixed nor determinable.   Thus, defendants were able to inflate BlackBerry's revenues for the fiscal year and portray to the investing public that BlackBerry was again profitable.

19.     Moreover, to preserve the illusion of profitability and success of the BlackBerry 10s, Defendants failed, in violation of GAAP, to increase BlackBerry's reserves for costs related to the BlackBerry 10s and obsolete or unsalable 10 products even though Defendants knew by the time the 2013 fiscal year end financial statements were issued that BlackBerry would likely need to take charges in the future for losses related to the BlackBerry 10s.   By failing to properly increase reserves, Defendants were able to conceal their knowledge that the 10s were a commercial failure and to further inflate BlackBerry's earnings as reserves would have reduced those earnings and signaled to the market the problems with the BlackBerry 10s.

20.     Further, Defendants were aware that, due to their accounting treatment of booking revenues on shipment coupled with the failure of the BlackBerry 10, that the fourth quarter of 2013 and fiscal year 2013 was likely not to be representative of future quarters as the commercial failure of the BlackBerry 10s became more pronounced.   Therefore, Defendants had the affirmative obligation under SEC item 303 to disclose that the reported financial results for the fourth quarter and full year 2013 (for the fiscal year ending March 2, 2013) were subject to a

known trend and uncertainty that that BlackBerry reasonably expected would have a material unfavorable impact on net sales, revenues and income from continuing operations in subsequent quarters.  As a result, Defendants withheld information they had a regulatory duty to disclose that was material and, thus, constituted a material omission.

21.     It was not until September 20, 2013, the end of the Class Period, that the truth began to emerge concerning the BlackBerry 10 smartphones and the impact on the Company's performance and prospects.  That day, Defendants announced that BlackBerry would report a "charge against inventory and supply commitments in the second quarter of ***approximately $930 million to $960 million, which is primarily attributable to BlackBerry Z10 devices;***"  that the current quarter would also include a "restructuring charge" in the approximate amount of $72 million;" that the Company planned "to transition its future smartphone portfolio from six devices to four;" and that the Company would implement "a workforce reduction of approximately 4,500 positions or approximately 40% of the Company's global workforce."

22.     Immediately, BlackBerry stock plummeted, on heavy volume, losing almost a quarter of its market value in just days, dropping from a closing price of $10.52 per share on September 19, 2013 to close at $8.73 per share on September 20, 2013.  By close of trading on September 25, 2013, the price of BlackBerry stock slid down to just $8.01.

23.     The news came as a shock to financial analysts.  For example, UBS issued a report on September 20, 2013, which stated in part:

> BBRY negatively preannounces F2Q results now anticipating Revs of $1.6b (cons $3.1b) and EPS loss, prior to an inventory write-down charge of $930-960m, of -$0.47 to -$0.51 vs. cons at -$0.15. There were 2 main surprises in our opinion: a) the magnitude of the miss (50% in revenues); b) of the 3.7m phones for which revs were recognized, almost all were BB7, i.e., almost no revenue was recognized for the newer BB10 devices.

24.     The BlackBerry 10 line of smartphones represented a Hail Mary play for

BlackBerry that would either launch the Company back into the mobile forefront, or render it and its products antiquated and passé.  Throughout the Class Period, Defendants materially misrepresented to investors the true financial condition of BlackBerry and that its supposed recovery was an illusion created by manipulating the Company's final statements coupled with public misrepresentations regarding the BlackBerry 10s' success as a product.  In turn, these false and misleading statements and omissions to disclose material information artificially inflated the market price of BlackBerry common stock.

25.     The Individual Defendants were further motivated to tout the BlackBerry 10 phones and conceal the accompanying waxing inventory and waning revenues because – after seeing the prior co-CEOs Mike Lazaridis and Jim Balsillie forced out of the Company following the failure of the BlackBerry PlayBook – they were able to secure substantial performance based bonuses (tied to the Company's improperly inflated revenues) and delay for months their own forced departures from BlackBerry which promptly occurred after the truth was revealed in order to continue receiving their high salaries and other compensation and benefits for as long as they could conceal the true commercial failure of the BlackBerry 10s.

26.     Defendants knew or recklessly disregarded that the Company's Class Period statements regarding the BlackBerry Z10's success were materially false and misleading because the BlackBerry Z10 had already launched in other countries without success, and carriers in those countries were already offering steep discounts to move the phones off their shelves.

27.     Fundamentally, Defendants bet the Company on the BlackBerry 10 phones, and the wager did not pay off.  New CEO John Chen even expressed that BlackBerry – the inventor of the smart phone – will cease making smartphones if the Company cannot profit from them, telling Reuters, "If I cannot make money on handsets, I will not be in the handset business."

## JURISDICTION AND VENUE

28.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

29.     This Court has jurisdiction over the subject matter of this action pursuant to §28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). The violations of law complained of herein occurred in part in the District, including, but not limited to, the dissemination of materially false and misleading statements into this District.

31.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.  Plaintiffs

32.     Lead Plaintiff Todd Cox, as set forth in his previously-filed certification [Dkt. # 13-1], incorporated herein by reference, purchased BlackBerry common stock at an artificially inflated price during the Class Period, and was harmed when the price of BlackBerry stock dropped as a result of the revelations of the truth at the end of the Class Period.

33.     Lead Plaintiff Mary Dinzik, as set forth in her previously-filed certification [Dkt. # 13-1], incorporated herein by reference, purchased BlackBerry common stock at an artificially

inflated price during the Class Period, and was harmed when the price of BlackBerry stock dropped as a result of the revelations of the truth at the end of the Class Period.

34.     Additional Plaintiff Yong M. Cho ("Cho"), purchased BlackBerry common stock at an artificially inflated price during the Class Period, and was harmed when the price of BlackBerry stock dropped as a result of the revelations of the truth at the end of the Class Period. The certification for Plaintiff Cho is attached hereto as Exhibit A.

35.     Additional Plaintiff Batuhan Ulug ("Ulug"), purchased BlackBerry common stock at an artificially inflated price during the Class Period, and was harmed when the price of BlackBerry stock dropped as a result of the revelations of the truth at the end of the Class Period. The certification for Plaintiff Ulug is attached hereto as Exhibit B.

**B.  Defendants**

36.     Defendant BLACKBERRY is incorporated under the laws of Canada, maintaining its principal place of business 295 Phillip Street, Waterloo, Ontario, Canada, N2L 3W8.  As explained above, BlackBerry is a designer, manufacturer and marketer of wireless solutions, through the development of integrated hardware, software, and services.

37.     Defendant Thorsten Heins ("Heins") was, during the Class Period, the Chief Executive Officer ("CEO") and President of BlackBerry.  Heins also served as a member of the Board of Directors.  Heins resigned as President and CEO and as a director on November 13, 2013, after the end of the Class Period.  Heins personally certified all of the Company's financial reports issued during the Class Period.

38.     Defendant Brian Bidulka ("Bidulka") was, during the Class Period, Chief Financial Officer ("CFO") of BlackBerry.  Bidulka resigned as CFO on November 25, 2013, after the end of the Class Period.  Bidulka personally certified all of the Company's financial

reports issued during the Class Period.

39.     Collectively, BlackBerry, Heins, and Bidulka, are referred to as "Defendants."

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

**A.     Materially False and Misleading Statements Regarding the Success of BlackBerry and its BlackBerry 10 Smartphones**

40.     Throughout the Class Period, BlackBerry made materially false and misleading statements and omissions regarding the Company's new BlackBerry 10 line of smartphones, customer satisfaction with the phones, meeting of sales expectations, and return rates for the phones.  In truth, the BlackBerry 10 phones were not selling-through to customers, return rates exceeded expectations, and BlackBerry was forced, almost immediately after their introduction, to initiate steep discounts on the phones to attempt to move inventories.

41.     On March 28, 2013, the first day of the Class Period, BlackBerry filed with the SEC its Annual Information Form on Form 40-F for the fiscal year ending March 2, 2013. BlackBerry's filing stated: **"**Successfully transitioning to BlackBerry 10, the Company's next generation BlackBerry platform. . . . **The launch of BlackBerry 10 in January 2013 marked the beginning of the organization's transition to becoming a leading mobile computing organization.**" [Emphasis added].

42.     The foregoing statement was materially false and misleading when made because by March 28, 2013, Defendants knew and/or recklessly disregarded the facts available to them that, among other things, the BlackBerry 10s were not "successful," and that the 10s would not return BlackBerry to being "a leading mobile computing organization."  In reality, the launch of BlackBerry Z10 smartphones in overseas markets, which took place months before the March 22, 2013 U.S. launch, had already proven to be a disaster for the Company.  As early as January 2013, BlackBerry was already working with its carriers to discount the new BlackBerry Z10

15

smartphones overseas, which indicated that the launch of the BlackBerry 10 was not "successful" because end-users were not buying the phones.

43.     On March 28, 2013, BlackBerry issued a press release (also filed with the SEC on Form 6-K) announcing fourth quarter and year-end results for fiscal 2013 (the fiscal year ended March 2, 2013).  The press release quoted Defendant Heins:

> "We have implemented numerous changes at BlackBerry over the past year and ***those changes have resulted in the* Company <u>returning to profitability</u>** in the fourth quarter," said Thorsten Heins, President and CEO. "With the launch of BlackBerry 10, we have introduced the newest and what we believe to be the most innovative mobile computing platform in the market today. ***<u>Customers love the device and the user experience, and our teams and partners are now focused on getting those devices into the hands of BlackBerry consumer and enterprise customers."</u>***

[Emphasis added].

