**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |
|---|---|
| MARVIN PEARLSTEIN, Individually And On Behalf of All Others Similarly Situated, | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| BLACKBERRY LIMITED (formerly known as RESEARCH IN MOTION LIMITED), THORSTEIN HEINS and BRIAN BIDULKA, | ) ) ) ) ) |
| Defendants. | ) ) ) |

**File No. 1:13-CV-7060-TPG**

Oral Argument Requested

_____

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

Kim E. Miller
Bruce W. Dona
**KAHN SWICK & FOTI, LLC**
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
J. Ryan Lopatka
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiffs and*
*the Class*

David A.P. Brower
**BROWER PIVEN**
 **A Professional Corporation**
475 Park Avenue South
33rd Floor, New York, NY 10016
Phone (212) 501-9000
Fax (212) 501-0300

*Additional Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

I.     PRELIMINARY STATEMENT ................................................................................1

II.    ARGUMENT ...............................................................................................................2

   A.  Applicable Pleading Standards ..........................................................................2

   B.  Materially False and Misleading Statements and Omissions ..............................3

      1.  BlackBerry's Recognition of Revenue Was Objectively Unreasonable......................6

      2.  Excess Inventory and High Return Rates ...................................................8

      3.  Product Novelty, Increased Competition, and Adverse Results ...................................9

      4.  BlackBerry's Accounting for Z10 Inventory and Supply Commitments Was
          Objectively Unreasonable ........................................................................9

   C.  Defendants Were Obligated by Item 303 to Disclose Trends and Uncertainties .............13

   D.  The Safe Harbor Is Inapplicable ....................................................................15

   E.  Defendants' Statements and Omissions Are Not Inactionable Puffery ...........................16

   F.  The Complaint Adequately Alleges Scienter.....................................................16

      1.  Defendants Knowingly or Recklessly Made False and Misleading Statements
          Concerning BlackBerry's Core Product ....................................................17

      2.  The Temporal Proximity of Defendants' Statements with the Revelation of
          the Truth and the Sheer Magnitude of the Charge Support Scienter .........................20

      3.  Defendants Face Overwhelming Pressure to Resuscitate BlackBerry .......................21

      4.  The Inference of Culpable Conduct Is At Least as Compelling as any
          Alternative Non-Culpable Inference..........................................................23

   G.  Plaintiffs Have Adequately Pleaded Loss Causation..........................................24

   H.  The Complaint Adequately Pleads Control Person Liability..............................................25

III.   CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)................................................................... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................ 2

*Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011).................................................. 17

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................... 8, 20

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)............................................................. 2, 24

*Clal Fin. Batucha Inv. Mgmt. v. Perrigo Co.*,
2010 U.S. Dist. LEXIS 105185 (S.D.N.Y. Sept. 30, 2010)................. 12

*Dura Pharm., Inc. v. Brodo*,
544 U.S. 336 (2005)............................................................................. 24

*Fadem v. Ford Motor Co.*,
352 F. Supp. 2d 501 (S.D.N.Y. 2005).................................................... 6

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)......................................................... 7, 8, 11

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir.1995) ................................................................ 20

*Fed. Hous. Fin. Agency v. SG Ams., Inc.*,
No. 11-6203, 2012 U.S. Dist. LEXIS 168295 (S.D.N.Y. Nov. 27, 2012)................................ 7

*Freedman v. Weatherford Int'l Ltd.*,
No. 12 Civ. 2121, 2013 U.S. Dist. LEXIS 135149 (S.D.N.Y. Sept. 19, 2013) ....................... 21

*Freudenberg v. E*Trade Financial Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................. 25

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................. 22

*Goldman v. Belden*,
754 F.2d 1059 (2d Cir. 1985).................................................................. 9

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008).................................................. 15

*Heller v. Goldin Restructuring Fund, L.P.*,
590 F. Supp. 2d 603 (S.D.N.Y. 2008).................................................. 23

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
No. 11-4209, 2013 U.S. Dist. LEXIS 43774 (S.D.N.Y. Mar. 27, 2013) ......................... 8

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010).................................................. 25

*In re AT&T Corp. Sec. Litig.*,
Civ. No. 00-5364, 2002 U.S. Dist. LEXIS 22219 (D.N.J. Jan. 28, 2002) ......................... 16

*In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................. 24

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................ 11, 12
*In re Cabletron Sys.*,
  311 F.3d 11 (1st Cir. 2002)................................................................................... 22
*In re Corning Inc. Sec. Litig.*,
  349 F. Supp. 2d 698 (S.D.N.Y. 2004).................................................................. 13
*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010).................................................................... 6
*In re Forest Labs. Sec. Litig.*,
  No. 05 Civ. 2827, 2006 U.S. Dist. LEXIS 97475 (S.D.N.Y. July 19, 2006)........... 18
*In re Gilat Satellite Networks, Ltd.*,
  No. 02-1510, 2005 U.S. Dist. LEXIS 41996 (E.D.N.Y. Sept. 19, 2005) ................ 18
*In re Grand Casinos, Secs. Litig.*,
  988 F. Supp. 1273 (D. Minn. 1997) ...................................................................... 20
*In re IBM Corp. Sec. Litig.*,
  163 F.3d 1-2 (2d Cir. 1998) .................................................................................... 8
*In re Loral Space and Commun. Ltd. Sec. Litig.*,
  No. 01 Civ. 4388, 2004 U.S. Dist. LEXIS 3059 (S.D.N.Y. Feb. 27, 2004) ............ 6
*In re Motorola Sec. Litig.*,
  505 F. Supp. 2d 501 (N.D. Ill. 2007) .................................................................... 25
*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000).................................................................... 16
*In re Nokia Corp. Sec. Litig.*,
  No. 96-CIV-3752, 1998 U.S. Dist. LEXIS 4100 (S.D.N.Y. Mar. 31, 1998)........... 19
*In re Nokia Oyj Sec. Litig.*,
  423 F. Supp. 364 (S.D.N.Y. 2006)........................................................................ 16
*In re Number Nine Visual Tech. Corp. Secs. Litig.*,
  51 F. Supp. 2d 1 (D. Mass. 1999) ......................................................................... 21
*In re Rediff.com India Ltd. Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004).................................................................... 14
*In re Regeneron Pharms., Inc. Sec. Litig.*,
  No 03-3111, 2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 1, 2005)....................... 15
*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)................................................................... 3, 13, 15, 21
*In re Symbol Techs., Inc., Sec. Litig.*,
  No. 05-CV-3923, 2013 U.S. Dist. LEXIS 171688 (E.D.N.Y. Dec. 5, 2013) ........... 15
*In re Telxon Corp. Sec. Litig.*,
  No. 5:98-2876, 2000 U.S. Dist. LEXIS 20192 (N.D. Ohio Sept. 29, 2000)........... 22
*In re Top Tankers, Inc. Sec. Litig.*,
  528 F. Supp. 2d 408 (S.D.N.Y. 2007).................................................................... 14
*In re Veeco Instru., Inc., Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................... 18
*In re Wilmington Trust Sec. Litig.*,
  No. 10-990, 2014 U.S. Dist. LEXIS 36624 (D. Del. Mar. 20, 2014) ..................... 11
*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).................................................................. 19, 20, 20

