UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------x
                                             :
MARVIN PEARLSTEIN, Individually and          :
on Behalf of All Others Similarly            :
Situated,                                    :
                                             :
                         Plaintiff,          :      13-CV-7060 (TPG)
                                             :
           – against –                       :      OPINION
                                             :
BLACKBERRY LIMITED, et al.,                  :
                                             :
                         Defendants.         :
                                             :
---------------------------------------------x
```

Plaintiffs bring this action against mobile technology manufacturer BlackBerry Limited and its former officers for securities fraud relating to the release of defendants' new BlackBerry 10 operating system and series of smartphones. Plaintiffs allege that defendants attempted to conceal the poor performance of the BlackBerry 10 devices in order to artificially inflate the company's stock price. Defendants move to dismiss the Consolidated Amended Class Action Complaint ("the complaint" or "CAC"). Defendants' motion to dismiss is granted because plaintiffs have failed to plausibly allege that defendants made misrepresentations or omissions of material fact, and have failed to show that defendants acted with scienter.

Factual Allegations

Plaintiffs purchased BlackBerry Limited stock between March 28, 2013 and September 20, 2013 (the "Class Period"). CAC ¶ 1. BlackBerry Limited, formerly Research in Motion Limited, was at one point a leading

smartphone manufacturer. CAC ¶ 3. It was one of the first companies to release a mobile device integrating electronic mail and messenger capabilities. CAC ¶ 3. From 2002 through 2007, BlackBerry came to dominate the smartphone market in the United States, accounting for one-third of all smart devices sold. CAC ¶ 4. In 2007, however, competing technology company Apple Inc. introduced the first iPhone, a smartphone offering a fully internet-capable browser. CAC ¶ 5. Over the next several years, BlackBerry lost market share to Apple Inc. and other companies offering technologically superior products. CAC ¶ 5. In an effort to reverse its decline in the smartphone market, BlackBerry began to develop a new series of smartphones running a new operating system, BlackBerry 10. CAC ¶ 8. The BlackBerry Z10 would be an all-touchscreen device, and the Q10 would have a physical keyboard. BlackBerry put all of its resources into the new BlackBerry 10 devices, counting on them to reverse the company's losses and bring a return to profitability. CAC ¶¶ 9–13.

In January of 2013, BlackBerry debuted the new Z10 smartphone in some foreign markets. CAC ¶¶ 15–16. Soon after the debut, a number of foreign news media outlets began reporting that the phone was being sold at a discount in response to poor sales. CAC ¶ 16. BlackBerry released its Z10 smartphones in the United States on March 28, 2013. CAC ¶ 54. That date marks the beginning of the Class Period, which ran until September 20, 2013. CAC ¶ 1. The Z10's domestic performance was poor, leading the devices to be sold at a discount. CAC ¶¶ 19–22. Nevertheless,

defendants made a number of positive statements about the devices in their public filings, press releases, and earnings calls. CAC ¶¶ 41–119. The Class Period ended on September 20, 2013, when BlackBerry issued a press release stating that it expected to report a charge against inventory of approximately $930 million, attributable to the Z10 devices. CAC ¶ 116. BlackBerry's stock price fell from $10.52 per share to $8.01 per share by the end of September. CAC ¶ 117.

Plaintiffs allege that during the Class Period defendants made a number of misrepresentations to conceal the poor performance of the BlackBerry 10 smartphones. See CAC ¶¶ 16–19. Plaintiffs further allege that defendants: (1) violated generally accepted accounting principles ("GAAP"); and (2) failed to disclose to the SEC that BlackBerry devices, although shipped, were not being sold through to end customers. CAC ¶ 66, 109. Plaintiffs claim that defendants took these actions, either knowingly or recklessly, in order to "return the Company as a meaningful competitor in the mobile arena" and to ensure that corporate officers would continue in their employment and receive performance-based compensation. CAC ¶¶ 125, 128–132. These actions purportedly increased BlackBerry's stock price and led market analysts to overstate the company's value, causing plaintiffs and other investors to purchase the stocks at inflated prices. CAC ¶¶ 140, 146. Plaintiffs allege that BlackBerry's share price fell once the truth of defendants' fraud came to light, causing them economic losses. CAC ¶ 138.

