**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MARVIN PEARLSTEIN, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BLACKBERRY LIMITED (formerly known as RESEARCH IN MOTION LIMITED), THORSTEN HEINS, BRIAN BIDULKA, and STEVE ZIPPERSTEIN<br><br>Defendants. | File No. 1:13-CV-7060-TPG<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

1.      Lead Plaintiffs Todd Cox and Mary Dinzik ("Plaintiffs") and additional Plaintiffs Yong M. Cho and Batuhan Ulug bring this federal securities class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the purchasers of BlackBerry Limited ("BlackBerry" or the "Company") common stock between March 28, 2013 and September 20, 2013 (the "Class Period"), against BlackBerry, its former Chief Executive Officer Thorsten Heins, its former Chief Financial Officer Brian Bidulka, and its Chief Legal Officer Steve Zipperstein  (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise from a series of materially false and misleading statements and omissions  concerning  BlackBerry,  its  new  BlackBerry 10  smartphones,  its  recognition  of revenue, and compliance with Generally Accepted Accounting Principles ("GAAP") that Defendants made during the Class Period.

1

2.      Plaintiffs allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by BlackBerry, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company and its executives, media reports about BlackBerry, a criminal complaint concerning Z10 sales and returns data, and interviews with witnesses with knowledge of the allegations herein and consultation with industry experts. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## POST-*OMNICARE* ALLEGATIONS AND NEW INFORMATION SUPPORTING SCIENTER AND FALSITY

3.      Plaintiffs submit this pleading in light of *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.C. 1318 (2015), which provides new guidance for the pleading of statements and omissions of opinion, and in light of new evidence demonstrating that Defendants made material misrepresentations and omissions concerning the sales and rate of returns of the Z10s (and, accordingly, the proper amount of revenues to record) and that Defendants knew those statements and omissions were outright lies at the time of the statements and omissions.  An overview of the new allegations based on *Omnicare* and the new information – comprising a criminal complaint, plea and sentencing hearing transcripts, a government sentencing memorandum and an FBI Special Agent affidavit related to negative sales data concerning the Z10s during the Class Period that Defendants admit they obtained from retailers and partners and reviewed and monitored – is set forth directly below at ¶¶ 4-33.

## Defendants' Actionable Statements and Omissions of Opinion In Light of *Omnicare*

4.      Defendants' opinion statements omitted material facts about Defendants' inquiry into or knowledge concerning such statements of opinion.  The omitted facts show the statements

made by Defendants lacked the basis for making those statements that a reasonable investor would expect, even if Defendants subjectively held those opinions, which they did not. A reasonable investor in BlackBerry expects not just that Defendants believe the opinions publicly stated (however irrationally), but that they fairly align with the information in Defendants' possession at the time.

5.      Class members' expectations about the degree of certainty underlying an opinion is the function of the context in which the opinion is expressed, including the specificity of the opinion itself and the speaker's special knowledge that is unavailable to Class members. For statements of opinion, the proper analysis is what a reasonable person would naturally understand a statement to convey beyond its literal meaning. For opinion statements, this means considering the foundation investors would expect an issuer to have before making the statement. Where, as here, Defendants omitted material facts about their inquiry into or knowledge concerning their statements of opinion, and those facts conflict with what a reasonable investor would take from the statements themselves, the omissions create liability.

6.      Defendants knew at the time they made these statements of opinion particular facts the omission of which made the opinions at issue misleading to a reasonable person reading the statement fairly and in context.

7.      Defendants' false and misleading statements and omissions based on opinions are actionable. Defendants' April 12, 2013 press release includes materially untrue statements and omissions of opinion. The opinion component of the April 12, 2013 release includes the following language: "Everyone is entitled to their opinion about the merits of the many competing products in the smartphone industry, but when false statements of material fact are deliberately purveyed for the purpose of influencing the markets a red line has been crossed."

8.      Defendants' choices of accounting treatments are statements of opinion.  Those opinions imply that Defendants had a basis in fact to utilize the particular treatment and that Defendants were not in possession of facts that rebutted the opinion.   The material misrepresentations and omissions concerning Defendants' accounting practices are actionable statements of opinion.   These practices include BlackBerry's misstated revenue recognition policy and improperly recorded revenues from the Z10 upon shipment; its delay in taking a charge against income to account for decreased value of the Z10 inventory; and its failure to record a charge against income to reflect the fact that supply commitments outstripped demand for the Z10.

### The *Dunham* Action Criminal Complaint, Plea and Sentencing Transcripts, Sentencing Memorandum and Affidavit Support Falsity and Scienter as To Defendants' Statements and Omissions

9.      The material falsity and misleading nature of Defendants' statements and omissions concerning the Z10's sales and returns, customer acceptance of the Z10s, and Defendant Heins' vigorous denial of the accuracy of an April 11, 2013 analyst report concerning returns of the Z10s, as well as other Class Period statements and omissions (including Defendants' accounting judgments or opinions) are further demonstrated by a criminal complaint and accompanying affidavit in the case *U.S. v. James Dunham, Jr.*, filed in Federal District Court for the District of Massachusetts on February 24, 2015, Mr. Dunham's subsequent guilty plea, in addition to hearing transcripts and the government's sentencing memorandum.   This new evidence shows that Defendants' opinion statements had no reasonable basis – even if they were subjectively believed, which they were not.

10.      The Affidavit of FBI Special Agent David Makor submitted with the criminal complaint ("Affidavit"), incorporated herein by reference and attached hereto as Exhibit A, paints a compelling picture of the manner in which Mr. Dunham, a former executive at a wireless

4

franchisor [Wireless Zone], obtained very specific, confidential financial data and information concerning sales and returns of a wireless smartphone manufacturer [BlackBerry] and provided it to a financial analyst [Detwiler Fenton].  In the Affidavit, Special Agent Makor swears based on interviews with multiple witnesses that Mr. Dunham provided this detailed, real-time financial data to the analyst, which issued a report revealing the negative, information, resulting in a stock drop of 7% in the wireless manufacturers' [BlackBerry's] stock.

11.     On March 26, 2015, despite the fact that no names of the business entities involved were contained in the criminal complaint, the *Boston Business Journal* reported that a comparison of data in the criminal complaint to public information shows that the wireless manufacturer in question is BlackBerry; that Mr. Dunham was an executive at Wireless Zone; and that the financial analyst 13-is Detwiler Fenton.  February 26, 2015 *Boston Business Journal* article, "*Detwiler Fenton Facing Criminal Case Over BlackBerry Sales Data.*"  The franchisor where Dunham worked is one of six exclusive national Verizon retailers that sell the smartphone maker's devices.  February 26, 2015 *Bloomberg News* article, *BlackBerry Sales Leak Coincides with Alleged Fraud Scheme.*

12.     The *Boston Business Journal* article states that a "former executive at a Verizon Wireless retailer [who was also a former executive at Wireless Zone at the time of the alleged misconduct] was arrested Thursday for allegedly selling confidential sales and product information to the Boston financial services firm Detwiler Fenton, including information that caused BlackBerry's stock price to plummet in April 2013.  According to the [criminal] complaint, Dunham was the source behind a controversial research note published by Detwiler analyst Jeff Johnston in April 2013."

13.     Based on the *Dunham* criminal proceedings and related press coverage, as well as research and investigation by Plaintiff's Counsel, it is now clear that the detailed, negative financial data at issue related to sales and returns of the BlackBerry Z10 and that Detwiler Fenton relied upon this true, real-time data in its analyst report of April 11, 2013 concerning BlackBerry.  This data was available to Dunham in his capacity as an executive at Wireless Zone, which had access to "very specific information [about BlackBerry] from [approximately 400] franchisees, including sales…product launch information, and cost information."  Exhibit A at ¶9.

14.     Indeed, throughout the Dunham criminal proceedings, the accuracy of this information was raised several times.  During the plea hearing before Judge Woodlock in the District of Massachusetts on June 4, 2015, Mr. Dunham acknowledged that he had taken confidential information from his employer, given it to a Detwiler analyst, and the subsequent Detwiler report was based on that confidential information:

MS. WALTERS:

If this case were to proceed to trial, the Government would present evidence establishing the following:

Between approximately August of 2009 and September of 2013, Mr. Dunham served as the Chief Strategy Officer and then the President and Chief Operating Officer of a wireless franchisor which is an exclusive national indirect retailer for a major provider of wireless services.

And so, how this would work is the major wireless providers have agency relationships with a series of indirect retailers throughout the country. This particular one had relationships with, I believe, six. Mr. Dunham's employer was one of those six.

Those six were exclusive to this particular service provider and sold products and services provided by that specific wireless provider. Examples of wireless providers are T-Mobile, Verizon, Sprint.

Those wireless providers then, obviously, sell various devices, Blackberry devices, Apple devices, Samsung devices, through each of the wireless providers. So, as a national indirect retailer, Mr. Dunham's employer supervised or maintained 400 franchisees which sold wireless services and wireless devices to the public.

***In his roles at the wireless franchisor Dunham had access to very specific confidential information from the wireless franchisor's franchisee. So, specific sales information, specific return information, compensation information, information regarding activating or upgrading, simply buying a new service plan, product launch information and other cost information.***

Again, all of that information was confidential, as witnesses would testify, and as set forth in his employment agreements. Again, in light of his position at the wireless franchisor, and pursuant to his employment agreements, Mr. Dunham had a duty not to disclose wireless franchisor confidential information, and he certainly had a duty not to disclose it without permission, specific permission from the wireless franchisor. As Dunham knew, disclosure of such information could jeopardize key business relationships with business providers, with his business partners, including the service provider, including the manufacturers of the smartphones and other devices that were sold through the franchisees.

…

Beginning in May 2010 and continuing through at least April 2013, and unbeknownst to Mr. Dunham's employer, the wireless franchisor, Dunham acted as a paid consultant to a Boston-based financial services firm that provides investment research to institutional clients who then use that research for the purposes of trading. ***Pursuant to that consulting agreement, Mr. Dunham provided that research firm with confidential information belonging to the wireless franchisor, including specifically sales information, return information, also a variety of information about sales numbers of upgrades and downgrades in service***, and he did this in exchange for $2,000 monthly payments.

Again, he wasn't permitted to disclose the information at all from the wireless franchisor without permission. He was not permitted to disclose it for his own personal purposes, which is what he was doing in this instance. The wireless franchisor was, in fact, unaware that he had this consulting relationship, and the CEO of the wireless franchisor would testify at trial he would not have given such permission, given the potential disastrous effect on business relationships.

As Mr. Dunham knew, ***the confidential information that was being disclosed by him was then included in research notes that were distributed by the research firm to its institutional clients for use in trading decisions.***

In particular, in April, 2002,[1] *Mr. Dunham disclosed the wireless franchisor's confidential business information regarding sales and return information for a specific smartphone that had been recently launched by a major smartphone manufacturer and had just recently become offered by the major wireless provider with whom Mr. Dunham's employer had a relationship. The analyst then drafted and the research firm released an April 11, 2013 research note on that smartphone, which note included the specific sales and return information that had been provided by Dunham.*

THE COURT:
All right. You have heard what Ms. Walters tells me the evidence would be in this case. *Is that what happened*?

MR. DUNHAM: *Yes, your Honor*.

THE COURT: *You did what was recited there*?

MR. DUNHAM: *Yes, your Honor*.[2]

(Emphasis added).

15.     The Government's sentencing memorandum, executed on September 11, 2015, similarly described Mr. Dunham's actions, and expressly stated that the "real time" information Mr. Dunham conveyed to Detwiler was "accurate" as it concerned his employer's 400 retail stores:

*According to the analyst, Dunham's information was valuable because he provided "real time" information based on what was happening in the Wireless Franchisor's 400 retail stores*, which information then was the basis for research reports authored by the analyst and distributed to the Research Firm's investor clients.  In exchange for his consulting services, the Research Firm paid Dunham $2,000 per month.

The scheme came to light in April 2013 in connection with information Dunham provided to the analyst about sales and returns of a newly released smartphone.  Specifically, at the end of March 2013, the Major Smartphone Manufacturer released its much anticipated smartphone—the success or failure of which was

---

[1] The date "2002" is a typo in the transcript, as the transcript itself and other documents in the *Dunham* action make clear, Mr. Dunham provided this data to Detwiler Fenton in April 2013.

[2] Rule 11/Plea Hearing Transcript, 1:15-cr-10110, Dkt. No. 36 (D. Mass. June 4, 2015), incorporated by reference and attached hereto as Exhibit B at 19:18-23:12.

widely considered critical to the troubled company's prospects.  By early April, reports had been circulating that the smartphone's sales had been lagging and so the analyst reached out to Dunham to see if he could obtain more specific information on sales.  In an April 10, 2013 telephone call, Dunham told the analyst that some Wireless Franchisor stores were seeing returns of the smartphone exceeding sales.  This information was not publicly available and was highly confidential to the Wireless Franchisor, as well as the Wireless Franchisor's business partners. ***The analyst used that information in a research report that his Firm published the next day.***  That same day, the share price of the Major Smartphone Manufacturer's stock dropped more than seven percent and ***the Major Smartphone Manufacturer publicly disputed the accuracy of the information.  In fact, <u>the information was accurate</u>, in-so-far as it reflected what was happening in the Wireless Franchisor's stores***, although it may not have been accurate with respect to the Major Smartphone Manufacturer's overall sales and returns.[3]

(Emphasis added).

16.     Then, during Mr. Dunham's sentencing hearing on September 15, 2015, Judge Woodlock discussed with the prosecuting attorney the issue of whether Mr. Dunham deceived the market by disclosing this information and, if not, whether this should be a mitigating factor to his sentencing.  The prosecuting attorney, who had access to and reviewed the specific sales and return data at issue, acknowledged that the information that Mr. Dunham had provided to Detwiler Fenton was accurate:

> MS. WALTERS:  But here, of course, we are talking about leaking information that is confidential, and in this case, at least from the public reports and in terms of how the major Smartphone manufacturer responded to it, they said, "That's not accurate information."   Now the market is reacting to inaccurate information about –
>
> THE COURT:  ***But it was accurate information, wasn't it***?
>
> MS. WALTERS:  ***It was accurate as to Mr. Dunham's employer***.[4]

---

[3] Government's Sentencing Memorandum, 1:15-cr-10110, Dkt. No. 34, (D. Mass. Sept. 11, 2015), incorporated by reference and attached hereto as Exhibit C at 2-3.

[4] Sentencing Hearing and Motion Hearing Transcript, 1:15-cr-10110, Dkt. No. 41, (D. Mass. October 1, 2015), incorporated by reference and attached hereto as Exhibit D at 7:20-8:4.

(Emphasis added).

17. The filings and court proceedings in the *Dunham* action demonstrate that the statements made in the Detwiler Report were based on the true, real-time data of 400 retail stores selling the BlackBerry Z10; how Mr. Dunham had access to this information; and the manner in which Mr. Dunham gave the information to Detwiler to be published in the April 11, 2015 report.

18. In an April 12, 2013 BlackBerry press release, however, Defendant Heins falsely told investors the Detwiler Report was "materially false and misleading" and "absolutely without basis." At the time of Heins' vigorous denial of the veracity of the Detwiler Fenton report and Defendants' issuance of positive statements and omissions about the Z10, Defendants, including Defendant Heins, by their own admission, were in possession of facts incompatible with their opinions. Defendants have ***expressly acknowledged*** they had the relevant data in hand and monitored it actively during the Class Period. Defendants publicly stated in their April 12, 2013 press release "[s]ales of the BlackBerry Z10 are meeting expectations and that ***data we have collected from our retailers and carrier partners demonstrates that customers are satisfied… Return rate statistics show that we are at or below our forecasts and right in line with the industry***." This statement demonstrates two things: 1) Defendants admittedly had the very real data from retailers and partners concerning sales and returns of the Z10 that had been in the possession of Mr. Dunham and provided to Detwiler Fenton; and 2) Defendants' statements and omissions, including statements of opinion regarding customer satisfaction and return rates being at or below forecast and right in line with the industry were outright lies and known to be lies at the time the statements were made. Further demonstrating Defendants' active role in monitoring demand requirements, as noted in the Company's Fiscal 2013 Form 40-F, Defendants concede

10

"*the Company performs an assessment of inventory* during each reporting period, *which includes a review of*, among other factors, *demand requirements*, component part purchase commitments of the Company and certain key suppliers, product life cycle and development plans, component cost trends, product pricing and quality issues."   (Emphasis added).