44.     Defendant Heins' statements quoted in the March 28, 2013 press release were materially false and misleading when made because Defendants knew and/or recklessly disregarded facts available to them that BlackBerry's purported return to profitability in the fourth quarter of fiscal 2013 was the result of improper revenue recognition techniques which would likely have to be reversed by charges or write-downs in future quarters) and that  the vast majority of the pool of potential BlackBerry 10 customers were shunning the product.  For example, a March 5, 2013 Forbes.com report quoted Pacific Crest analyst, James Faucette, asserting "that U.K inventory levels of the Z10 touch-screen BB10-based smartphones are 'already too high,' and that inventory levels in Canada are 'quickly approaching typically targeted levels.'"[3]  James Faucette also stated that "'[o]ur checks indicate that as sell-through run-rates for the Z10 have declined meaningfully in the weeks following launch, we believe carriers and third-party retailers in the U.K. are already well above typically targeted inventory

---

[3] http://www.forbes.com/sites/ericsavitz/2013/03/05/blackberry-z10-inventories-piling-up-in-u-k-analyst-says/

levels.'"  As a result, BlackBerry was already working with its carriers to discount the phones in the United Kingdom, India, Canada, Dubai and elsewhere because they were simply not selling through to customers.  Moreover, according to a Marketing Manager for one of BlackBerry's largest distributors, customers were simply not asking for the BlackBerry devices.  The Marketing Manager informed BlackBerry personnel of these issues, saying "there is nothing they can do to move the needle" and ultimately put his hands up and said "we can't help you."

45.    During an earnings call on March 28, 2013, Defendant Heins stated:

- Over the past year, we have also regained the confidence and excitement of our carrier distribution partners with the introducing of the amazing Blackberry 10 platform for consumers and enterprises. The Blackberry 10 platform has been worth the wait.

- As mentioned at our launch in January, availability of Q10 will commence in April. ***The initial early global demand for the 10 has been better than anticipated, and our recent announcement of the largest single purchase order in our history, for 1 million units, is also indicative of a strong initial support and demand.***

[Emphasis added].

46.    Defendant Heins' statements during the March 28, 2013 earnings call regarding having "regained the confidence and excitement of [its] carrier distribution partners" with the introduction of the BlackBerry 10, were materially false and misleading when made because Defendants failed and omitted to disclose BlackBerry carriers in the UK, Canada, Dubai, India, and elsewhere were already offering steep discounts on BlackBerry's supposedly "amazing" Z10 smartphones as early as January 2013.  Thus, to the extent there was an "initial early global demand for the 10 has been better than anticipated," that demand had waned by March 28, 2013 and consumers had already soured on the device.

47.    Furthermore, with respect to the 1 million unit order, that order came from Brightstar, a national distributor of smart phones.  The Brightstar order came before the

17

BlackBerry 10s had been available to consumers in the U.S. market.  According to a Brightstar Marketing Manager, who was specifically assigned from July 2013 to mid-October 2013 to assist sales of the Z10 and Q10 for the Verizon dealer network, and who worked directly with Verizon Channel Marketing Managers and BlackBerry employees to develop a sales program to incentivize franchisee sales managers to create sell-through on the BlackBerry 10 devices, that customers were simply not asking for the BlackBerry 10.  The Marketing Manager explained that part of the reason was that BlackBerry 10's did not have support from software developers and therefore had no "apps" like the iPhone and other leading devices.  He also stated that the BlackBerry 10 platform was not compatible with very many applications, which is key to smartphone utility and acceptance.   The Brightstar Marketing Manager informed BlackBerry personnel of these issues, saying "there is nothing they can do to move the needle" and ultimately put his hands up and said "we can't help you."

48.    On April 11, 2013, THE WALL STREET JOURNAL'S DIGITS blog reported that, according to analyst Jeff Johnston from research and investment firm Detwiler Fenton, "customer returns of the Z10 are actually outnumbering sales."[4]  The Detwiler report stated that "'We believe key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are now exceeding sales, a phenomenon we have never seen before.'"[5]

49.    On April 12, 2013, BlackBerry issued a strongly-worded press release (filed with the SEC on Form 6-K) aggressively denying the claims from Detwiler Fenton that BlackBerry Z10 phones were being returned in unusually high numbers:

**"Sales of the BlackBerry® Z10 are meeting expectations and the data we have collected from our retail and carrier partners demonstrates that**

---

[4] http://blogs.wsj.com/digits/2013/04/11/analyst-blackberry-z10-returns-outnumber-sales/
[5] *Id.*

**customers are satisfied with their devices**," said BlackBerry President and CEO Thorsten Heins. "**Return rate statistics show that we are at or below our forecasts and right in line with the industry.  To suggest otherwise is either a gross misreading of the data or a willful manipulation.** Such a conclusion is absolutely without basis and BlackBerry will not leave it unchallenged."

*        *        *

BlackBerry Chief Legal Officer Steve Zipperstein said: "**These materially false and misleading comments about device return rates in the United States harm BlackBerry and our shareholders, and we call upon the appropriate authorities in Canada and the United States to conduct an immediate investigation.** Everyone is entitled to their opinion about the merits of the many competing products in the smartphone industry, but **when false statements of material fact are deliberately purveyed for the purpose of influencing the markets a red line has been crossed.**" [Emphasis added].

50.     Defendants' denials of reports concerning high level of returns on BlackBerry 10 devices made in the April 12, 2013 press release were materially false and misleading when made because Defendants knew and/or recklessly disregarded the facts available to them that the Detwiler Fenton report was accurate, and that BlackBerry Z10 customers were not "satisfied with their devices."  In fact, BlackBerry Z10 devices were not moving off the shelves and the Company had already spent months working with carriers to discount the phones to try to sell them off.

51.     During a June 28, 2013 earnings call, CEO Heins stated:

- The BlackBerry Z10 has been an effective launch product to showcase the renewed and reengineered BlackBerry 10 experience to both consumers and enterprises.

- Let's remember, one year ago none of these products existed, and today they are just launching, **and have been well-received**, because of the performance and quality of BlackBerry 10. It has been very exciting and challenging for our teams, and we are looking forward to the next stage of our transition this year.  [Emphasis added].

52.     Defendant Heins' statements during the June 28, 2013 earnings call were

materially false and misleading when made because Defendants knew and/or recklessly disregarded facts known to him that the BlackBerry 10 was  not "well received."  Indeed, the opposite was true.  By January 2013, it had failed abroad and was subject to steep discounting to attempt to move inventory, and by April 2013, BlackBerry was forced to have U.S. carriers discount the devices as well.

53.     On August 12, 2013, the Company issued a press release (filed with the SEC on Form 6-K) announcing that BlackBerry's Board of Directors was exploring strategic alternatives. The press release quoted Defendant Heins:

> We continue to see compelling long-term opportunities for BlackBerry 10, we have exceptional technology that customers are embracing, we have a strong balance sheet and we are pleased with the progress that has been made in our transition.

54.     Defendant Heins' statements in the August 12, 2013 press release were materially false and misleading when made because Defendants knew and/or recklessly disregarded facts available to him that customers were not "embracing" the 10's technology but shunning the product.  At the time these statements were made, carriers all over the world were offering the BlackBerry 10 smartphones at a fraction of the cost because consumers simply would not purchase the phones at BlackBerry's initial price point.  For example, BlackBerry Z10 phones were released in the United States through Verizon on March 28, 2013 at an initial price of $200 with a two-year contract.  According to an article published on April 13, 2013, just weeks after the Verizon Z10 release, a Verizon store in Queens, NY was selling the Z10 at $100—half the price—with the same two-year contract.  Similarly, on April 10, 2013, CrackBerry.com reported that in the United States, Amazon had dropped the price of the Z10 on both AT&T and Verizon to just $99 with a two-year contract and that those who already had purchased a Z10 from Amazon could claim a $50 credit.

55.     Furthermore, to the extent Defendant Heins was "pleased with the progress" of the Company's transition to the BlackBerry 10 (as far fetched as that would have to be for a rational CEO), he failed and omitted to disclose that, irrespective of his purported personal pleasure with the product's lackluster performance, from any objective standpoint the introduction of the BlackBerry 10s – the Company's make-it, or break-it product – was a disaster for the Company and its investors.

56.     Likewise, as discussed more fully below, Defendant Heins' statement regarding BlackBerry's "strong balance sheet" was false and misleading because, as Defendant Heins knew and/or recklessly disregarded, that balance sheet was the product of material violations of GAAP and SEC accounting rules as well as SEC financial statement reporting rules and rules and regulations governing management's discussion in public filings that rendered them artificially inflated and thereby fraudulent.

**B.      BlackBerry's False and Misleading Financial Statements**

57.     In addition to the materially false and misleading representations concerning the purported success of and positive consumer reaction to the BlackBerry 10 smartphones, during the Class Period, Defendants issued materially false and misleading financial results for the Company that improperly recognized and inflated revenue, that did not comply with GAAP (as Defendants certified they did), and that failed to disclose known trends and uncertainties that, if they came to fruition, would have a material adverse impact on BlackBerry's results of operation and financial condition in violation of SEC regulations.