*Jones v. Perez*,
   550 Fed. Appx. 24 (2d Cir. 2013) .................................................................... 8

*Kushner v. DBG Property Investors, Inc.*,
   793 F. Supp. 1161 (S.D.N.Y. 1992)................................................................. 5

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)............................................................. 7

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)............................................................................ 25

*Lewy v. Skypeople Fruit Juice, Inc.*,
   No. 11 Civ. 2700, 2012 U.S. Dist. LEXIS 128416 (S.D.N.Y. Sept. 7, 2012) .................... 3, 25

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .......................................................................... 24

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011)..................................................................................... 3

*McCarthy v. Dun & Bradstreet Corp.*,
   482 F.3d 184 (2d Cir. 2007)............................................................................ 4

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)............................................................... 14

*New Orleans Emples. Ret. Sys. v. Celestica, Inc.*,
   455 Fed. Appx. 10 (2d Cir. 2011).................................................................. 16

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................ 12

*Panther Partners Inc. v. Ikanos Communs., Inc.*,
   681 F.3d 114 (2d Cir. 2012)............................................................................ 3

*Pirraglia v. Novell, Inc.*,
   339 F.3d 1182 (10th Cir. 2003) ...................................................................... 22

*Pollio v. MF Global, Ltd.*,
   608 F. Supp. 2d 564 (S.D.N.Y. 2009)............................................................. 16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)............................................................................ 19

*Rosen v. Textron*,
   321 F.Supp.2d 308 (D.R.I. 2004)................................................................... 16

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)......................................................................... 9, 11, 21

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009).............................................................................. 16

*SEC v. Cotton*,
   No. 06-0905 AG, 2006 U.S. Dist. LEXIS 98393 (C.D. Cal. Dec. 20, 2006) .................... 9

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
   707 F.3d 95 (1st Cir. 2013)............................................................................. 14

*Simon v. Am. Power Conversion Corp.*,
   945 F. Supp. 416 (D.R.I. 1996)....................................................................... 13

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)............................................................................ 15

*South Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) .......................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................ 16, 17, 23
*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)................................................................................................. 7, 8
*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)........................................................................ 24
*Wallace v. Intralinks*,
    No. 11 CV 8861, 2013 U.S. Dist. LEXIS 65958 (S.D.N.Y. May 8, 2013) .............. 24


**Statutes**
15 U.S.C. § 78u-5(c)(1). ................................................................................................. 15


**Other Authorities**
ASC §605-10-25-1(a) ....................................................................................................... 6
Management Discussion and Analysis of Financial Condition and Results of Operations,
SEC Release No. 6835, 1989 WL 1092885 (May 18, 1989)......................................... 13


**Regulations**
17 C.F.R. §229.303(a)(3)(ii)........................................................................................... 13
Instructions 11 and 12 to ¶303(a) ................................................................................. 14
National Instrument 51-102: Continuous Disclosure Obligations, ONTARIO SECURITIES
    COMMISSION BULLETIN (Canada) (Oct. 1, 2011), Form 51-102F1 ................................. 14

## I. **PRELIMINARY STATEMENT**

Through the use of self-serving re-interpretations of their own Class Period statements, out-of-context quotations, and extraneous purported "facts" neither alleged in the Complaint nor properly considered on this motion, Defendants seek to distract the Court with every possible excuse for their material misstatements and omissions. But smoke and mirrors cannot extricate them from the well-pleaded allegations. This case is not about faulty projections; it is not about optimistic statements about future events; and it is not about management missteps. It is a case of a corporation and its management simply lying to cover up a financial disaster concerning their core product line, on which Defendants had bet the Company.

BlackBerry, the progenitor of the modern smartphone, found itself after almost a decade-long monopoly faced with very stiff competition. BlackBerry fell behind its competitors, losing market share and customers. After several missed opportunities to reinvigorate the brand, BlackBerry was in dire straits. Its last hope to be a serious contender in the smartphone business was its long-delayed and highly-anticipated 10 series line of smartphones, which included the Z10 all-touchscreen phone and the Q10 keyboard phone. Unfortunately, the 10 series product line was too little, too late. Poor sales of the Z10s, which launched months ahead of the Q10, were immediate. Returns were high. Desperate to increase sales, the Company offered steep discounts. These efforts were futile. BlackBerry had previously introduced two long-delayed key products – the BlackBerry 7 and the Playbook tablet. These products failed and co-CEOs Jim Balsillie and Mike Lazaridis were forced to step down in favor of Defendant Thorsten Heins just one year prior to the worldwide launch of the Z10. Because of this pattern, Defendants knew the failure of the 10s would cost them their high-profile jobs and would be fatal to BlackBerry's ability to be a meaningful player in the smartphone business again. Further, Defendants knew that admitting the failure of the 10s would drive investors away from BlackBerry stock and

consumers away from its products for fear that BlackBerry would cease to exist, and thus, would not provide support for its devices.

Hoping against hope to right the failure of the Z10s, Defendants embarked on a course of conduct to conceal the failure of the products and mislead the investing public to believe it was well received, had high demand, and was immediately profitable. Time finally ran out on Defendants' desperate efforts to produce sales of Z10s commensurate with those sales Defendants had falsely reported to the public. On September 20, 2013, Defendants announced that BlackBerry would report a "charge against inventory and supply commitments in the second quarter of approximately ***$930 million to $960 million, which is primarily attributable to BlackBerry Z10 devices***. ¶21. This charge resulted in a write off of BlackBerry's prior quarter sales of the 10s – effectively reversing all those previously reported sales, revenues, and income. The result was an immediate, substantial decline in the price of BlackBerry stock as the investing public recognized that the financial statements of the Company during the Class Period and the purported success of the Z10s were an illusion and that BlackBerry, as a competitor in the smartphone business, was no more. Thus, the Court has before it a well-pleaded Complaint of securities fraud. Defendants' motion should be denied.

## II. <u>ARGUMENT</u>

### A. **Applicable Pleading Standards**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Complaint alleges detailed facts, based on numerous analyst reports and media reports, that BlackBerry's purported savior, the Z10, was experiencing

poor sales, massive customer returns, and excess levels of inventory, compelling the Company to offer steep discounts on the smartphones almost immediately. ¶¶16, 48, 71-75. These facts were in stark contrast to BlackBerry's contemporaneous public statements heralding consumer acceptance of and demand for the Z10s, Defendants' financial results reflecting overstated sales and revenues from the 10 line, and Defendants' denials of any reports that the Z10s were facing stiff consumer resistance. ¶¶16, 48.