**A. Defendants' Alleged Misrepresentations and Omissions**.

Plaintiffs allege that during the Class Period defendants issued press releases, made public statements, and filed financial reports misrepresenting the true performance of the BlackBerry 10 devices. These alleged misrepresentations occurred on four dates in the spring and summer of 2013.

**1. The March 28, 2013 Financial Form, Press Release, and Earnings Call.**

March 28, 2013 plays a central role in the events described in the complaint. On that date, BlackBerry filed its annual report on Form 40-F with the SEC for the 2013 fiscal year. CAC ¶ 41. BlackBerry also issued a press release describing the previous year's performance. CAC ¶¶ 43. Finally, defendant Thorstein Heins ("Heins"), then president and CEO of BlackBerry, participated in an earnings call to discuss the 2013 fiscal year. CAC ¶ 45.

BlackBerry's 40-F annual report described the company's revenue recognition strategy, stating that "The Company recognizes revenue when it is realized or realizable and earned." CAC ¶ 67. The report also stated, "Successfully transitioning to BlackBerry 10, the Company's next generation BlackBerry platform . . . the launch of BlackBerry 10 in January 2013 marked the beginning of the organization's transition to becoming a leading mobile computing organization." CAC ¶ 41. Finally, the form disclosed that BlackBerry held $603 million in inventory after

"including the determination of obsolete or excess inventory . . . ." CAC ¶ 91.

The March 28, 2013 press release announced BlackBerry's fourth quarter and year-end results for the 2013 fiscal year. The press release quoted Heins as saying, "We have implemented numerous changes at BlackBerry over the past year and those changes have resulted in the Company returning to profitability in the fourth quarter." CAC ¶ 43. In regard to the BlackBerry 10 devices, Heins said: "Customers love the device and the user experience and our teams . . . are now focused on getting those devices into the hands of . . . customers." CAC ¶ 43. The press release also announced revenues from the fourth quarter of $2.7 billion, with 61% of those revenues coming from hardware. CAC ¶ 79.

Finally, defendant Heins participated in an earnings call discussing BlackBerry's performance in the previous fiscal year. CAC ¶ 45. Heins said: "The initial early global demand for the [BlackBerry] 10 has been better than anticipated, and our recent announcement of the largest single purchase order in our history, for 1 million units, is also indicative of a strong initial support and demand." CAC ¶ 45.

### 2. The April 12, 2013 Press Release.

On April 11, 2013, a Wall Street Journal blog reported that, according to research and investment firm Detwiler Fenton, customer returns of the BlackBerry Z10 were outnumbering sales, "a phenomenon we have never seen before." CAC ¶ 48. BlackBerry responded to this blog

posting by issuing a "strongly-worded press release." CAC ¶ 49. The press release quoted defendant Heins as saying "sales of the BlackBerry Z10 are meeting expectations and the data we have collected . . . demonstrates that customers are satisfied with their devices . . . . Return rate statistics show that we are at or below our forecasts . . . ." CAC ¶ 49. The press release also called upon authorities in Canada and the United States to investigate the "materially false and misleading comments about device return rates." CAC ¶ 49.

### 3. The June 28, 2013 Financial Report, Press Release, and Earnings Call.

On June 28, 2013, BlackBerry filed is first quarter earnings release for the 2014 fiscal year. CAC ¶ 70. BlackBerry "disclosed that "[t]he smartphone market remains highly competitive, making it difficult to estimate units, revenue and levels of profitability." CAC ¶ 70. BlackBerry reported that "it had shipped 6.8 million smart phones of which approximately 40% or 2.7 million were BlackBerry 10 devices." CAC ¶ 77. The report went on to say that BlackBerry held $887 million in inventory after "including the determination of obsolete or excess inventory. CAC ¶ 93. It also reported an increase in gross margins of $256 million, which it attributed to "to higher average selling prices and related gross margins of BlackBerry 10 devices shipped." CAC ¶ 99.

The June 28, 2013 financial report was accompanied by a press release announcing BlackBerry's results in the first quarter. CAC ¶ 81. The press release described a 15% increase in revenues from the previous

quarter, and showed that 6.8 million BlackBerry smartphones had been shipped. CAC ¶ 81. The press release also disclosed that BlackBerry's gains were "partially offset by an increase in marketing expenditures and sales incentives to support the continued launch of BlackBerry 10 and a reduction in the recovery of income taxes." CAC ¶ 119.