19.     Defendants monitored and reviewed the very detailed negative financial data that formed the basis for Detwiler Fenton's revelations of unusually-high returns of the Z10 – as that data is the very same data and underlying information that Defendants admitted they collected from retailers and partners and reviewed and monitored throughout the Class Period.   Thus, Defendants made opinion statements and omissions that lacked a reasonable basis and omitted facts known to them concerning their stated opinions – *e.g.*, omitted that Detwiler Fenton obtained very specific, negative data about the Z10 that was real and material. Defendants – while simultaneously and aggressively denying the validity of the information reported by Detwiler Fenton – had no reasonable basis to issue this denial and did so with knowledge the denial was false when made or, at a minimum, was made with recklessness.   Such omitted facts conflict with what a reasonable investor would take from the statement itself.

20.     The criminal complaint in *United States v. James Dunham, Jr.*, 15MJ7051JCB (D. Mass.), related Affidavit, plea and sentencing hearing transcripts and government sentencing memorandum demonstrate the veracity of the Detwiler Fenton research report and the fact that Defendants' denials of its contents were lies.   According to the Affidavit and sentencing memorandum, the statements contained in the research report were based on confidential, real-time sales and return data relating to about 400 retailers of the wireless manufacturer's products that was in the hands of Dunham and which he sold to the Analyst.   During his plea hearing, Dunham himself acknowledged that these facts were true and admitted to the charged conduct.

11

**Dunham's Access To "Very Specific" Confidential Sales**
**Data Relating to the Z10 for 400 Retailers**

21.     The Affidavit states that Dunham had access to "*very specific*" confidential sales and return data that he learned through his employment at a wireless franchisor later identified by the *Boston Business Journal* as Connecticut-based Wireless Zone, one of six exclusive national Verizon retailers that sold BlackBerry's devices.  *See Boston Business Journal* article "*Detwiler Fenton Facing Criminal Case Over BlackBerry Sales Data*"; *see also* 02/26/2015 *Bloomberg News* article "*BlackBerry sales leak coincides with alleged fraud scheme.*" According to the Affidavit, between August 2009 and September 2013, Dunham served as the Chief Strategy Officer and then President and Chief Operating Officer of a wireless franchisor, which is a retailer for a major provider of wireless services.  Exhibit A at ¶4.  During at least some of that time, Dunham was a paid consultant to a Boston-based financial service firm that provided investment research to institutional clients. *Id.*  Dunham shared with the analyst "information regarding the wireless industry, including **sales, return and other confidential business information that he learned through his employment at the wireless franchisor.**  The information disclosed by Dunham then was included in research notes distributed by the Research Firm."  *Id.* (emphasis added).  The Affidavit also confirms that "[*t]he Wireless Franchisor has access to very specific information from the franchisees, including sales, compensation, service activating or upgrading information, product launch information, and cost information.*"  *Id.* at ¶9 (emphasis added).

22.     Dunham's access to the data in question was confirmed not only through the analyst firm Detwiler Fenton, but also through Dunham's boss at Wireless Zone, who confirmed "in Dunham's role as Chief Strategy Officer and later as the President and COO of the Wireless Franchisor, Dunham had access to certain business information, including… **sales and return**

*information for Wireless Franchisor franchisees.*"   *Id*. at ¶10 (emphasis added).   According to

the Affidavit, Dunham "recalled the Analyst had told him Dunham's information was valuable

and that the Analyst wanted to put him on a monthly retainer."   *Id*. at ¶16.   The Analyst

explained "***Dunham's information was valuable because Dunham had real-time visibility into***

***sales from the Wireless Franchisor's <u>400 locations</u>***."   *Id*. at ¶17 (emphasis added).

23.     Dunham's access to this information was also confirmed by Dunham himself

during his plea hearing.   Specifically, the Assistant United States Attorney ("AUSA") explained

that "as a national indirect retailer, Mr. Dunham's employer supervised or maintained 400

franchisees which sold wireless services and wireless devices to the public" and therefore

"Dunham had access to very specific confidential information from the wireless franchisor's

franchisee. So, specific sales information, specific return information, compensation information,

information regarding activating or upgrading, simply buying a new service plan, product launch

information and other cost information." Exhibit B at 20:12-17. When asked by the Court to

confirm the AUSA's evidence, Mr. Dunham stated, under oath, "Yes, your Honor." *Id*. at 23:10.

### Dunham's Sharing of Confidential Data with Detwiler Fenton

24.     The Affidavit states that Dunham and the Analyst spoke by telephone on April 10,

2013, the day before the April 11, 2013 Research Note was released.   Exhibit A at ¶24.   The call

took place at 2:00pm and lasted approximately eight minutes.   *Id*.   The Affidavit further states

that the following language contained in the April 11, 2013 research note was information

provided to the Analyst by Dunham: "We believe ***key retail partners*** have seen a significant

increase in [Wireless Manufacturer] returns to the point where, in several cases, returns are now

exceeding sales, a phenomenon we have never seen before."   *Id*. at ¶26 (emphasis added).

25.     Dunham was charged with mail and wire fraud because he allegedly received payments from Detwiler Fenton, which deprived his employer, Wireless Zone, of its right to his honest and faithful service through bribes and kickbacks that were mailed to him. The information supplied by Dunham was supplied in part by telephone and also distributed electronically to the analyst's clients, some of which were out of state.  *Id.* at ¶33.  In other words, Dunham allegedly defrauded his employer by providing the real-time, confidential information and research data concerning BlackBerry's sales and returns of the Z10 to Detwiler Fenton.

26.     During the June 4, 2015 Plea Hearing, Mr. Dunham admitted to this conduct. According to the transcript, Mr. Dunham provided Detwiler Fenton "with confidential information belonging to [Wireless Zone], including specifically sales information, return information, also a variety of information about sales numbers of upgrades and downgrades in service, and he did this in exchange for $2,000 monthly payments."  Exhibit B at 21:24-22:5. Moreover, "[a]s Mr. Dunham knew, the confidential information that was being disclosed by him was then included in research notes that were distributed by the research firm to its institutional clients for use in trading decisions."  *Id*. at 22:14-17.  Specifically, Mr. Dunham admitted to disclosing Wireless Zone's specific sales and return information for BlackBerry Z10s to Detwiler Fenton, who "then drafted and the research firm released an April 11, 2013 research note on that smartphone, which note included the specific sales and return information that had been provided by Dunham."  *Id*. at 22:24-23:2.

**Defendants Admitted They Possessed Data from Retailers and Partners and Actively Monitored this Data – which Includes the Negative Z10 Sales and Returns Data Forming the Basis of the Detwiler Fenton Report**

27.     The criminal complaint, Affidavit, plea and sentencing hearing transcripts, and sentencing memorandum show that Dunham had this real-time data concerning sales and returns of the Wireless Manufacturer's product on April 10, 2013, in his possession and sold it to the Analyst.   BlackBerry had the data as well, as the manufacturer working with a key retailer, Verizon, for which Wireless Zone served as a franchisor.   As noted above, Defendants affirmatively admitted that they monitor the "data we have collected from our retailers and carrier partners" and that they not only looked at "return rate statistics" throughout the Class Period but also stated that those return rates were "at or below our forecasts and right in line with the industry" as of April 12, 2013.   The April 11, 2013 Detwiler Report specifically refers to "key retail partners" – the same partners whose data Defendants state they monitored.

28.     When Defendant Heins aggressively denied the Detwiler Fenton report and asserted that the information was therein false and "absolutely without basis," he had in truth prior to that time actively reviewed the real-time sales data that plainly showed the veracity of the statements by Detwiler Fenton, and revealed the falsity of his own aggressive denial and Defendants' positive statements and omissions concerning sales, returns, customers, financials, and accounting judgments.

29.     It has now been publicly revealed that the specific, negative financial information concerning the sales and returns of the Z10 revealed by Detwiler Fenton on April 11, 2013, was based on confidential, true and specific sales and return numbers relating to the Z10.   The criminal complaint, notarized Affidavit, plea and sentencing hearing transcripts, and sentencing memorandum demonstrate that real-time data concerning the Wireless Manufacturer was true –it was specific, confidential, financial information that was sold to the Analyst.   These new revelations come as no surprise as they strongly support BlackBerry's belated announcement of a

$930-960 million restatement relating to the Z10 that occurred within weeks of repeated positive statements about sales and returns and customer acceptance of the Z10s during the Class Period.

### Additional Allegations Concerning Actionable Financial Misstatements of Opinion and Omissions

*Defendants' Statements and Omissions Concerning Revenue Recognition Policy and Recording of Revenue*

30.    Defendants' statements and omissions of opinion concerning Defendants' accounting practices regarding BlackBerry's misstated revenue recognition policy and improperly recorded revenues from the Z10 upon shipment were materially false and misleading when made.  Defendants knew particular, material facts going to Defendants' opinion at the time, and the omission of those facts made the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.  Those particular, material facts included that Defendants' revenue recognition on Z10 sales was objectively unreasonable at the time for at least three reasons: the likelihood of price concessions due to the newness of the product; the introduction of competitors' products with superior technology or greater expected market acceptance; and prior, multiple, failed new product launches.  In addition, the sales price for the Z10 devices was not fixed but rather in flux as the result of price concessions and other facts.  Therefore, Defendants' statements of opinion regarding their accounting judgments concerning the misstated revenue recognition policy and improperly recorded revenues from the Z10 upon shipment lacked a reasonable basis and are actionable under Section 10(b) of the Securities Exchange Act, even if Defendants subjectively (and irrationally) believed  their unreasonable opinions at the time.

*Defendants' Statements and Omissions Regarding Delay in Taking Timely Charge*

16

31.     Defendants' material misrepresentations and omissions regarding BlackBerry's delay in taking a timely charge against income to account for decreased value of the Z10 inventory were materially false and misleading when made. Defendants knew particular, material facts going to Defendants' opinion at the time, and the omission of those facts made the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context. Those particular, material facts included possession of real-time sales and returns data concerning the Z10s that showed sales and returns were not in line with estimates. Further, BlackBerry's policy – providing that inventory would be written down if management believes that demand (or lack thereof) no longer allowed smartphones to be sold above cost – is actionable where Defendants' belief – even if subjectively true – *had no reasonable basis*. Further, Defendants' failure to take a timely charge against income to reflect a deterioration in the value of the Z10 inventory was objectively unreasonable at the time for several reasons: the likelihood of price concessions due to the newness of the product; the introduction of competitors' products with superior technology or greater expected market acceptance; and prior, multiple, failed new product launches.  Defendants had no reasonable basis for their failure to record a timely charge against income to reflect deterioration in the value of Z10 inventory. Thus, Defendants' opinion statements were either known to be false or, at a minimum, made with reckless disregard that they had no reasonable basis.

### Defendants' Misleading Statements of Opinion Regarding Failure To Record a Charge for Supply Commitments

32.     Defendants' representations concerning BlackBerry's consolidated gross margin from continuing operations in its March 28, 2013 earnings release, its 2013 Form 40-F, and its June 28, 2013 6-K were materially false and misleading as a result of BlackBerry's failure to record a charge for supply commitments for quantities that Defendants knew or recklessly

17

disregarded were in excess of any reasonable anticipated future customer demand forecasts. Defendants' accounting statements of opinion lacked a reasonable basis and are actionable under Section 10(b) of the Securities Exchange Act even if Defendants irrationally believed their opinions.

33.    Defendants' statements of opinion regarding failure to record a charge for supply commitments were also materially false and misleading because BlackBerry's supply commitments for Z10 devices were larger than demand for the devices during the Class Period, and if BlackBerry had properly recorded a charge for supply commitments it would have reported much lower gross margins in March and June.  Defendants' accounting statements of opinion lacked a reasonable basis.   Further, Defendants possessed sale and return data concerning the Z10s that showed sales and returns were not in line with estimates. Therefore, Defendants' opinion statements are actionable. Thus, Defendants' opinion statements were either known to be false or, at a minimum, made with reckless disregard that they had no reasonable basis.

## OVERVIEW OF CASE

34.    This overview section comprises the summary of allegations, exclusive of the allegations set forth above.

35.    BlackBerry, formerly Research In Motion,[5] revolutionized the mobile communication industry in 1999 with its unique portable email device, which utilized a thumb-based keyboard and a track wheel for scrolling through menus and messages.  The technology was immensely popular in the business world, where email was quickly becoming the primary form of communication.  Then, in 2002, when the Company integrated its messenger capabilities

---

[5] On July 10, 2013, the Company changed its name from Research in Motion Limited ("RIM") to BlackBerry Limited.

into cellular phones, BlackBerry became a household name.  BlackBerry saw its subscriber base grow from around 500,000 in 2003 to nearly 5 million in 2006, as the Company kept improving its handsets with color displays, Wi-Fi, Bluetooth, predictive typing and more.

36.     By 2007, BlackBerry was valued at over $40 billion and more than 1 out of every 3 new smart device purchases in the United States was a BlackBerry. BlackBerry owned the market. However, 2007 was a pivotal year for BlackBerry and the mobile communications world, as in July of that year Apple released the first iPhone.

37.     Although BlackBerry still dominated the industry at the time of the iPhone's introduction, the iPhone was a technologically superior product that utilized two processors and, unlike BlackBerry products, had a fully internet-capable browser.  BlackBerry still enjoyed a healthy market share, but the Company and its devices were not positioned well for the future. Over the next couple years, BlackBerry struggled to keep pace with Apple and, subsequently, the introduction of Android-based systems.   The Company would either cobble together technologies and rush poorly designed products to market, or it would experience long delays in launching new products that would render its devices stale by the time they reached the market.

38.     Over the next several years, BlackBerry started losing its market share and with it, the Company's torrid revenue growth began to slow.  Between the fourth quarter of fiscal 2011 (Feb. 26, 2011) and the third quarter fiscal 2012 (Nov. 26, 2011), BlackBerry reported revenues between $4.2 billion and $5.6 billion per quarter.  However, signs of a diminishing brand and market share were starting to manifest themselves in BlackBerry's financial results, because although revenues were averaging approximately $5 billion per quarter, net income was dropping precipitously each and every quarter.

19

(USD in
millions)

|  | FY 2011 | FY 2012 | | |
|---|---|---|---|---|
|  | 4th Quarter | 1st Quarter | 2nd Quarter | 3rd Quarter |
| Quarter Ended: | Feb. 26, 2011 | May 28, 2011 | Aug. 27, 2011 | Nov. 26, 2011 |
| Revenues | $5,556 | $4,908 | $4,168 | $5,169 |
| Net income (loss) | 934 | 695 | 329 | 265 |

39.     Things were about to get worse.  Starting in the fourth quarter of fiscal 2012 (March 3, 2012), prior to the start of the Class Period, Blackberry reported losses in 3 out of 4 quarters with cumulative net losses approximating $869 million, resulting from the Company's plummeting revenue stream.  For example, BlackBerry reported revenue of $2.8 billion for the first quarter of fiscal 2013 (June 2, 2012), a decrease of approximately $2.1 billion, or 42.7%, from $4.9 billion in the first quarter of fiscal 2012 (May 28, 2011).   In fact, BlackBerry's quarterly revenues in fiscal 2013 dropped significantly each and every quarter, as compared to fiscal year 2012.

(USD in
millions)

|  | FY 2012 | FY 2013 | | |
|---|---|---|---|---|
|  | 4th Quarter | 1st Quarter | 2nd Quarter | 3rd Quarter |
| Quarter Ended: | Mar. 3, 2012 | June 2, 2012 | Sept. 1, 2012 | Dec. 1, 2012 |

| Revenues | $4,190 | $2,814 | $2,873 | $2,727 |
|---|---|---|---|---|
| Net income (loss) | (125) | (518) | (235) | 9 |

40.     As the Company fell further and further behind its competitors, it became clear BlackBerry needed something new, different and superior to existing products to attract new customers and retain its current users and re-capture its lost customers.   In April 2010, BlackBerry announced a deal to acquire QNX Software ("QNX"), a cutting edge software engineering firm that would help create the operating system for the BlackBerry 10, a new smartphone that the Company hoped would save it from ruin.  The Company would strip away its former, Java-based applications and build the BlackBerry 10 entirely from scratch.   In addition to the newly acquired QNX team, BlackBerry pulled its resources off of its failed BlackBerry 7 phones and dedicated all its time, money and personnel to the new BlackBerry 10 project.

41.     Mounting delays on the BlackBerry 10 and another product flop—the PlayBook, a failed tablet intended to compete with Apple's iPad—combined to push BlackBerry into full decline.  BlackBerry 7 phones were not selling, the Company's revenues were tumbling, and its stock plunged from $69 (Canadian) in February 2011 to less than $15 by the year's end.   In January 2012, the failures of the PlayBook and BlackBerry 7 phones drove Jim Balsillie and Mike Lazaridis to step down as co-CEOs of BlackBerry in favor of Defendant Thorsten Heins, a German executive who had run the Company's handset division.  As opposed to Lazaridis, who felt that the physical keyboard was vital to the success of BlackBerry, Defendant Heins' management team believed the market wanted full touchscreen, and therefore pushed to launch the all-touchscreen Z10 phone and continue developing the Q10 keyboard phone.