58.     BlackBerry's financial statements are based on a fiscal year ending at the beginning of March.  Thus, the following financial statements issued during the Class Period: 1) the 2013 40F annual report for the fiscal year ending March 2, 2013 (also includes financial

report for the 4th quarter of fiscal 2013, which covered the three months ending on March 2, 2013); 2) the first fiscal quarter 2014, which covered the three months ending on June 1, 2013; 3) the second fiscal quarter of 2014, which covered the three months ending on August 31, 2013; and 4) the third fiscal quarter of 2014, which covered the three months ending on November 30, 2014.

### 1.     Defendants' Financial Statements Failed to Comply with GAAP

59.     During the Class Period, in the Company's SEC filings and elsewhere, Defendants represented that BlackBerry's financial statements were prepared in conformity with GAAP.  GAAP are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. BlackBerry discloses in each of its interim financial statements filed on a 6-K the following:

> "These interim consolidated financial statements have been prepared by management in accordance with United States generally accepted accounting principles ("U.S. GAAP"). They do not include all of the disclosures required by U.S. GAAP for annual financial statements and should be read in conjunction with Research In Motion's (the "Company") audited consolidated financial statements (the "financial statements") for the year ended March 2, 2013, which have been prepared in accordance with U.S. GAAP."

60.     The foregoing statements were materially false and misleading because BlackBerry's financial statements did not comply with GAAP, but rather resulted from a series of decisions by Defendants designed to conceal the truth regarding BlackBerry's actual financial position and operating results.  Defendants caused the Company to violate GAAP and SEC rules, among other things, by improperly recognizing revenues, misreporting other related financial metrics, and failing to take timely and adequate loss reserves.  As a result, Defendants materially inflated the Company's financial results reported for at least the three months and fiscal year

ended March 2, 2013 (fourth quarter and full year fiscal 2013) and the three months ended June 1, 2013 (first quarter Fiscal 2014).

61.    As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

62.    Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

63.    SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing financial statements that conform to GAAP.  As stated in the professional standards adopted by the AICPA:

> [F]inancial statements are management's responsibility . . . .  [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . .  Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

64.     In connection with the Company's fiscal 2013 40F annual report for the year ending March 2, 2013, both Defendant Heins and Defendant Bidulka executed and filed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that attested to the purported accuracy and completeness of the Company's financial and operational reports as well as statements concerning BlackBerry's internal controls and procedures, as follows:

1. I have reviewed this annual report on Form 40-F of Research In Motion Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5. The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent function):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

65.     Defendants' SOX Certifications were materially false and misleading because the financial reports in the Company's fiscal 2013 40F annual report improperly recognized and inflated revenue, failed to properly account for inventory, did not comply with GAAP as Defendants claimed, and failed to disclose known trends and uncertainties in violation of SEC regulations.   Furthermore, contrary to the statements in Defendants' SOX Certifications that internal controls were in place, BlackBerry's internal controls and procedures suffered from material weaknesses, and, as a result, the Company's financial reports were inaccurate, unreliable, and/or subject to manipulation.

66.     In BlackBerry's desperate attempt to create the perception that its new BlackBerry 10 platform was successful, Defendants violated GAAP in at least two ways: 1) Defendants improperly recognized revenue upon the shipment of the BlackBerry 10 devices despite the Company's inability to reasonably and reliably estimate future price concessions; and

2) Defendants failed to take a timely charge against earnings to account for the fact that the market value of the Company's Z10 inventory had deteriorated substantially below cost.

###### a. Defendants' Improper Recognition of Revenue

67.     BlackBerry's Fiscal 2013 Form 40-F, filed on March 28, 2013, represented the following:

Revenue Recognition

***The Company recognizes revenue when it is realized or realizable and earned.*** The Company considers revenue realized or realizable and earned when it has persuasive evidence of an arrangement, the product has been delivered or the services have been provided to the customer, ***the sales price is fixed or determinable*** and collection is reasonably assured. In addition to this general policy, the following paragraphs describe the specific revenue recognition policies for each of the Company's major categories of revenue.

Hardware

Revenue from the sale of BlackBerry wireless hardware products (e.g. BlackBerry® handheld devices and BlackBerry® PlayBook™ tablets) is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collection is probable. Product is considered delivered to the customer once it has been shipped and title and risk of loss have been transferred. For most of the Company's product sales, these criteria are met at the time the product is shipped. For hardware products for which the software is deemed essential to the functionality of the hardware, the Company recognizes revenue in accordance with general revenue recognition accounting guidance.

[Emphasis added].

68.     GAAP permits the recognition of revenue only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectability is probable.  SEC Staff Accounting Bulletin ("SAB") No. 104.  Moreover, in order for revenue to be recognized, it must be earned and

realized or realizable.  Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 83, ASC § 605-10-25-1(a)[6].

69.     Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.  *Id*.  Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash.  *Id*.  If collectability is not reasonably assured, revenues should be recognized on the basis of cash received.  Concepts Statement No. 5, ¶ 84g; *see also Accounting Research Bulletin* No. 43 ("ARB 43"), Ch. 1A, ¶ 1 (June 1943); ASC § 605-10-25-1; Accounting Principles Board Opinion No. 10 ("APB 10") *Omnibus Opinion-1966* ¶ 12 (Dec. 1966).  If payment is subject to a significant contingency, revenue recognition is improper.  ASC § 450-30-25-1.

70.     BlackBerry's representations in its Fiscal 2013 Form 40-F, filed on March 28, 2013, that the Company recognizes revenue when it is ***realized or realizable and earned*** was false and misleading because the sale price of the BlackBerry Z10 device was not ***fixed or determinable.*** BlackBerry could not reasonably and reliably estimate future price concessions, thus revenue recognition was improper and in violation of GAAP.   BlackBerry knew or recklessly disregarded that various factors precluded the Company from reasonably and reliably estimating future price concessions, including: (1) ***excess levels of inventory in a distribution channel*** due to substantially lower sell through than shipping volumes); (2) ***larger than expected returns of current products***; (3) the ***newness of a product***; (4) the ***introduction of competitors' products with superior technology*** or greater expected market acceptance; and (5) ***prior adverse***

---

[6] With the issuance of FASB Statement No. 168, *The FASB Accounting Standards Codification^{TM} and the Hierarchy of Generally Accepted Accounting Principles*, the FASB approved the Codification ("ASC") as the source of authoritative US GAAP for non-governmental entities for interim and annual periods ending after September 15, 2009.  The *FASB Accounting Standards Codification*, hereinafter cited as "ASC __."

*historical results* in connection with the Company's release of the BlackBerry 7 and PlayBook, necessitating material write-downs of goodwill and inventory.  BlackBerry was required to carefully analyze all factors, including trends in historical data, which could affect the Company's ability to make reasonable and reliable estimates of expected price concessions. Moreover, BlackBerry was acutely aware of the foregoing factors.  For example, in the Company's 1st quarter fiscal 2014 earnings release on June 28, 2013,  BlackBerry disclosed that "[t]he smartphone market remains highly competitive, making it difficult to estimate units, revenue and levels of profitability."

71.     First, BlackBerry was experiencing excess levels of inventory due to a lack of sell-through on BlackBerry 10 smartphones.  On March 25, 2013, a FOX BUSINESS story titled "Citi: BlackBerry Z10 U.S. Launch a 'Big Disappointment'" quoted Jim Suva, an analyst at Citigroup, as stating in a note to investors that the "'new product launch was not what people were expecting,'" that the new phones suffered from "poor product placement, with the Z10 pushed to the side or back of AT&T stores," and that "[c]arriers abroad [had] already shifted promotions to other products and there [had] been an increasing number of customer returns, with the most cited reason being lack of apps, including Instagram and Netflix."[7]  Moreover, by March 2013, carrier and distributor partners were carrying excess levels of inventories.  For example, a March 5, 2013 Forbes.com report quoted Pacific Crest analyst, James Faucette, asserting "that U.K inventory levels of the Z10 touch-screen BB10-based smartphones are 'already too high,' and that inventory levels in Canada are 'quickly approaching typically targeted levels.'"[8]  James Faucette also stated that "'[o]ur checks indicate that as sell-through run-rates for the Z10 have declined meaningfully in the weeks following launch, we believe

---

[7] http://www.foxbusiness.com/technology/2013/03/25/citi-blackberry-z10-us-launch-big-disappointment/
[8] http://www.forbes.com/sites/ericsavitz/2013/03/05/blackberry-z10-inventories-piling-up-in-u-k-analyst-says/

carriers and third-party retailers in the U.K. are already well above typically targeted inventory levels.'"