Defendants argue that Plaintiffs must plead evidence including the exact "statistics reflecting how many BlackBerry 10 devices had been sold into the channel" or "had been purchased by end users" or exact "return rate statistics" and "how those statistics compared to internal forecasts or industry norms." Def. Br. at 12. This attempt to graft a new requirement onto Plaintiffs' pleading burden contravenes Supreme Court and Second Circuit authority. It is well-settled that a plaintiff need not plead evidence. *See*, *e.g.*, *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 72 (2d Cir. 2001), and, thus, "[a] motion to dismiss is not the proper vehicle to test the...manner in which plaintiffs will attempt to prove their allegations." *Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 Civ. 2700, 2012 U.S. Dist. LEXIS 128416, at *40-41 (S.D.N.Y. Sept. 7, 2012); *see also Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1318-21 (2011) (holding there is no statistical threshold for materiality under Section 10(b)); *Panther Partners Inc. v. Ikanos Communs., Inc.,* 681 F.3d 114, 122 (2d Cir. 2012) ("[D]isclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries [into defect rates].").

### B.  Materially False and Misleading Statements and Omissions

As required by Fed. R. Civ. P. 9(b) and the PSLRA, the Complaint alleges that, throughout the Class Period, Defendants made misstatements and omissions regarding the

success of the 10 smartphones and their positive impact on Blackberry's reported financial results, (¶¶40-57), by: (1) improperly recognizing, and thereby artificially inflating, revenues (¶¶67-82), failing to properly account and reserve for inventory (¶¶83-95), and failing to properly account for supply commitments (¶¶96-101); (2) failing to disclose known trends and/or uncertainties likely to have a material adverse impact on BlackBerry's operations and financial results in the form of slow sales and high returns of the Z10s, and steep discounts offered in an effort to sell them that Defendants had a duty to disclose; and (3) making statements regarding the historic and current demand for its Z10s that were false and without a reasonable basis.

Lacking any legally cognizable challenge to the well-pleaded allegations of the Complaint, Defendants seek to contest the fact that the Z10s were a consumer sales failure *for BlackBerry* by positing their own premature new "fact" based claim – that BlackBerry was only responsible for sales incentives in Q2-2014. *See* Def. Br. at 13. Not only is this claim contrary to the allegations of the Complaint, *see McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007) (A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference."),[1] but Defendants' argument is rebutted by BlackBerry's own admissions in its Q1-2014 earnings release that BlackBerry was responsible for the early discounting of the Z10s. *See* Def. Br. at 13. BlackBerry's Q1-2014

---

[1] Defendants 'motion to dismiss is riddled with premature arguments based on unsupported facts outside the Complaint or contradicted by the allegations of the Complaint. For instance, to support their argument that the Z10 launch was successful, Defendants cite two articles dated January 29 and 30, 2013—the day before and day of the worldwide launch of the Z10. Def. Br. at 2 (citing Exs. B and C). The timing of the articles precludes them from supporting that proposition. In contrast, the media and analyst reports cited in the Complaint detailed the failure of both launches as they occurred or thereafter. *See, e.g.*, ¶¶16, 44, 71. Similarly, Defendants argue that Plaintiffs' own news reports echoed enthusiasm about the Z10s at the "outset of the launch" by cherry picking snippets out of context. *See, e.g.*, Def. Br. at 3 (Defendants claim that Exh. F stated that "the device showed a lot of promise," but omit the remaining negative context: "that the device that showed a lot of promise during its not-so-distant launch, seems to be now headed downhill – including its price."); *id.* (With respect to Exhibit G, Defendants select the phrase had "a successful launch [in Europe in Canada]," but do not point out that the article further reveals that Citigroup called the launch a "big disappointment.").

earnings release filed on June 28, 2013, states:

> In support of the launch of BlackBerry Z10 smartphones, ***the Company increased*** marketing spending and ***sales incentives*** offered to channel and carrier partners in order to enhance adoption of the platform.

¶119 (emphasis added). BlackBerry's Q2-2014 earnings release filed on September 27, 2013, stated that: "***The Company plans to implement further sales incentives*** with its carrier and distributor partners to increase sell-through." ¶120 (emphasis added). These reports make clear that ***BlackBerry*** implemented the discounting of the Z10s beginning in Q1-2014, which continued to increase through Q2-2014. ¶¶119-20.

The Complaint alleges that Defendants artificially inflated BlackBerry's revenues and income because BlackBerry: (1) contradicted its own stated revenue recognition policy that it recognizes revenue when it is realized or realizable and earned, because the need to steeply discount and offer incentives on the Z10s made the sale price neither fixed nor determinable (¶¶67-82); (2) failed to properly value inventory, increase reserves, and/or take necessary charges for excess inventory of Z10 notwithstanding its fast rising inventory and returns (¶¶83-95); (3) failed to record a charge for supply commitments for quantities in excess of anticipated future customer demand forecasts, resulting in a material overstatement of the Company's gross margin and earnings (¶¶96-101); and (4) failed to take a provision for inventory losses in its interim financial statements, in violation of ASC 450, ASC 270, and FASB Statement of Concepts No. 5 (¶¶102-06).

Defendants wrongly seek to characterize these allegations as "hindsight-based," Def. Br. at 14,[2] and the cases cited by Defendants involving a reasonable disagreement over subjective

---

[2] In *Kushner v. DBG Property Investors, Inc.*, 793 F. Supp. 1161, 1179 (S.D.N.Y. 1992), Def. Mem. at 17, plaintiff alleged fraudulent intent based exclusively on a single fact that was "fully disclosed to investors prior to their investment." 793 F. Supp. at 1179. By contrast here, Defendants vigorously denied the true facts concerning sales, returns, and revenue relating to the Z10s. ¶49.

judgment calls, *see id.*,[3] do not apply here. This case alleges that the facts that occurred ***during the Class Period*** made Defendants' accounting treatment objectively unreasonable.

### 1. BlackBerry's Recognition of Revenue Was Objectively Unreasonable

BlackBerry's 2013 Form 40-F represented that "[t]he Company recognizes revenue when it is realized or realizable and earned," and that this recognition only occurs when "the sales price is fixed or determinable and collection is reasonably assured." ¶67. BlackBerry's stated policy is consistent with GAAP, which permits the recognition of revenue only if: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectability is probable. *See* SEC Staff Accounting Bulletin ("SAB") No. 104. GAAP also requires that, for revenue to be recognized, it must be earned and realized or realizable. *See* Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶83, ASC §605-10-25-1(a).