Defendant Heins then held an earnings call regarding the BlackBerry 10 devices. CAC ¶ 51. Heins stated: "The BlackBerry Z10 has been an effective launch product to showcase the renewed and reengineered BlackBerry 10 experience to both consumers and enterprises. Let's remember, one year ago none of these products existed, and today they are just launching, and have been well-received, because of the performance and quality of BlackBerry 10. It has been very exciting and challenging for our teams, and we are looking forward to the next stage of our transition this year." CAC ¶ 51.

### 4. The August 12, 2013 Press Release.

On August 12, 2013, BlackBerry issued a press release regarding the BlackBerry 10. The press released stated, "We continue to see compelling long-term opportunities for BlackBerry 10, we have exceptional technology that customers are embracing, we have a strong balance sheet and we are pleased with the progress that has been made in our transition." CAC ¶ 53.

### B. Procedural History

This case is the consolidation of three separate actions.[1] The court consolidated the actions on March 25, 2014 and also appointed the lead plaintiffs and counsel. Dkt. # 36. Plaintiffs filed the Consolidated Amended Class Action Complaint on June 2, 2014. Dkt. # 42. Defendants moved to dismiss the CAC on July 29, 2014. Dkt. # 44.

Discussion

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead sufficient facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. Rather, the complaint must "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In deciding the motion, the court accepts as true all well-pleaded allegations contained in the complaint and draws all reasonable inferences in favor of the plaintiff. See Twombly, 550 U.S. at 555-56. However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

Securities fraud claims are subject to a heightened standard of pleading. Under Federal Rule of Civil Procedure 9(b), a party alleging fraud

---

[1] Pearlstein v. Blackberry Limited et al., No. 13-CV-7060; Kohanim v. Blackberry Limited et al.; No. 13-CV-7132; and Tran v. Blackberry Limited et al., No. 13-CV-7972

must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Where the claim is based on the defendant's alleged misstatements, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Moreover, the complaint must also satisfy the Private Securities Litigation Reform Act ("PSLRA") by, *inter alia*, "giving rise to a strong inference that the defendant acted with the required state of mind." Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 345 (2005). While the court is generally limited to the pleadings in deciding a motion to dismiss, in a securities fraud action it may consider the full text of documents partially quoted in the complaint. San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 808 (2d Cir. 1996).

## A. Plaintiffs' Claim Under Section 10(b) of the Securities Exchange Act.

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder prohibit the use of manipulative or deceptive practices in connection with the sale of securities. 15 U.S.C. § 78(j)(b). To state a claim for securities fraud, a plaintiff must plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission;

(5) economic loss; and (6) loss causation. <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta</u>, 552 U.S. 148, 157 (2008).

**1. Material Misrepresentations or Omissions.**

The first element of the securities fraud claim requires the plaintiff to plausibly allege that the defendant made a misrepresentation or omission of a material fact. <u>Id.</u> A misrepresentation is a false or misleading statement. <u>See, e.g.</u>, <u>Dura</u>, 544 U.S. at 341. An omission is the failure to state something needed in order for the truth to be told. <u>See</u> <u>Ironworkers Local 580–Joint Funds v. Linn Energy, LLC</u>, No. 13 CIV. 4875(CM), 2014 WL 3345028, at *23 (S.D.N.Y. July 8, 2014). "For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." <u>Resnik v. Swartz</u>, 303 F.3d 147, 154 (2d Cir. 2002). A misrepresentation or omission is material if "a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." <u>S.E.C. v. Mayhew</u>, 121 F.3d 44, 52 (2d Cir. 1997).

**a. Whether BlackBerry's Optimistic Statements Were Misrepresentations.**

Plaintiffs argue that defendants misrepresented material facts by making optimistic statements about the BlackBerry's 10's performance even though the devices were selling poorly. <u>See, e.g.</u>, CAC ¶¶ 41–42; Pls. Mem. L. Opp. Mot. Dismiss at 18.

Statements of positive corporate outlook are generally not actionable in a securities fraud action. Such statements are often considered mere puffery, because "people in charge of an enterprise are not required to take

a gloomy, fearful or defeatist view of the future." <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004). Moreover, the PSLRA provides safe harbor for certain "forward looking statements" that later prove false. 15 U.S.C. § 78u-5(c). The forward looking statement will qualify for safe harbor if it was:

> (i) identified as a forward-looking statement, and . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial, or . . . the plaintiff fails to prove that the forward-looking statement . . . if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading.