21

42.    The year 2012 turned out to be the most challenging year in the Company's history. The 2012 fiscal fourth quarter (three months ended March 3, 2012), marked the first time that BlackBerry recorded a net loss (-$128 million) for the quarter.  The BlackBerry 7 smartphones' weak sell-through also resulted in a $355 million charge for the impairment of goodwill and a $267 million inventory write-down of those devices in the quarter, and necessitated the introduction of aggressive customer incentive programs to improve sales throughout FY 2013. That trend continued through the year (1Q:13 (three months ended June 2, 2012) loss of $518 million, 2Q:13 (three months ended September 1, 2012) loss of $142 million, 3Q:13 (three months ended December 1, 2012) loss of $114 million), for a cumulative net loss of $869 million.  For example, BlackBerry reported revenue of $2.8 billion for the first quarter of fiscal 2013 (three months ended June 2, 2012), a decrease of approximately $2.1 billion, or 42.7%, from $4.9 billion in the first quarter of fiscal 2012 (three months ended May 28, 2011).  In fact, BlackBerry's quarterly revenues in fiscal 2013 dropped significantly each and every quarter, as compared to fiscal 2012.  BlackBerry needed to stop the bleeding.

43.    Further evidencing BlackBerry's dramatic fall from grace and the desperate situation Defendants found themselves in necessitating success of the BlackBerry 10 line,  a December 14, 2012 *THE WALL STREET JOURNAL* article entitled "*A Swedish Tribe Aids BlackBerry Rescue Bid*" reported that in 1999 BlackBerry had a whopping 50% of smartphone market. By 2011 it had just 9.5% of that market. In 2012, BlackBerry was holding onto a paltry 4.7% share of the smartphone market.  Even shipments of BlackBerry's devices  to the Company's hardcore target market -- corporations and the government -- were expected to be surpassed by iPhones by 2013.

44.     The delays in production for the Z10 had proven costly.  By December 20, 2012, a month before introduction of the BlackBerry 10 device, the Company reported revenues for its fiscal third quarter ended December 1, 2012 had fallen 48% from the previous year's third quarter, and that after adjusting for a charges and a tax gain, the Company had a loss of $114 million, or $0.22 per share compared with earnings of $265 million, or $0.51 per share in the prior year's third quarter.   As *The New York Times* reported on December 20, 2012, "[t]he [C]ompany has pinned all of its hopes on the BlackBerry 10 to win back customers who may have defected to iPhones or phones using Google's Android operating system."   Defendant Heins, during an analyst conference call on December 20, 2012, stated that "[w]e believe the company has stabilized and will turn the corner in the next year," and that the introduction of the BlackBerry 10 would bring an end to the Company's cash hoarding and it would dig into its cash reserves during its fiscal fourth quarter to stockpile BlackBerry 10 phones in advance of their release and to finance advertising and other marketing campaigns for the devices.

45.     The Company also reported it shipped slightly over 7 million current BlackBerry models during its fiscal third quarter; BlackBerry officials conceded those products were being heavily discounted.

46.     Based on the lack of market acceptance of the BlackBerry 7, it was critical that Defendant Heins condition the market to believe that the launch of the BlackBerry 10 was running according to plan and, during the December 2012 analyst conference call reported by *The New York Times,* stated that, "[w]e are realistic about our competitors, but we know that customers in the industry demand and respond to innovation." In fact, however, as Defendant Heins and the other Defendants were aware, when the Company finally unveiled the upcoming

BlackBerry 10 smartphones, the technology was two years behind what was already on the market.

47.     Although the long-awaited BlackBerry 10 debuted at a flashy launch event in January 2013 featuring Alicia Keys, BlackBerry's "global creative director," the launch fizzled. Indeed, soon after the launch, a scandal emerged as Alicia Keys was caught tweeting from her iPhone when she had publicly sworn allegiance to the new BlackBerry 10.

48.     As the Z10 rolled out to consumers across the globe, the response to the new phones was tepid.  Despite vigorous assurances from BlackBerry that the phones were selling well and any reports to the contrary were untrue, in reality, inventory was piling up and BlackBerry was forced to offer its carrier and distributor partners costly sales incentives to move bloated inventories of the Z10s off the shelves.  For example:

a.  On January 30, 2013, BerryReview reported that Rogers, a major Canadian wireless communications provider, confirmed it would offer the white BlackBerry Z10 for up to $100 off.

b.  On February 6, 2013, Telegraph.co.uk reported that shops in the UK were denying claims by defendant Heins that Z10 phones were selling out.

c.  On March 5, 2013, BGR reported that the UK's leading mobile phone retailer, Carphone Warehouse, had cut the monthly package price of the BlackBerry Z10 from £36 to £29, which amounted to a £160 price drop over the life of a 24-month contract.  BGR also reported that Vodafone was offering a package deal for the Z10 that was £72 cheaper than its previous one.

d.  On March 4, 2013, Telegraph.co.uk reported that UK-based Carphone Warehouse had cut the price of the Z10 by about £139 over a two-year contract period.

e.  On March 17, 2013, Softpedia.com reported:  "The Z10 was launched at all Canadian carriers, including TELUS, Rogers and Bell, for $150/€110 with a new three-year agreement.  Well, it appears at least three Canadian carriers dropped the phone's price one more time.  As MobileSyrup points out, Rogers, Bell and Virgin Mobile are now offering the BlackBerry Z10 for only $100/€75 on a 3-year term."   Softpedia.com added:  "Even though only three carriers discounted the BlackBerry Z10, we expect more Canadian operators to add to the initiative."

f.  On March 19, 2013, Know Your Mobile India related that BlackBerry had decided to slash the price of its Z10 smartphone in India, from Rs 43,490 to Rs 39,990.   According to NerdBerry.com, a site focused on BlackBerry news, "[t]here was a lot of controversy over the price tag of the Z10 in India …"

g.  On March 25, 2013, Emirates 24/7 in Dubai published a report with the headline "BlackBerry Z10 sales & prices are sinking:  Blame Samsung Galaxy S4."  The report noted that, with "the unveiling of newer offerings from rivals, including the HTC One, the Sony Xperia Z and the Samsung Galaxy," "[i]t might come as no surprise, then, that the device that showed a lot of promise during its not-so-distant launch, seems to be now headed downhill – including its price."  "Online deals on the BlackBerry Z10 are getting hotter by the day across the UAE, with group buying websites jumping in on the frenzy – the best bargain yet, Dh2,170 for the handset that is officially priced at Dh2,599."   The Emirates 24/7 report also noted:  "A new research note from Citigroup analyst Jim Suva states that sales of the BlackBerry Z10 smartphones have 'dramatically slowed' after an initial 'honeymoon' and that carriers 'have already shifted promotions to other products [read:  Samsung Galaxy S4] and moved the Z10 to less favourable in-store locations.'"  Emirates 24/7 further noted that "[t]he Z10 has been officially available in the UAE since February 10, and today, within a month-and-a-half since then, prices seem to have slipped more than 16 per cent" and that "the price-slash is not limited to the UAE – retail price of the Z10 has reportedly been slashed elsewhere in the world too."

h.  On March 26, 2013, the *International Business Times* reported:  "Despite Heins' confident assertions that stock of the BlackBerry Z10 had run low in several stores and shops – 'White is sold out already,' he said – many retailers have pointed to the contrary, saying the BlackBerry Z10 handsets haven't sold too well at all.  In fact, according to the *Daily Telegraph*, many British stores said they had 'loads left' and 'plenty left,' while Phones 4U, the exclusive UK supplier of the white BlackBerry Z10, said it didn't sell out of the handsets, contrary to Heins' statement."   The *International Business Times* went on:  UK "retailers are reportedly slashing prices for the BlackBerry Z10 to spur along sales of the struggling handset."

i.  On April 5, 2013, BBin, a blog for BlackBerry users in India, reported that Junglee.com, an online shopping site, was offering the Z10 at a discounted price of Rs 37,990, and that Rediff.com, an India-based shopping portal, was selling the phone at an even more discounted price of Rs 37,500.

j.  On April 10, 2013, CrackBerry.com reported that in the United States, Amazon had dropped the price of the Z10 on both AT&T and Verizon to just $99 with a two-year contract and that those who already had purchased a Z10 from Amazon could claim a $50 credit.

k.  According to an April 13, 2013 *New York Post* article, "Blackberry is in the bargain bin.  Retailers [in the United States] are turning to steep discounts on the

newest Blackberry Z10 smartphone in an effort to move millions stockpiled on store shelves."  "A number of retailers -- some of whom said they were having trouble moving their Z10s -- have begun discounting from the initial $200 price with a two-year contract.  A Verizon store in Bayside [in Queens, New York] is selling the Z10 for $100 -- or half price -- with a two-year contract.  And it wasn't the only seller cutting prices.  Amazon was offering the same cut-rate deal for the phone.  A manager at the Bayside store said the Z10 was not selling well."

l.   On May 23, 2013, Cheap-Phones.com, an online provider of phones at discounted prices based in New York, announced it was offering the BlackBerry Z10 on its site at "a fraction" of the retail price.

49.   BlackBerry had very recent experience with a product failure, as both the PlayBook and the BlackBerry 7 seriously underperformed.  Familiar with the mechanics of a product failure, BlackBerry was desperate to hide the BlackBerry 10 catastrophe, and thus the failure of Defendant Heins' BlackBerry 10 strategy as well as its broader implications of that failure on future sales of BlackBerry 10s.[6]

50.   As a result of their desperation, BlackBerry began issuing false and misleading financial reports.  Notwithstanding Defendants' knowledge by the time BlackBerry filed its 40-F for its fiscal year ended March 2, 2013, that the BlackBerry 10s were failing commercially and steep discounting was and would in the future be required to sell, if at all possible, the outstanding inventory of BlackBerry 10s, BlackBerry, reported its fiscal year revenues based on shipments of BlackBerry 10s rather than end-user sales of the product. Consequently, BlackBerry's revenue recognition was not compliant with Generally Accepted Accounting Principles ("GAAP"), as it was recognizing revenues despite the Company's inability to reasonably and reliably estimate price concessions to carriers and retailers, and thus the price

---

[6] As more of the 10s failed to sell through, the fewer 10s would be sold as consumers feared either that providers would cease supporting the product or BlackBerry itself would cease to exist.

was neither fixed nor determinable. Thus, Defendants were able to inflate BlackBerry's revenues for the fiscal year and portray to the investing public that BlackBerry was again profitable.

51.     Moreover, to preserve the illusion of profitability and success of the BlackBerry 10s, Defendants failed, in violation of GAAP, to increase BlackBerry's reserves for costs related to the BlackBerry 10s and obsolete or unsalable 10 products even though Defendants knew by the time the 2013 fiscal year end financial statements were issued that BlackBerry would likely need to take charges in the future for losses related to the BlackBerry 10s.  By failing to properly increase reserves, Defendants were able to conceal their knowledge that the 10s were a commercial failure and to further inflate BlackBerry's earnings as reserves would have reduced those earnings and signaled to the market the problems with the BlackBerry 10s.

52.     The truth began to emerge on June 28, 2013, when, prior the opening of the market, BlackBerry filed its 1st quarter fiscal 2014 financial report for the period ending June 1, 2013 on Form 6-K.  The Company posted a surprise loss for the quarter, and disclosed that it had shipped just 2.7 million new BlackBerry 10 devices, which made up just 40% of the Company's total smartphone shipments in the period.  Given that this was the first full quarter that the new devices were on sale, analysts had widely expected the Company to post a profit with a much larger number of BlackBerry 10 shipments.

53.     The market reacted swiftly and negatively to the disclosure, which partially revealed the truth behind Defendants' misrepresentations regarding the purported success of and positive customer reaction to the BlackBerry 10 smartphones. BlackBerry stock fell from $14.48 per share at close on June 27, 2013, to $10.46 per share at close on June 28, 2013, a decline of approximately 28% on heavy trading volume.

54.     Defendants continued to mislead investors after these revelations came to light, and downplayed the significance of the 1st quarter fiscal 2014 results. Indeed, during the BlackBerry earnings call later that day on June 28, 2013, when analysts questioned the low shipment numbers of the BlackBerry 10 devices, Defendant Heins reassured that the Company was "still in our launch cycle" and that "[w]e're focusing on driving the sell-through so our customers get the devices in their hands. And when they get them in their hands, they seem to be really happy with what they see, and what they can experience with the new user experience on BlackBerry." But when an analyst asked if the Company "could give us what you sold through of BlackBerry 10," Defendant Bidulka refused, saying "[w]e're not going to provide the split on sell-through on the BB10 versus BBOS." Defendant Heins added that "[w]hat I can tell you, qualitatively, is that I received very, very good feedback." In truth, sell-through of the BlackBerry 10s was dismal, returns were mounting, and inventory was piling up.

55.     It was not until September 20, 2013, the end of the Class Period, that the truth fully emerged concerning the BlackBerry 10 smartphones and the impact on the Company's performance and prospects. That day, Defendants announced that BlackBerry would report a "charge against inventory and supply commitments in the second quarter of ***approximately $930 million to $960 million, which is primarily attributable to BlackBerry Z10 devices;***" that the current quarter would also include a "restructuring charge" in the approximate amount of $72 million;" that the Company planned "to transition its future smartphone portfolio from six devices to four;" and that the Company would implement "a workforce reduction of approximately 4,500 positions or approximately 40% of the Company's global workforce."

56.     Immediately, BlackBerry stock plummeted, on heavy volume, losing almost a quarter of its market value in just days, dropping from a closing price of $10.52 per share on

September 19, 2013 to close at $8.73 per share on September 20, 2013.  By close of trading on September 25, 2013, the price of BlackBerry stock slid down to just $8.01.

57.     The news came as a shock to financial analysts.  For example, UBS issued a report on September 20, 2013, which stated in part:

> BBRY negatively preannounces F2Q results now anticipating Revs of $1.6b (cons$3.1b) and EPS loss, prior to an inventory write-down charge of $930-960m, of -$0.47 to -$0.51 vs. cons at -$0.15. There were 2 main surprises in our opinion: a) the magnitude of the miss (50% in revenues); b) of the 3.7m phones for which revs were recognized, almost all were BB7, i.e., almost no revenue was recognized for the newer BB10 devices.

58.     The BlackBerry 10 line of smartphones represented a Hail Mary play for BlackBerry that would either launch the Company back into the mobile forefront, or render it and its products antiquated and passé.   Throughout the Class Period, Defendants materially misrepresented to investors the true financial condition of BlackBerry and that its supposed recovery was an illusion created by manipulating the Company's final statements coupled with public misrepresentations regarding the BlackBerry 10s' success as a product.  In turn, these false and misleading statements and omissions to disclose material information artificially inflated the market price of BlackBerry common stock.

59.     Defendants Heins and Bidulka were further motivated to tout the BlackBerry 10 phones and conceal the accompanying waxing inventory and waning revenues because – after seeing the prior co-CEOs Mike Lazaridis and Jim Balsillie forced out of the Company following the failure of the BlackBerry PlayBook – they were able to secure substantial performance based bonuses (tied to the Company's improperly inflated revenues) and delay for months their own forced departures from BlackBerry which promptly occurred after the truth

was revealed in order to continue receiving their high salaries and other compensation and benefits for as long as they could conceal the true commercial failure of the BlackBerry 10s.

60.     Defendants knew or recklessly disregarded that the Company's Class Period statements regarding the BlackBerry Z10's success were materially false and misleading because the BlackBerry Z10 had already launched in other countries without success, and carriers in those countries were already offering steep discounts to move the phones off their shelves. Defendants also actively monitored real-time sales and return data concerning the Z10s that showed sales and returns were not in line with estimates.

61.     Fundamentally, Defendants bet the Company on the BlackBerry 10 phones, and the wager did not pay off.  New CEO John Chen even expressed that BlackBerry – the inventor of the smart phone – will cease making smartphones if the Company cannot profit from them, telling Reuters, "If I cannot make money on handsets, I will not be in the handset business."

## JURISDICTION AND VENUE

62.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

63.     This Court has jurisdiction over the subject matter of this action pursuant to §28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

64.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). The violations of law complained of herein occurred in part in the District, including, but not limited to, the dissemination of materially false and misleading statements into this District.

65.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A. Plaintiffs

66.     Lead Plaintiff Todd Cox, as set forth in his previously-filed certification [Dkt. # 13-1], incorporated herein by reference, purchased BlackBerry common stock at an artificially inflated price during the Class Period, and was harmed when the price of BlackBerry stock dropped as a result of the revelations of the truth at the end of the Class Period.

67.     Lead Plaintiff Mary Dinzik, as set forth in her previously-filed certification [Dkt. # 13-1], incorporated herein by reference, purchased BlackBerry common stock at an artificially inflated price during the Class Period, and was harmed when the price of BlackBerry stock dropped as a result of the revelations of the truth at the end of the Class Period.