72.     Second, BlackBerry also could not reasonably and reliably estimate price concessions as a result of the larger than expected returns of its current products – BlackBerry 10 devices.  On April 11, 2013, THE WALL STREET JOURNAL'S DIGITS blog reported that, according to analyst Jeff Johnston from Detwiler Fenton, "customer returns of the Z10 are actually outnumbering sales."[9]  The Detwiler report stated that "'We believe key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are now exceeding sales, a phenomenon we have never seen before.'"[10]

73.     Third, BlackBerry could not reasonably and reliably estimate price concessions as a result of the newness of the product.  The launch of BlackBerry 10 was "the launch of an entirely new mobile computing platform."[11]  According to a report on abcnews.go.com:

> BlackBerry 10 is a completely new version of the BlackBerry software; it doesn't share a line of code with the previous version called BlackBerry 7 and was built completely for the touchscreen. While the operating system is similar to that of the iPhone or Android, as it is built around pages of apps, BlackBerry says the other platforms are now outdated and that the BlackBerry 10 will provide "differentiating" features.[12]

Defendants also knew that the "results [were] very difficult to estimate during this transition. . . ."[13]

74.     Fourth, BlackBerry could not reasonably and reliably estimate price concessions as a result of the introduction of competitors' products with superior technology or greater

---

[9] http://blogs.wsj.com/digits/2013/04/11/analyst-blackberry-z10-returns-outnumber-sales/
[10] *Id.*
[11] BBRY Q1 Fiscal 2014 Earnings Call Tr. (Jun. 28, 2013).
[12] http://abcnews.go.com/Technology/blackberry-reinvents-blackberry-10-blackberry-z10-q10-launch/story?id=18353250
[13] BBRY Q1 Fiscal 2014 Earnings Call Tr. (Jun. 28, 2013).

expected market acceptance.  On February 12, 2014, IDC[14] issued a press release titled "Android and iOS Continue to Dominate the Worldwide Smartphone Market with Android Shipments Just Shy of 800 Million in 2013, According to IDC."  The press release stated in pertinent part, the following:

> BlackBerry was the only operating system to realize negative year-over-year change both for the quarter (-77.0%) and for the year (-40.9%). ***Moreover, its legacy BB7 outpaced BB10 towards the end of the year, definitely not the results that the company had hoped for when it released BB10 in January.*** With new leadership, management, and a tighter focus on the enterprise market, BlackBerry may in a better position, but still finds itself having to evangelize the new platform to its user base.[15]

[Emphasis added].

75.     As a result of the anemic sales and larger than expected returns of the BlackBerry Z10 devices, BlackBerry was forced to offer price concessions to retailers.  In the fourth quarter fiscal 2013 financial report filed on Form 40F on March 28, 2013, BlackBerry disclosed that it had shipped 1 million BlackBerry 10 devices.  That same day, on the 4th Quarter Fiscal 2013 Earnings Call, Defendant Heins represented that "two-thirds to three-quarters already have sold through."  But prior to Defendant Heins' representations on March 28, 2013, BlackBerry was already offering substantial price concessions to carriers and retailers on the Z10 (some as early as January 2013) worldwide, including in the United Kingdom, India, Canada, Dubai and elsewhere.  For example:

| Source | Date | Retailer | Location | Discount |
| --- | --- | --- | --- | --- |

---

[14] International Data Corporation (IDC) is the premier global provider of market intelligence, advisory services, and events for the information technology, telecommunications and consumer technology markets. IDC helps IT professionals, business executives, and the investment community make fact-based decisions on technology purchases and business strategy. More than 1,100 IDC analysts provide global, regional, and local expertise on technology and industry opportunities and trends in over 110 countries worldwide. For 50 years, IDC has provided strategic insights to help our clients achieve their key business objectives. IDC is a subsidiary of IDG, the world's leading technology media, research, and events company.
[15] http://www.idc.com/getdoc.jsp?containerId=prUS24442013

| BerryReview | 1/30/2013 | Rogers | Canada | White Z10 for $100 off |
| Telegraph.co.uk | 3/4/2013 | Carphone Warehouse | U.K. | Appx. £139 price drop over 2 year contract |
| BGR | 3/5/2013 | Carphone Warehouse; Vodafone | U.K. | Monthly package price drop from £36 /mo. to £29 /mo. (£160 value over 2 yrs.); £72 discount off package deal. |
| Softpedia.com | 3/17/2013 | Rogers; Bell; Virgin Mobile | Canada | Drop from $150/€110 on 3-year contract to $100/€75 on same contract. |
| Know Your Mobile; Nerdberry.com | 3/19/2013 | BlackBerry | India | Drop from Rs 43,490 to Rs 39,990. |
| Emirates 24/7 | 3/25/2013 | n/a | Dubai | Drop from Dh 2,599 to Dh 2,170. |

76.     Observed discounts and incentives offered after Defendant Heins' March 28, 2013 earnings call statement that "two-thirds to three-quarters already have sold through" confirm that his statement was false at the time it was made.

| Source | Date | Retailer | Location | Discount |
|---|---|---|---|---|
| BBin | 4/5/2013 | Rediff.com; Junglee.com | India | Drop from Rs 43,490 to Rs 37,990; drop from RS 43,490 to Rs 37,500. |
| CrackBerry.com | 4/10/2013 | AT&T; Verizon | U.S. | Drop from $200 to $99 with two-year contract; previous purchasers could receive $50 credit |
| New York Post | 4/13/2013 | Verizon; Amazon | U.S. | Drop from $200 to $100 with two-year contract |

77.     On June 28, 2013 BlackBerry filed its 1st quarter fiscal 2014 financial report for the period ending June 1, 2013 on Form 6-K, reporting that it had shipped 6.8 million smart phones of which approximately 40% or 2.7 million were BlackBerry 10 devices.  During the 1st quarter fiscal 2014 earnings call held on June 28, 2013, Defendant Bidulka refused "to provide the split on sell-through on the BB10 versus BBOS."

78.     Fifth, BlackBerry could not reasonably and reliably estimate price concessions because of adverse historical data showing declining demand for the BlackBerry 7 smartphone and BlackBerry's PlayBook tablets, resulting in weak sell-through.   The BlackBerry 7 smartphones' weak sell-through resulted in a $355 million charge for the impairment of goodwill and a $267 million inventory write-down of those devices in the 4th quarter fiscal 2012,[16] and necessitated the introduction of aggressive customer incentive programs to improve sales throughout FY 2013.   The weak sales of the PlayBook tablets necessitated a $485 million inventory write-down of those products in the 3rd quarter of fiscal 2012.

79.     On March 28, 2013, the Company issued a press release announcing BlackBerry's fourth quarter and year end fiscal 2013 results via a 6-K, stating the following:

> Revenue for the fourth quarter of fiscal 2013 was approximately $2.7 billion, down $49 million or 2% from approximately $2.7 billion in the previous quarter and down 36% from $4.2 billion in the same quarter of fiscal 2012.  The revenue breakdown for the quarter was approximately 61% for hardware, 36% for service and 3% for software and other revenue.  During the quarter, BlackBerry shipped approximately 6 million BlackBerry smartphones and approximately 370,000 BlackBerry PlayBook tablets.
>
> GAAP income for the quarter from continuing operations was $94 million, or $0.18 per share diluted, compared with the GAAP income from continuing operations of $14 million, or $0.03 per share diluted, in the prior quarter and a GAAP loss from continuing operations of $118 million, or $0.23 per share diluted, in the same quarter of fiscal 2012. GAAP income for the quarter,

---

[16] BBRY 6-K at 4, 5 (Mar. 30, 2012).

including income from discontinued operations, was $98 million, or $0.19 per share diluted, compared with the GAAP income including loss from discontinued operations of $9 million, or $0.02 per share diluted, in the prior quarter and a GAAP loss, including loss from discontinued operations of $125 million, or $0.24 per share diluted, in the same quarter of fiscal 2012.

Adjusted income from continuing operations for the fourth quarter was $114 million, or $0.22 per share diluted.

Fiscal 2013 Results

Revenue from continuing operations for the fiscal year ended March 2, 2013 was $11.1 billion, down 40% from $18.4 billion in fiscal 2012. The Company's GAAP net loss from continuing operations for fiscal 2013 was $628 million, or $1.20 per share diluted, compared with GAAP net income from continuing operations of $1.2 billion, or $2.23 per share diluted in fiscal 2012.

80.     Defendants' March 28, 2013 statements regarding revenues and earnings were materially false and misleading when made because Defendants knowingly and/or recklessly disregarded that BlackBerry was recognizing revenues at the time of shipment, despite the Company's inability to reasonably and reliably estimate price concessions to carriers and retailers, and thus the price was neither fixed nor determinable.  Defendants knew or recklessly disregarded that various factors precluded the Company from reasonably and reliably estimating future price concessions, including larger than expected returns, the newness of BlackBerry 10 devices, lower than expected sell through, and new competitor introductions.

81.     Then, on June 28, 2013, the Company issued a press release filed on Form 6-K announcing BlackBerry's first quarter fiscal 2014 results for the quarter ending June 1, 20013:

Revenue for the first quarter of fiscal 2014 was $3.1 billion, up 15% from $2.7 billion in the previous quarter and up 9% from $2.8 billion in the same quarter of fiscal 2013. The revenue breakdown for the quarter was approximately 71% for hardware, 26% for service and 3% for software and other revenue. During the quarter, the Company shipped 6.8 million BlackBerry smartphones and approximately 100,000 BlackBerry PlayBook tablets.

GAAP loss from continuing operations for the quarter was $84 million, or $0.16 per share diluted, compared with a GAAP income from continuing operations of $94 million, or diluted earnings per share of $0.18, in the prior quarter and GAAP loss from continuing operations of $510 million, or $0.97 per share diluted, in the same quarter last year.

Adjusted loss from continuing operations for the first quarter was $67 million, or $0.13 per share diluted.

82.    The first quarter fiscal 2014 report of revenues and earnings was likewise materially false and misleading when made because Defendants knowingly and/or recklessly disregarded that BlackBerry was recognizing revenues at the time of shipment despite the Company's inability to reasonably and reliably estimate price concessions to carriers and retailers, and thus the price was neither fixed nor determinable.  Defendants knew or recklessly disregarded that various factors precluded the Company from reasonably and reliably estimating future price concessions, including larger than expected returns, the newness of BlackBerry 10 devices, lower than expected sell through, and new competitor introductions.