BlackBerry's recognition of revenue during the Class Period from sales of Z10s failed to comport with its stated policy because the revenues it recognized were neither realized nor realizable when reported. Consumer resistance to the product meant the Z10s sale price was neither fixed nor determinable at the time, and Defendants could not reasonably and reliably estimate future price concessions due to: (1) excess levels of inventory in a distribution channel due to substantially lower sell through than shipping volumes; (2) higher than expected returns of current products; (3) the newness of a product; (4) the introduction of competitors' products with

---

[3] In *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 512 (S.D.N.Y. 2005), no duty arose during the class period that required defendant to record a loss. Once the duty arose, after the class period, defendant "timely recorded the loss pursuant to FAS 107." *Id.* In *Fannie Mae* regulators "scrutinized" defendant's financials and found no violations, undercutting plaintiff's alleged GAAP violations. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010). In *In re Loral Space and Commun. Ltd. Sec. Litig.*, No. 01 Civ. 4388, 2004 U.S. Dist. LEXIS 3059, *51 (S.D.N.Y. Feb. 27, 2004), defendants' "disclosures of the ongoing poor performance" at the company undermined the inference of fraud.

equal or superior technology, or greater expected market acceptance; and (5) prior poor results in connection with its releases of the BlackBerry 7 and PlayBook, necessitating material write-downs of goodwill and inventory. BlackBerry was required to analyze all factors, including trends in historical data, which could affect its ability to make reasonable and reliable estimates of expected price concessions. As a result of anemic sales and larger than expected returns of Z10s, BlackBerry was forced, beginning at the launch, to offer significant price concessions to retailers. These factors were known or recklessly disregarded by Defendants when BlackBerry reported Z10 revenues. Thus, Defendants' recognition of revenues from Z10 shipments at the full wholesale prices was objectively unreasonable and violated BlackBerry's stated revenue recognition policy. *See Fed. Hous. Fin. Agency v. SG Ams., Inc*., No. 11-6203, 2012 U.S. Dist. LEXIS 168295, at *8 (S.D.N.Y. Nov. 27, 2012) ("The defendants in this action, however, made statements of belief about a matter of objective fact – that Fremont adhered to its underwriting guidelines in originating or acquiring the mortgage loans.").

Defendants claim that accounting judgments are inherently subjective and insist "plaintiffs must 'plausibly allege that defendants did not believe the statements . . . at the time they made them.'" Def. Br. at 16 (quoting *Fait v. Regions Fin. Corp*., 655 F.3d 105, 112 (2d Cir. 2011)). Defendants are wrong. Statements of reason, opinion, or belief are actionable where they "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991)). Thus, contrary to Defendants' contention that the Complaint must establish that Defendants did not believe their statements (Def. Br. at 16), Plaintiffs need only sufficiently plead that "the opinion was without a basis in fact *or* the speakers were aware of facts undermining the positive statements." *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221,

239 (S.D.N.Y. 2006) (emphasis added); *see also Va. Bankshares*, 501 U.S. at 1093; *Jones v. Perez*, 550 Fed. Appx. 24, 29 (2d Cir. N.Y. 2013); *In re IBM Corp. Sec. Litig.*, 163 F.3d 1-2, 109 (2d Cir. 1998). The objective factors discussed above, all of which are alleged to have been known or recklessly disregarded by Defendants at the time of the alleged financial misstatements, constitute "facts undermining the positive statements." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11-4209, 2013 U.S. Dist. LEXIS 43774, at *41 (S.D.N.Y. Mar. 27, 2013).[4]

### 2.  Excess Inventory and High Return Rates

Defendants argue that Plaintiffs "fail to allege particularized facts about inventory levels and return rates for BlackBerry 10 devices in FY2013 (through March 2, 2013) and Q1-2014 (through June 1, 2013)." Def. Br. at 16-17. But the Complaint contains numerous facts and news reports from this time period specifically corroborating these allegations. ¶¶71-72. Defendants mischaracterize these reports as "cherry-picked anecdotal reports about *retailer* price reductions." Def. Br. at 17. The Complaint, however, cites reports concerning disappointing sales, price cutting, and high returns involving almost all of the important smartphone retailers and carriers worldwide, including but not limited to Verizon, AT&T, Virgin Mobile, Amazon, Rogers, Carphone Warehouse, Vodafone, and Bell. ¶¶73-74. It is not credible for Defendants to suggest they were unaware of systematic price concessions on its newest and most important product being offered by its largest retailers worldwide. *See Berson v. Applied Signal Tech., Inc.,*

---

[4] Contrary to Defendants' overbroad reading of *Fait,* the Second Circuit did not hold that **all** accounting decisions are inherently subjective, but rather that estimates of intangibles, like "[e]stimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact," 655 F.3d at 109-110, and loan losses, which numerous courts have recognized cannot be computed objectively. *Id.* at 113 (citing cases). Even if *Fait* applied, however, the Complaint's revenue recognition allegations meet that standard, because Defendants knew or recklessly disregarded objective facts available to them at the time of their improper recognition of revenues that would significantly undermine a reasonable person's belief that BlackBerry's revenues at its wholesale prices were realizable on its shipments of Z10s.

527 F.3d 982 (9th Cir. 2008).

### 3.  Product Novelty, Increased Competition, and Adverse Results

The Complaint alleges that revenue recognition on Z10 sales was objectively unreasonable because of the likelihood of price concessions due to the newness of the product, the introduction of competitors' products with superior technology or greater expected market acceptance, and prior failed new product launches. ¶¶71-76. Defendants argue that "[n]o authority holds that a company cannot recognize revenue merely because particular devices are new and the market is competitive." Def. Br. at 17. But that is precisely what GAAP requires here. *See, e.g., SEC v. Cotton,* No. 06-0905 AG, 2006 U.S. Dist. LEXIS 98393, at *8 (C.D. Cal. Dec. 20, 2006) ("Recognition of revenues from these sales [of new products] was improper [because of the risk of returns], and Defendants caused Lantronix to improperly recognize these revenues to inflate Lantronix's reported revenue and earnings."). By recognizing these revenues, Defendants represented there was no uncertainty about the Z10, when Defendants knew or recklessly disregarded true contemporaneous, adverse facts to the contrary. *See Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985) (holding that positive representations about the viability of a new product were fraudulent because they "were made with knowledge or reckless disregard of the grave uncertainties and problems concerning future sales of [the product]"); *see also Rothman v. Gregor,* 220 F.3d 81, 90-92 (2d Cir. 2000).

### 4.  BlackBerry's Accounting for Z10 Inventory and Supply Commitments Was Objectively Unreasonable

Defendants represented that BlackBerry's accounting for inventory was consistent with GAAP and computed according to an objective standard whereby "inventories are stated at the lower of cost and net realizable value." ¶84. The Complaint alleges Defendants failed to take a charge to income or increase BlackBerry's reserves for the Z10 during the Class Period in

violation of GAAP, and that such a charge or reserve was required because: (1) BlackBerry was experiencing a lack of sell-through on the Z10s; (2) carrier and distributor partners were holding very high levels of excess inventory; and (3) the costs of the carrier and distributor partner sales incentives and refunds were increasing with no sign of slowing – all of which would have a material adverse impact on reported revenues and earnings. ¶¶81-93. Instead of taking a charge or increasing the reserve, Defendants *reduced* the overall reserves for excess and obsolete inventory at the end of fiscal 2013. ¶82.

Defendants falsely represented in BlackBerry's 2013 Form 40-F that if "management believes that demand no longer allows the Company to sell inventories above cost or at all, such inventory is written down to net realizable value or excess inventory is written off," ¶87, and falsely represented that BlackBerry held $603 million in inventory, after "including the determination of obsolete or excess inventory . . . " ¶89. In its Form 6-K, filed on June 28, 2013, BlackBerry falsely represented it held $887 million in inventory, after "including the determination of obsolete or excess inventory . . . " ¶91. In truth, Defendants failed to take a charge to income for the Z10 even though they knew or recklessly disregarded that the Z10s were not selling through, resulting in excessive levels of inventory that could not be sold at cost if at all. ¶¶88, 90, 92.