§ 78u-5(C)(1)(A)–(B). As indicated above, the court may determine that a forward looking statement was immaterial given the presence of adequate cautionary language. <u>See</u> <u>Heller v. Goldin Restructuring Fund, L.P.</u>, 590 F. Supp. 2d 603, 617 (S.D.N.Y. 2008).

Plaintiffs have failed to identify any material false or misleading statements by defendants. To be sure, BlackBerry sounded an optimistic note in March of 2013 when it announced its financial results for the previous fiscal year. BlackBerry's annual report to the SEC enthusiastically proclaimed that "the launch of BlackBerry 10 in January 2013 marked the beginning of the organization's transition to becoming a leading mobile computing organization." CAC ¶ 41. Moreover, the press release dated March 28, 2013 quoted defendant Heins as saying, "customers love the [BlackBerry 10] device and our teams . . . are now focused on getting those devices into the hands of consumers." CAC ¶ 43.

Heins made similar statements in the press release on August 12, 2013, saying "we continue to see compelling long-term opportunities for BlackBerry 10, we have exceptional technology that customers are embracing." CAC ¶ 53. Plaintiffs allege that these statements, and others like them, were false and misleading because, by the time they were made, defendants knew or should have known that "the BlackBerry 10s were not successful, and that the 10s would not return BlackBerry to being a leading mobile computing organization." CAC ¶ 42. The complaint alleges that defendants "disregarded facts available . . . that customers were not 'embracing' the 10's technology but shunning the product." CAC ¶ 54. It further alleges that defendants knew of the BlackBerry 10's poor performance because the company had been discounting the devices "in order to move stagnant inventory." CAC ¶ 119.

Defendants' statements of optimism fall far short of being actionable false or misleading misrepresentations. Even though media reports showed that the BlackBerry 10 devices were not selling well in foreign markets in early 2013, see CAC ¶¶ 16, 42–44, that fact does not contradict generally optimistic sentiments that the Z10 devices were being "embraced" by customers and marked a "transition" for the company. A poor selling device may still be embraced by customers and may still mark a transition for the company. The same is true even if, as plaintiffs allege, wireless carriers and BlackBerry itself were selling the devices at a discount. See CAC ¶¶ 16, 119. It is simply implausible to argue that

discounting Z10 prices is incompatible with an optimistic belief that the smartphones "have been well-received," CAC ¶ 51. Such a statement is not false in any sense creating liability. While the complaint succeeds in showing that defendants put a positive gloss on the company's performance, it fails to show how that gloss amounted to fraud. These statements were so optimistic, and so lacking in tangible detail, that they would be immaterial from a reasonable investor's standpoint. They were, at most, puffery.

Some of defendants' statements "looked forward" and indicated future performance, but they were accompanied by cautionary language qualifying them for safe harbor under the PLSRA. Indeed, in its annual report to the SEC BlackBerry was careful to identify its statements as "forward looking," and included five disclaimers expressly indicating that the company's business prospects could be harmed if the devices were not accepted by consumers. See CAC ¶70; see also Research in Motion Limited Annual Report, Dkt. #46-1 at 44–48, 60. Similarly, during the March 28, 2013 earnings call, BlackBerry's officers cautioned that the call contained forward looking statements which "reflect[ed] [its] current views . . . and [were] subject to risks and uncertainties" including "*intense competition*, and short product life cycles that characterize our industry." CAC ¶ 45; Ed. Tr. RIM Earnings Conf. Call Mar. 28, 2013, Ex. 46-9 at 3 (emphasis added). BlackBerry carefully prefaced each of its earnings calls during the Class Period with this language. See Ed. Tr. RIM Earnings Conf. Call June

28, 2103, Ex. 46-10 at 3. Thus, plaintiffs' forward looking statements qualify for safe harbor.