68.     Additional Plaintiff Yong M. Cho ("Cho"), purchased BlackBerry common stock at an artificially inflated price during the Class Period, and was harmed when the price of BlackBerry stock dropped as a result of the revelations of the truth at the end of the Class Period. The previously-filed certification for Plaintiff Cho is incorporated herein by reference.

69.     Additional Plaintiff Batuhan Ulug ("Ulug"), purchased BlackBerry common stock at an artificially inflated price during the Class Period, and was harmed when the price of BlackBerry stock dropped as a result of the revelations of the truth at the end of the Class Period. The previously-filed certification for Plaintiff Ulug is incorporated herein by reference.

### B. Defendants

70.     Defendant BLACKBERRY is incorporated under the laws of Canada, maintaining its principal place of business 295 Phillip Street, Waterloo, Ontario, Canada, N2L 3W8.  As explained above, BlackBerry is a designer, manufacturer and marketer of wireless solutions, through the development of integrated hardware, software, and services.

71.     Defendant Thorsten Heins ("Heins") was, during the Class Period, the Chief Executive Officer ("CEO") and President of BlackBerry.  Heins also served as a member of the Board of Directors.  Heins resigned as President and CEO and as a director on November 13, 2013, after the end of the Class Period.  Heins personally certified all of the Company's financial reports issued during the Class Period.

72.     Defendant Brian Bidulka ("Bidulka") was, during the Class Period, Chief Financial Officer ("CFO") of BlackBerry.  Bidulka resigned as CFO on November 25, 2013, after the end of the Class Period.  Bidulka personally certified all of the Company's financial reports issued during the Class Period.

73.     Defendant Steve Zipperstein ("Zipperstein") was, during the Class Period, Chief Legal Officer of Blackberry. He made materially false and misleading statements and omissions during the Class Period.

74.     Collectively, BlackBerry, Heins, Bidulka, and Zipperstein are referred to as "Defendants."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.     Materially False and Misleading Statements Regarding the Success of BlackBerry and its BlackBerry 10 Smartphones

75.     Throughout the Class Period, BlackBerry made materially false and misleading statements and omissions regarding the Company's new BlackBerry 10 line of smartphones,

customer satisfaction with the phones, meeting of sales expectations, and return rates for the phones.  In truth, the BlackBerry 10 phones were not selling-through to customers, return rates exceeded expectations, and BlackBerry was forced, almost immediately after their introduction, to initiate steep discounts on the phones to attempt to move inventories.

76.     On March 28, 2013, the first day of the Class Period, BlackBerry filed with the SEC its Annual Information Form on Form 40-F for the fiscal year ending March 2, 2013. BlackBerry's filing stated: "Successfully transitioning to BlackBerry 10, the Company's nextgeneration BlackBerry platform. . . .  **The launch of BlackBerry 10 in January 2013 marked the beginning of the organization's transition to becoming a leading mobile computing organization.**"  (Emphasis added).

77.     The foregoing statement was materially false and misleading when made because by March 28, 2013, Defendants knew and/or recklessly disregarded the facts available to them that, among other things, the BlackBerry 10s were not "successful," and that the 10s would not return BlackBerry to being "a leading mobile computing organization."  In reality, the launch of BlackBerry Z10 smartphones in overseas markets, which took place months before the March 22, 2013 U.S. launch, had already proven to be a disaster for the Company.  As early as January 2013, BlackBerry was already working with its carriers to discount the new BlackBerry Z10 smartphones overseas, which indicated that the launch of the BlackBerry 10 was not "successful" because end-users were not buying the phones.

78.     On March 28, 2013, BlackBerry issued a press release (also filed with the SEC on Form 6-K) announcing fourth quarter and year-end results for fiscal 2013 (the fiscal year ended March 2, 2013).  The press release quoted Defendant Heins:

> "We have implemented numerous changes at BlackBerry over the past year and ***those changes have resulted in the* Company returning to profitability**

in the fourth quarter," said Thorsten Heins, President and CEO. "With the launch of BlackBerry 10, we have introduced the newest and what we believe to be the most innovative mobile computing platform in the market today. ***Customers love the device and the user experience, and our teams and partners are now focused on getting those devices into the hands of BlackBerry consumer and enterprise customers.***" (Emphasis added).

79.    Defendant Heins' statements quoted in the March 28, 2013 press release were materially false and misleading when made because Defendants knew and/or recklessly disregarded facts available to them that BlackBerry's purported return to profitability in the fourth quarter of fiscal 2013 was the result of improper revenue recognition techniques which would likely have to be reversed by charges or write-downs in future quarters) and that  the vast majority of the pool of potential BlackBerry 10 customers were shunning the product.   For example, a March 5, 2013 Forbes.com report quoted Pacific Crest analyst, James Faucette, asserting "that U.K inventory levels of the Z10 touch-screen BB10-based smartphones are 'already too high,' and that inventory levels in Canada are 'quickly approaching typically targeted levels.'"[7] James Faucette also stated that "'[o]ur checks indicate that as sell-through run-rates for the Z10 have declined meaningfully in the weeks following launch, we believe carriers and third-party retailers in the U.K. are already well above typically targeted inventory.'"

80.    During an earnings call on March 28, 2013, Defendant Heins stated:

- Over the past year, we have also regained the confidence and excitement of our carrier distribution partners with the introducing of the amazing Blackberry 10 platform for consumers and enterprises. The Blackberry 10 platform has been worth the wait.

- As mentioned at our launch in January, availability of Q10 will commence in April. ***The initial early global demand for the 10 has been better than anticipated, and our recent announcement of the largest single purchase***

---

[7]    http://www.forbes.com/sites/ericsavitz/2013/03/05/blackberry-z10-inventories-piling-up-in-u-k-analyst-says/

> **order in our history, for 1 million units, is also indicative of a strong initial support and demand.**

(Emphasis added).

81.     Defendant Heins' statements during the March 28, 2013 earnings call regarding having "regained the confidence and excitement of [its] carrier distribution partners" with the introduction of the BlackBerry 10, were materially false and misleading when made because Defendants failed and omitted to disclose BlackBerry carriers in the UK, Canada, Dubai, India, and elsewhere were already offering steep discounts on BlackBerry's supposedly "amazing" Z10 smartphones as early as January 2013. Thus, to the extent there was an "initial early global demand for the 10 has been better than anticipated," that demand had waned by March 28, 2013 and consumers had already soured on the device. Furthermore, Defendants possessed, reviewed and actively monitored real-time sales and returns data concerning the Z10s that showed sales and returns were not in line with estimates.

82.     Furthermore, with respect to the 1 million unit order, that order came from Brightstar, a national distributor of smart phones.  The Brightstar order came before the BlackBerry 10s had been available to consumers in the U.S. market.  According to a Brightstar Marketing Manager, who was specifically assigned from July 2013 to mid-October 2013 to assist sales of the Z10 and Q10 for the Verizon dealer network, and who worked directly with Verizon Channel Marketing Managers and BlackBerry employees to develop a sales program to incentivize franchisee sales managers to create sell-through on the BlackBerry 10 devices, that customers were simply not asking for the BlackBerry 10.  The Marketing Manager explained that part of the reason was that BlackBerry 10's did not have support from software developers and therefore had no "apps" like the iPhone and other leading devices.  He also stated that the BlackBerry 10 platform was not compatible with very many applications, which is key to

smartphone utility and acceptance.   The Brightstar Marketing Manager informed BlackBerry personnel of these issues, saying "there is nothing they can do to move the needle" and ultimately put his hands up and said "we can't help you."

83.   On April 11, 2013, THE WALL STREET JOURNAL'S DIGITS blog reported that, according to analyst Jeff Johnston from research and investment firm Detwiler Fenton, "customer returns of the Z10 are actually outnumbering sales."[8]   The Detwiler Fenton report stated that "'We believe key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are now exceeding sales, a phenomenon we have never seen before.'"[9]

84.   On April 12, 2013, BlackBerry issued a strongly-worded press release (filed with the SEC on Form 6-K) aggressively denying the claims from Detwiler Fenton that BlackBerry Z10 phones were being returned in unusually high numbers:

> "**Sales of the BlackBerry® Z10 are meeting expectations and the data we have collected from our retail and carrier partners demonstrates that customers are satisfied with their devices**," said BlackBerry President and CEO Thorsten Heins. "**Return rate statistics show that we are at or below our forecasts and right in line with the industry.  To suggest otherwise is either a gross misreading of the data or a willful manipulation.** Such a conclusion is absolutely without basis and BlackBerry will not leave it unchallenged."
>
> *              *              *
>
> BlackBerry Chief Legal Officer Steve Zipperstein said: "**These materially false and misleading comments about device return rates in the United States harm BlackBerry and our shareholders, and we call upon the appropriate authorities in Canada and the United States to conduct an immediate investigation.** Everyone is entitled to their opinion about the merits of the many competing products in the smartphone industry, but **when false statements of**

---

[8] http://blogs.wsj.com/digits/2013/04/11/analyst-blackberry-z10-returns-outnumber-sales/
[9] *Id.*

**material fact are deliberately purveyed for the purpose of influencing the markets a red line has been crossed.**" (Emphasis added).

85.     Defendants' denials of reports concerning high level of returns on BlackBerry 10 devices made in the April 12, 2013 press release were materially false and misleading when made because Defendants knew and/or recklessly disregarded the facts available to them that the Detwiler Fenton report was accurate, and that BlackBerry Z10 customers were not "satisfied with their devices."  In fact, BlackBerry Z10 devices were not moving off the shelves and the Company had already spent months working with carriers to discount the phones to try to sell them off.   Defendants' April 12, 2013 statements and omissions are also materially false and misleading for the reasons set forth at ¶¶3-33. In truth, Defendants had admittedly reviewed the sales and returns data which directly contradicted their public denial of the veracity of the Detwiler Fenton report.

86.     During a June 28, 2013 earnings call, CEO Heins stated:

- The BlackBerry Z10 has been an effective launch product to showcase the renewed and reengineered BlackBerry 10 experience to both consumers and enterprises.

- Let's remember, one year ago none of these products existed, and today they are just launching, **and have been well-received**, because of the performance and quality of BlackBerry 10. It has been very exciting and challenging for our teams, and we are looking forward to the next stage of our transition this year.  (Emphasis added).

87.     Defendant Heins' statements during the June 28, 2013 earnings call were materially false and misleading when made because Defendants knew and/or recklessly disregarded facts known to him that the BlackBerry 10 was  not "well received."  Indeed, the opposite was true.  By January 2013, it had failed abroad and was subject to steep discounting to attempt to move inventory, and by April 2013, BlackBerry was forced to have U.S. carriers

discount the devices as well. Defendants' April 12, 2013 statements and omissions are also materially false and misleading for the reasons set forth above at ¶¶ 3-33.

88.     On August 12, 2013, the Company issued a press release (filed with the SEC on Form 6-K) announcing that BlackBerry's Board of Directors was exploring strategic alternatives. The press release quoted Defendant Heins:

> We continue to see compelling long-term opportunities for BlackBerry 10, we have exceptional technology that customers are embracing, we have a strong balance sheet and we are pleased with the progress that has been made in our transition.

89.     Defendant Heins' statements in the August 12, 2013 press release were materially false and misleading when made because Defendants knew and/or recklessly disregarded facts available to him that customers were not "embracing" the 10's technology but shunning the product.  At the time these statements were made, carriers all over the world were offering the BlackBerry 10 smartphones at a fraction of the cost because consumers simply would not purchase the phones at BlackBerry's initial price point.  For example, BlackBerry Z10 phones were released in the United States through Verizon on March 28, 2013 at an initial price of $200 with a two-year contract.  According to an article published on April 13, 2013, just weeks after the Verizon Z10 release, a Verizon store in Queens, NY was selling the Z10 at $100—half the price—with the same two-year contract.  Similarly, on April 10, 2013, CrackBerry.com reported that in the United States, Amazon had dropped the price of the Z10 on both AT&T and Verizon to just $99 with a two-year contract and that those who already had purchased a Z10 from Amazon could obtain a $50 credit. In addition, Defendants had reviewed and monitored real-time sales and returns data from retailers and partners that demonstrated customers were no embracing Blackberry's technology.

90.     Furthermore, to the extent Defendant Heins was "pleased with the progress" of the Company's transition to the BlackBerry 10 (as far-fetched as that would have to be for a rational CEO), he failed and omitted to disclose that, irrespective of his purported personal pleasure with the product's lackluster performance, from any objective standpoint the introduction of the BlackBerry 10s – the Company's make-it, or break-it product – was a disaster for the Company and its investors.

91.     Likewise, as discussed more fully below, Defendant Heins' statement regarding BlackBerry's "strong balance sheet" was false and misleading because, as Defendant Heins knew and/or recklessly disregarded, that balance sheet was the product of material violations of GAAP and SEC accounting rules as well as SEC financial statement reporting rules and rules and regulations governing management's discussion in public filings that rendered them artificially inflated and thereby fraudulent. Defendants' April 12, 2013 statements and omissions are also materially false and misleading for the reasons set forth above at ¶¶ 3-33.

**B.      BlackBerry's False and Misleading Financial Statements**

92.     In addition to the materially false and misleading representations concerning the purported success of and positive consumer reaction to the BlackBerry 10 smartphones, during the Class Period, Defendants issued materially false and misleading financial results for the Company that improperly recognized and inflated revenue and that did not comply with GAAP (as Defendants certified they did).

93.     BlackBerry's financial statements are based on a fiscal year ending at the beginning of March.  Thus, the following financial statements issued during the Class Period: 1) the 2013 40F annual report for the fiscal year ending March 2, 2013 (also includes financial report for the 4th quarter of fiscal 2013, which covered the three months ending on March 2,

2013); 2) the first fiscal quarter 2014, which covered the three months ending on June 1, 2013; 3) the second fiscal quarter of 2014, which covered the three months ending on August 31, 2013; and 4) the third fiscal quarter of 2014, which covered the three months ending on November 30, 2014.

## 1.    Defendants' Financial Statements Failed to Comply with GAAP

94.    During the Class Period, in the Company's SEC filings and elsewhere, Defendants represented that BlackBerry's financial statements were prepared in conformity with GAAP.  GAAP are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. BlackBerry discloses in each of its interim financial statements filed on a 6-K the following:

> "These interim consolidated financial statements have been prepared by management in accordance with United States generally accepted accounting principles ("U.S. GAAP"). They do not include all of the disclosures required by U.S. GAAP for annual financial statements and should be read in conjunction with Research In Motion's (the "Company") audited consolidated financial statements (the "financial statements") for the year ended March 2, 2013, which have been prepared in accordance with U.S. GAAP."

95.    The foregoing statements were materially false and misleading because BlackBerry's financial statements did not comply with GAAP, but rather resulted from a series of decisions by Defendants designed to conceal the truth regarding BlackBerry's actual financial position and operating results.  Defendants caused the Company to violate GAAP and SEC rules, among other things, by improperly recognizing revenues, misreporting other related financial metrics, and failing to take timely and adequate loss reserves.  As a result, Defendants materially inflated the Company's financial results reported for at least the three months and fiscal year ended March 2, 2013 (fourth quarter and full year fiscal 2013) and the three months ended June 1, 2013 (first quarter Fiscal 2014).

96.     Defendants' statements and omissions of opinion concerning Defendants' accounting practices regarding BlackBerry's misstated revenue recognition policy and improperly recorded revenues from the Z10 upon shipment were materially false and misleading when made.  Defendants knew particular, material facts going to Defendants' opinion at the time, and the omission of those facts made the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.  Those particular, material facts included that Defendants' revenue recognition on Z10 sales was objectively unreasonable at the time for at least three reasons: the likelihood of price concessions due to the newness of the product; the introduction of competitors' products with superior technology or greater expected market acceptance; and prior, multiple, failed new product launches.  In addition, the sales price for the Z10 devices were not fixed but rather in flux as the result of price concessions and other facts.   Therefore, Defendants' statements of opinion regarding their accounting judgments concerning the misstated revenue recognition policy and improperly recorded revenues from the Z10 upon shipment lacked a reasonable basis and are actionable under Section 10(b) of the Securities Exchange Act, even if Defendants subjectively (and irrationally) believed  their unreasonable opinions at the time.

97.     As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

98.     Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

99.     SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing financial statements that conform to GAAP.  As stated in the professional standards adopted by the AICPA:

> [F]inancial statements are management's responsibility . . . .  [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . .  Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

100.     In connection with the Company's fiscal 2013 40F annual report for the year ending March 2, 2013, both Defendant Heins and Defendant Bidulka executed and filed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that attested to the purported accuracy and completeness of the Company's financial and operational reports as well as statements concerning BlackBerry's internal controls and procedures, as follows:

1. I have reviewed this annual report on Form 40-F of Research In Motion Limited;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5. The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent function):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

101.    Defendants' SOX Certifications were materially false and misleading because the financial reports in the Company's fiscal 2013 40F annual report improperly recognized and inflated revenue, failed to properly account for inventory, and did not comply with GAAP as Defendants claimed.  Furthermore, contrary to the statements in Defendants' SOX Certifications that internal controls were in place, BlackBerry's internal controls and procedures suffered from material weaknesses, and, as a result, the Company's financial reports were inaccurate, unreliable, and/or subject to manipulation.