### b.    Defendants' Failure to Properly Account for Inventory

83.    Defendants failed to take a charge to income for the Z10 during the Class Period. In fact, as depicted in the chart below, Defendants actually reduced the "Provision for Excess and Obsolete Inventory" at the end of fiscal 2013, compared to the third quarter of fiscal 2013, both in dollars and as a percent of total inventory – from $477 million to $434 million.

| (in millions) | Period Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3-Mar-12 | 1-Sep-12 | 1-Dec-12 | 2-Mar-13 | 1-Jun-13 |
| Raw materials | $771 | $786 | $622 | $588 | $641 |
| Work in process | 520 | 379 | 236 | 371 | 629 |
| Finished goods | 167 | 105 | 76 | 78 | 80 |
| | 1,458 | 1,270 | 934 | 1,037 | 1,350 |

| | | | | | |
|---|---|---|---|---|---|
| Provision for excess and obsolete inventory | (431) | (485) | (477) | (434) | (463) |
| | $1,027 | $785 | $457 | $603 | $887 |

84.     Defendants represented that the Company's accounting for inventory was consistent with GAAP.  In this regard, the Company's fiscal 2013 annual report filed on Form 40-F, issued March 28, 2013, disclosed BlackBerry's accounting for inventory as follows:

> Raw materials are stated *at the lower of cost and replacement cost*. Work in process and finished goods *inventories are stated at the lower of cost* and net realizable value."  [Emphasis added].

85.     BlackBerry violated GAAP by failing to take a timely charge against earnings to account for the fact that the market value of the Company's Z10 inventory had deteriorated substantially below cost, because, among other things: (1) BlackBerry was experiencing a lack of sell-through on the Z10s; (2) the carrier and distributor partners were holding extraordinarily high levels of excess inventory, in absolute and relative terms; and (3) the cost of the carrier and distributor partner sales incentives and refunds were increasing, and would continuing to increase for the foreseeable future.

86.     In connection with inventory accounting, GAAP provides, in pertinent part:

> A departure from the cost basis of pricing the *inventory* is required when the utility of the goods is no longer as great as its cost.  Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period.  This is generally accomplished by stating such goods at a lower level commonly designated as *market*.

ASC 330-10-35-1.  [Emphasis in original.]

87.     As a result of the poor sell-through, BlackBerry was holding extraordinarily high levels of excess Z10 inventory.  The Z10 had launched in the UK and Canada on January 31,

2013 and February 5, 2013, respectively.  But by March 2013, carrier and distributor partners were carrying excess levels of inventories.  For example, a March 5, 2013 Forbes.com report quoted Pacific Crest analyst, James Faucette, asserting "that U.K inventory levels of the Z10 touch-screen BB10-based smartphones are 'already too high,' and that inventory levels in Canada are 'quickly approaching typically targeted levels.'"[17]  James Faucette also stated that "'[o]ur checks indicate that as sell-through run-rates for the Z10 have declined meaningfully in the weeks following launch, we believe carriers and third-party retailers in the U.K. are already well above typically targeted inventory levels.'"[18]

88.    Consequently, BlackBerry was forced to offer its carrier and distributor partners sales incentives to increase sell-through.  According to GAAP, "[t]he offer of a sales incentive that will result in a loss on the sale of a product may indicate an impairment of existing inventory."  ASC 330-10-35-13.  As indicated above, the price of the Z10 dropped precipitously, soon after the launch –from approximately $200 to as low as $49 or free with contract. BlackBerry representatives, however, claimed that the Z10 price drops were "part of life cycle management to tier the pricing for current devices to make room for the next ones,"[19] and not part of a build-up of excess inventory. Indeed, not until the fiscal 2014 third quarter did the Company admit in a 6-K filing made December 20, 2013 that "The company plans to implement *further sales incentives with its carrier and distributor partners to increase sell-through*, which could be applicable to all BlackBerry 10 devices shipped in the second and third quarters of fiscal 2014."  [Emphasis added].

---

[17] http://www.forbes.com/sites/ericsavitz/2013/03/05/blackberry-z10-inventories-piling-up-in-u-k-analyst-says/
[18] *Id.*
[19] A BlackBerry spokesman made this comment in an email to THE WALL STREET JOURNAL  following dramatic price cuts in July, 2013.  *See* Will Connors, *BlackBerry Z10 Prices Drop to $49 Amid Weak Sales*, The Wall Street Journal, July 12, 2013, http://online.wsj.com/news/articles/SB10001424127887324425204578601701101031158.

89.     The Company's Fiscal 2013 Form 40-F also disclosed the following regarding BlackBerry's accounting for inventory:

> The Company's policy for the valuation of inventory, including the determination of obsolete or excess inventory, requires management to estimate the future demand for the Company's products within specific time horizons. Inventory purchases and purchase commitments are based upon such forecasts of future demand and scheduled rollout of new products. The business environment in which the Company operates is subject to rapid changes in technology and customer demand. The Company performs an assessment of inventory during each reporting period, which includes a review of, among other factors, demand requirements, component part purchase commitments of the Company and certain key suppliers, product life cycle and development plans, component cost trends, product pricing and quality issues. ***If customer demand subsequently differs from the Company's forecasts, requirements for inventory write-offs that differ from the Company's estimates could become necessary. If management believes that demand no longer allows the Company to sell inventories above cost or at all, such inventory is written down to net realizable value or excess inventory is written off.***

[Emphasis added].

90.     At the time BlackBerry issued this statement saying that, among other things, "[*i*]*f management believes that demand no longer allows the Company to sell inventories above cost or at all, such inventory is written down to net realizable value or excess inventory is written off*," Defendants already knew or recklessly disregarded that the Z10 was experiencing a lack of sell-through.  A March 5, 2013 forbes.com report stated "that U.K inventory levels of the Z10 touch-screen BB10-based smartphones are 'already too high,' and that inventory levels in Canada are 'quickly approaching typically targeted levels.'" Furthermore, a Fox Business story titled "Citi: BlackBerry Z10 U.S. Launch a 'Big Disappointment'" on March 25, 2013 noted that the "'new product launch was not what people were expecting,'" suffered from "poor product placement, with the Z10 pushed to the side or back of AT&T stores," and that "[c]arriers abroad [had] already shifted promotions to other products and there [had] been an increasing number of

customer returns, with the most cited reason being lack of apps, including Instagram and Netflix."

91.    The March 28, 2013 Form 40-F also set forth the Company's financial results, which were essentially the same as those contained in press release issued on the same day, and disclosed that it held $603 million in inventory, after "including the determination of obsolete or excess inventory . . . ."

92.    The foregoing statement regarding inventory was materially false and misleading because Defendants knew or recklessly disregarded that carriers and distribution partners were not achieving the expected sell-through on the Z10, resulting in extraordinarily high levels of excess inventory, thus requiring a charge to income to reduce the value of the inventory. However, Defendants failed to take a charge to income for the Z10 during the Class Period.

93.    On June 28, 2013, the Company filed a Form 6-K with BlackBerry's consolidated financial statements for the first quarter fiscal 2014, setting forth the Company's financial results, which were essentially the same as those contained in the press release issued on the same day.  The Company disclosed that it held $887 million in inventory, after "including the determination of obsolete or excess inventory . . . ."

94.    The foregoing statement regarding inventory was materially false and misleading because Defendants did not take a charge to income for the Z10 even though they knew or recklessly disregarded that carriers and distribution partners were not selling-through on the Z10, resulting in high levels of excess inventory, and, as a result, requiring an appropriate charge to income to reduce the value of the inventory.

95.    BlackBerry violated GAAP by failing to take a timely charge against earnings to account for the fact that the market value of the Company's Z10 inventory had deteriorated

substantially below cost, because, among other things, (1) BlackBerry was experiencing a lack of sell-through on the Z10s; (2) the carrier and distributor partners were holding extraordinarily high levels of excess inventory, in absolute and relative terms; and (3) the cost of the carrier and distributor partner sales incentives and refunds were increasing, and would continuing to increase for the foreseeable future – all of which would have a material adverse impact on reported revenues and earnings and effectively reverse the profits Defendants' financial statement manipulations produced in the fourth quarter of BlackBerry's fiscal 2013 and the first two fiscal quarters of 2014.

### c.  Defendants' Failure to Properly Account for Supply Commitments

96.    The Company failed to record a charge for supply commitments for quantities which Defendants knew or recklessly disregarded were in excess of anticipated future customer demand forecasts.  As a result of Defendants' failure to record a charge for supply commitments, BlackBerry's gross margin and earnings were materially overstated. In the Company's fiscal 2013 annual report, issued March 28, 2013, BlackBerry described purchase commitments as follows:

> The Company has negotiated favorable pricing terms with many of its suppliers, some of which have volume-based pricing. In the case of volume-based pricing arrangements, the Company may experience higher than anticipated costs if current volume-based purchase projections are not met. Some contracts have minimum purchase commitments and the Company may incur large financial penalties or increased production costs if these commitments are not met.

97.    In BlackBerry's earnings release dated March 28, 2013, for the fourth and fiscal year ended March 2, 2013, Defendants disclosed that: the Company achieved "Gross margin of 40% driven by higher average selling prices and hardware margins" for the fourth quarter.