Defendants' representations concerning BlackBerry's consolidated gross margin from continuing operations in its March 28, 2013 earnings release, its 2013 Form 40-F, and its June 28, 2013 6-K, were materially false and misleading as a result of BlackBerry's failure to record a charge for supply commitments for quantities that Defendants knew or recklessly disregarded were in excess of any reasonable anticipated future customer demand forecasts. ¶¶94-98.[5]

---

[5] The materiality of Defendants' false and misleading statements is exemplified by the impact of the Z10 inventory charge on reported gross margin, which included approximately $307 million related to supply commitments. ¶98.

Defendants argue the Complaint fails to specify precisely when Blackberry should have taken charges on inventory and supply commitments. Def. Br. at 18. But there is no requirement that an exact moment in time must be alleged. *See Rothman*, 220 F.3d at 91 ("Appellants do not have to fix the exact date and time that GT and its officers became aware that recovering royalty payments through future sales would be unlikely… ."); *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig*., 763 F. Supp. 2d 423, 496 (S.D.N.Y. 2011) ("Whether these facts establish that Bear Stearns knew, as alleged, that major write downs of the collateral were required before the third quarter of 2007 is an issue for trial.").

Defendants reiterate their argument that "[d]ecisions about appropriate accounting reserves reflect management's opinion and judgment," Def. Br. at 18 (quoting *Fait*, 655 F.3d at 113), but ignore the fact that Defendants' failures to take appropriate reserves and charges on inventory and supply commitments are allegedly based upon BlackBerry's own stated objective standards – *i.e.*, in the case of inventory, "the lower of cost and net realizable value," and in the case of supply, whether "current volume-based purchase projections are met." *See In re Wilmington Trust Sec. Litig*., No. 10-990, 2014 U.S. Dist. LEXIS 36624, at \*47 (D. Del. Mar. 20, 2014) ("Contrary to the plaintiff in *Fait*, which did not 'point to an objective standard for setting loan loss reserves,' in the case at bar, WTC alleged adequate reserves, calculated using an objective and consistent standard, in part based on credit risk and loan classifications.").

Defendants claim "Plaintiffs fail to provide any factual basis that BlackBerry knew or was reckless in not knowing in March or in June 2013 . . . that sales forecasts would not be achieved," Def. Br. at 19, by attempting to belittle the sources of facts that demonstrate that Defendants knew or recklessly disregarded the fact that BlackBerry could not recover its stated realizable values of the Z10s as mere "anecdotal reports about retailer price reductions and

subsequent accounting decisions." *Id*. Putting aside the Court's obligation to take Plaintiffs' allegations as true, these sources are reputable business and analyst reports that establish unambiguously that supply exceeded demand at the Company's largest retailers almost immediately after the Z10's launch. *See* ¶¶88, 99; *see also Novak v. Kasaks,* 216 F.3d 300, 312 (2d Cir. 2000) (holding plaintiffs sufficiently alleged fraud where the defendant recklessly overstated the value of outdated inventory despite being in possession of information reflecting the reduced value); *In re Bear Stearns Cos*., 763 F. Supp. 2d at 496 ("However, the Securities Complaint does allege facts concerning the subprime market sufficient to establish that the Bear Stearns Defendants knew or should have known of the need for asset write down. . . ."").

The allegations of BlackBerry's recent experience with the market's rejection of its new products (the BlackBerry 7 and PlayBook) and the need to write down inventories of those products, ¶¶10, 70, support the fact that Defendants could not reliably expect the market to accept its new, long delayed Z10 and, thus, BlackBerry's recording revenues and income from sales of Z10s based on shipments rather than actual sales was not an objectively reasonable accounting method. *See Clal Fin. Batucha Inv. Mgmt. v. Perrigo Co.,* 2010 U.S. Dist. LEXIS 105185, at *18-*19 (S.D.N.Y. Sept. 30, 2010) ("Plaintiffs argue persuasively that the identical factors that caused Perrigo to drastically writedown the value of the ARS on February 3, 2009— increased credit and liquidity risks—were operative and evident to defendants at the time they issued the November 6, 2008 statements."). That BlackBerry announced it abandoned that methodology in the second quarter fiscal 2014 earnings release to only account for actual sales was effectively an admission that the prior methodology was overly optimistic and improper, and that the product was not the success BlackBerry represented it to be or its financial reports would lead investors to believe it was. ¶120.

### C.  Defendants Were Obligated by Item 303 to Disclose Trends and Uncertainties

The Complaint alleges that Defendants failed to comply with SEC Item 303 of Regulation S-K, 17 C.F.R. §229.303 ¶¶105-12. Defendants correctly argue that a violation of Item 303 cannot, by itself, give rise to a cause of action under §10(b). Def. Br. at 20. Pursuant to Item 303, public companies are required in each quarterly and annual report, to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii)). If an issuer fails to disclose information required by Item 303 and that information is "material," the failure to disclose that information will constitute a material omission under §10(b). Numerous courts, including the Second Circuit, have held that the failure to disclose material adverse information as required by Item 303 can provide a predicate for a §10(b) claim. *See, e.g., Scholastic*, 252 F.3d at 70; *In re Corning Inc. Sec. Litig.*, 349 F. Supp. 2d 698, 715-17 (S.D.N.Y. 2004).[6]

The duty to disclose does not change if the issuer is unable to mathematically quantify the impact on a company's results or financial condition of the known trend or uncertainty. Under the SEC's Item 303 "when in doubt disclose" mandate,[7] if an issuer is uncertain whether a known trend or uncertainty will come to fruition, the issuer must disclose if the trend or uncertainty is likely to have a material adverse impact on the issuer's financial condition or results if it were to come to pass. *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 431 (D.R.I. 1996) (holding in §10(b) case that Item 303 required disclosure of product defect because it was likely to materially impact future costs and revenues even though defendants could not quantify the precise amount of that impact when the 10Q was issued).

---

[6] Defendants cite two district court decisions to the contrary, but neither can trump *Scholastic*.
[7] *See* Management Discussion and Analysis of Financial Condition and Results of Operations, SEC Release No. 6835, 1989 WL 1092885, at *1, *6 (May 18, 1989).