### b. Whether BlackBerry Made Material Misrepresentations or Omissions Through its Accounting Practices.

Plaintiffs allege that BlackBerry made material misrepresentations or omissions by engaging in manipulative accounting practices to overstate the company's performance during the Class Period. They identify four allegedly deceptive accounting practices. First, they allege that BlackBerry misstated its revenue recognition policy in reports to the SEC and improperly recorded revenues from the Z10 devices upon shipment rather than on sale to the customer. See CAC ¶¶ 66–70. Second, they argue that BlackBerry improperly delayed in taking a charge against income to account for the decreased value of its Z10 inventory. CAC ¶¶ 83–95. Third, plaintiffs allege that BlackBerry failed to a record a charge against its income to reflect the fact that its supply commitments during the Class Period outstripped demand for the Z10 devices. CAC ¶ 96. Fourth, plaintiffs allege that defendants failed to disclose under SEC item 303 a "known trend . . . expected to have a material unfavorable impact on revenues." CAC ¶ 107.

Recognition of revenue refers to the moment when a company "recognizes," or takes accounting notice of, moneys it has earned or expects to earn. BlackBerry's annual report to the SEC, dated March 28, 2013, described the company's revenue recognition policy in the following manner:

> The Company recognizes revenue when it is realized or realizable and earned. The Company considers revenue realized or realizable and earned when it has persuasive evidence of an arrangement, the product has been delivered or the services have been provided to the customer, the sales price is fixed or determinable and collection is reasonably assured. In addition to this general policy, the following paragraphs describe the specific revenue recognition policies for each of the Company's major categories of revenue.

CAC ¶ 67. With regard to recognition of revenue from hardware, BlackBerry represented that:

> "Revenue from the sale of BlackBerry wireless hardware products . . . is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the sale price is fixed or determinable, and collection is probable. Product is considered delivered to the customer once it has been shipped."

CAC ¶ 67. These revenue recognition policies mirror generally accepted accounting principles. See CAC ¶ 68 (describing GAAP for recognition of revenues).

Plaintiffs argue that the policies quoted above were false or misleading because BlackBerry's actual practice was to recognize hardware revenues as early as possible in order to overstate the Z10's launch performance. See CAC ¶ 70. This is not a plausible theory given the facts alleged. The complaint shows that BlackBerry recognized revenue from the Z10 devices both in the fourth quarter of fiscal year 2013 and the first quarter of fiscal year 2014. CAC ¶¶ 110–111. But plaintiffs do not allege violation of the essence of the hardware recognition policy. Plaintiffs do not allege that defendants lacked "persuasive evidence" of hardware

arrangements, or that the Z10 devices were not delivered, or that collection was improbable.

Rather, plaintiffs allege that defendants could not have considered the sales price of the Z10 devices "fixed and determinable" given that: (1) retailers in foreign markets were experiencing lackluster sales of the devices; CAC ¶71; (2) customer returns of the devices were high; CAC ¶ 72; (3) the BlackBerry 10 was a novel product; CAC ¶ 74; and (4) BlackBerry could not predict future price concessions. CAC ¶ 74.

In hindsight, it can be argued that prices of the Z10 devices were not in fact "fixed" when defendants recognized Z10 revenues. However, plaintiffs have not shown that defendants' choice to recognize revenue was impermissibly false or misleading at the time that recognition occurred. Accounting choices may prove wrong in hindsight because they involve subjective judgments. Thus, to sufficiently plead the actionable falsity of subjective accounting choices the plaintiff must plausibly show that defendants did not believe in those choices when made. Fait v. Regions Fin. Corp., 655 F.3d 105, 112 (2d Cir. 2011). Here, as far as timing is concerned, defendants could have waited until the devices were sold to customers to recognize revenue. However, as the complaint shows, GAAP allows for the early recognition of revenue. CAC ¶ 68. Defendants chose this early option, recognizing revenues from the Z10 devices on March 28, 2013 and June 28, 2013. CAC ¶¶ 99, 110–111.

Of course, recognizing Z10 revenues implied that defendants had real confidence in the delivery numbers of the Z10 devices. Among other things, it meant that defendants believed that the sales price for the devices was "fixed or determinable." CAC ¶ 67. Plaintiffs have alleged a number of facts showing that the sales price of the Z10 devices was not "fixed," but was in flux as the result of price concessions and other factors. CAC ¶¶ 71–74. But this merely shows, in hindsight, that the sales price was actually indeterminate. It does not plausibly show that defendants' *subjective* assessment of determinability was false or misleading at the time—in essence, that defendants did not believe in their own accounting judgments. Plaintiffs' after-the-fact theory of what constitutes a misleading statement would require more of defendants than truthfulness. It would require infallibility. This is not a standard that the securities laws impose.