102.    In BlackBerry's desperate attempt to create the perception that its new BlackBerry 10 platform was successful, Defendants violated GAAP in at least two ways: 1) Defendants improperly recognized revenue upon the shipment of the BlackBerry 10 devices despite the Company's inability to reasonably and reliably estimate future price concessions; and 2) Defendants failed to take a timely charge against earnings to account for the fact that the market value of the Company's Z10 inventory had deteriorated substantially below cost.

### a.    Defendants' Improper Recognition of Revenue

103.    BlackBerry's Fiscal 2013 Form 40-F, filed on March 28, 2013, represented the following:

Revenue Recognition

***The Company recognizes revenue when it is realized or realizable and earned.*** The Company considers revenue realized or realizable and earned when it has persuasive evidence of an arrangement, the product has been delivered or the services have been provided to the customer, ***the sales price is fixed or determinable*** and collection is reasonably assured. In addition to this general policy, the following paragraphs describe the specific revenue recognition policies for each of the Company's major categories of revenue.

Hardware

Revenue from the sale of BlackBerry wireless hardware products (e.g. BlackBerry® handheld devices and BlackBerry® PlayBook™ tablets) is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collection is probable. Product is considered delivered to the customer once it has been shipped and title and risk of loss have been transferred. For most of the Company's product sales, these criteria are met at the time the product is shipped. For hardware products for which the software is deemed essential to the functionality of the hardware, the Company recognizes revenue in accordance with general revenue recognition accounting guidance.

(Emphasis added).

104.    GAAP permits the recognition of revenue only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectability is probable.  SEC Staff Accounting Bulletin ("SAB") No. 104.  Moreover, in order for revenue to be recognized, it must be earned and realized or realizable.  Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 83, ASC § 605-10-25-1(a)[10].

105.    Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.  *Id*.  Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash.  *Id*.  If collectability is not reasonably assured, revenues should be recognized on the basis of cash received.  Concepts Statement No. 5, ¶ 84g; *see also Accounting Research Bulletin* No. 43 ("ARB 43"), Ch. 1A, ¶ 1 (June 1943); ASC § 605-10-25-1; Accounting

---

[10] With the issuance of FASB Statement No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles*, the FASB approved the Codification ("ASC") as the source of authoritative US GAAP for non-governmental entities for interim and annual periods ending after September 15, 2009.  The *FASB Accounting Standards Codification*, hereinafter cited as "ASC __."

Principles Board Opinion No. 10 ("APB 10") *Omnibus Opinion-1966* ¶ 12 (Dec. 1966).   If payment is subject to a significant contingency, revenue recognition is improper.  ASC § 450-30-25-1.

106.    BlackBerry's representations in its Fiscal 2013 Form 40-F, filed on March 28, 2013, that the Company recognizes revenue when it is ***realized or realizable and earned*** was false and misleading because the sale price of the BlackBerry Z10 device was not ***fixed or determinable.*** BlackBerry could not reasonably and reliably estimate future price concessions, thus revenue recognition was improper and in violation of GAAP.   BlackBerry knew or recklessly disregarded that various factors precluded the Company from reasonably and reliably estimating future price concessions, including: (1) ***excess levels of inventory in a distribution channel*** due to substantially lower sell through than shipping volumes); (2) ***larger than expected returns of current products***; (3) the ***newness of a product***; (4) the ***introduction of competitors' products with superior technology*** or greater expected market acceptance; and (5) ***prior adverse historical results*** in connection with the Company's release of the BlackBerry 7 and PlayBook, necessitating material write-downs of goodwill and inventory.   BlackBerry was required to carefully analyze all factors, including trends in historical data, which could affect the Company's ability to make reasonable and reliable estimates of expected price concessions.  Moreover, BlackBerry was acutely aware of the forgoing factors.   For example, in the Company's 1st quarter fiscal 2014 earnings' release on June 28, 2013, Blackberry disclosed that "[t]he smartphone market remains highly competitive, making it difficult to estimate units, revenue and levels of profitability."

107.    First, BlackBerry was experiencing excess levels of inventory due to a lack of sell-through on BlackBerry 10 smartphones.  On March 25, 2013, a Fox Business story titled

"Citi: BlackBerry Z10 U.S. Launch a 'Big Disappointment'" quoted Jim Suva, an analyst at Citigroup, as stating in a note to investors that the "'new product launch was not what people were expecting,'" that the new phones suffered from "poor product placement, with the Z10 pushed to the side or back of AT&T stores," and that "[c]arriers abroad [had] already shifted promotions to other products and there [had] been an increasing number of customer returns, with the most cited reason being lack of apps, including Instagram and Netflix."[11]  Moreover, by March 2013, carrier and distributor partners were carrying excess levels of inventories.  For example, a March 5, 2013 Forbes.com report quoted Pacific Crest analyst, James Faucette, asserting "that U.K inventory levels of the Z10 touch-screen BB10-based smartphones are 'already too high,' and that inventory levels in Canada are 'quickly approaching typically targeted levels.'"[12]  James Faucette also stated that "'[o]ur checks indicate that as sell-through run-rates for the Z10 have declined meaningfully in the weeks following launch, we believe carriers and third-party retailers in the U.K. are already well above typically targeted inventory levels.'"

108.    Second, BlackBerry also could not reasonably and reliably estimate price concessions as a result of the larger than expected returns of its current products – BlackBerry 10 devices.  On April 11, 2013, THE WALL STREET JOURNAL'S DIGITS blog reported that, according to analyst Jeff Johnston from Detwiler Fenton, "customer returns of the Z10 are actually outnumbering sales."[13]  The Detwiler Fenton report stated that "'We believe key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are

---

[11]       http://www.foxbusiness.com/technology/2013/03/25/citi-blackberry-z10-us-launch-big-disappointment/

[12]    http://www.forbes.com/sites/ericsavitz/2013/03/05/blackberry-z10-inventories-piling-up-in-u-k-analyst-says/

[13]  http://blogs.wsj.com/digits/2013/04/11/analyst-blackberry-z10-returns-outnumber-sales/

now exceeding sales, a phenomenon we have never seen before.'"[14] The veracity of the Detwiler

Fenton report is demonstrated by the allegations at ¶¶ 9-29 above.

109.    Third, BlackBerry could not reasonably and reliably estimate price concessions as

a result of the newness of the product.   The launch of BlackBerry 10 was "the launch of an

entirely new mobile computing platform."[15]   According to a report on abcnews.go.com:

> BlackBerry 10 is a completely new version of the BlackBerry software; it
> doesn't share a line of code with the previous version called BlackBerry 7
> and was built completely for the touchscreen. While the operating system is
> similar to that of the iPhone or Android, as it is built around pages of apps,
> BlackBerry says the other platforms are now outdated and that the
> BlackBerry 10 will provide "differentiating" features.[16]

Defendants also knew that the "results [were] very difficult to estimate during this

transition...."[17]

110.    Fourth, BlackBerry could not reasonably and reliably estimate price concessions

as a result of the introduction of competitors' products with superior technology or greater

expected market acceptance.   On February 12, 2014, IDC[18] issued a press release titled "Android

and iOS Continue to Dominate the Worldwide Smartphone Market with Android Shipments Just

---

[14] *Id.*

[15] BBRY Q1 Fiscal 2014 Earnings Call Tr. (Jun. 28, 2013).

[16] http://abcnews.go.com/Technology/blackberry-reinvents-blackberry-10-blackberry-z10-q10-launch/story?id=18353250

[17] BBRY Q1 Fiscal 2014 Earnings Call Tr. (Jun. 28, 2013).

[18] International Data Corporation (IDC) is the premier global provider of market intelligence, advisory services, and events for the information technology, telecommunications and consumer technology markets. IDC helps IT professionals, business executives, and the investment community make fact-based decisions on technology purchases and business strategy. More than 1,100 IDC analysts provide global, regional, and local expertise on technology and industry opportunities and trends in over 110 countries worldwide. For 50 years, IDC has provided strategic insights to help our clients achieve their key business objectives. IDC is a subsidiary of IDG, the world's leading technology media, research, and events company.

Shy of 800 Million in 2013, According to IDC." The press release stated in pertinent part, the following:

> BlackBerry was the only operating system to realize negative year-over-year change both for the quarter (-77.0%) and for the year (-40.9%). _**Moreover, its legacy BB7 outpaced BB10 towards the end of the year, definitely not the results that the company had hoped for when it released BB10 in January.**_ With new leadership, management, and a tighter focus on the enterprise market, BlackBerry may in a better position, but still finds itself having to evangelize the new platform to its user base.[19]

(Emphasis added).

111.    As a result of the anemic sales and larger than expected returns of the BlackBerry Z10 devices, BlackBerry was forced to offer price concessions to retailers. In the fourth quarter fiscal 2013 financial report filed on Form 40F on March 28, 2013, BlackBerry disclosed that it had shipped 1 million BlackBerry 10 devices. That same day, on the 4th Quarter Fiscal 2013 Earnings Call, Defendant Heins represented that "two-thirds to three-quarters already have sold through." But prior to Defendant Heins' representations on March 28, 2013, BlackBerry was already offering substantial price concessions to carriers and retailers on the Z10 (some as early as January 2013) worldwide, including in the United Kingdom, India, Canada, Dubai and elsewhere. For example:

| Source | Date | Retailer | Location | Discount |
|--------|------|----------|----------|----------|
| BerryReview | 1/30/2013 | Rogers | Canada | White Z10 for $100 off |
| Telegraph.co.uk | 3/4/2013 | Carphone Warehouse | U.K. | Appx. £139 price drop over 2 year contract |
| BGR | 3/5/2013 | Carphone Warehouse; Vodafone | U.K. | Monthly package price drop from £36 /mo. to £29 /mo. (£160 value over 2 yrs.); £72 |

---

[19] http://www.idc.com/getdoc.jsp?containerId=prUS24442013

| Source | Date | Retailer | Location | Discount |
|---|---|---|---|---|
| | | | | discount off package deal. |
| Softpedia.com | 3/17/2013 | Rogers; Bell; Virgin Mobile | Canada | Drop from $150/€110 on 3-year contract to $100/€75 on same contract. |
| Know Your Mobile; Nerdberry.com | 3/19/2013 | BlackBerry | India | Drop from Rs 43,490 to Rs 39,990. |
| Emirates 24/7 | 3/25/2013 | n/a | Dubai | Drop from Dh 2,599 to Dh 2,170. |

112.   Observed discounts and incentives offered after Defendant Heins' March 28, 2013 earnings call statement that "two-thirds to three-quarters already have sold through" confirm that his statement was false at the time it was made.

| Source | Date | Retailer | Location | Discount |
|---|---|---|---|---|
| BBin | 4/5/2013 | Rediff.com; Junglee.com | India | Drop from Rs 43,490 to Rs 37,990; drop from RS 43,490 to Rs 37,500. |
| CrackBerry.com | 4/10/2013 | AT&T; Verizon | U.S. | Drop from $200 to $99 with two-year contract; previous purchasers could receive $50 credit |
| New York Post | 4/13/2013 | Verizon; Amazon | U.S. | Drop from $200 to $100 with two-year contract |

113.   On June 28, 2013 BlackBerry filed its 1st quarter fiscal 2014 financial report for the period ending June 1, 2013 on Form 6-K, reporting that it had shipped 6.8 million smart

phones of which approximately 40% or 2.7 million were BlackBerry 10 devices. During the 1st quarter fiscal 2014 earnings call held on June 28, 2013, Defendant Bidulka refused "to provide the split on sell-through on the BB10 versus BBOS."

114.    Fifth, BlackBerry could not reasonably and reliably estimate price concessions because of adverse historical data showing declining demand for the BlackBerry 7 smartphone and BlackBerry's PlayBook tablets, resulting in weak sell-through. The BlackBerry 7 smartphones' weak sell-through resulted in a $355 million charge for the impairment of goodwill and a $267 million inventory write-down of those devices in the 4th quarter fiscal 2012,[20] and necessitated the introduction of aggressive customer incentive programs to improve sales throughout FY 2013. The weak sales of the PlayBook tablets necessitated a $485 million inventory write-down of those products in the 3rd quarter of fiscal 2012.

115.    On March 28, 2013, the Company issued a press release announcing BlackBerry's fourth quarter and year end fiscal 2013 results via a 6-K, stating the following:

> Revenue for the fourth quarter of fiscal 2013 was approximately $2.7 billion, down $49 million or 2% from approximately $2.7 billion in the previous quarter and down 36% from $4.2 billion in the same quarter of fiscal 2012. The revenue breakdown for the quarter was approximately 61% for hardware, 36% for service and 3% for software and other revenue. During the quarter, BlackBerry shipped approximately 6 million BlackBerry smartphones and approximately 370,000 BlackBerry PlayBook tablets.
>
> GAAP income for the quarter from continuing operations was $94 million, or $0.18 per share diluted, compared with the GAAP income from continuing operations of $14 million, or $0.03 per share diluted, in the prior quarter and a GAAP loss from continuing operations of $118 million, or $0.23 per share diluted, in the same quarter of fiscal 2012. GAAP income for the quarter, including income from discontinued operations, was $98 million, or $0.19 per share diluted, compared with the GAAP income including loss from discontinued operations of $9 million, or $0.02 per share diluted, in the prior quarter and a

---

[20] BBRY 6-K at 4, 5 (Mar. 30, 2012).

GAAP loss, including loss from discontinued operations of $125 million, or $0.24 per share diluted, in the same quarter of fiscal 2012.

Adjusted income from continuing operations for the fourth quarter was $114 million, or $0.22 per share diluted.

Fiscal 2013 Results

Revenue from continuing operations for the fiscal year ended March 2, 2013 was $11.1 billion, down 40% from $18.4 billion in fiscal 2012. The Company's GAAP net loss from continuing operations for fiscal 2013 was $628 million, or $1.20 per share diluted, compared with GAAP net income from continuing operations of $1.2 billion, or $2.23 per share diluted in fiscal 2012.

116.    Defendants' March 28, 2013 statements regarding revenues and earnings were materially false and misleading when made because Defendants knowingly and/or recklessly disregarded that Blackberry was recognizing revenues at the time of shipment, despite the Company's inability to reasonably and reliably estimate price concessions to carriers and retailers, and thus the price was neither fixed nor determinable.

117.    Defendants knew or recklessly disregarded that various factors precluded the Company from reasonably and reliably estimating future price concessions, including larger than expected returns, the newness of Blackberry 10 devices, lower than expected sell through, and new competitor introductions.

118.    Then, on June 28, 2013, the Company issued a press release filed on Form 6-K announcing BlackBerry's first quarter fiscal 2014 results for the quarter ending June 1, 2013:

Revenue for the first quarter of fiscal 2014 was $3.1 billion, up 15% from $2.7 billion in the previous quarter and up 9% from $2.8 billion in the same quarter of fiscal 2013. The revenue breakdown for the quarter was approximately 71% for hardware, 26% for service and 3% for software and other revenue. During the quarter, the Company shipped 6.8 million BlackBerry smartphones and approximately 100,000 BlackBerry PlayBook tablets.

GAAP loss from continuing operations for the quarter was $84 million, or $0.16 per share diluted, compared with a GAAP income from continuing operations of $94 million, or diluted earnings per share of $0.18, in the prior quarter and GAAP loss from continuing operations of $510 million, or $0.97 per share diluted, in the same quarter last year.

Adjusted loss from continuing operations for the first quarter was $67 million, or $0.13 per share diluted.

119.    The first quarter fiscal 2014 report of revenues and earnings was likewise materially false and misleading when made because Defendants knowingly and/or recklessly disregarded that BlackBerry was recognizing revenues at the time of shipment despite the Company's inability to reasonably and reliably estimate price concessions to carriers and retailers, and thus the price was neither fixed nor determinable.  Defendants knew or recklessly disregarded that various factors precluded the Company from reasonably and reliably estimating future price concessions, including larger than expected returns, the newness of BlackBerry 10 devices, lower than expected sell through, and new competitor introductions.