98.    In BlackBerry's annual report on 40-F, filed on the same date, Defendants disclosed that the Company achieved "Consolidated gross margin from continuing operations

decreased by $3.1 billion, to $3.4 billion, or 31.0% of consolidated revenue, in fiscal 2013, compared to $6.6 billion, or 35.7% of consolidated revenue, in fiscal 2012."

99.     On June 28, 2013, BlackBerry filed its 6-K for the first quarter ended and disclosed that the Company achieved "Consolidated gross margin from continuing operations increased by $256 million to $1.0 billion, or 33.9% of consolidated revenue, in the first quarter of fiscal 2014, compared to $786 million, or 28.0% of consolidated revenue, in the first quarter of fiscal 2013." The disclosure further stated that "The $256 million increase in consolidated gross margin was primarily attributable to higher average selling prices and related gross margins of BlackBerry 10 devices shipped."

100.     Each of the foregoing statements was materially false and misleading as a result of BlackBerry's failure to record a charge for supply commitments for quantities which Defendants knew or recklessly disregarded were in excess of anticipated future customer demand forecasts. The materiality of Defendants' false and misleading statements is exemplified by the impact of the Z10 inventory charge on gross margin which included approximately $307 million related to supply commitments. In this regard, at the end of the Class Period, Defendants disclosed a consolidated gross margin from continuing operations of $(374) million, or (23.8)% of consolidated revenue, in the second quarter of fiscal 2014, compared to $744 million, or 26.0% of consolidated revenue, in the second quarter of fiscal 2013. This was in sharp contrast to Defendants' Class Period statements regarding gross margin.

101.     GAAP provides that "[a] net loss on firm purchase commitments for goods for inventory, measured in the same way as are inventory losses, shall be recognized in the accounts." ASC 330-10-35-17. According to analyst James Faucette, overall production remained quite high through the end of May 2013, and that even if "production is reduced by

30% or more . . . production will remain well in excess of demand."  Despite Defendants' knowledge that the sales of the Z10 were "significantly less than production over the past few months," they failed to take a charge to income related to the losses incurred from supply commitments.  Not until the end of the Class Period did the Company record a Z10 Inventory charge of approximately $307 million related to supply commitments.  BlackBerry also recorded post-Class Period Z10 inventory charges related to supply commitments of $511 million in the third quarter fiscal 2014.

### d. Defendants' Other GAAP Violations Related to Inventory and Supply Commitments

102.    ASC 450 *Contingencies*, provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.  ASC 450-20-25-2

103.    ASC 450 also requires that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred.  ASC 450-20-50-3.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made.  ASC 450-20-50-4.

104.    The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that, "where material

contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred." 17 C.F.R. § 210.10-01.

105.    The Company violated the GAAP requirement by failing to take a provision for inventory losses in its interim financial statements, as indicated by ASC 270-10-45-6(c), *Interim Reporting*: "Inventory losses from market declines shall not be deferred beyond the interim period in which the decline occurs."

106.    In addition, FASB Statement of Concepts No. 5 ("CON5") states, "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . . ."

### B. Defendants Failed to Disclose Known Trends in Violation of SEC Regulations

107.    Defendants' failure to comply with SEC Item 303 of Regulation S-K, 17 C.F.R. §229.303, which requires the MD&A sections to describe "known trends or uncertainties that" BlackBerry "reasonably expect[ed would] have a material unfavorable impact on net sales or revenues or income from continuing operations" as well as "events that will cause a material change in the relationship between costs and revenues" in its Class Period Forms 40-F and 6-K. Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii); Exchange Act Release No. 34-26831 ("Interpretative Release"), 43 SEC Docket 1577 (May 18, 1989) ("Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects.").

108.    The instructions to Item 303(a) state the following:

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

109.    Defendants had a duty but failed to make adequate disclosures in its public filings during the Class Period.  As noted in SAB 101, the SEC Staff requires that the following be disclosed and discussed by all registrants, in accordance with the SEC's Financial Reporting Release No. 36:

> Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns.

Defendants knew or reckless disregarded that the Z10 devices shipped into the channel during the Class Period had not sold through to end customers and thus could be expected to have a significant adverse effect on future sales and returns.

110.    In the fiscal fourth quarter 2013 ending on March 2, 2013, BlackBerry shipped 6 million BlackBerry devices and recorded $1.6 billion in revenues from hardware sales. Notwithstanding the limited time during which the BlackBerry Z10 devices were available in FY 2013, the 2013 MD&A stated that revenue recognized on the shipment of the BlackBerry Z10 smartphones had a positive impact on BlackBerry's Q4 and FY 2013 financial results: "The overall decrease in revenue in fiscal 2013 is . . . partially offset by the higher average selling prices of BlackBerry 10 devices." [20]

111.    In the fiscal first quarter of 2014 ending on June 1, 2013, BlackBerry shipped approximately 2.7 million BlackBerry 10 smartphones, representing approximately 40% of the total 6.8 million BlackBerry smartphones shipped during the quarter.  In that quarter, BlackBerry recorded $2.2 billion in revenues from hardware sales, which represented $512 million, or 30.7% increase compared with the first quarter of fiscal year 2012, "*primarily due to the higher average selling prices of BlackBerry 10 devices shipped*," according to the Q1 2014 MD&A.

---

[20] BBRY Fiscal 2013 20-F at 25 (Mar. 28, 2014).

Revenue from continuing operations for the first quarter of fiscal 2014 was $3.1 billion, an increase of approximately $263 million, or 9.4%, from $2.8 billion in the first quarter of fiscal 2013. ***Hardware revenue increased by $512 million, or 30.7%, to $2.2 billion, primarily due to the higher average selling prices of BlackBerry 10 devices shipped, partially offset by lower shipment volumes.*** The lower shipment volumes were a result of decreased demand for the Company's older device models in a very competitive environment, partially offset by the continued introduction of BlackBerry 10 smartphones into certain markets in the first quarter of fiscal 2014. The number of BlackBerry handheld devices shipped decreased by approximately 1.0 million, or 12.8%, to approximately 6.8 million in the first quarter of fiscal 2014, compared to approximately 7.8 million in the first quarter of fiscal 2013. ***Approximately 40% of the handheld devices shipped were BlackBerry 10 smartphones.[21]***   [Emphasis added].

112.    The statements above regarding the amount of revenue the Company recognized in first quarter of fiscal 2013 were materially false and misleading because they omitted any reference to BlackBerry's improper revenue recognition in contravention of GAAP, as the Company knew or recklessly disregarded that it could not reasonably and reliably estimate future price concessions as a result of the presence of various factors, including larger than expected returns, the newness of the BlackBerry 10 devices, lower than expected sell through, and new competitor introductions, precluding the Company from recognizing revenue upon shipment.

113.    The BlackBerry 10s were, throughout the Class Period, BlackBerry's primary product and the Company's financial success (and, indeed, its survival in the smart phone business it created) was dependent on the success of that device.  Nonetheless, BlackBerry's Class Period Forms 40-F and 6-Ks failed to disclose the presence of the aforementioned factors and their material unfavorable impact on net sales or revenues or income from continuing operations.  Indeed, the Company was forced to offer price concessions to customers to sell the BlackBerry 10 devices that had been shipped and recognized as revenues in previous quarters, which was already having a material adverse effect on BlackBerry's operating results, and was necessary for a proper understanding and evaluation of the Company's operating performance

---

[21] BBRY Q1 2014 6-K at 9 (June 28, 2013).

and an informed investment decision.  By failing to report the facts concerning its sales practices, the Class Period's 40-F and 6-Ks failed to provide investors with the most basic information necessary to understand Blackberry's financial results, mischaracterized the Company's sales and operations and omitted material information.

114.    Defendants failed to disclose the existence of known trends and uncertainties that they already knew were having a material unfavorable impact on BlackBerry's operating results in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303). Defendants, however, failed to disclose these factors and its impact on operating results. Because the impact of these undisclosed facts were material to BlackBerry and its financial prospects, and BlackBerry had a duty to disclose these material facts by virtue of Item 303, the failures to disclose these facts in BlackBerry's periodic filings with the SEC during the Class Period constitute material omissions for the purposes of an action under Section 10b of the Exchange Act and Rule 10b-5.

### THE TRUTH IS REVEALED

115.    On September 20, 2013, the last day of the Class Period, the truth began to emerge when BlackBerry issued a press release announcing preliminary second quarter fiscal 2014 results.

116.    Specifically, BlackBerry disclosed:

*Waterloo, ON* – BlackBerry Limited (NASDAQ:BBRY; TSX:BB), a world leader in the mobile communications market, today announced certain preliminary financial results for the three months ended August 31, 2013 and provided an update on business operations.

*        *        *

[The Company] ***expects to report a primarily non-cash, pre-tax charge against inventory and supply commitments in the second quarter of approximately $930***

*million to $960 million, which is primarily attributable to BlackBerry Z10 devices.*

*The current quarter will also include a pre-tax restructuring charge in the approximate amount of $72 million reflecting ongoing cost efficiency initiatives.*

\*        \*        \*

As part of the Company's focus on enhancing its financial results, and in response to the increasing competition in the smartphone market, BlackBerry also announced plans to transition its future smartphone portfolio from six devices to four. The portfolio will focus on enterprise and prosumer-centric targeted devices, including 2 high-end devices and 2 entry-level devices in all-touch and QWERTY models. With the launch of the BlackBerry Z30 – the next generation high-tier smartphone built on the BlackBerry 10 platform -- this week, the Company will re-tier the BlackBerry Z10 smartphone to make it available to a broader, entry-level audience. At the same time, the Special Committee of the Company's Board of Directors continues to evaluate all strategic alternatives for the Company.