BlackBerry's Class Period Forms 40-F and 6-Ks failed to disclose the existence and impact of risks known at the time, including the significant amount of returns, low sell-through, and costly price concessions to retailers that jeopardized the success of the 10s, which were likely to have a material adverse impact on the Company's future sales and revenues. *See, e.g.,* ¶¶ 108-112. Trends or uncertainties relating to sales prices and market acceptance of a product must be disclosed pursuant to Item 303. *See, e.g.*, *In re Rediff.com India Ltd. Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (holding that a downward trend in advertising rates was required to be disclosed under Item 303); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999) (allegation that products were not gaining market acceptance stated claim that registration statement omitted material information required to be stated therein under Item 303). Defendants' failures to disclose these facts in BlackBerry's filings constitute material omissions.[8]

Defendants argue that Item 303 "does not apply to foreign private issuers such as BlackBerry that file on Forms 40-F and 6-K." Def. Br. at 20. But neither of the authorities they cite exempts foreign private issuers from the disclosure requirements of Item 303.[9] In fact, the instructions to Item 303 expressly contemplate application of the provisions at issue to "foreign private issuers." Instructions 11 and 12 to ¶303(a). Even if foreign issuers were exempt from Item 303, Canadian companies like BlackBerry are permitted to file on Forms 40-F and 6-K as part of the multi-jurisdictional disclosure system of the Exchange Act ("MJDS"), and the MJDS contains virtually identical requirements to disclose trends or uncertainties. *See* National

---

[8] Defendants argue that the facts alleged do not constitute a trend because as of June 1, 2013, **the U.S. launch**, which occurred in March, was still in its early stages. *See* Def. Br. at 20-21. But the Complaint alleges the trend was cognizable after the **worldwide launch** of the BlackBerry 10, which started in January 2013 – six months before the U.S. launch. ¶¶15-16. Courts have held that six months constitutes a trend. *See, e.g., Silverstrand Invs. v. AMAG Pharms., Inc.,* 707 F.3d 95, 103 (1st Cir. 2013). Regardless, the uncertainty prong of Item 303 applies as well.

[9] Neither the Instruction B to Form 40-F nor those to Form 6-K refers to Item 303(a) at all. And *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408 (S.D.N.Y. 2007) did not involve Item 303, but rather "Item 304." *Id.* at 416.

Instrument   51-102:   Continuous   Disclosure   Obligations,   ONTARIO   SECURITIES
COMMISSION BULLETIN (Canada) (Oct. 1, 2011), Form 51-102F1, Item 1.2; *id.* at Item 2.2.

### D.  The Safe Harbor Is Inapplicable

The PSLRA's safe harbor applies to forward-looking statements (1) identified as forward-looking statements and accompanied by meaningful cautionary language; or (2) that "the plaintiff ***fails to prove***" were made with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1). Defendants' statements are plainly statements of past or present fact. *See, e.g.,* Def. Br. at 10; ¶47; *see also In re Regeneron Pharms., Inc. Sec. Litig.,* No 03-3111, 2005 U.S. Dist. LEXIS 1350, at *39 (S.D.N.Y. Feb. 1, 2005). To "avail themselves of safe harbor protection under the "meaningful cautionary language" prong, Defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.,* 604 F.3d 758, 772 (2d Cir. 2010). Defendants' language, s*ee* Def. Br. at 11-12, was generic and not meaningful. *See, e.g., In re Symbol Techs., Inc., Sec. Litig.,* No. 05-CV-3923, 2013 U.S. Dist. LEXIS 171688, *50-51 (E.D.N.Y. Dec. 5, 2013). The Complaint alleges that when BlackBerry published its boilerplate risk factors regarding the future success of the 10s, information was available to Defendants demonstrating that the product already was not a success. *See, e.g.,* ¶¶16; 119-20. "[S]tatements are not protected where defendants 'had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality.'" *Hall v. Children's Place Retail Stores, Inc.,* 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) (quotation omitted).

Finally, there is no safe harbor protection where a defendant assures investors that the potential risks are, in fact, not materializing. Defendants cannot seriously argue they meaningfully warned investors when they vehemently (and falsely) denied a report that

BlackBerry was experiencing an inordinately high rate of Z10 returns, ¶48. *See New Orleans Emples. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 15 (2d Cir. 2011) (holding safe harbor inapplicable where defendants unequivocally denied inventory problems about which the company purportedly warned).

### E.  Defendants' Statements and Omissions Are Not Inactionable Puffery

Ignoring all of the specifically alleged actionable financial statements and omissions in the Complaint, Defendants cherry pick just three phrases out-of-context to try to recast their false statements of current and historical fact as "puffery." Def. Br. at 9. But "whether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also to the context. . . " *Rosen v. Textron*, 321 F.Supp.2d 308, 320 (D.R.I. 2004); *In re AT&T Corp. Sec. Litig.*, Civ. No. 00-5364, 2002 U.S. Dist. LEXIS 22219, at *69 (D.N.J. Jan. 28, 2002). In context, it is clear the statements are not inactionable puffing.[10]

### F.  The Complaint Adequately Alleges Scienter

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Celestica*, 455 Fed. Appx. at 12-13 (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)). A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324. The

---

[10] In contrast to the misstatements of historic and present fact here, the statements in *In re Nokia Oyj Sec. Litig.*, 423 F. Supp. 364, 398 (S.D.N.Y. 2006), expressed a management's hopes for the future. The misstatements here relate to BlackBerry's most anticipated product, whereas the statements in *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 465-66 (S.D.N.Y. 2000) and *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) were held inactionable because they were generalized statements that could apply to any product or company.

16

Court's role is to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323.

The Complaint details abundant facts supporting a strong inference of Defendants' scienter, including: Defendants admitted having access to (and actually accessing) data regarding returns of the 10 phones and customer satisfaction (¶49); Defendant Heins contemporaneously and vigorously denied a negative analyst report detailing the failed launch of the Z10s (¶49); the failed worldwide launch of the 10, which occurred three months prior to the start of the Class Period (¶¶16, 26, 42); the temporal proximity of Defendants' alleged misstatements with the revelation of the nearly $1 billion charge largely attributable to the Z10 (¶¶21, 51, 53); the sheer magnitude of that charge (¶21); the overwhelming pressure faced by Defendants Heins and Bidulka to resuscitate BlackBerry in the face of recent product failures and the Company's prior course of dealing of terminating senior management for product failures (¶25); Defendants' motive to retain their high-level positions with the Company and receive lucrative, concrete incentives tied directly to the success of the BlackBerry 10 (¶127-134); and the applicability of the core operations inference, which imputes knowledge to Heins and Bidulka (¶¶8, 111).

### 1. Defendants Knowingly or Recklessly Made False and Misleading Statements Concerning BlackBerry's Core Product

The Complaint establishes that the Z10, which accounted for approximately 40% of the total 6.8 million BlackBerry smartphones shipped during the first quarter of 2014, *see* ¶111, was of critical importance to the survival of BlackBerry. *See* ¶8. Thus, the core operations inference applies and the Court may impute knowledge of facts concerning these devices to Defendants Heins and Bidulka. *See Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 871 (S.D.N.Y. 2011) (The "core operations" inference allows courts to impute

knowledge of facts to "key officers" relating to the "core operations" of their company.); *see also In re Forest Labs. Sec. Litig.*, No. 05 Civ. 2827, 2006 U.S. Dist. LEXIS 97475, at *32 (S.D.N.Y. July 19, 2006). Here, that inference is particularly strong because the scheme to conceal the failure of the Z10 was pursued, in part, through improper recognition of revenues on the shipments of the devices that artificially inflated BlackBerry's financial results during the Class Period and lent credibility to Defendants' false statements about the product's success – almost all of which was reversed when the truth was revealed at the end of the Class Period and BlackBerry took an almost $1 billion charge primarily related to the 10 series smartphones. "[C]ourts have recognized that accounting manipulations involving premature revenue recognition . . . are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently,' but instead 'suggest a conscious decision to improperly recognize revenue.'" *In re Veeco Instru., Inc., Sec. Litig.*, 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006) (quoting *In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2005 U.S. Dist. LEXIS 41996 (E.D.N.Y. Sept. 19, 2005) (quotation omitted)).