The same is true of defendants' failure to take a timely charge against income to reflect a deterioration in the value of Z10 inventory. See CAC ¶ 83. In its March 28, 2013 report to the SEC, BlackBerry described its inventory accounting policy in the following manner.

> The Company's policy for the valuation of inventory, including the determination of obsolete or excess inventory, requires management to estimate the future demand for the Company's products within specific time horizons. Inventory purchases and purchase commitments are based upon such forecasts of future demand and scheduled rollout of new products. The business environment in which the Company operates is subject to rapid changes in technology and customer demand. The Company performs an assessment of inventory during each reporting period, which includes a review of, among other factors, demand requirements, component part purchase commitments of the Company and

certain key suppliers, product life cycle and development plans, component cost trends, product pricing and quality issues. If customer demand subsequently differs from the Company's forecasts, requirements for inventory write-offs that differ from the Company's estimates could become necessary. If *management believes* that demand no longer allows the Company to sell inventories above cost or at all, such inventory is written down to net realizable value or excess inventory is written off.

CAC ¶ 89 (emphasis added). The report also showed that BlackBerry "held $603 million in inventory, after 'including the determination of obsolete or excess inventory . . . ." CAC ¶ 91.

Plaintiffs have failed to allege facts showing that these statements, and others like them, were false or misleading. BlackBerry's policy provided that inventory would be written down "if management believes" that demand (or lack thereof) no longer allowed smartphones to be sold above cost. CAC ¶ 89. Thus, in order to allege a misrepresentation or omission, plaintiffs must plausibly show that BlackBerry management *believed* that a write-down was necessary during the Class Period but omitted to do so. Plaintiffs point to a number of sources showing that the "Z10 U.S. Launch [was] a 'Big Disappointment," CAC ¶ 90, and that as a result, carriers were selling the devices at a discount to clear out high levels of inventory. CAC ¶ 92. But this does nothing to show whether defendants' believed a write down was necessary. While plaintiffs assert that defendants should have taken a charge to income in March or June of 2013, rather than September of 2013, CAC ¶¶ 91–93, this merely substitutes their judgment, gained with the benefit of hindsight, for that

of defendants. Moreover, plaintiffs have failed to allege what the *costs* of the Z10 devices actually were, and thus have failed to plausibly show that the devices were being sold *below cost* warranting a write-down at all. See CAC ¶¶ 54, 66, 95 (stating in a conclusory manner that devices were being sold below cost, but failing to allege what the costs actually were). Given these deficiencies, plaintiffs have not shown that defendants' failure to record a charge against inventory during the Class Period was a misrepresentation or omission.

The same is true of defendants' failure to record a charge for supply commitments. In its March 28, 2013 report to the SEC, BlackBerry reported a decrease in gross margins from 2012. CAC ¶ 98. In June of 2013, BlackBerry showed an increase in gross margins of $256 million, which it stated "was primarily attributable to higher average selling prices and related gross margins of BlackBerry 10 devices shipped." CAC ¶ 99. Plaintiffs allege that these statements were false because BlackBerry's supply commitments for Z10 devices were larger than demand for the devices during the Class Period, and that if BlackBerry had properly recorded a charge for supply commitments it would have reported much lower gross margins in March and June. CAC ¶ 100. While the court accepts this inference as true, it does nothing to show that defendants' failure to record the charge before September of 2013 was false or misleading, as opposed to simply ill-advised. Again, it is insufficient to argue, in hindsight, that defendants made poor accounting choices.

Rather, plaintiffs must allege facts showing, in a particularized manner, that it was *false* or *misleading* to do so. They fail to carry that burden here.

Finally, plaintiffs argue that BlackBerry made a material omission by failing to comply with SEC Item 303, which requires a company to "describe any known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on net sales or revenues. . . ." CAC ¶ 107 (citing 17 C.F.R. § 229.303). Plaintiffs allege that defendants failed to disclose downward trends including a significant increase in the rate of smartphone returns, low sell-through of Z10 devices, and costly price concessions to retailers. CAC ¶¶ 109–112. This argument is without merit. Defendant BlackBerry Limited is a Canadian entity, CAC ¶ 36, and it is doubtful that SEC Item 303 of Regulation S-K applies to foreign private issuers at all. In re Top Tankers, Inc. Sec. Litig., 528 F. Supp. 2d 408, 416 (S.D.N.Y. 2007) ("Top Tankers is a foreign private issuer, and foreign private issuers are not subject to SEC Regulation S-K . . . ."). Because omissions are not actionable absent a legal duty to disclose, Resnik, 303 F.3d at 154, defendants' failure to comply with Item 303 is insufficient to allege securities fraud.