**b.    Defendants' Failure to Properly Account for Inventory**

120.    Defendants failed to take a charge to income for the Z10 during the Class Period. In fact, as depicted in the chart below, Defendants actually reduced the "Provision for Excess and Obsolete Inventory" at the end of fiscal 2013, compared to the third quarter of fiscal 2013, both in dollars and as a percent of total inventory – from $477 million to $434 million.

| (in millions) | Period Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3-Mar-12 | 1-Sep-12 | 1-Dec-12 | 2-Mar-13 | 1-Jun-13 |
| Raw materials | $771 | $786 | $622 | $588 | $641 |
| Work in process | 520 | 379 | 236 | 371 | 629 |
| Finished goods | 167 | 105 | 76 | 78 | 80 |

|   |   |   |   |   |
|---|---|---|---|---|
| 1,458 | 1,270 | 934 | 1,037 | 1,350 |
| (431) | (485) | (477) | (434) | (463) |
| $1,027 | $785 | $457 | $603 | $887 |

Provision for excess and obsolete inventory

121.    Defendants represented that the Company's accounting for inventory was consistent with GAAP.  In this regard, the Company's fiscal 2013 annual report filed on Form 40-F, issued March 28, 2013, disclosed BlackBerry's accounting for inventory as follows:

> Raw materials are stated *at the lower of cost and replacement cost*. Work in process and finished goods *inventories are stated at the lower of cost* and net realizable value." (Emphasis added).

122.    BlackBerry violated GAAP by failing to take a timely charge against earnings to account for the fact that the market value of the Company's Z10 inventory had deteriorated substantially below cost, because, among other things: (1) BlackBerry was experiencing a lack of sell-through on the Z10s; (2) the carrier and distributor partners were holding extraordinarily high levels of excess inventory, in absolute and relative terms; and (3) the cost of the carrier and distributor partner sales incentives and refunds were increasing, and would continuing to increase for the foreseeable future.

123.    Defendants' material misrepresentations and omissions regarding BlackBerry's delay in taking a timely charge against income to account for decreased value of the Z10 inventory were materially false and misleading when made. Defendants knew particular, material facts going to Defendants' opinion at the time, and the omission of those facts made the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context. Those particular, material facts included that BlackBerry's policy – providing that inventory would be written down if management believes that demand (or lack thereof) no longer allowed

smartphones to be sold above cost – is actionable where Defendants' belief – even if subjectively true – *had no reasonable basis*.   Further, Defendants' failure to take a timely charge against income to reflect a deterioration in the value of the Z10 inventory was objectively unreasonable at the time for several reasons: the likelihood of price concessions due to the newness of the product; the introduction of competitors' products with superior technology or greater expected market acceptance; and prior, multiple, failed new product launches.   Defendants had no reasonable basis for their failure to record a timely charge against income to reflect a deterioration in the value of Z10 inventory. Thus, Defendants' opinion statements were either known to be false or, at a minimum, made with reckless disregard that they had no reasonable basis.

124.    In connection with inventory accounting, GAAP provides, in pertinent part:

> A departure from the cost basis of pricing the ***inventory*** is required when the utility of the goods is no longer as great as its cost.   Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period.   This is generally accomplished by stating such goods at a lower level commonly designated as ***market***.

ASC 330-10-35-1.  (Emphasis in original).

125.    As a result of the poor sell-through, BlackBerry was holding extraordinarily high levels of excess Z10 inventory.   The Z10 had launched in the UK and Canada on January 31, 2013 and February 5, 2013, respectively.   But by March 2013, carrier and distributor partners were carrying excess levels of inventories.   For example, a March 5, 2013 Forbes.com report quoted Pacific Crest analyst, James Faucette, asserting "that U.K inventory levels of the Z10 touch-screen BB10-based smartphones are 'already too high,' and that inventory levels in

Canada are 'quickly approaching typically targeted levels.'"[21]   James Faucette also stated that "'[o]ur checks indicate that as sell-through run-rates for the Z10 have declined meaningfully in the weeks following launch, we believe carriers and third-party retailers in the U.K. are already well above typically targeted inventory levels.'"[22]

126.    Consequently, BlackBerry was forced to offer its carrier and distributor partners sales incentives to increase sell-through.  According to GAAP, "[t]he offer of a sales incentive that will result in a loss on the sale of a product may indicate an impairment of existing inventory."  ASC 330-10-35-13.  As indicated above, the price of the Z10 dropped precipitously, soon after the launch – from approximately $200 to as low as $49 or free with contract. BlackBerry representatives, however, claimed that the Z10 price drops were "part of life cycle management to tier the pricing for current devices to make room for the next ones,"[23] and not part of a build-up of excess inventory. Indeed, not until the fiscal 2014 third quarter did the Company admit in a 6-K filing made December 20, 2013 that "The company plans to implement *further sales incentives with its carrier and distributor partners to increase sell-through*, which could be applicable to all BlackBerry 10 devices shipped in the second and third quarters of fiscal 2014."  (Emphasis added).

127.    The Company's Fiscal 2013 Form 40-F also disclosed the following regarding BlackBerry's accounting for inventory:

---

[21]   http://www.forbes.com/sites/ericsavitz/2013/03/05/blackberry-z10-inventories-piling-up-in-u-k-analyst-says/

[22] *Id.*

[23]   A BlackBerry spokesman made this comment in an email to THE WALL STREET JOURNAL following dramatic price cuts in July, 2013.  *See* Will Connors, *BlackBerry Z10 Prices Drop to $49 Amid Weak Sales*, The Wall Street Journal, July 12, 2013, http://online.wsj.com/news/articles/SB10001424127887324425204578601701101031158.

The Company's policy for the valuation of inventory, including the determination of obsolete or excess inventory, requires management to estimate the future demand for the Company's products within specific time horizons. Inventory purchases and purchase commitments are based upon such forecasts of future demand and scheduled rollout of new products. The business environment in which the Company operates is subject to rapid changes in technology and customer demand. The Company performs an assessment of inventory during each reporting period, which includes a review of, among other factors, demand requirements, component part purchase commitments of the Company and certain key suppliers, product life cycle and development plans, component cost trends, product pricing and quality issues. *If customer demand subsequently differs from the Company's forecasts, requirements for inventory write-offs that differ from the Company's estimates could become necessary. If management believes that demand no longer allows the Company to sell inventories above cost or at all, such inventory is written down to net realizable value or excess inventory is written off.*

(Emphasis added).

128.    At the time BlackBerry issued this statement saying that, among other things, "[*i*]*f management believes that demand no longer allows the Company to sell inventories above cost or at all, such inventory is written down to net realizable value or excess inventory is written off*," Defendants already knew or recklessly disregarded that the Z10 was experiencing a lack of sell-through.  A March 5, 2013 forbes.com report stated "that U.K inventory levels of the Z10 touch-screen BB10-based smartphones are 'already too high,' and that inventory levels in Canada are 'quickly approaching typically targeted levels.'" Furthermore, a FOX BUSINESS story titled "Citi: BlackBerry Z10 U.S. Launch a 'Big Disappointment'" on March 25, 2013 noted that the "'new product launch was not what people were expecting,'" suffered from "poor product placement, with the Z10 pushed to the side or back of AT&T stores," and that "[c]arriers abroad [had] already shifted promotions to other products and there [had] been an increasing number of customer returns, with the most cited reason being lack of apps, including Instagram and Netflix."

129.    The March 28, 2013 Form 40-F also set forth the Company's financial results, which were essentially the same as those contained in press release issued on the same day, and disclosed that it held $603 million in inventory, after "including the determination of obsolete or excess inventory . . . ."

130.    The foregoing statement regarding inventory was materially false and misleading because Defendants knew or recklessly disregarded that carriers and distribution partners were not achieving the expected sell-through on the Z10, resulting in extraordinarily high levels of excess inventory, thus requiring a charge to income to reduce the value of the inventory. However, Defendants failed to take a charge to income for the Z10 during the Class Period.

131.    On June 28, 2013, the Company filed a Form 6-K with BlackBerry's consolidated financial statements for the first quarter fiscal 2014, setting forth the Company's financial results, which were essentially the same as those contained in the press release issued on the same day.  The Company disclosed that it held $887 million in inventory, after "including the determination of obsolete or excess inventory . . . ."

132.    The foregoing statements regarding inventory were materially false and misleading because Defendants did not take a charge to income for the Z10 even though they knew or recklessly disregarded that carriers and distribution partners were not selling-through on the Z10, resulting in high levels of excess inventory, and, as a result, requiring an appropriate charge to income to reduce the value of the inventory.

133.    BlackBerry violated GAAP by failing to take a timely charge against earnings to account for the fact that the market value of the Company's Z10 inventory had deteriorated substantially below cost, because, among other things, (1) BlackBerry was experiencing a lack of sell-through on the Z10s; (2) the carrier and distributor partners were holding extraordinarily

high levels of excess inventory, in absolute and relative terms; and (3) the cost of the carrier and distributor partner sales incentives and refunds were increasing, and would continuing to increase for the foreseeable future – all of which would have a material adverse impact on reported revenues and earnings and effectively reverse the profits Defendants' financial statement manipulations produced in the fourth quarter of BlackBerry's fiscal 2013 and the first two fiscal quarters of 2014.

### c.      Defendants' Failure to Properly Account for Supply Commitments

134.    The Company failed to record a charge for supply commitments for quantities which Defendants knew or recklessly disregarded were in excess of anticipated future customer demand forecasts.  As a result of Defendants' failure to record a charge for supply commitments, BlackBerry's gross margin and earnings were materially overstated. In the Company's fiscal 2013 annual report, issued March 28, 2013, BlackBerry described purchase commitments as follows:

> The Company has negotiated favorable pricing terms with many of its suppliers, some of which have volume-based pricing. In the case of volume-based pricing arrangements, the Company may experience higher than anticipated costs if current volume-based purchase projections are not met. Some contracts have minimum purchase commitments and the Company may incur large financial penalties or increased production costs if these commitments are not met

135.    In BlackBerry's earnings release dated March 28, 2013, for the fourth and fiscal year ended March 2, 2013, Defendants disclosed that: the Company achieved "Gross margin of 40% driven by higher average selling prices and hardware margins" for the fourth quarter.

136.    In BlackBerry's annual report on 40-F, filed on the same date, Defendants disclosed that the Company achieved "Consolidated gross margin from continuing operations

decreased by $3.1 billion, to $3.4 billion, or 31.0% of consolidated revenue, in fiscal 2013, compared to $6.6 billion, or 35.7% of consolidated revenue, in fiscal 2012."

137.   On June 28, 2013, BlackBerry filed its 6-K for the first quarter ended and disclosed that the Company achieved "Consolidated gross margin from continuing operations increased by $256 million to $1.0 billion, or 33.9% of consolidated revenue, in the first quarter of fiscal 2014, compared to $786 million, or 28.0% of consolidated revenue, in the first quarter of fiscal 2013."   The disclosure further stated that "The $256 million increase in consolidated gross margin was primarily attributable to higher average selling prices and related gross margins of BlackBerry 10 devices shipped."

138.   Each of the foregoing statements was materially false and misleading as a result of BlackBerry's failure to record a charge for supply commitments for quantities which Defendants knew or recklessly disregarded were in excess of anticipated future customer demand forecasts.  The materiality of Defendants' false and misleading statements is exemplified by the impact of the Z10 inventory charge on gross margin which included approximately $307 million related to supply commitments.   In this regard, at the end of the Class Period, Defendants disclosed a consolidated gross margin from continuing operations of $(374) million, or (23.8)% of consolidated revenue, in the second quarter of fiscal 2014, compared to $744 million, or 26.0% of consolidated revenue, in the second quarter of fiscal 2013.  This was in sharp contrast to Defendants' Class Period statements regarding gross margin.

139.   Defendants' representations concerning BlackBerry's consolidated gross margin from continuing operations in its March 28, 2013 earnings release, its 2013 Form 40-F, and its June 28, 2013 6-K were materially false and misleading as a result of BlackBerry's failure to record a charge for supply commitments for quantities that Defendants knew or recklessly

disregarded were in excess of any reasonable anticipated future customer demand forecasts. Defendants' accounting statements of opinion lacked a reasonable basis and are actionable under Section 10(b) of the Securities Exchange Act even if Defendants irrationally believed their opinions.

140.    Defendants' statements of opinion regarding failure to record a charge for supply commitments were also materially false and misleading because BlackBerry's supply commitments for Z10 devices were larger than demand for the devices during the Class Period, and if BlackBerry had properly recorded a charge for supply commitments it would have reported much lower gross margins in March and June.  Defendants' accounting statements of opinion lacked a reasonable basis.  Therefore, Defendants' opinion statements are actionable. Thus, Defendants' opinion statements were either known to be false or, at a minimum, made with reckless disregard that they had no reasonable basis.

141.    GAAP provides that "[a] net loss on firm purchase commitments for goods for inventory, measured in the same way as are inventory losses, shall be recognized in the accounts."  ASC 330-10-35-17.  According to analyst James Faucette, overall production remained quite high through the end of May 2013, and that even if "production is reduced by 30% or more . . . production will remain well in excess of demand."  Despite Defendants' knowledge that the sales of the Z10 were "significantly less than production over the past few months," they failed to take a charge to income related to the losses incurred from supply commitments.  Not until the end of the Class Period did the Company record a Z10 Inventory charge of approximately $307 million related to supply commitments.  BlackBerry also recorded post-Class Period Z10 inventory charges related to supply commitments of $511 million in the third quarter fiscal 2014.

### d.      Defendants' Other GAAP Violations Related to Inventory and Supply Commitments

142.     ASC 450 *Contingencies*, provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.  ASC 450-20-25-2

143.     ASC 450 also requires that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred.  ASC 450-20-50-3.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made.  ASC 450-20-50-4.

144.     The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."  17 C.F.R. § 210.10-01.

145.     The Company violated the GAAP requirement by failing to take a provision for inventory losses in its interim financial statements, as indicated by ASC 270-10-45-6(c), *Interim Reporting*: "Inventory losses from market declines shall not be deferred beyond the interim period in which the decline occurs."

146.    In addition, FASB Statement of Concepts No. 5 ("CON5") states, "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . . ."

## THE TRUTH IS REVEALED

147.    The truth began to emerge on June 28, 2013, when, prior the opening of the market, BlackBerry filed its 1st quarter fiscal 2014 financial report for the period ending June 1, 2013 on Form 6-K.  The Company posted a surprise loss for the quarter, and shipped just 2.7 million new BlackBerry 10 devices.  In fact, BlackBerry disclosed that BlackBerry 10 devices made up just 40% of the Company's total smartphone shipments in the period, a discouraging figure given that this was the first full quarter that the new devices were on sale.

148.    The market reacted swiftly and negatively to the disclosure, which partially revealed the truth behind Defendants' misrepresentations regarding the purported success of and positive customer reaction to the BlackBerry 10 smartphones. BlackBerry stock fell from $14.48 per share at close on June 27, 2013, to $10.46 per share at close on June 28, 2013, a decline of approximately 28% on heavy trading volume.

149.    As these revelations began to come to light, Defendants continued to mislead the market and downplay the significance of the 1st quarter fiscal 2014 results. During the BlackBerry earnings call later that day on June 28, 2013, when analysts questioned the low shipment numbers of the BlackBerry 10 devices, Defendant Heins reassured that the Company was "still in our launch cycle" and that "[w]e're focusing on driving the sell-through so our customers get the devices in their hands.  And when they get them in their hands, they seem to be really happy with what they see, and what they can experience with the new user experience on BlackBerry."  But when an analyst asked if the Company "could give us what you sold through

of BlackBerry 10," Defendant Bidulka refused, saying "[w]e're not going to provide the split on sell-through on the BB10 versus BBOS." Defendant Heins added that "[w]hat I can tell you, qualitatively, is that I received very, very good feedback."

150.     On September 20, 2013, the last day of the Class Period, the truth finally emerged when BlackBerry issued a press release announcing preliminary second quarter fiscal 2014 results.

151.     Specifically, BlackBerry disclosed:

*Waterloo, ON* – BlackBerry Limited (NASDAQ:BBRY; TSX:BB), a world leader in the mobile communications market, today announced certain preliminary financial results for the three months ended August 31, 2013 and provided an update on business operations.

\*        \*        \*

 [The Company] **expects to report a primarily non-cash, pre-tax charge against inventory and supply commitments in the second quarter of approximately $930 million to $960 million, which is primarily attributable to BlackBerry Z10 devices.**

**The current quarter will also include a pre-tax restructuring charge in the approximate amount of $72 million reflecting ongoing cost efficiency initiatives.**

\*        \*        \*

As part of the Company's focus on enhancing its financial results, and in response to the increasing competition in the smartphone market, BlackBerry also announced plans to transition its future smartphone portfolio from six devices to four. The portfolio will focus on enterprise and prosumer-centric targeted devices, including 2 high-end devices and 2 entry-level devices in all-touch and QWERTY models.  With the launch of the BlackBerry Z30 – the next generation high-tier smartphone built on the BlackBerry 10 platform -- this week, the Company will re-tier the BlackBerry Z10 smartphone to make it available to a broader, entry-level audience. At the same time, the Special Committee of the Company's Board of Directors continues to evaluate all strategic alternatives for the Company.