Furthermore, the Company also announced that it is targeting an approximate 50% reduction in operating expenditures by the end of the first quarter of Fiscal 2015. *As part of this, BlackBerry will implement a workforce reduction of approximately 4,500 positions or approximately 40% of the Company's global workforce resulting in a total workforce of approximately 7,000 full-time global employees.*

Thorsten Heins, President and Chief Executive Officer of BlackBerry said, "We are implementing the difficult, but necessary operational changes announced today to address our position in a maturing and more competitive industry, and to drive the company toward profitability. Going forward, we plan to refocus our offering on our end-to-end solution of hardware, software and services for enterprises and the productive, professional end user. This puts us squarely on target with the customers that helped build BlackBerry into the leading brand today for enterprise security, manageability and reliability."

[Emphasis added.]

117.   Immediately upon the revelation of these previously undisclosed facts, BlackBerry stock plummeted, on heavy volume, from a closing price of $10.52 per share on September 19, 2013 to close at $8.73 per share on September 20, 2013, after an intra-day low of

$8.19.  As investors digested the bad news over the next few days, the price of BlackBerry stock continued to slide on heavy trading volume and closed at $8.01 on September 25, 2013.

118.    The news also came as a shock to financial analysts.  For example, UBS issued a report on September 20, 2013, which stated in part:

> BBRY negatively preannounces F2Q results now anticipating Revs of $1.6b (cons $3.1b) and EPS loss, prior to an inventory write-down charge of $930-960m, of -$0.47 to -$0.51 vs. cons at -$0.15. ***There were 2 main surprises in our opinion: a) the magnitude of the miss (50% in revenues); b) of the 3.7m phones for which revs were recognized, almost all were BB7, i.e., almost no revenue was recognized for the newer BB10 devices***. [Emphasis added].

## BLACKBERRY ADMITS IT IS RESPONSIBLE FOR THE COST OF SALES INCENTIVES

119.    The Company expressly admits in its earnings releases that BlackBerry -- not its carriers -- was responsible for discounting the BlackBerry 10 smartphones in the form of "sales incentives" in order to move its stagnant inventory.  The Company's first quarter fiscal 2014 earnings release on June 28, 2013, disclosed, in pertinent part, the following:

> The decrease in net loss is primarily attributable to an increase in the Company's gross margin, partially offset by an increase in marketing expenditures and *sales incentives* to support the continued launch of BlackBerry 10 and a reduction in the recovery of income taxes.
>
> *                    *                    *
>
> *In support of the launch of BlackBerry Z10 smartphones, the Company increased marketing spending and sales incentives offered to channel and carrier partners in order to enhance adoption of the platform.*

[Emphasis added].

120.    The Company's second quarter fiscal 2014 earnings release on September 27, 2013 disclosed that such incentives offering would continue:

> The Company plans to implement *further sales incentives* with its carrier and distributor partners to increase sell-through, which could be applicable to all BlackBerry 10 devices shipped in the second quarter of fiscal 2014.

As a result, the Company determined during the second quarter of fiscal 2014, that it could no longer reasonably estimate the amount of the potential future sales incentives that may be offered on the BlackBerry 10 devices shipped into the channel during the second quarter of fiscal 2014 but not sold through to end customers by the end of the second quarter of fiscal 2014. Therefore, the Company concluded that the delivery of these devices to its carrier and distributor partners did not meet the criteria for revenue recognition. The revenue for these BlackBerry 10 devices was deferred and will be recognized in future quarters when the devices sell through to end customers.  [Emphasis added].

## POST-CLASS PERIOD DEVELOPMENTS

121.    On Monday, September 23, 2013, the next trading day following BlackBerry's revelation of its nearly $1 billion BlackBerry 10 charge and the layoff of 4,500 employees, BlackBerry announced it had entered into a letter of intent agreement under which a consortium led by Fairfax Financial Holdings Limited ("Fairfax Financial"), BlackBerry's largest shareholder, would acquire BlackBerry.  Pursuant to the proposed transaction, BlackBerry shareholders would receive $9.00 in cash for each share of BlackBerry held.

122.    On October 1, 2013, BlackBerry filed with the SEC on Form 6-K its financial information for the six months ended August 31, 2013, which revealed that the Company was in even worse financial shape than previously reported.  In light of the 4,500 employee reduction, the October 1, 2013 Form 6-K disclosed that the Company's cost optimization program would incur $400 million in charges -- four times the $100 million in charges BlackBerry had projected in the first quarter of fiscal 2014.

123.    On November 4, 2013, it was revealed that Fairfax Financial's BlackBerry buyout would not go through and that BlackBerry had abandoned the search for a buyer for the Company.  Instead, BlackBerry announced it had entered into an agreement pursuant to which Fairfax Financial and other institutional investors would make a $1 billion capital investment in the Company.  According to BlackBerry: "Today's announcement marks the conclusion of the

review of strategic alternatives previously announced on August 12, 2013."   BlackBerry also announced that Defendant Heins would step down as CEO upon the closing of the financing transaction and that John S. Chen, formerly CEO, President, and Chairman of Sybase Inc., would serve as Interim CEO pending completion of a search for a new CEO.   Upon the closing of the transaction on November 13, 2013, BlackBerry announced the resignation of Defendant Heins as President and CEO and as a director.  As previously announced, Mr. Chen was appointed Interim CEO and Executive Chair of the Board.  On November 25, 2013, BlackBerry announced that James Yersh, BlackBerry's Senior Vice President and Controller, had replaced defendant Bidulka as CFO.

## SCIENTER ALLEGATIONS

124.   Defendants acted with scienter in that each Defendant knew and/or recklessly disregarded facts available to them that demonstrated that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and, knowingly or recklessly disregarded, and/or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   Defendants participated in the fraudulent scheme alleged by virtue of their receipt of information reflecting the true facts regarding BlackBerry, their control over the Company's alleged materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning BlackBerry and the Company's recovery efforts.

125.   BlackBerry, once the leading innovator in mobile technologies, fell behind other companies such as Apple and Samsung as a result of its failure to enter the modern, application-

driven smartphone market, which has since captured all mobile users, personal and business alike. The BlackBerry 10 line of smartphones represented a life or death situation for BlackBerry that would either return the Company as a meaningful competitor in the mobile arena, or relegate it to oblivion as a footnote in the annals of technology innovation as the company that invented a new form of technology and then ceased to innovate and disappeared from the market for its own invention.

126.    Indeed, the stakes for BlackBerry and its senior management could not have been higher. When the BlackBerry 10s immediately failed to garner consumer interest or acceptance (and, thus, end-user sales), Defendants began a campaign to materially misrepresent the success of BlackBerry 10 to the public, and, in particular, potential smartphone end users who would be deterred from purchasing BlackBerry 10s if they learned they were unpopular and might not continue to be supported by the large cell phone carriers and app developers. Also, as a consequence, Defendants materially misled the SEC and investors as to the true condition of BlackBerry and the true facts about the product's commercial failure.

127.    Defendants effectuated this scheme by misrepresenting the Company's supposed return to profitability tied to the initial shipments of BlackBerry 10s, falsely asserting the broad acceptance and popularity of the product with distributors (carriers) and end-users and by vehemently denying any reports that entered the market from technology or investor reporting that questioned the success of the BlackBerry 10s or revealed the true, material unfavorable consumer response to the device, which enabled Defendants to: (a) deceive the investing public regarding the Company's new BlackBerry 10 product line and re-emergence in the wireless communications industry; (b) deceive the investing public regarding BlackBerry's business, operations, performance, and prospects, and the true value of BlackBerry common stock; and (c)

cause Plaintiffs and other members of the Class to purchase BlackBerry common stock at artificially inflated prices and to suffer substantial damages when the truth was revealed and the artificial inflation was removed from the stock price.

128.    Defendants Heins and Bidulka also were motivated to misrepresent the purported success of the BlackBerry Z10 and the Company's overall performance and prospects because they profited personally from those misrepresentations, which artificially inflated the stock price and allowed them to retain their lucrative, high-level positions with the Company throughout the Class Period.   In the first quarter of fiscal year 2014, Heins and the Company entered into an amended and restated employment agreement, effective May 21, 2013.   According to the Company's 2014 Proxy Solicitation dated May 9, 2014, for fiscal year 2014 (the period from March 3, 2013 to March 1, 2014, inclusive) ("2014 Proxy"), Heins and Bidulka received compensation (cash and non-cash, and including salaries until termination and certain termination entitlements) totaling $49,701,796 and $5,630,730, respectively.[22]   *See* 2014 Proxy at p. 40.

129.    Pursuant to their employment agreements, Heins' base salary for the fiscal year 2014 was $1,458,425,[23] an increase of 50% over his Fiscal 2013 base salary of $972,290.   *See id.* at 30. Bidulka's base salary for fiscal year 2014 was $678,097, an increase of 12% over his fiscal year 2013 base salary of $608,653.   *See id.*

130.    In addition to their base salaries, pursuant to BlackBerry's Annual Incentive Plan ("AIP"), the Company's Executive Officers, including Heins and Bidulka, also were compensated "based on a combination of the Company's achievement of certain key financial and operational measures and individual performance relative to annual individual and Company

---

[22] All dollars referred to in this pleading are U.S. Dollars unless otherwise noted.
[23] Pursuant to the 2014 Proxy, salaries were converted into U.S. dollars using the Bank of Canada average noon exchange rate of $1 = CDN $1.0323 on May 24, 2013.

objectives." *See id.* For the fiscal year 2014, the metrics used for the AIP were adjusted "to further focus" the Company's executives on "the most critical business outcomes for the year," and included revenue, EPS, liquidity position, ***and BlackBerry 10 success***. *Id.* at 31.