The Complaint also alleges that Defendants repeatedly made statements regarding the purported success of the Z10 in the face of contradictory information. For example, numerous articles and analysts expressly contradicted Defendants' representations that the launch of the Z10 was a success, including a report cited in *THE WALL STREET JOURNAL'S* DIGITS blog on April 11, 2013, about a Detwiler Fenton analyst stating "[w]e believe key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are now exceeding sales, a phenomenon we have never seen before." ¶72; *see also* ¶¶16, 71, 73-76.[11] A day later, Defendant Heins vigorously denied the Detwiler Fenton report, claiming that

---

[11] An ITG analyst quoted in that same blog stated that the Z10 launch "started poorly and weakened significantly as the days passed." ¶72. The blog noted that the ITG analyst said that "initially the Z10's share of sales was 4% at Verizon stores and 7% at AT&T stores, but those numbers have fallen to about 1% to 2%." *Id.*

BlackBerry's data revealed "[s]ales of the BlackBerry® Z10 are meeting expectations," that "[r]eturn rate statistics show that we are at or below our forecasts and right in line with the industry," and that "[t]o suggest otherwise is either a gross misreading of the data or a willful manipulation." ¶49. The fact that Defendant Heins took the unusual step of flatly denying the Detwiler Fenton report in statements evincing certitude strongly supports the inference that Heins acted with scienter. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 269-71 (3d Cir. 2009) (finding the "most powerful evidence of scienter" was a defendant CFO "flatly den[ying] in statements evincing certitude" specific and repeated questions about "whether the company's pricing has held steady despite the competitiveness of the market").

The Complaint further alleges that Defendants knew or recklessly disregarded that the Company's Class Period statements misrepresented BlackBerry's ability to collect the sales prices of the Z10 by reporting revenues on the product's shipments because the Z10 had already launched in other countries without success months before its U.S. debut, and carriers in those countries were already offering steep discounts to try to move the phones off their shelves. *See* ¶¶16, 26, 42. Because Defendant Heins admitted that BlackBerry had access to data — and did access that data — from its "retail and carrier partners" that revealed information such as return rate statistics and customer satisfaction for the BlackBerry Z10, *see* ¶49, there can be no doubt that Defendants knew or recklessly disregarded the negative information that Heins conceded he had, but which was inconsistent with Defendants' statements regarding the Z10's success.[12]

---

[12] Defendants cite *Rombach v. Chang*, 355 F.3d 164, 176-77 (2d Cir. 2004), for their argument that because BlackBerry preannounced — by a single week — the nearly $1 billion charge, plaintiff's scienter allegations are "weakened." Def. Br. at 23. But in *Rombach*, "the company revealed problems . . . *well in advance of the deadline* for filing its 1998 Form 10-K." 355 F.3d at 176-77. (emphasis added). The authority cited to in *Rombach* for that very proposition, *In re Nokia Corp. Sec. Litig.*, No. 96-CIV-3752, 1998 U.S. Dist. LEXIS 4100, at *38) (S.D.N.Y. Mar. 31, 1998), held that preannouncing financial problems by *8 to 10 weeks* undercut the allegation that defendants acted recklessly. BlackBerry's one-week preannouncement does not undermine scienter.

## 2. The Temporal Proximity of Defendants' Statements with the Revelation of the Truth and the Sheer Magnitude of the Charge Support Scienter

On August 12, 2013, approximately one month before BlackBerry announced it would report a charge of approximately $930 million to $960 million — primarily attributable to Z10s — Defendant Heins stated that "[w]e continue to see compelling long-term opportunities for BlackBerry 10, [and] we have exceptional technology *that customers are embracing*." ¶53. Similarly, just six weeks prior to that statement, Defendant Heins assured the market on June 28, 2013, that the 10s "have been well received." ¶51. Under the facts alleged, it is inconceivable that just one and three months prior to the announcement of an almost $1 billion charge primarily related to the Z10, Defendants Heins and Bidulka did not know or did not recklessly disregard that the product was not selling, that inventory was piling up, that there were significant customer returns, and that significant price cutting was well underway and more would be needed. Thus, the "temporal proximity" between Defendants' misstatements and the revelation of the truth contributes to a strong inference of scienter. *See Avaya,* 564 F.3d at 271 (finding the "temporal proximity" of defendants' denials with the revelation of the truth supports the inference of scienter); *see also Berson v. Applied Signal Tech.*, Inc., 527 F.3d 982, 988 n.5 (9th Cir. 2008) (finding temporal proximity can "bolster" the inference of scienter); *In re Grand Casinos, Secs. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) (proximity of six months supported inference of scienter); *Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir.1995) (proximity of two and one-half months was circumstantial evidence of scienter).[13]

Moreover, an accounting charge of this type and magnitude does not develop overnight. *See In re Grand Casinos, Secs. Litig.*, 988 F. Supp. at 1283; *see also South Ferry LP v. Killinger*,

---

[13] The first misstatement was made on March 28, 2013, which was about three months after the worldwide launch in January of 2013 and just six months before BlackBerry announced the nearly $1 billion charge on September 20, 2013. ¶¶15, 21, 41. Plaintiffs point to the June 28 and August 12 statements as the strongest examples of proximity supporting the inference of scienter.

542 F.3d 776, 784 (9th Cir. 2008) ("[F]ederal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."). The size of the charge, which Defendants conceded was primarily attributable to the Z10, bolsters the inference that Defendants Heins and Bidulka knew or recklessly disregarded the fact that the Company's statements regarding the Z10's success were materially false and misleading. *See In re Scholastic,* 252 F.3d at 73 (finding that the size of a charge taken after the class period supported the inference that it did not develop "only in that month, but throughout the class period."); *Rothman*, 220 F.3d at 92 ("[W]e deem significant [for the scienter analysis] the amount of the write-off GT eventually did take for the final quarter of 1997."); *see also Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121, 2013 U.S. Dist. LEXIS 135149, at *16 (S.D.N.Y. Sept. 19, 2013) ("[T]he magnitude of the [$500 million] error is further supportive of defendants' scienter with respect to their prior statements."); *In re Number Nine Visual Tech. Corp. Secs. Litig.*, 51 F. Supp. 2d 1, 16 (D. Mass. 1999) ("[A] $ 1.2 billion restructuring charge is of such magnitude and consequence that its necessity develops and should be recognized by management over a much longer horizon. Therefore, it is not unreasonable to infer that management knew of impending restructuring necessities some four months before their announcement.").

### 3.   Defendants Faced Overwhelming Pressure to Resuscitate BlackBerry

The Complaint alleges Defendants Heins and Bidulka faced overwhelming pressure to bring BlackBerry back from the edge of oblivion via the 10 line, knowing full well the failure of prior key product launches directly led to the dismissals of their immediate predecessors, co-CEOs Mike Lazaridis and Jim Balsillie. *See* ¶¶25, 133. When Defendants Heins and Bidulka could no longer hide the failure of the 10s, they were promptly forced to step down. ¶¶127-134.