Even if Item 303 does apply, it is implausible to allege that there was a recognizable trend regarding the Z10 devices in early 2013. The Z10 devices were launched in foreign markets in January of 2013. CAC ¶ 15. They were released domestically in March of 2013. CAC ¶ 54. Defendants made public filings at the end of March and June 2013. CAC ¶¶ 41, 70.

The two- and five-month periods preceding defendants' public filings were insufficient to establish a reportable trend in device performance given the pleaded volatility of the smartphone market. <u>See, e.g.</u>, CAC ¶ 70. Even inferring in plaintiffs' favor that the longer five-month period could constitute a trend, the complaint merely alleges, in a conclusory fashion, that defendants had knowledge of this trend. CAC ¶ 114. It does not plausibly allege facts actually attributing knowledge of the trend to them. Thus, plaintiffs have failed to state an actionable omission given the dubious applicability of Item 303 to defendants and the short periods alleged in the complaint.

Plaintiffs' securities fraud claim fails because they have not plausibly alleged that defendants made misrepresentations or omissions of material fact. This is true before any consideration of scienter. But the court will now consider this element of the securities fraud claim.

**2. Scienter.**

The second element of a securities fraud claim requires the plaintiff to plead facts giving rise to a "strong inference" that the defendant acted with an intent to deceive, manipulate or defraud, or that the defendant acted with a conscious and reckless disregard for the truth. 15 U.S.C. § 78u–4(b)(2); <u>S. Cherry St., LLC v. Hennessee Grp. LLC</u>, 573 F.3d 98, 108 (2d Cir. 2009). "To qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007)).

Scienter may be established by showing that defendants had a motive and opportunity to defraud, meaning they "(1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." S. Cherry St, 573 F.3d at 110. However, it in insufficient to allege motivations "possessed by virtually all corporate insiders, such as . . . the desire to maintain a high stock price in order to increase executive compensation." Id. at 109.

A plaintiff may also plead scienter by making a strong showing that defendants acted with reckless disregard for the truth. Id. (collecting cases). This means showing "conscious recklessness–*i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence.*" Id. (emphasis in original). Thus, for recklessness to amount to scienter, the defendant's conduct must represent "an extreme departure from the standards of ordinary care to the extent that the danger was either known . . . or so obvious that the defendant must have been aware of it." Id.

The complaint alleges that defendants acted both intentionally and recklessly. Plaintiffs allege that defendants intentionally misrepresented

- 22 -

the performance of the BlackBerry 10 devices in order to save the company from "a life or death situation" and "return [it] to a meaningful competitor in the mobile arena." CAC ¶ 125. Moreover, they claim that BlackBerry's corporate officers, defendants Heins and Chief Financial Officer Bidulka, were motivated to commit fraud in order to "retain their lucrative, high-level positions with the Company" and to qualify for performance based executive compensation. CAC ¶¶ 128–132. Plaintiffs claim that this intent is clear from defendants' accounting "manipulations." CAC ¶ 24. They assert that even if defendants' conduct was not intentional, it was reckless in that defendants repeatedly announced confidence in the BlackBerry 10's sales performance despite clear indications that sales of the devices were not meeting expectations. CAC ¶ 49.

These allegations are insufficient to raise a strong inference of scienter. To the extent the complaint alleges that defendants were motivated by a desire to return the company to profitability and to retain their lucrative positions and executive bonuses, CAC ¶¶ 128–132, these are motives possessed by most if not all corporate directors and insufficient to state a claim for securities fraud. See Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs have not alleged any *impermissible* pecuniary motive, such as a desire to engage in insider trading, that would indicate an intent to defraud. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 310 (2007) (noting that while the absence of a

pecuniary motive is not alone fatal to a securities fraud claim, "personal financial gain may weigh heavily in favor of a scienter inference.").

To the extent plaintiffs allege scienter based on recklessness, they have failed to plausibly show that defendants acted with *conscious recklessness*, or a culpable state of mind approaching actual intent. S. Cherry St, 573 F.3d at 110.