Furthermore, the Company also announced that it is targeting an approximate 50% reduction in operating expenditures by the end of the first quarter of Fiscal 2015. *As part of this, BlackBerry will implement a workforce reduction of approximately 4,500 positions or approximately 40% of the Company's global workforce resulting in a total workforce of approximately 7,000 full-time global employees.*

Thorsten Heins, President and Chief Executive Officer of BlackBerry said, "We are implementing the difficult, but necessary operational changes announced today to address our position in a maturing and more competitive industry, and to drive the company toward profitability. Going forward, we plan to refocus our offering on our end-to-end solution of hardware, software and services for enterprises and the productive, professional end user. This puts us squarely on target with the customers that helped build BlackBerry into the leading brand today for enterprise security, manageability and reliability."

(Emphasis added).

152.   Immediately upon the revelation of these previously undisclosed facts, BlackBerry stock plummeted, on heavy volume, from a closing price of $10.52 per share on September 19, 2013 to close at $8.73 per share on September 20, 2013, after an intra-day low of $8.19.  As investors digested the bad news over the next few days, the price of BlackBerry stock continued to slide on heavy trading volume and closed at $8.01 on September 25, 2013.

153.   The news also came as a shock to financial analysts.  For example, UBS issued a report on September 20, 2013, which stated in part:

> BBRY negatively preannounces F2Q results now anticipating Revs of $1.6b (cons $3.1b) and EPS loss, prior to an inventory write-down charge of $930-960m, of -$0.47 to -$0.51 vs. cons at -$0.15. *There were 2 main surprises in our opinion: a) the magnitude of the miss (50% in revenues); b) of the 3.7m phones for which revs were recognized, almost all were BB7, i.e., almost no revenue was recognized for the newer BB10 devices*. (Emphasis added).

**BLACKBERRY ADMITS IT IS RESPONSIBLE FOR THE COST OF SALES INCENTIVES**

154.    The Company expressly admits in its earnings releases that BlackBerry – not its carriers – was responsible for discounting the BlackBerry 10 smartphones in the form of "sales incentives" in order to move its stagnant inventory.   The Company's first quarter fiscal 2014 earnings release on June 28, 2013, disclosed, in pertinent part, the following:

> The decrease in net loss is primarily attributable to an increase in the Company's gross margin, partially offset by an increase in marketing expenditures and **sales incentives** to support the continued launch of BlackBerry 10 and a reduction in the recovery of income taxes.
>
> *          *          *
>
> **In support of the launch of BlackBerry Z10 smartphones, the Company increased marketing spending and sales incentives offered to channel and carrier partners in order to enhance adoption of the platform.**

(Emphasis added).

155.    The Company's second quarter fiscal 2014 earnings release on September 27, 2013 disclosed that such incentives offering would continue:

> The Company plans to implement **further sales incentives** with its carrier and distributor partners to increase sell-through, which could be applicable to all BlackBerry 10 devices shipped in the second quarter of fiscal 2014. As a result, the Company determined during the second quarter of fiscal 2014, that it could no longer reasonably estimate the amount of the potential future sales incentives that may be offered on the BlackBerry 10 devices shipped into the channel during the second quarter of fiscal 2014 but not sold through to end customers by the end of the second quarter of fiscal 2014. Therefore, the Company concluded that the delivery of these devices to its carrier and distributor partners did not meet the criteria for revenue recognition. The revenue for these BlackBerry 10 devices was deferred and will be recognized in future quarters when the devices sell through to end customers.  (Emphasis added).

**POST-CLASS PERIOD DEVELOPMENTS**

156.    On Monday, September 23, 2013, the next trading day following BlackBerry's revelation of its nearly $1 billion BlackBerry 10 charge and the layoff of 4,500 employees,

BlackBerry announced it had entered into a letter of intent agreement under which a consortium led by Fairfax Financial Holdings Limited ("Fairfax Financial"), BlackBerry's largest shareholder, would acquire BlackBerry.   Pursuant to the proposed transaction, BlackBerry shareholders would receive $9.00 in cash for each share of BlackBerry held.

157.   On October 1, 2013, BlackBerry filed with the SEC on Form 6-K its financial information for the six months ended August 31, 2013, which revealed that the Company was in even worse financial shape than previously reported.   In light of the 4,500 employee reduction, the October 1, 2013 Form 6-K disclosed that the Company's cost optimization program would incur $400 million in charges – four times the $100 million in charges BlackBerry had projected in the first quarter of fiscal 2014.

158.   On November 4, 2013, it was revealed that Fairfax Financial's BlackBerry buyout would not go through and that BlackBerry had abandoned the search for a buyer for the Company.   Instead, BlackBerry announced it had entered into an agreement pursuant to which Fairfax Financial and other institutional investors would make a $1 billion capital investment in the Company.   According to BlackBerry: "Today's announcement marks the conclusion of the review of strategic alternatives previously announced on August 12, 2013."   BlackBerry also announced that Defendant Heins would step down as CEO upon the closing of the financing transaction and that John S. Chen, formerly CEO, President, and Chairman of Sybase Inc., would serve as Interim CEO pending completion of a search for a new CEO.   Upon the closing of the transaction on November 13, 2013, BlackBerry announced the resignation of Defendant Heins as President and CEO and as a director.   As previously announced, Mr. Chen was appointed Interim CEO and Executive Chair of the Board.   On November 25, 2013, BlackBerry announced that

James Yersh, BlackBerry's Senior Vice President and Controller, had replaced defendant Bidulka as CFO.

159.    On February 24, 2015, the *Dunham* criminal complaint and Affidavit were filed in the District of Massachusetts.  On June 4, 2015, during a hearing before Judge Woodlock, Mr. Dunham entered a plea of guilty, acknowledging that he had taken confidential information from his employer, given it to a Detwiler analyst, and the subsequent Detwiler report was based on that confidential information.

## SCIENTER ALLEGATIONS

**The *Dunham* Criminal Proceedings Support a Strong Inference of Scienter for Defendants**

160.    The material falsity and misleading nature of Defendants' statements and omissions concerning the Z10's sales and returns, customer acceptance of the Z10s, and Defendant Heins' vigorous denial of the accuracy of an April 11, 2013 analyst report concerning returns of the Z10s, as well as other Class Period statements (including Defendants' accounting judgments or opinions) are further demonstrated by the criminal proceedings in the case *U.S. v. James Dunham, Jr.*, filed in Federal District Court for the District of Massachusetts on February 24, 2015.  This new evidence shows that Defendants' opinion statements had no reasonable basis – even if they were subjectively believed, which they were not.

161.    The Affidavit paints a compelling picture of the manner in which Mr. Dunham, a former executive at a wireless franchisor [Wireless Zone], obtained very specific, confidential financial data and information concerning sales and returns of a wireless smartphone manufacturer [BlackBerry] and provided it to a financial analyst [Detwiler Fenton].  In the Affidavit, Special Agent Makor swears based on interviews with multiple witnesses that Mr. Dunham provided this detailed, real-time financial data to the analyst, which issued a report

revealing the negative, information, resulting in a stock drop of 7% in the wireless manufacturers' [BlackBerry's] stock.

162.    On March 26, 2015, despite the fact that no names of the business entities involved were contained in the criminal complaint, the *Boston Business Journal* reported that a comparison of data in the criminal complaint to public information shows that the wireless manufacturer in question is BlackBerry; that Mr. Dunham was an executive at Wireless Zone; and that the financial analyst is Detwiler Fenton.  February 26, 2015 *Boston Business Journal* article, "*Detwiler Fenton Facing Criminal Case Over BlackBerry Sales Data.*"  The franchisor where Dunham worked is one of six exclusive national Verizon retailers that sell the smartphone maker's devices.  February 26, 2015 *Bloomberg News* article, *"BlackBerry Sales Leak Coincides with Alleged Fraud Scheme."*

163.    The *Boston Business Journal* story states that a "former executive at a Verizon Wireless retailer [who was also a former executive at Wireless Zone at the time of the alleged misconduct] was arrested Thursday for allegedly selling confidential sales and product information to the Boston financial services firm Detwiler Fenton, including information that caused BlackBerry's stock price to plummet in April 2013.  According to the [criminal] complaint, Dunham was the source behind a controversial research note published by Detwiler analyst Jeff Johnston in April 2013." *Boston Business Journal* article.

164.    Based on the filings and transcripts in the *Dunham* criminal action and related press coverage, as well as research and investigation by Plaintiff's Counsel, it is now clear that the detailed, negative financial data at issue related to sales and returns of the BlackBerry Z10 and that Detwiler Fenton relied upon this true, real-time data in its analyst report of April 11, 2013 concerning BlackBerry.  This data was available to Dunham in his capacity as an executive

at Wireless Zone, which had access to "very specific information [about BlackBerry] from [approximately 400] franchisees, including sales…product launch information, and cost information." Exhibit A at ¶9.

165.    At the time of Heins' vigorous denial of the veracity of the Detwiler Fenton report and Defendants' issuance of positive statements about the Z10 between April 11, 2013 and the end of the Class Period, Defendants, including Defendant Heins, were in possession of facts incompatible with their opinions.  Defendants have ***admitted*** they had the relevant data in hand and monitored it actively during the Class Period.  Defendants publicly stated in their April 12, 2013 press release "[s]ales of the BlackBerry Z10 are meeting expectations and that ***data we have collected from our retailers and carrier partners demonstrates that customers are satisfied… Return rate statistics show that we are at or below our forecasts and right in line with the industry***."  This statement demonstrates two things: 1) Defendants admittedly had the very data from retailers and partners concerning sales and returns of the Z10 that had been in the possession of Mr. Dunham and provided to Detwiler Fenton; and 2) Defendants' statements and omissions, including statements of opinion regarding customer satisfaction, return rates being at or below forecast and right in line with the industry were outright lies and known to be lies at the time the statements were made.  Further demonstrating Defendants' active role in monitoring demand requirements, as noted in the Company's Fiscal 2013 Form 40-F, Defendants concede "***the Company performs an assessment of inventory*** during each reporting period, ***which includes a review of***, among other factors, ***demand requirements***, component part purchase commitments of the Company and certain key suppliers, product life cycle and development plans, component cost trends, product pricing and quality issues." (Emphasis added).

166.    Defendants monitored and reviewed the very detailed negative financial data that formed the basis for Detwiler Fenton's revelations of unusually-high returns of the Z10 – as that data is the very same data (if not virtually identical in substance, if not format) that Defendants admitted they collected from retailers and partners and reviewed and monitored.   Thus, Defendants made opinion statements and omissions that lacked a reasonable basis and omitted facts known to them concerning their stated opinions – *e.g.*, omitted that Detwiler Fenton obtained very specific, negative data about the Z10 that was real and material. Defendants – while simultaneously and aggressively denying the validity of the information reported by Detwiler Fenton – had no reasonable basis to issue this denial and did so with knowledge the denial was false or, at a minimum, recklessness.   Such omitted facts conflict with what a reasonable investor would take from the statement itself.

167.    The criminal proceedings in *United States v. James Dunham, Jr.*, 15MJ7051JCB (D. Mass.) demonstrate the veracity of the Detwiler Fenton research report and the fact that Defendants' denials of the report were lies.  According to the Affidavit, the statements contained in the research report were based on confidential, real-time sales and return data relating to about 400 retailers of the wireless manufacturer's products that was in the hands of Dunham and which he allegedly sold to the Analyst.  Exhibit A at ¶9.

168.    The Affidavit states that Dunham had access to "***very specific***" confidential sales and return data that he learned through his employment at a wireless franchisor later identified by the *Boston Business Journal* as Connecticut-based Wireless Zone, one of six exclusive national Verizon retailers that sold BlackBerry's devices.  *See Boston Business Journal* article "*Detwiler Fenton Facing Criminal Case Over BlackBerry Sales Data*"; *see also* 02/26/2015 *Bloomberg News* "*BlackBerry sales leak coincides with alleged fraud scheme*."  According to the

Affidavit, between August 2009 and September 2013, Dunham served as the Chief Strategy Officer and then President and Chief Operating Officer of a wireless franchisor, which is a retailer for a major provider of wireless services.  Exhibit A at ¶4.  During at least some of that time, Dunham was a paid consultant to a Boston-based financial service firm that provided investment research to institutional clients.  *Id.*  Dunham shared with the analyst "information regarding the wireless industry, including **sales, return and other confidential business information that he learned through his employment at the wireless franchisor.**  The information disclosed by Dunham then was included in research notes distributed by the Research Firm."  *Id*. (emphasis added).  The Affidavit also confirms that "[*t*]*he Wireless Franchisor has access to very specific information from the franchisees, including sales, compensation, service activating or upgrading information, product launch information, and cost information.*"  *Id*. at ¶9 (emphasis added).

169.    Dunham's access to the data in question was confirmed not only through the analyst firm Detwiler, but also through Dunham's boss at Wireless Zone, who confirmed "in Dunham's role as Chief Strategy Officer and later as the President and COO of the Wireless Franchisor, Dunham had access to certain business information, including… **sales and return information for Wireless Franchisor franchisees.**"  *Id*. at ¶10 (emphasis added).  According to the Affidavit, Dunham "recalled the Analyst had told him Dunham's information was valuable and that the Analyst wanted to put him on a monthly retainer."  *Id*. at ¶16.  The Analyst explained "*Dunham's information was valuable because Dunham had real-time visibility into sales from the Wireless Franchisor's 400 locations.*"  *Id*. at ¶17 (emphasis added).

170.    The Affidavit states that Dunham and the Analyst  spoke by telephone on April 10, 2013, the day before the April 11, 2013 Research Note was released.  *Id.* at ¶24.  The call

took place at 2:00pm and lasted approximately eight minutes.  *Id*.  The Affidavit further states that the following language contained in the April 11, 2013 research note was information provided to the Analyst by Dunham: "We believe ***key retail partners*** have seen a significant increase in [Wireless Manufacturer] returns to the point where, in several cases, returns are now exceeding sales, a phenomenon we have never seen before."  *Id*. at ¶26 (emphasis added).

171.    Dunham was charged with mail and wire fraud because he allegedly received payments from Detwiler Fenton, which deprived his employer, Wireless Zone, of its right to his honest and faithful service through bribes and kickbacks that were mailed to him. The information supplied by Dunham was supplied in part by telephone and also distributed electronically to the analyst's clients, some of which were out of state. *Id* at ¶33.  In other words, the criminal complaint alleged that *Dunham* defrauded his employer by providing the confidential real-time, confidential information and research data concerning BlackBerry's sales and returns of the Z10 to Detwiler Fenton.

172.    Dunham pled guilty to these charges.  During his plea hearing, the AUSA explained that "as a national indirect retailer, Mr. Dunham's employer supervised or maintained 400 franchisees which sold wireless services and wireless devices to the public" and therefore "Dunham had access to very specific confidential information from the wireless franchisor's franchisee. So, specific sales information, specific return information, compensation information, information regarding activating or upgrading, simply buying a new service plan, product launch information and other cost information." Exhibit B at 20:12-17. The AUSA asserted that the government had evidence that Mr. Dunham provided Detwiler Fenton "with confidential information belonging to [Wireless Zone] including specifically sales information, return information also a variety of information about sales numbers of upgrades and downgrades in

service, and he did this in exchange for $2,000 monthly payments."  Exhibit B at 21:24-22:5.

Moreover, "[a]s Mr. Dunham knew, the confidential information that was being disclosed by him

was then included in research notes that were distributed by the research firm to its institutional

clients for use in trading decisions." *Id*. at 22:14-17. More specifically, the AUSA asserted that

Mr. Dunham disclosed Wireless Zone's specific sales and return information for BlackBerry

Z10s to Detwiler Fenton, who "then drafted and the research firm released an April 11, 2013

research note on that smartphone, which note included the specific sales and return information

that had been provided by Dunham." *Id*. at 22:24-23:2. When asked by the Court to confirm the

AUSA's evidence, Mr. Dunham stated, under oath, "Yes, your Honor." *Id*. at 23:10.

### Defendants Admitted They Possessed Data from Retailers and Partners and Actively Monitor this Data – Which Includes the Negative Z10 Sales and Returns Data Forming the Basis of the Detwiler Report

173.   The criminal proceedings show that Dunham had this real-time data concerning

sales and returns of the Wireless Manufacturer's product on April 10, 2015, in his possession and

sold it to the Analyst.  BlackBerry had the data as well, as the manufacturer working with a key

retailer, Verizon, for which Wireless Zone served as a franchisor.  As noted above, Defendants

affirmatively admitted that they collect and monitor "data we have collected from our retailers

and carrier partners" and that they not only looked at "return rate statistics" throughout the Class

Period but also stated that those return rates were "at or below our forecasts and right in line with

the industry" as of April 12, 2013.  The April 11, 2013 Detwiler Report specifically refers to

"key retail partners."