131.   Furthermore, during the 2013 fiscal year (March 4, 2012 to March 2, 2013), prior to the Class Period, the Company's Board created the Special Achievement Bonus Program for the Executive Officers, including Heins and Bidulka, "focused on the most critical deliverables driving the overall success of the Company in Fiscal 2013 and Fiscal 2014." *Id.* at 32.   In December 2012, the Board established two performance criteria for the program:  (i) cash and liquidity maintenance above a $1.5 billion threshold and (ii) ***BlackBerry 10 launch success***, to be determined at the discretion of the Board.  *Id.*  In April 2013, the Board approved a bonus in the amount of CDN $3 million for Heins.  *Id.*  In May 2013, a bonus in the amount of CDN $700,000 for Bidulka was approved.  *Id.*

132.   Under the terms of his new employment agreement for the 2014 fiscal year, Heins was granted an up-front long-term incentive equity award, consisting of a time-based restricted share unit ("RSU") award valued at $22.5 million and a performance-based RSU award worth $11.25 million.  *Id.* at 34.  These awards were approved May 21, 2013 and granted July 3, 2013. *Id.*  The time-based award did not vest until three years from May 21, 2013, the date of the employment agreement. *Id.*  In order for Heins' performance-based RSU award to vest, the Company had to achieve earnings per share of not less than a specified minimum target. *Id.*

133.   As the recent Playbook episode showed, the failure of a key product at BlackBerry can lead (and did previously lead) to a change in management.  Under pressure of this recent historical precedent at the Company, Heins and Bidulka engaged in the misconduct complained of herein, among other things, so they could continue to reap millions of dollars in

personal financial benefits for as long as they could conceal and misrepresent the truth. Sure enough, when Defendants could no longer hide the failure of the BlackBerry Z10 and the truth was revealed, Heins and Bidulka were soon replaced.

134. In sum, to protect and maximize their substantial salaries and bonuses, Defendants had powerful, personal financial incentives to engage in the wrongful conduct described herein. Defendants' strong motives support a strong inference of knowing or, at a minimum, reckless misconduct.

## LOSS CAUSATION/ECONOMIC LOSS

135. During the Class Period, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated BlackBerry's stock price and operated as a fraud or deceit on Class Period purchasers of BlackBerry's stock by misrepresenting the success of the Company's BlackBerry 10 smartphone and BlackBerry's re-emergence in the wireless communication industry. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors, shares of BlackBerry declined precipitously—evidence that the prior artificial inflation in the price of BlackBerry's shares was eradicated—and, as a result of their purchases of BlackBerry stock during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic losses when the Company's true condition and the truth about the Company's failed recovery was finally and fully revealed and the artificial inflation was removed from price of the Company's stock, *i.e.*, damages under the federal securities laws.

136. Immediately upon the revelation of these previously undisclosed facts, BlackBerry stock plummeted, on heavy volume, from a closing price of $10.52 per share on September 19, 2013 to close at $8.73 per share on September 20, 2013, after an intra-day low of

$8.19.  As investors digested the bad news over the next few days, the price of BlackBerry stock continued to slide on heavy trading volume and closed at $8.01 on September 25, 2013.

137.    The news came as a shock to financial analysts.  For example, UBS issued a report on September 20, 2013, which stated in part:

> BBRY negatively preannounces F2Q results now anticipating Revs of $1.6b (cons $3.1b) and EPS loss, prior to an inventory write-down charge of $930-960m, of -$0.47 to -$0.51 vs. cons at -$0.15. There were 2 main surprises in our opinion: a) the magnitude of the miss (50% in revenues); b) of the 3.7m phones for which revs were recognized, almost all were BB7, i.e., almost no revenue was recognized for the newer BB10 devices.

138.    The declines in the price of BlackBerry securities after the truth came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of BlackBerry's stock price decline negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants fraudulent conduct.  The economic loss suffered by Plaintiffs and the other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of BlackBerry's securities and the subsequent decline in the value of BlackBerry's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

139.    The economic loss, *i.e.,* damages suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of Defendants' prior misstatements and omissions being revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

140.    Throughout the Class Period, the market for BlackBerry stock was an efficient market for the following reasons, among others:

a.    BlackBerry securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market, throughout the Class Period;

b.    As a regulated issuer, BlackBerry filed periodic public reports with the SEC and the NASDAQ;

c.    BlackBerry securities were followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

d.    BlackBerry regularly issued press releases, which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

## STATUTORY SAFE HARBOR DOES NOT APPLY

141.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of BlackBerry who knew that those statements were false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

142.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired shares of  BlackBerry common stock between March 28, 2013 and September 20, 2013, inclusive, in the United States or on a United States-based stock exchange and who were damaged when the truth regarding BlackBerry's recovery was revealed to the public by the decline in  the value of BlackBerry common stock.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

143.    The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, BlackBerry common stock was actively traded on an American stock exchange, the NASDAQ.  As of September 21, 2012, the Company had 524 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BlackBerry or its transfer agent and may be notified of the pendency of this action by mail and publication, using the forms of notice similar to those customarily used in securities class actions.

144.    Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs and all members of the Class were similarly affected by Defendants' conduct in

violation of the federal securities laws that is complained of herein.

145.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

146.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.  A classwide proceeding will generate common answers to the following questions of law and fact common to the Class, among others:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether Defendants made materially untrue and/or misleading statements/omissions during the Class Period; and

(c)    whether the members of the Class have sustained damages and the proper measure of damages.

147.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.  Plaintiffs' allegations stem from Defendants' issuance of materially false and/or misleading statements and omissions during the Class Period contained in SEC filings, Company releases, and conference calls with analysts.  These statements and omissions concealed true, adverse facts about, *inter alia*, the BlackBerry 10 smartphone driving the recovery and

revitalization of BlackBerry.

## CLAIMS FOR RELIEF

## COUNT I

### (For Violations of §10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants—BlackBerry, Heins, and Bidulka)

148.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

149.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding BlackBerry's business, operations, performance, and prospects, and the true value of BlackBerry stock; (b) enable Defendants to inflate and to maintain the artificial inflation in the price of Company stock throughout the Class Period; and (c) cause Plaintiffs and other members of the Class to purchase BlackBerry common stock at artificially inflated prices, resulting in damages after the truth was revealed and the artificial inflation was removed from the price of the stock.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

150.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain an artificially high market price for BlackBerry stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

151.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of BlackBerry as specified herein.

152.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BlackBerry's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about BlackBerry and its business, operations, performance, and prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of BlackBerry stock during the Class Period.

153.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing the truth regarding BlackBerry's business, operations, performance, and prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by Defendants' material misstatements and omissions concerning the Company's business, operations, performance, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were

reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

154.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of BlackBerry stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of BlackBerry stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired BlackBerry stock during the Class Period at artificially high prices and were damaged after the truth regarding the Company was revealed, which removed the artificial inflation from BlackBerry's stock.

155.    Defendants Heins and Bidulka's primary liability arises from the following facts: (a)  Defendants Heins and Bidulka were high-level executives and a director at the Company during the Class Period and members of the Company's management team or had control thereof; (b) both of these Defendants, by virtue of their responsibilities and activities as a senior officer and director of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) both of these Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's business, operations, performance, and prospects at all relevant times; and (d) both of these Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly

60

disregarded was materially false and misleading.

156.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BlackBerry stock.  At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that BlackBerry was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their BlackBerry stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

157.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

158.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

**COUNT II**

**(For Violations of §20(a) of the Exchange Act against Individual Defendants Heins and Bidulka)**

159.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

160.    Defendants Heins and Bidulka acted as controlling persons of BlackBerry within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Defendants Heins and Bidulka had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Defendants Heins and Bidulka were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

161.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

162.    As set forth above, BlackBerry and Defendants Heins and Bidulka each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants Heins and Bidulka also are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants Heins and Bidulka's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period and the related damages resulting after the true facts were revealed and the artificial inflation was removed from the price of the stock.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

1.  Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

2. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

4. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

5. Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 27, 2014                                Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

_/s/ Kim E. Miller_____
Kim E. Miller (KM-6996)
Bruce W. Dona (BD-3730)
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone:   (212) 696-3730
Facsimile:   (504) 455-1498

-and-

Lewis S. Kahn
J. Ryan Lopatka
206 Covington St.
Madisonville, LA 70447
Telephone (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiffs and the Class*

**BROWER PIVEN**
  A Professional Corporation
David A.P. Brower
Richard H. Weiss
475 Park Avenue South, 33rd Floor
New York, NY 10016
Telephone:   (212) 501-9000
Facsimile:    (212) 501-0300

*Counsel for Additional Plaintiffs Yong M.*
*Cho and Batuhan Ulug and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was filed on May 27, 2014, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on May 27, 2014.

_/s/ Kim E. Miller_____
Kim E. Miller