21

The Complaint alleges that by misrepresenting the purported success of the 10s and BlackBerry's overall financial performance, Defendants Heins and Bidulka were able to retain their high-level positions longer and personally reap lucrative, concrete monetary benefits tied directly to the illusory success of the 10s. *See* ¶128; *see Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 170 (2d Cir. 2000) ("Motive 'entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'"); *In re Telxon Corp. Sec. Litig.*, No. 5:98-2876, 2000 U.S. Dist. LEXIS 20192, at *53-*54 (N.D. Ohio Sept. 29, 2000) ("[T]he Court cannot ignore the fact that Telxon and its officers were in a very difficult position, facing unusual pressures to perform during the class period, and stood to benefit substantially from a performance record which matched the healthy ones Brick continually projected to the public.").

Ignoring the specific facts alleged, Defendants complain that saving one's job is a generic motive possessed by all corporate insiders. Def. Br. at 21-22. But where a company has a history of terminating executives for similar failures as the one faced by Defendants Heins and Bidulka, courts have held that such facts give rise to a cognizable motive. The Complaint alleges Defendants Heins and Bidulka were fighting for the very survival of their careers, their reputations, and the Company, all the while under the unforgiving microscope of the outside world and under the pressure of a prior pattern of product failure and management terminations. In *Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003), shortly before defendants took the reins, Novell had fired its previous executive for failing to improve the company's revenue, and defendant Marengi was eventually fired for the same reason. The court concluded that "[w]hile the desire to protect one's own position is shared by all company executives, the defendants in the instant case had especial cause to think that they would lose their jobs if they failed to

produce results, given the recent termination of Frankenberg." *Id.* at 1191; *see also In re Cabletron Sys.*, 311 F.3d 11, 39 (1st Cir. 2002) ("[I]t appears that Levine, a cofounder of the company, was forced out of management as the magnitude of Cabletron's problems began to come to light, thus confirming that these motivating fears were realistic. This is more than the usual concern by executives to improve financial results; the executives' careers and the very survival of the company were on the line."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("What makes this case different are the inferences that corporate officers understood . . . that the success of the new products, and of taking the old line company into a new world, was important to their own survival and that of the company."). Therefore, the Complaint's motive allegations strongly support the inference of scienter.[14]

### 4. The Inference of Culpable Conduct Is At Least as Compelling as any Alternative Non-Culpable Inference

Considering all the foregoing allegations holistically, the culpable explanation of Defendants' allegedly false and misleading statements regarding the purported success of the Z10 is at least as compelling as any nonculpable alternatives. *See Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 620 n.14 (S.D.N.Y. 2008) ("[Under *Tellabs*,] if an inference of non fraudulent intent is equally permissible as any inference of fraudulent intent, the complaint is properly pleaded."). In fact, the only nonculpable alternative put forth by Defendants is the flimsy excuse that "statements by BlackBerry management reflected sincere optimism about BlackBerry 10." Def. Br. at 23. But that inference cannot stand up in the face of particularized allegations of Defendants' knowledge or reckless disregard of facts known to them when they made those admittedly optimistic statements that severely undermined any such optimism.

---

[14] Defendants argue that because Mr. Heins and Mr. Bidulka did not sell any shares during the Class Period, the inference of scienter is undermined. Def. Br. at 21. The Supreme Court has rejected that contention. *Tellabs*, 551 U.S. at 325 (rejecting the argument scienter was negated because the plaintiff "did not allege that [the defendant] sold any shares during the class period").

Indeed, even if Defendants believed they could reverse the failure of the Z10s, as the Seventh Circuit explained, "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

### G.    Plaintiffs Have Adequately Pleaded Loss Causation

Despite the precipitous 17% drop of BlackBerry stock immediately after Defendants revealed the true, previously concealed adverse facts about BlackBerry's 10 line and its severe adverse impact on BlackBerry's financial results and condition, Defendants absurdly argue Plaintiffs cannot plead loss causation because the September 20, 2013 press release "did not reveal the falsity of any alleged misstatement in previous financial filings." Def. Br. at 24.

Contrary to Defendants' myopic view, "[n]o court addressing the loss causation pleading standard requires "a corrective disclosure be a '"mirror image" tantamount to a confession of fraud.'" *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013) (quotation omitted). To allege loss causation, Plaintiffs need only allege a "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Brodo*, 544 U.S. 336, 342 (2005). In the Second Circuit, loss causation, which is governed by Rule 8 notice pleading, *see Wallace v. Intralinks*, No. 11 CV 8861, 2013 U.S. Dist. LEXIS 65958, at *26 (S.D.N.Y. May 8, 2013) (citing *Dura Pharms.*, 544 U.S. at 346-47), is adequately pleaded "by alleging that 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-233 (2d Cir. 2014). Under the materialization of the risk theory, proximate cause is shown where

"the risk that caused the loss was within the zone of risk concealed by the [] omissions alleged." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-73 (2d Cir. 2005). The Complaint meets this requirement by alleging that beginning on March 28, 2013, BlackBerry's stock price was inflated during the Class Period by Defendants' misleading statements and omissions concerning the success of the 10 line and improper recognition of revenues from shipments of those smartphones. ¶¶1, 127. On September 20, 2013, Defendants' prior statements were revealed to be false when BlackBerry announced a $930-960 million charge "primarily attributable to BlackBerry Z10 devices." ¶110. BlackBerry stock immediately plummeted, on heavy volume,[15] from a closing price of $10.52 per share on September 19, 2013 to $8.73 per share at close on September 20, 2013, after an intra-day low of $8.19. ¶128. Thus, the Complaint adequately alleges loss causation. *See, e.g., In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273-74 (S.D.N.Y. 2010).[16]

### H.  The Complaint Adequately Pleads Control Person Liability

Plaintiffs have adequately pleaded the primary §10(b) claims, and thus, secondary liability under §20(a) is also adequately pleaded.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

---

[15] The immediate 17% stock drop on high volume after the September 20 announcement strongly supports the adequacy of Plaintiffs' allegations of causation. ¶128. *See, e.g., Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 203 (S.D.N.Y. 2010) (citing cases); *see also Lewy*, 2012 U.S. Dist. LEXIS 128416 at *49-51.

[16] Defendants' argument that the Company did not conceal the risk of BlackBerry concessions or a charge (Def. Br. at 24) is contradicted by the Complaint and discredited by the surprised response of the market and resulting massive drop in stock price. *See In re Ambac*, 693 F. Supp. 2d at 273.

Dated: September 5, 2014                    Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

  /s/ Kim E. Miller
Kim E. Miller
Bruce W. Dona
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
J. Ryan Lopatka
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiffs and the
Class*


**BROWER PIVEN**
 A Professional Corporation
David A.P. Brower
Richard H. Weiss
475 Park Avenue South, 33rd Floor
New York, NY 10016
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

*Counsel for Additional Plaintiffs Yong M.
Cho and Batuhan Ulug and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this opposition brief was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on September 5, 2014.

 /s/ Kim E. Miller
Kim E. Miller