The complaint alleges that on April 11, 2013, the Wall Street Journal Digits blog reported that investment firm Detwiler Fenton had concluded that customer returns of the Z10 devices were outnumbering sales. CAC ¶ 48. Defendants responded to this blog posting by issuing a press release stating: "Sales of the BlackBerry® Z10 are meeting expectations and that data we have collected from our retail and carrier partners demonstrates that customers are satisfied . . . . Return rate statistics show that we are at or below our forecasts and right in line with the industry." CAC ¶ 49.

The April 11th blog posting is insufficient to raise an inference of scienter based on recklessness. While the blog posting and the existence of external media reports showing tepid Z10 sales should have concerned defendants, see CAC ¶¶ 16, 49, their failure to credit and internalize those reports does not demonstrate a culpable state of mind approaching an intent to defraud. Nor does defendants' vigor in denying the blog posting indicate an intent to defraud. As discussed, securities fraud actions require plaintiffs to raise an inference of scienter at least as compelling as opposing inferences of non-fraudulent intent. ECA, 553 F.3d at 198. While

the court could read defendants' denial of the veracity of the blog posting as evidence of some fraudulent motive to return the company to profitability by concealing the poor public response to the Z10, a more compelling inference can be drawn that defendants had sincere confidence in the accuracy of their internal metrics showing that sales of the devices were meeting forecasts. See CAC ¶ 49.

Plaintiffs suggest that since the Z10 was a "core product," defendants Heins and Bidulka should have known the devices were performing poorly and refrained from issuing positive statements about them during the Class Period. Id. at 17–18. This argument invokes the positions-based inference and core operations inference, which impute knowledge of a corporation's workings to officers based on the officers' high position in the company or the critical nature of the operation at issue. See Shemian v. Research In Motion Ltd., No. 11 CIV. 4068(RJS), 2013 WL 1285779, at *17 (S.D.N.Y. Mar. 29, 2013) aff'd, 570 F. App'x 32 (2d Cir. 2014). However, these inferences are insufficient of themselves to establish scienter, because "it is well established that accusations founded on nothing more than a defendant's corporate position are entitled to no weight" since "legal obligations do not establish that the Individual Defendants were actually privy to, or failed to monitor, specific statements or reports contradicting their public statements." Id. (internal markers and citations omitted). Here, the complaint is devoid of facts showing that defendants were aware of specific information contradicting their

optimistic statements and is thus insufficient to show those statements were reckless.

Finally, plaintiffs argue that scienter can be inferred from the close temporal proximity between defendants' positive statements in August of 2013 and their recording of a sizable charge against inventory in September of 2013. Pls.' Mem. Opp. Mot. Dismiss at 20. But this is too ephemeral a connection to raise a strong inference of scienter. Indeed, courts in this district have held that "temporal proximity alone does *not* raise a circumstantial inference of fraud." Fant v. Perelman, No. 97 CIV. 8435 (LAP), 1999 WL 199078, at *13 (S.D.N.Y. Apr. 9, 1999). Rather, plaintiffs must "*specifically allege* defendants' knowledge of facts or access to information contradicting their public statements." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001). Because the complaint fails to specifically allege such knowledge, it fails to give rise to an inference of conscious recklessness.

Since plaintiffs have failed to adequately plead the first and second elements of their securities fraud claim, the court need not address the sufficiency of the remaining four elements thereof. Plaintiff's claim under Section 10(b) of the Securities Exchange Act is dismissed.

**B. Plaintiffs' Claim Under Section 20(a) of the Securities Exchange Act.**

Section 20(a) of the Securities Exchange Act allows for joint and several liability against persons shown to have controlled an entity that has committed securities fraud. See 15 U.S.C. 78t(a). However there must

be a primary underlying violation of Section 10(b) for Section 20(a) to apply. See Shemian, 2013 WL 1285779, at *24. Since plaintiffs have failed to adequately plead a primary violation of Section 10(b), their Section 20(a) claim is also dismissed.

<u>Conclusion</u>

For the above stated reasons, defendants' motion to dismiss the Consolidated Amended Class Action Complaint is granted.

This opinion resolves the item listed as document number 44 in this case.

SO ORDERED.

Dated:  New York, New York
        March 13, 2015

                                     Thomas P. Griesa
                                     U.S. District Judge