174.   When Defendant Heins aggressively denied the report and asserted that the

information was false and "absolutely without basis," he had in truth prior to that time actively

reviewed the real-time sales data, that plainly showed the veracity of the statements by the

Detwiler Fenton, and reveal the falsity of his own aggressive denial and Defendants' later positive statements concerning sales, returns, customers, financials, and accounting judgments.

175.    It has now been publicly revealed that the specific, negative financial information concerning the sales and returns of the Z10 revealed by Detwiler Fenton on April 11, 2013, was based on confidential, true and specific sales and return numbers relating to the Z10.   The criminal complaint, notarized Affidavit, plea and sentencing transcripts and sentencing memorandum demonstrate that real-time data concerning the Wireless Manufacturer was true – it was specific, confidential, financial information that was sold to the Analyst.   Exhibit A at ¶4, Exhibit B at 21:24-23:2; Exhibit C at 2-3; Exhibit D at 7:20-8:4. These new revelations come as no surprise as they strongly support BlackBerry's belated announcement of a $930-960 million restatement relating to the Z10 that occurred within weeks of repeated positive statements about sales and returns and customer acceptance of the Z10s during the Class Period.

**Additional Scienter Allegations**

176.    Defendants acted with scienter in that each Defendant knew and/or recklessly disregarded facts available to them that demonstrated that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and, knowingly or recklessly disregarded, and/or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   Defendants participated in the fraudulent scheme alleged by virtue of their receipt of information reflecting the true facts regarding BlackBerry, their control over the Company's alleged materially misleading misstatements, and/or their

associations with the Company, which made them privy to confidential proprietary information concerning BlackBerry and the Company's recovery efforts.

177.     BlackBerry, once the leading innovator in mobile technologies, fell behind other companies such Apple and Samsung as a result of its failure to enter the modern, application-driven smartphone market, which has since captured all mobile users, personal and business alike.   The BlackBerry 10 line of smartphones represented a life or death situation for BlackBerry that would either return the Company as a meaningful competitor in the mobile arena, or relegate it to oblivion as a footnote in the annals of technology innovation as the company that invented a new form of technology and then ceased to innovate and disappeared from the market for its own invention.

178.     Indeed, the stakes for BlackBerry and its senior management could not have been higher.  When the BlackBerry 10s immediately failed to garner consumer interest or acceptance (and, thus, end-user sales), Defendants began a campaign to materially misrepresent the success of Blackberry 10 to the public, and, in particular, potential smartphone end users who would be deterred from purchasing BlackBerry 10s if they learned they were unpopular and might not continue to be supported by the large cell phone carriers and app developers. Also, as a consequence, Defendants materially misled the SEC and investors as to the true condition of BlackBerry and the true facts about the product's commercial failure.

179.     Defendants effectuated this scheme by misrepresenting the Company's supposed return to profitability tied to the initial shipments of BlackBerry 10s, falsely asserting the broad acceptance and popularity of the product with distributors (carriers) and end-users and by vehemently denying any reports that entered  the market from technology or investor reporting that questioned the success of the BlackBerry 10s or revealed the true, material unfavorable

consumer response to the device, which enabled Defendants to: (a) deceive the investing public regarding the Company's new BlackBerry 10 product line and re-emergence in the wireless communications industry; (b) deceive the investing public regarding BlackBerry's business, operations, performance, and prospects, and the true value of BlackBerry common stock; and (c) cause Plaintiffs and other members of the Class to purchase BlackBerry common stock at artificially inflated prices and to suffer substantial damages when the truth was revealed and the artificial inflation was removed from the stock price.

180.    Defendants Heins and Bidulka also were motivated to misrepresent the purported success of the BlackBerry Z10 and the Company's overall performance and prospects because they profited personally from those misrepresentations, which artificially inflated the stock price and allowed them to retain their lucrative, high-level positions with the Company throughout the Class Period.   In the first quarter of fiscal year 2014, Heins and the Company entered into an amended and restated employment agreement, effective May 21, 2013.   According to the Company's 2014 Proxy Solicitation dated May 9, 2014, for fiscal year 2014 (the period from March 3, 2013 to March 1, 2014, inclusive) ("2014 Proxy"), Heins and Bidulka received compensation (cash and non-cash, and including salaries until termination and certain termination entitlements) totaling $49,701,796 and $5,630,730, respectively.[24]   *See* 2014 Proxy at p. 40.

181.    Pursuant to their employment agreements, Heins' base salary for the fiscal year 2014 was $1,458,425,[25] an increase of 50% over his Fiscal 2013 base salary of $972,290.  *See id.*

---

[24] All dollars referred to in this pleading are U.S. Dollars unless otherwise noted.

[25] Pursuant to the 2014 Proxy, salaries were converted into U.S. dollars using the Bank of Canada average noon exchange rate of $1 = CDN $1.0323 on May 24, 2013.

at 30. Bidulka's base salary for fiscal year 2014 was $678,097, an increase of 12% over his fiscal year 2013 base salary of $608,653.   *See id.*

182.   In addition to their base salaries, pursuant to BlackBerry's Annual Incentive Plan ("AIP"), the Company's Executive Officers, including Heins and Bidulka, also were compensated "based on a combination of the Company's achievement of certain key financial and operational measures and individual performance relative to annual individual and Company objectives." *See id.* For the fiscal year 2014, the metrics used for the AIP were adjusted "to further focus" the Company's executives on "the most critical business outcomes for the year," and included revenue, EPS, liquidity position, ***and BlackBerry 10 success***. *Id.* at 31.

183.   Furthermore, during the 2013 fiscal year (March 4, 2012 to March 2, 2013), prior to the Class Period, the Company's Board created the Special Achievement Bonus Program for the Executive Officers, including Heins and Bidulka, "focused on the most critical deliverables driving the overall success of the Company in Fiscal 2013 and Fiscal 2014." *Id.* at 32.   In December 2012, the Board established two performance criteria for the program:  (i) cash and liquidity maintenance above a $1.5 billion threshold and (ii) ***BlackBerry 10 launch success***, to be determined at the discretion of the Board.   *Id.*   In April 2013, the Board approved a bonus in the amount of CDN $3 million for Heins.   *Id.*   In May 2013, a bonus in the amount of CDN $700,000 for Bidulka was approved.   *Id.*

184.   Under the terms of his new employment agreement for the 2014 fiscal year, Heins was granted an up-front long-term incentive equity award, consisting of a time-based restricted share unit ("RSU") award valued at $22.5 million and a performance-based RSU award worth $11.25 million.   *Id.* at 34.   These awards were approved May 21, 2013 and granted July 3, 2013.   *Id.*   The time-based award did not vest until three years from May 21, 2013, the date of the

employment agreement. *Id.* In order for Heins' performance-based RSU award to vest, the Company had to achieve earnings per share of not less than a specified minimum target. *Id.*

185.    As the recent Playbook episode showed, the failure of a key product at BlackBerry can lead (and did previously lead) to a change in management. Under pressure of this recent historical precedent at the Company, Heins and Bidulka engaged in the misconduct complained of herein, among other things, so they could continue to reap millions of dollars in personal financial benefits for as long as they could conceal and misrepresent the truth. Sure enough, when Defendants could no longer hide the failure of the BlackBerry Z10 and the truth was revealed, Heins and Bidulka were soon replaced.

186.    Defendants' scienter is further supported by the *U.S. v. Dunham* criminal proceedings, which demonstrate the April 11, 2013 Detwiler Fenton analyst report was based on true, negative real-time data reflecting high returns of the Z10 and demonstrating Defendants' vigorous denial of the accuracy of the analyst report was a baseless lie. Defendants admit and affirmatively state that they had this very data from partners and retailers showing the sales and returns of the Z10 prior to April 11, 2013. Nevertheless, they publicly and aggressively denied the veracity of the data and analysis contained in the Detwiler Fenton report, knowing it was based on true, negative data that Defendants themselves had in hand at that time. At minimum, Defendants had no reasonable basis for making such statements and were reckless. The Class Period statements about the sales of the Z10 and customer satisfaction with the devices were untrue and known to be untrue at the time by Defendants because Defendants have conceded that they continuously monitored and reviewed the data demonstrating the Z10 was not in fact selling in line with guidance and expectations and which ultimately led to the announcement of the need for a $930-$960M write-off.

187.    In  sum,  to  protect  and  maximize  their  substantial  salaries  and  bonuses, Defendants  had  powerful,  personal  financial  incentives  to  engage  in  the  wrongful conduct described herein.

188.    Defendants'  strong  motives  support  a  strong  inference  of  knowing  or,  at  a minimum, reckless misconduct.

## LOSS CAUSATION/ECONOMIC LOSS

189.    During the Class Period, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated BlackBerry's stock price and operated as a fraud or deceit on Class Period purchasers of BlackBerry's stock by misrepresenting the success of the Company's  BlackBerry  10  smartphone  and  BlackBerry's  re-emergence  in  the  wireless communication industry.  Ultimately, however, when Defendants' prior misrepresentations and fraudulent  conduct  came  to  be  revealed  to  investors,  shares  of  BlackBerry  declined precipitously—evidence that the prior artificial inflation in the price of BlackBerry's shares was eradicated—and, as a result of their purchases of BlackBerry stock during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic losses when the Company's true condition and the truth about the Company's failed recovery was finally and fully revealed and the artificial inflation was removed from price of the Company's stock, *i.e.*, damages under the federal securities laws.

190.    Immediately  upon  the  revelation  of  these  previously  undisclosed  facts, BlackBerry  stock  plummeted,  on  heavy  volume.    First,  on  June  28,  2013,  when,  prior  the opening  of  the  market,  BlackBerry  filed  its  1st  quarter  fiscal  2014  financial  report  revealing previously undisclosed facts, BlackBerry's stock fell from $14.48 per share at close on June 27, 2013, to $10.46 per share at close on June 28, 2013, a decline of approximately 28% on heavy

trading volume.  Then, on September 20, 2013, the last day of the Class Period, the truth finally

emerged when BlackBerry issued a press release announcing preliminary second quarter fiscal

2014 results.  BlackBerry's stock price fell from a closing price of $10.52 per share on

September 19, 2013 to close at $8.73 per share on September 20, 2013, after an intra-day low of

$8.19.  As investors digested the bad news over the next few days, the price of BlackBerry stock

continued to slide on heavy trading volume and closed at $8.01 on September 25, 2013.

191.    The news came as a shock to financial analysts.  For example, UBS issued a

report on September 20, 2013, which stated in part:

> BBRY negatively preannounces F2Q results now anticipating Revs of $1.6b (cons
> $3.1b) and EPS loss, prior to an inventory write-down charge of $930-960m, of -
> $0.47 to -$0.51 vs. cons at -$0.15. There were 2 main surprises in our opinion: a)
> the magnitude of the miss (50% in revenues); b) of the 3.7m phones for which
> revs were recognized, almost all were BB7, i.e., almost no revenue was
> recognized for the newer BB10 devices.

192.    The declines in the price of BlackBerry securities after the truth came to light

were a direct result of the nature and extent of Defendants' fraud finally being revealed to

investors and the market.  The timing and magnitude of BlackBerry's stock price declines negate

any inference that the loss suffered by Plaintiffs and the other Class members was caused by

changed market conditions, macroeconomic or industry factors or Company-specific facts

unrelated to Defendants fraudulent conduct.  The economic loss suffered by Plaintiffs and the

other members of the Class was a direct result of Defendants' fraudulent scheme to artificially

inflate the prices of BlackBerry's securities and the subsequent decline in the value of

BlackBerry's securities when Defendants' prior misrepresentations and other fraudulent conduct

were revealed.

193.    The economic loss, *i.e.,* damages suffered by Plaintiffs and other members of the

Class, was a direct result of Defendants' misrepresentations and omissions being revealed to

investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of Defendants' prior misstatements and omissions being revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

194.   Throughout the Class Period, the market for BlackBerry stock was an efficient market for the following reasons, among others:

a.   BlackBerry securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market, throughout the Class Period;

b.   As a regulated issuer, BlackBerry filed periodic public reports with the SEC and the NASDAQ;

c.   BlackBerry securities were followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

d.   BlackBerry regularly issued press releases, which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

## STATUTORY SAFE HARBOR DOES NOT APPLY

195.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BlackBerry who knew that those statements were false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired shares of  BlackBerry common stock between March 28, 2013 and September 20, 2013, inclusive, in the United States or on a United States-based stock exchange and who were damaged when the truth regarding BlackBerry's recovery was revealed to the public by the decline in  the value of BlackBerry common stock.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

197.    The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, BlackBerry common stock was actively traded on an American stock exchange, the NASDAQ.  As of September 21, 2012, the Company had 524 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BlackBerry or its transfer

agent and may be notified of the pendency of this action by mail and publication, using the forms of notice similar to those customarily used in securities class actions.

198.   Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs and all members of the Class were similarly affected by Defendants' conduct in violation of the federal securities laws that is complained of herein.

199.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

200.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.   A classwide proceeding will generate common answers to the following questions of law and fact common to the Class, among others:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether Defendants made materially untrue and/or misleading statements/omissions during the Class Period; and

(c)     whether the members of the Class have sustained damages and the proper measure of damages.

201.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class

action.   Plaintiffs' allegations stem from Defendants' issuance of materially false and/or misleading statements and omissions during the Class Period contained in SEC filings, Company releases, and conference calls with analysts.   These statements and omissions concealed true, adverse facts about, *inter alia*, the BlackBerry 10 smartphone driving the recovery and revitalization of BlackBerry.

## CLAIMS FOR RELIEF

### COUNT I

**(For Violations of §10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants—BlackBerry, Heins, Bidulka and Zipperstein)**

202.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

203.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding BlackBerry's business, operations, performance, and prospects, and the true value of BlackBerry stock; (b) enable Defendants to inflate and to maintain the artificial inflation in the price of Company stock throughout the Class Period; and (c) cause Plaintiffs and other members of the Class to purchase BlackBerry common stock at artificially inflated prices, resulting in damages after the truth was revealed and the artificial inflation was removed from the price of the stock.   In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

204.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain an artificially high market price for BlackBerry stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

205.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of BlackBerry as specified herein.

206.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BlackBerry's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about BlackBerry and its business, operations, performance, and prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of BlackBerry stock during the Class Period.

207.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing the truth regarding BlackBerry's business, operations, performance, and prospects

from the investing public and supporting the artificially inflated price of its stock. As demonstrated by Defendants' material misstatements and omissions concerning the Company's business, operations, performance, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

208. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of BlackBerry stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of BlackBerry stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired BlackBerry stock during the Class Period at artificially high prices and were damaged after the truth regarding the Company was revealed, which removed the artificial inflation from BlackBerry's stock.

209. Defendants Heins, Bidulka and Zipperstein's primary liability arises from the following facts: (a) Defendants Heins, Bidulka and Zipperstein were high-level executives and a director at the Company during the Class Period and members of the Company's management team or had control thereof; (b) these Defendants, by virtue of their responsibilities and activities as a senior officer and director of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) these Defendants enjoyed significant personal contact and familiarity with each other

and were advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's business, operations, performance, and prospects at all relevant times; and (d) these Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

210.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BlackBerry stock.  At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that BlackBerry was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their BlackBerry stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

211.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

212.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

## COUNT II

### (For Violations of §20(a) of the Exchange Act against Individual Defendants Heins and Bidulka)

213.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

214.    Defendants Heins and Bidulka acted as controlling persons of BlackBerry within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants Heins and Bidulka had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Defendants Heins and Bidulka were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

216.    As set forth above, BlackBerry and Defendants Heins and Bidulka each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants Heins and Bidulka also are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants Heins and Bidulka's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period and the related

damages resulting after the true facts were revealed and the artificial inflation was removed from the price of the stock.

     **WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

1. Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

2. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

4. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

5. Such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiffs hereby demand a trial by jury.

Dated: September 29, 2017                 Respectfully submitted,

                        **KAHN SWICK & FOTI, LLC**

                         /s/ Kim E. Miller
                        Kim E. Miller (KM-6996)
                        J. Ryan Lopatka
                        250 Park Avenue, Suite 2040
                        New York, NY 10177
                        Telephone:   (212) 696-3730
                        Facsimile:   (504) 455-1498

                        -and-

                        Lewis S. Kahn
                        206 Covington St.

Madisonville, LA 70447
Telephone (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiffs and the Class*

**BROWER PIVEN**
  A Professional Corporation
David A.P. Brower
Richard H. Weiss
475 Park Avenue South, 33rd Floor
New York, NY 10016
Telephone:   (212) 501-9000
Facsimile:   (212) 501-0300

*Counsel for Additional Plaintiffs Yong M. Cho and Batuhan Ulug and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on September 29, 2017.

 /s/ Kim E. Miller
Kim E. Miller