UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARVIN PEARLSTEIN, Individually And
On Behalf of All Others Similarly Situated,

                                        Plaintiffs,

           -against-

BLACKBERRY LIMITED (F/K/A RESEARCH
IN MOTION LIMITED), THORSTEN HEINS,
BRIAN BIDULKA, and STEVE ZIPPERSTEIN,

                                        Defendants.

No. 13 Civ. 7060 (CM)

---

## ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

McMahon, C.J.:

On September 29, 2017, Lead Plaintiffs Todd Cox and Mary Dinzik ("Plaintiffs") and additional Plaintiffs Yong M. Cho and Batuhan Ulug[1] filed the Second Consolidated Amended Class Action Complaint ("SAC"), the operative complaint in this action, against Defendants BlackBerry Limited ("BlackBerry" or the "Company"), its former Chief Executive Officer Thorsten Heins, its former Chief Financial Officer Brian Bidulka, and its Chief Legal Officer Steve Zipperstein (collectively, "Defendants") for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., (the "Exchange Act"). ("SAC" ¶ 1, Dkt. No. 84.) Plaintiffs bring this federal securities class action on behalf of the purchasers of BlackBerry common stock between March 28, 2013 and September 20, 2013 (the "Class Period"). (Id.) They allege that Defendants made a series of materially false and misleading statements and omissions concerning the Company's new BlackBerry 10 smartphones ("BB10s") during the Class Period. (Id.)

---

[1]      Cho and Ulug were dismissed from this case. (See Dkt. Nos. 338, 409, 413, 417.) They appealed their dismissal to the Second Circuit, where their appeal is currently pending (No. 19-3376).

In short, Plaintiffs allege that Defendants' misstatements and omissions maintained the price of BlackBerry's stock or otherwise prevented it from falling over the course of the Class Period. Thus, when Plaintiffs bought BlackBerry common stock during the Class Period, they did so at an artificially inflated price. They were harmed when the stock price dropped as these misrepresentations were revealed throughout the Class Period. (*Id.* ¶¶ 66-67.)

Plaintiffs now seek to certify a class of "all those who purchased or otherwise acquired the common stock of BlackBerry Limited on the NASDAQ during the period from March 28, 2013 through and including September 20, 2013 (the 'Class Period'), excluding Defendants, officers, and directors of BlackBerry Limited, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest." (Mem. in Supp. of Pls.' Mot. for Class Certification ("Pls.' Br.") at 13, Dkt. No. 464.)

For the reasons that follow, Plaintiffs' motion is GRANTED.

## I.     Relevant Factual Background

The allegations of the SAC are accepted as true for purposes of the instant motion. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 86 n.5 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702, (2018) (citing *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656. 661 n.15 (2d Cir. 1978)). The Court presumes the parties' familiarity with the facts of this case, which were recited in Opinion #105318 re: Motion to Dismiss the Consolidated Amended Complaint (Dkt. No. 54), Opinion re: Motion to Amend/Correct Amended Complaint (Dkt. No. 81), and this Court's Decision and Order Denying Defendants' Motion to Dismiss the Second Amended Complaint (Dkt. No. 115) – which addressed the new allegations included in the SAC. The following provides facts pertinent to class certification.

In brief, Plaintiffs allege that Defendants (i) made false and misleading statements about the success of BlackBerry and the BB10s (SAC ¶¶ 75-91) and (ii) issued false and misleading financial statements regarding the same (*id.* ¶¶ 92-146). The SAC alleges that Defendants made misstatements and omissions on March 28, 2013, April 12, 2013, August 12, 2013, and June 28, 2013. In his report (the "Feinstein Report"), Plaintiffs' expert Dr. Steven P. Feinstein identifies additional misrepresentations made on these dates, as well as misrepresentations made on two other dates within the class period, April 11, 2013 and April 29, 2013. (*See* Steven. P. Feinstein, Rep. on Loss Causation & Damages, (May 29, 2020) ("Feinstein Rep.") at ¶¶ 31-40, Dkt. No. 466-1.)

Plaintiffs assert that the truth was revealed by a series of partial disclosures: (i) the Detwiler Fenton and ITG reports on April 11, 2013; (ii) BlackBerry's Q1 FY 2014 earnings announcement and conference call on June 28, 2013; and (iii) BlackBerry's preannouncement of its Q2 FY 2014 financial results on September 20, 2013 (*Id.* at ¶ 39.)

The following is a list of the misstatements and the disclosures alleged in the SAC and the Feinstein Report:

### a. March 28, 2013 Alleged Misstatements and Omissions

- On March 28, 2013, BlackBerry filed a Form 40-F with the SEC for the fiscal year ending on March 2, 2013, issued a press release, and held an earnings call. The Form 40-F touted a successful transition to the BlackBerry 10 platform and described the BB10 launch as "the beginning of the organization's transition to becoming a leading mobile computing organization." (SAC ¶ 76.) The Form 40-F recognized revenue on a sell-in basis and did not record a charge for supply commitments. (*Id.* ¶¶ 30-32.) Plaintiffs allege this violated Generally Accepted Accounting Principles ("GAAP") and misled investors due to the uncertain sale price of the Z10 – the first of two BB10 models released during the Class Period – based on excess inventory in the distribution channel, larger than expected returns, and the likelihood of price concessions, among other reasons. (*Id.* ¶¶ 30, 103-112.) The Feinstein Report adds that BlackBerry concealed that it had justified initial prices using outmoded pricing studies. (Feinstein Rep. ¶ 32(x).)

- In the March 28 press release, Defendant Heins said the Company had "return[ed] to profitability in the fourth quarter," and that "Customers love the [BB10] device and the user experience." (SAC ¶ 78.) Defendants omitted that BlackBerry's data showed consumer scores were well-below expectations – largely due a lack of applications and usability problems – and Z10 return rates with certain carriers were unusually high in the UK and Canada. (Feinstein Rep. ¶ 32(vi).)

- On the March 28 earnings call, Defendant Heins stated that the Company had "regained the confidence and excitement of our carrier distribution partners" with the BB10 launch. He also stated that, "The initial early global demand for the 10 has been better than anticipated, and our recent announcement of the largest single purchase order in our history, for 1 million units, is also indicative of a strong initial support and demand." (SAC ¶ 80.) Heins represented that "two-thirds to three-quarters" of the BB10s had already "sold through." (*Id.* ¶¶ 111-12.) The Feinstein Report adds that BlackBerry stated on the call that it had "just started selling in the US, and the launch is meeting our earlier expectations," and that "55% of the Z10 Customers globally are coming from platforms other than BlackBerry." (Feinstein Rep. ¶ 32(viii), (xi).)

### b. April 11, 2013 Partial Corrective Disclosures

- On April 11, 2013, research and investment firm Detwiler Fenton published a report (the "Detwiler report") revealing that "key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are now exceeding sales." (SAC ¶ 83.) The Feinstein Report adds that the biggest customer complaints were "the unintuitive nature of the user interface, the maps app and the lack of apps," and that BlackBerry would "have minimal success in attracting new users to its platform." (Feinstein Rep. ¶ 71.)

- The Feinstein Report also notes an analyst report published by ITG on April 11, 2013. (*Id.* ¶ 72.) The ITG report stated that "the clear takeaway from the independent dealer channel is that the US launch of the Z10 started poorly and weakened significantly as the days passed-relative to comps at both AT&T and Verizon." (*Id.*)

### c. April 11, 2013 and April 12, 2013 Alleged Misstatements and Omissions

- On April 11, 2013, BlackBerry issued an email response to the Detwiler and ITG reports. (*Id.* ¶ 34.) It stated that reports about high levels of returns of Z10s are "absolutely false. Our data shows that return rates for BlackBerry Z10 devices both in the U.S. and on a global basis are in line with or better than our expectations and are consistent with return rates for other premium smartphones in the market today." (*Id.*)

- However, a criminal action against James Dunham, Jr. (the "Dunham Action") confirmed that the veracity of the facts underlying the Detwiler report. (SAC ¶ 20.)

- On April 12, 2013, BlackBerry issued a press release in response to the Detwiler report. BlackBerry denied the report's claims that customer returns of the BB10s were exceeding sales. (*Id.* ¶¶ 83-84.) Defendant Heins stated the BB10 sales were "meeting expectations" and

that the data BlackBerry collected showed that "customers are satisfied with their devices." He also stated that, "Return rate statistics show that we are at or below our forecasts and right in line with the industry." (*Id.* ¶ 84.) Defendant Zipperstein called the Detwiler report's comments about the BB10 return rates "materially false and misleading," and called on the authorities to investigate. (*Id.*) The Feinstein Report adds that in the same press release, BlackBerry reported that Verizon had "refuted" claims that "Z10 devices were being returned in unusually high numbers." (Feinstein Rep. ¶ 35(v).)

### d. April 29, 2013 Alleged Misstatements

- The Feinstein Report identifies new alleged misrepresentations by Defendant Heins in television interviews on April 29, 2013. Heins stated in an interview with Bloomberg Television that BlackBerry's "data and also the Verizon data shows very clearly that we're totally in line within return rates," and that "[i]t varies from carrier to carrier the way they count it, but we are in line with the industry. Actually better than earlier BlackBerry launches were." (*Id.* ¶ 36(i).)

- In an interview with Fox Business that same day, Heins stated that there were "very, very good first signs" of sales of the Q10 – the second BB10 model launched during the class period – in the UK, and that BlackBerry "expect[ed] several tens of millions of units." (*Id.* ¶ 36(ii).)

### e. June 28, 2013 Partial Corrective Disclosure

- On June 28, 2013, BlackBerry's Form 6-K for the period ending June 1, 2013 revealed (i) a loss for the quarter; (ii) the shipment of only 2.7 million new BB10s; and (iii) that BB10s made up only 40% of BlackBerry's total smartphone shipments for that period. (SAC ¶ 147.)

### f. June 28, 2013 Alleged Misstatements and Omissions

- Plaintiffs assert that the June 28, 2013 6-K concealed poor demand and sell-through for BB10s and materially overstated revenue by improperly recording revenue from BB10s on a sell-in basis. (*Id.* ¶¶ 118-19.)

- On a June 28, 2013 earnings call, Defendant Heins called the BB10 "an effective launch product," and stated that the BB10s "have been well-received." (*Id.* ¶ 86.) He stated that when "customers get the devices in their hands . . . they seem to be really happy with what they see, and what they can experience with the new user experience on BlackBerry."(*Id.* ¶ 149.)

### g. August 12, 2013 Alleged Misstatements

- On August 12, 2013, BlackBerry issued a press release announcing that its Board of Directors was exploring strategic alternatives. Defendant Heins called the BB10s "exceptional technology that customers are embracing," and stated that BlackBerry has "a strong balance

sheet" and is "pleased with the progress that has been made in [the Company's] transition." (*Id.* ¶ 88.)

### h. September 20, 2013 Corrective Disclosure

- On September 20, 2013, BlackBerry issued a press release with preliminary second quarter results for the 2014 fiscal year. (*Id.* ¶ 150.) The press release revealed that:
  - BlackBerry expected a $930 - $960 million charge against inventory and supply commitments due to the BB10s;
  - the current quarter would include a $72 million restructuring charge;
  - BlackBerry would reduce its smartphone portfolio from six models to four; and
  - BlackBerry would reduce its global workforce by 40%. (*Id.* ¶ 151.)

- The Feinstein Report adds that September 20 press release also announced that:
  - BlackBerry expected revenue of $1.6 billion, and an adjusted loss per share of $0.47 to $0.51;
  - the majority of the 3.7 million BlackBerry units sold in the quarter were the older generation BlackBerry 7 model;
  - BlackBerry could not recognize revenue for certain BB10s because they had yet to be sold to actual end customers;
  - BlackBerry had switched its revenue recognition from sell-in to sell-through; and
  - BlackBerry "burned roughly $500 million of cash, or $1 per share." (Feinstein Rep. ¶¶98-99.)

With this announcement on September 20, 2013, "the truth finally emerged." (SAC ¶ 190.)

## II.   Relevant Procedural Background

This case has had a tortuous history.

The case was originally assigned to my late colleague, the Hon. Thomas P. Griesa. On March 13, 2015, Judge Griesa granted Defendants' motion to dismiss the consolidated amended class action complaint ("CAC"). (Dkt. No. 54.) Plaintiffs immediately moved for reconsideration. (Dkt. No 56) and sought leave to file a Second Amended Complaint, based on newly discovered information. (Dkt. No. 59.) The motion for reconsideration was denied. (Dkt. No. 62.) Plaintiffs appealed. (Dkt. No. 63.)

On August 24, 2016, the Second Circuit affirmed the dismissal of the CAC. However, the Circuit remanded the case to Judge Griesa so that he could reconsider whether to grant leave to amend in light of the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council*

*Construction Industry Pension Fund*, 575 U.S. 175 (2015), which changed the standard for determining whether a statement of opinion is misleading. The Circuit observed that the newly discovered evidence (obtained from another lawsuit) in the proposed SAC might support Plaintiffs' claims, but took no position on whether leave to amend should be granted. The Circuit noted that Judge Griesa's brief order denying leave to amend did not explain whether the denial was based on futility, undue delay, undue prejudice, or for some other reason, and directed the district court to explain its rationale. (Dkt. No. 64.)

On September 13, 2017, Judge Griesa granted Plaintiffs' motion to amend the complaint. He concluded that amendment would not be futile in light of *Omnicare*, and announced that the proposed SAC would survive a motion to dismiss. (Dkt. No. 81.) Plaintiffs promptly filed the SAC on September 29, 2017. Defendants failed to take Judge Griesa's hint and moved to dismiss the amended pleading.

Judge Griesa died in December 2017, and the case was reassigned to my docket.

On March 19, 2018, the Court denied Defendants' motion to dismiss the SAC for failure to state a claim upon which relief can be granted, essentially for the reasons on which Judge Griesa relied in allowing the SAC to be filed – specifically, his observations and that (1) amendment would not be futile in light of *Omnicare* and the newly-discovered evidence to which Plaintiffs pointed, and (2) because amendment was not futile, the SAC would not be dismissed on motion. (Dkt. No. 115.)

There followed a very lengthy and overly contentious period of taking discovery (including discovery internationally by letters rogatory), as well as briefing and decision on a motion for partial judgment on the pleadings as against Yong M. Cho and Batuhan Ulug. (*See* Dkt. Nos. 245, 246, 248, 257, 338, 367.) Additionally, on April 7, 2020 the Court stayed the making of a class

certification motion until the Second Circuit's resolution of *In Re Goldman Sachs Grp. Inc. Sec. Litig.*, No. 18-2557 (2d Cir.). As a result, the motion for class certification was not made until June 8, 2020, and briefing – interrupted by the COVID crisis – was not completed until September 2020.

Lead Plaintiffs have moved to certify a class of:

> All those who purchased or otherwise acquired the common stock of BlackBerry Limited on the NASDAQ during the period from March 28, 2013 through and including September 20, 2013 (the "Class Period"), excluding Defendants, officers, and directors of BlackBerry Limited, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

(Pls.' Br. at 13, Dkt. No. 464; *see also* SAC ¶ 196 (proposed class).)

Defendants BlackBerry, Heins, and Bidulka filed a joint brief in opposition. ("Opp'n," Dkt. No. 476.) Defendant Zipperstein filed his own brief in opposition ("Zipperstein Opp'n," Dkt. No. 477), but joins the opposition of his co-defendants. Accordingly, the Court will use "Defendants" to refer to all four Defendants and identify Zipperstein's individual arguments only where necessary.

## III. Discussion

Plaintiffs' motion for class certification is governed by the familiar requirements of Fed. R. Civ. P. 23.

Certification under Rule 23 is appropriate only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Since Plaintiffs seek class certification under Rule 23(b)(3), they must also demonstrate that "common" issues of law or fact "predominate over any questions affecting only individual members," and that a class action is "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). In addition to the express requirements of Rule 23, the Second Circuit has

recognized an implied requirement that the class be "ascertainable." *See, e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). If the Court finds that the requirements of Rule 23 have been met, the Court may, in its discretion, certify the class. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

Plaintiffs bear the burden of showing that Rule 23's requirements are satisfied by at least a preponderance of the evidence. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). In determining the appropriateness of class certification, the Court may consider the parties' declarations and appended supporting materials, in addition to the operative complaint. *See, e.g.*, *Heredia v. Americare, Inc.*, No. 17-cv-6219, 2018 WL 2332068, at *2 (S.D.N.Y. May 23, 2018).

A motion for class certification does not allow courts to engage in free-ranging merits inquiries; the question before the Court is whether Plaintiffs meet Rule 23's requirements, not whether Plaintiffs will prevail on the merits. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also Eisen v. Carlisle & Jacquelin* , 417 U.S. 156, 177–78 (1974). Of course, a court's analysis under Rule 23 must be "rigorous," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), which may require it to "probe behind the pleadings" and consider issues that "overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (internal quotations and citations omitted). But as the Second Circuit recently reiterated, "*Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage*. Merits questions may be considered to the extent—*but only to the extent—* that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 268 (2d Cir. 2020) [hereinafter *Goldman II*] (emphasis original) (quoting *Amgen*, 568 U.S. at 466), *cert.*

*granted sub nom. Goldman Sachs Grp. v. AR Teacher Ret.*, No. 20-222, 2020 WL 7296815 (U.S. Dec. 11, 2020).

I emphasize this rule because, in addition to the arguments they address to the Rule 23(a) and (b) factors, Defendants argue that this Court should not certify a class for two merits-based reasons.

Defendants first argue that the lawsuit cannot comprehend misrepresentations that Judge Griesa held to be immaterial – a ruling that was affirmed by the Second Circuit – but that were repleaded nonetheless in the SAC, under the doctrine of law of the case.

They also argue that class members cannot claim reliance on misrepresentations that were not specifically quoted in the SAC, but were only identified in the Feinstein Report, dated May 29, 2020. Although these misstatements were all made within the proposed Class Period and do not give rise to new causes of actions or involve additional legal theories, Defendants argue that these are new "claims" that were first injected into this case on May 29, 2020, after the Exchange Act's five year statute of repose.

These two arguments are perfect examples of merits-related questions that should not be considered in connection with a class certification motion, because they do not address the only issue presently before the court: whether the Rule 23 prerequisites for class certification have been satisfied. For the reasons discussed below, Plaintiffs can satisfy all the Rule 23 requirements solely on the basis of the specific misrepresentations that were pleaded in the SAC. Whether the trier of fact can consider other alleged misrepresentations made during the Class Period in determining whether Defendants have broken the law is a question for another day.

a. **The Proposed Class Satisfies the Standards for Certification Pursuant to Rule 23(a)**

Defendants do not dispute that Plaintiffs have satisfied the numerosity or commonality requirements of Rule 23(a). The Court will be brief in addressing these two issues. These typicality and adequacy requirements – the subject of Defendants' opposition briefing – require a more substantial discussion.

1. Plaintiffs Have Established Numerosity

To meet the requirements of Rule 23(a)(1), "the class must be so large that joinder of all members would be impracticable." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (internal citation and quotation). "Numerosity may be presumed when a class consists of forty or more [members]." *In re Bank of Am. Corp. Sec., Deriv. & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period. *Id.*

BlackBerry stock was cross-listed and traded both on the NASDAQ Global Select Market ("NASDAQ") and the Toronto Stock Exchange ("TSX"). (Feinstein Rep. ¶ 43.) During the Class Period, BlackBerry had an average of 524.2 million shares outstanding, and an average of 26.9 million shares of BlackBerry stock changed hands each day. (*Id.* ¶¶ 129, 154.)

This satisfies the numerosity requirement.

2. Plaintiffs Have Established Commonality

Rule 23(a)(2) requires Plaintiffs to demonstrate that common issues of law or fact affect all class members. Fed. R. Civ. P. 23(a)(2). Common questions must also "generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal citation

omitted). "[A] common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation, alteration, and citation omitted).

This case – as is typical of most securities fraud putative class actions, *see Amgen*, 568 U.S. at 474–75 – raises common questions of law and fact, including whether (i) Defendants' public statements during the Class Period misrepresented or omitted material facts; (ii) the alleged fraud was material; and (iii) Defendants acted with scienter.

The commonality requirement is satisfied.

### 3. Plaintiffs Have Established Typicality

Typicality requires that the claims of the class representatives be typical of those of the class. Fed. R. Civ. P. 24(a)(3). To satisfy this requirement, the party seeking certification must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation and citation omitted). "In a securities class action, when 'plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims,' the claims and nature of evidence 'are generally considered sufficient to satisfy the typicality requirement.'" *Bank of Am.*, 281 F.R.D. at 139 (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007) *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016)).

Here, the claims asserted by Lead Plaintiffs Cox and Dinzik arise from the same course of conduct as the claims of the absent class members. Cox and Dinzik allege that Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 by making various false and

misleading statements and omissions concerning BlackBerry's BB10 smartphones. They allege further that they and the other class members purchased shares of BlackBerry stock at artificially inflated prices and suffered damages as a direct and proximate result of Defendants' alleged misrepresentations and omissions. Clearly, all class members will seek to offer the same evidence to establish Defendants' liability.

Defendants contest none of this. Instead, they urge that Cox and Dinzik are atypical plaintiffs because they are subject to unique defenses.

The presence of unique defense may, in certain cases, defeat class certification when it threatens to become the focus of the litigation. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59–60 (2d Cir. 2000). The unique defense rule, however, "is not rigidly applied in this Circuit;" it is "intended to protect plaintiff class—not to shield defendants from a potentially meritorious suit." *In re Parmalat Sec. Litig.*, No. 04-md-1653, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008) (internal citations and quotations).

### i.   *Whether Dinzik is a "Purchaser" of BlackBerry Stock*

Defendants argue that Dinzik is not a "purchaser" of BlackBerry; rather, she was merely a joint tenant with her co-lead plaintiff, Cox, in an account that held BlackBerry stock. They claim that there is no evidence that Dinzik, as opposed to Cox, had any input in the decisions to transact in BlackBerry stock, and so was not a "purchaser" of BlackBerry securities and lacks standing under Section 10(b).

The critical fact underlying this argument is that at the time, Dinzik and Cox were dating and living together. They had a joint account with TD Ameritrade, initially funded by Dinzik. (Reply Ex. H ("Pl. Dinzik Dep.") at 56, 58, Dkt. No. 484-8.) That is why she was the joint owner of the BlackBerry stock with Cox.

13

Defendants rely on *Parmalat*, 2008 WL 3895539, at *6, in which the only two named plaintiffs in the modified class were also a couple – in *Parmalat*, they were husband and wife. *See id.* at *3. They were joint tenants in an account that held defendant Parmalat securities. *Id.* at *6. The court reasoned that the husband "made all investment decisions regarding Parmalat, and he did so without consulting with [the wife] in any material respect." *Id.* Accordingly, the court concluded that the wife's claims were atypical of the class because she would not be able to establish reliance: "She was simply a joint tenant with her husband in an account that held Parmalat securities." *Id.*

There are undoubtedly many couples who cede investment decisions to one partner. But there are undoubtedly others in which both individuals have input into the contents of the joint investment portfolio, and there is no reason why both should not serve as lead plaintiffs.[2] In this case, there is evidence that, while Cox gave the actual trading instructions for the account –he was the one "pushing the button" (Pl. Dinzik Dep. at 49) – he discussed most investment decisions with Dinzik prior to executing the trades (Reply Ex. G ("Pl. Cox. Dep.") at 30). And while Cox did not recall whether he discussed the specific BlackBerry trades at issue in this case with Dinzik (Opp'n Ex. G "Def. Cox Dep." at 39, Dkt. No. 478-7), Dinzik testified that both she and Cox were responsible for purchasing BlackBerry stock – "it was a joint decision," and while she could not recall "exact dates" of any specific discussion, decisions to purchase or sell stock from the joint account had to be "unanimous." (Pl. Dinzik Dep. at 49-51, 59-60.)

Thus, the record in this case can be distinguished from the record in *Parmalat*, 2008 WL 3895539, at *6. Here, there is evidence that Dinzik participated in Cox's decisions to buy and sell BlackBerry stock with the joint account. Of course, this issue may be litigated and decided by the

---

[2]       For purposes of the discussion that follows, let us assume that the Court agrees with the reasoning of the *Parmalat* court on this point.

trier of fact. But its resolution will certainly not become the focus of the trial. I thus decline to conclude at this juncture that Dinzik cannot serve as a class representative because she is subject to a unique defense.

        ii.    *Cox's Purchases Between Partial Corrective Disclosures and After the Final Corrective Disclosure*

Even if Dinzik were an atypical plaintiff, Cox is also a lead plaintiff – and if Plaintiffs are correct about Dinzik, they cannot possibly argue that Cox is atypical for the same reason. So in order to knock him out as atypical, Defendants try a different gambit.

The first issue they raise is with the timing to Cox's purchases. As detailed above, Plaintiffs allege that Defendants' fraud was revealed through three partial corrective disclosures on April 11, June 28, and September 20, 2013. All of Cox's purchases occurred after the initial April 11 partial corrective disclosure, and many occurred after the June 28 partial disclosure. Cox also continued to purchase BlackBerry stock after September 20, 2013 – the date of the final corrective disclosure. (Opp'n Ex. I at 4-6 ("Cox Trades"), Dkt. No. 478-9.) Defendants argue that Cox's post-disclosure purchases suggest that he would have purchased BlackBerry stock even if he had known of the alleged fraud.

Defendants' argument fails to persuade this Court that he is too atypical to serve as a class representative.

The fact that Cox made purchases during the period between the initial partial corrective disclosure on April 11 and the final, fully corrective disclosure on September 20 does not render him atypical. The case on which Defendants rely was not a decision on a class certification motion. It was, rather, a case in which the court was choosing a lead plaintiff among several contenders. *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015). The court concluded that one candidate for lead plaintiff status should not be selected for that role because – among

other reasons – many of its transactions occurred after partial disclosures. *Id.* However, other courts have noted that the same reasoning would not necessarily apply to someone who had already been selected to serve as a lead plaintiff:

> Defendants do not cite a single case—nor is this Court aware of one—holding that a lead plaintiff *seeking class certification* in a securities fraud suit fails to establish adequacy or typicality where that plaintiff made securities purchases after an alleged partial corrective disclosure but before the final corrective disclosure.

*In re JPMorgan Chase & Co. Sec. Litig.*, No. 12-cv-03852, 2015 WL 10433433, at *4 (S.D.N.Y. Sept. 29, 2015) (emphasis added); *see also Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018).

Moreover, even Cox's post-September 20 purchases do not render him an atypical plaintiff. It is true that several courts in this district have found a class representative to be atypical for making additional purchases after a final corrective disclosure. *See, e.g.*, *George v. China Auto. Sys., Inc.*, No. 11-cv-7533, 2013 WL 3357170, at *6–7 (S.D.N.Y. July 3, 2013); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69–70 (S.D.N.Y. 2000). However, "there is no per se rule to this effect." *Rocco v. Nam Tai Elecs, Inc.*, 245 F.R.D. 131, 36 (S.D.N.Y. 2007), and many courts in this district have adopted the reasoning of *In re Monster Worldwide, Inc. Securities Litigation*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) that:

> As numerous courts have held, the fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [the representative] relied on the integrity of the market during the class period, that is, before the information at issue was corrected or changed. In other words, the fact that an investor purchased additional shares upon learning the new information does not mean that he or she did not rely on the integrity of the market in purchasing shares before the new information was known. The post-disclosure purchase of the additional shares therefore will not necessarily present individual issues of reliance that render the investor atypical or inadequate to represent class members who did not purchase such additional shares.

(quoting *In re Salomon Analyst Metromedia*, 236 F.R.D. 208, 216 (S.D.N.Y. 2006)). Following *Monster*, these courts have refused to find that post-disclosure purchases render a class representative atypical. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, No. 15-cv-7614, 2018 WL 3913115, at *6 (S.D.N.Y. Aug. 13, 2018); *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 178–79 (S.D.N.Y. 2012) [hereinafter *Wyeth*]; *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 46–47 (S.D.N.Y. 2012).

One court explained that "while courts have found plaintiffs who have made post-disclosure purchases to be atypical when those plaintiffs possessed information that had not been disclosed to the investing public or when plaintiffs made a 'disproportionately large percentage' of their purchases post-disclosure, those circumstances are simply not present here." *Wyeth*, 284 F.R.D. at 178–79 (internal citations omitted). Here, "there is no evidence that [Plaintiffs] were aware of any ongoing, publicly undisclosed fraud or that they purchased the stock with anything other than public information." *See In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 168–69 (S.D.N.Y. 2010), *vacated and remanded*, 689 F.3d 229 (2d Cir. 2012) (vacated on other grounds). Moreover, Cox purchased far more BlackBerry stock during the Class Period than after. (*See* Opp'n at 21.)

I find the reasoning of *Monster* far more persuasive in the instant circumstances. What Cox chose to do when he had complete information is not probative of why he did what he did at a time when the available information was incomplete or deficient. The fact that Cox bought shares in BlackBerry after the market became aware of the corrective information does not render him an atypical class member.

### iii.   Cox's Day Trading and Alleged Merger Arbitrage

Defendants also argue that Cox's particular method of investing makes him atypical.

Cox often bought and sold BlackBerry stock on the same day – he engaged in "day trading." (Def. Cox Dep. at 48.) Additionally, Defendants note that on August 12, BlackBerry announced it was "exploring strategic alternatives" such that Cox's trading after August 12 reflects "merger arbitrage" – *i.e.*, that he was trying to buy in advance of a merger, rather than relying on the efficient market price of the stock.

Again, I do not find that any of this renders Cox an atypical plaintiff for Rule 23 purposes.

*First*, although Cox did "day trade" BlackBerry stock, "courts in this Circuit have generally rejected the argument that a day trader is barred from representing a class in a securities actions for reasons of atypicality." *In re Acclaim Entm't, Inc. Sec. Litig.*, No. cv-031270, 2006 WL 8441287, at *3 (E.D.N.Y. Aug. 7, 2006), *report and recommendation adopted*, 2006 WL 8441288 (E.D.N.Y. Sept. 25, 2006); *see Perez v. HEXO Corp.*, No. 19-cv-10965, 2020 WL 905753, at *4 (S.D.N.Y. Feb. 25, 2020), *reconsideration denied sub nom. In re HEXO Corp. Sec. Litig.*, 2020 WL 5503634 (S.D.N.Y. Sept. 11, 2020). Rather "the prevailing view in this Circuit is that 'day and momentum traders have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts. *Perez*, 2020 WL 905753, at *4.

*Second*, while Defendants note that "in-and-out" traders are sometimes subject to unique defenses, *see George*, 2013 WL 3357170, at *6, Cox is not a true in-and-out trader. "In-and-out traders are those who both purchase and sell all of their shares prior to a corrective disclosure," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15-cv-1249, 2017 WL 2062985, at *3 n.2 (S.D.N.Y. May 15, 2017) (internal citation omitted), but Cox held BlackBerry stock from his first purchase on May 13 until the end of the Class Period, and after, *see Wilson*, 2018 WL 3913115, at *6. (*See* Cox Trades at 4-6.)

*Third*, Defendants' portrayal of Cox as a merger arbitrageur is meritless.

After August 12, BlackBerry's hardware business was worthless. As a result, Defendants argue, any upside for investing in BlackBerry could only have come from a sale of the Company. (Opp'n at 21.) It is for this reason that they argue Cox's "frequent" trading after August 12 reflects "merger arbitrage." (*Id.*)

Defendants' argument fails to support a unique defense that could possibly become the focus of the litigation. The only piece of evidence they rely on that is specific to Cox is the frequency of his trading after August 12. But Cox's trades after August 12 were no more "frequent" than usual. Cox traded just as frequently in the first two weeks of June as he did in the last two weeks of August. (*See* Cox Trades 4-6.) And in any event, this strategy does not undermine the fact that Cox would have depended on the market to eventually reflect the value of any merger. *See Wilson*, 2018 WL 3913115, at *5 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273 (2014) [hereinafter *Halliburton II*]). Presumably the market was aware of precisely the conditions to which Defendants point, so Cox is no different from anyone who traded (or who traded more than casually) in BlackBerry stock during the last month of the Class Period. The fact that the market might have anticipated a sale does not demonstrate that Cox would have purchased BlackBerry securities even if he had known of BlackBerry's alleged fraud. *Cf. GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 218–21 (2d Cir. 2016).

Cox's trading patterns do not render him atypical.

### 4.   Plaintiffs Have Established Adequacy of Representation

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement seeks to ensure that Plaintiffs' interests are not antagonistic to those of the class and that Plaintiffs' attorneys are qualified,

experienced, and able to conduct the litigation. *Baffa*, 222 F.3d at 60; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

As described above, all members of the proposed class allege claims arising from the same wrongful conduct. Plaintiffs' theory of fraud, if vindicated, would vindicate the interests of the class. Defendants do not claim that Plaintiffs have any conflict of interest, nor is this Court aware of any. Plaintiffs have diligently prosecuted this action since 2013. They were appointed Lead Plaintiffs on March 14, 2014. (*See* Dkt. Nos. 11, Minute Entry (Mar. 14, 2014), 36.) They understand the nature of their claims and their fiduciary duties to the class. Lead counsel Kahn Swick & Foti, LLC, appointed March 14, 2014 (*see* Minute Entry (Mar. 14, 2014); Dkt. No. 36), and additional counsel Brower Piven, A Professional Corporation, which was formally appointed October 18, 2019 but has collaborated with lead counsel for the past six years (Dkt. No. 394), have ably conducted this litigation and satisfied each of the Rule 23(g) considerations.

Defendants do not challenge Dinzik's adequacy. She has satisfied the adequacy of representation requirement.

Defendants only objection is to Cox's adequacy as a class representative. Defendants do not argue that Cox's interests are antagonistic to those of the class or that his attorneys are not qualified, experienced, and able to conduct the litigation. *See Baffa.*, 222 F.3d at 60; *Amchem Prods.*, 521 U.S. at 625–26 . Rather, they attack his character.

In this Circuit, "courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (quoting *Kline v. Wolf*, 702 F.2d 400, 402–03 (2d Cir.1983)). "Such considerations of trustworthiness and credibility are not without limitation, however, but instead are restricted to their relevance to issues in the litigation." *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007).

Defendants argue that Cox is not trustworthy and lacks integrity due to his history of criminal charges and civil liability. Cox's siblings have obtained protective orders against him, and he has been arrested and charged with several assaults, felony arson, and conspiracy. (Def. Cox Dep. at 105-11.) Additionally, Cox has had civil judgments entered against him related to his former ownership of auto repair shops, one on the basis of a court's finding that he "intentionally, and with malice perpetrated a fraud" on the victims. (Opp'n Ex. L at 2, Dkt. No. 478-12.)

Despite his several arrests, Cox has no "criminal history" at all. Cox has never been convicted of a crime. (Pl. Cox Dep. at 109.) The assault charges filed against him are 20-30 years in the past (*see* Def. Cox Dep. at 104-09), and are irrelevant to this securities fraud case. *See Rocco*, 245 F.R.D. at 137. The same is true of the long-lapsed restraining orders against him that arose due to a family dispute over his father's will. (Def. Cox. Dep. at 109-11.) Although Cox's 2009 indictment for felony arson is much more recent, the charges were ultimately dismissed (*id.* at 107-08) and do not "touch upon" the class claims in this lawsuit. *See Jones v. Ford Motor Credit Co.*, No. 00-cv-8330, 2005 WL 743213, at *19 (S.D.N.Y. Mar. 31, 2005).

The civil judgments against Cox are more relevant – especially in this securities fraud action. "[C]onvictions of fraud or other forms of dishonesty undermine the qualifications of a potential class representative." *Xianglin Shi v. Sina Corp.*, No. 05-cv-2154, 2005 WL 1561438, at *4–5 (S.D.N.Y. July 1, 2005). Several courts have found that a prior fraud conviction disqualifies a class member from serving as lead plaintiff. *See Villare v. ABIOMED, Inc.*, No. 19-cv-7319, 2020 WL 3497285, at *7 (S.D.N.Y. June 29, 2020) (collecting cases).

But Cox was not "convicted" of – or ever prosecuted for – fraud. Two civil judgments were entered against Cox, arising out of unauthorized repairs of cars that took place at his auto repair shops. (*See* Opp'n Ex. M, Dkt. No. 478-12; Opp'n Ex. N, Dkt. No. 478-14.)

*First*, in 2003, a Texas Justice of the Peace rendered a judgment against Cox for deceptive trade practices. (*See* Opp'n Ex. N at 3). However, in 2007 this case was dismissed on appeal. (*See* Reply Ex. F, Dkt. No. 484-6; *see also* Opp'n at 23 n. 9 (acknowledging the case was dismissed)).

*Second*, in 2009, a post-answer default judgment was entered against Cox, again for deceptive trade practices. (*See* Opp'n Ex. M at 4.) An appellate court dismissed Cox's appeal on the ground that the judgment against Cox was not "final." (Reply Ex. D, Dkt. No. 484-4.) The record contains no evidence of what happened thereafter.

These civil judgments, both of which are over ten years old, one of which seems to have been vacated on appeal, are not the equivalent of a criminal conviction for fraud.

Frankly, this Court might not have certified Cox as Lead Plaintiff in a securities fraud class action, if only because defaulting in a civil litigation does not speak well of his ability to represent the interests of a class in an adequate manner.[3] However, another judge made that decision long before I had anything to do with this matter. And in the seven years since it was made, Cox appears to have been diligent in the prosecution of this lawsuit.

Moreover, as is always the case, in securities fraud class actions the best measure of whether a plaintiff will adequately represent the interests of a class is whether his lawyers are equipped to handle the matter. The adequacy and abilities of Plaintiffs' lawyers – Kahn Swick & Foti, LLC as lead counsel, and Brower Piven, A Professional Corporation as additional counsel – are not questioned by Defendants.

I thus conclude that Plaintiffs have satisfied the requirements of Rule 23(a)(1)-(4).

---

[3]     Having reviewed the record, this Court cannot find any indication that these matters were or were not known to Judge Griesa at the time he selected the Cox/Dinzik couple over competing lead plaintiffs.

### 5.   Plaintiff Has Satisfied the Implied Requirement of Ascertainability

Ascertainability "requires only that a class be defined using objective criteria that establish membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 264. This implied requirement is designed to prevent the certification of a class whose membership is "truly indeterminable." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (internal quotation and citations omitted).

Here, the proposed class definition clearly delineates the class's boundaries by the dates of investors' transactions in BlackBerry stock. Ascertaining the members of the class will be easily administrable by references to investor records.

### b.   The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires Plaintiffs to demonstrate that common questions of law or fact predominate over individual questions and that a class action is the superior method for adjudicating this dispute. Fed. R. Civ. P. 23(b)(3). Defendants argue that Plaintiffs cannot prove class-wide reliance or class-wide damages. They do not challenge superiority.

### 1.   Plaintiffs Have Established that Common Questions Predominate

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Waggoner*, 875 F.3d at 83 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)). This requirement is "far more demanding" than the commonality requirement under Rule 23(a). *Amchem Prods.*, 521 U.S. at 623–24. Designed to test the proposed class's cohesiveness, the predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 136 S. Ct. at 1045 (internal quotations and citations omitted).

23

This is a qualitative, not quantitative, inquiry, where the Court "must account for the nature and significance of the material common and individual issues in the case." *In re Petrobras Sec.*, 862 F.3d at 271.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–810 (2011) [hereinafter *Halliburton I*]. Under Section 10(b), Plaintiffs must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[4] *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

Defendants argue that common issues of law and fact do not predominate with respect to two elements of Plaintiffs' claims: (i) reliance and (ii) economic loss.

### i. Reliance

To recover for a violation of Section 10(b) and Rule 10b-5, a private securities plaintiff must demonstrate, among other things, that she relied upon the alleged misrepresentation or omission when deciding to buy or sell a security. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976). Under the now-familiar standard of *Basic v. Levinson*, 485 U.S. 224, 248 n.27 (1988), the Supreme Court held that reliance may be presumed where (i) the alleged misrepresentations were publicly known ("publicity"), (ii) the stock traded in an efficient market ("market efficiency"), and (iii) the plaintiff traded the stock between when the misrepresentations

---

[4]     Plaintiffs' claim under Section 20(a) indisputably presents common issues of law and fact, as the method for demonstrating whether Defendants exerted control over BlackBerry varies only based on Defendants' identities, not the Plaintiffs'. *See, e.g.*, *Wilson*, 2018 WL 3913115, at *8 n.8.

were made and when the truth was revealed ("market timing") – thereby obviating the need to demonstrate reliance on an individualized basis. *Accord Halliburton I*, 563 U.S. at 811.[5] This so-called *Basic* presumption is an indirect proxy for demonstrating "price impact," *i.e.*, that the defendant's fraudulent misstatements affected the price at which the plaintiff purchased her shares. *See Halliburton II*, 573 U.S. at 281. "The plaintiff bears the initial burden of demonstrating that the prerequisites for the *Basic* presumption are met." *Goldman II*, 955 F.3d at 270 (2d Cir. 2020) (citing *Waggoner*, 875 F.3d at 95).

Once a plaintiff has established the applicability of *Basic*'s presumption of reliance, the burden shifts to the defendants to rebut the *Basic* presumption by a preponderance of the evidence. *See, e.g.*, *Goldman II*, 955 F.3d at 270 (citing *Waggoner*, 875 F.3d at 101–03, 105). To meet their burden, defendants must "do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the [company's] stock's price by a preponderance of the evidence." *Waggoner*, 875 F.3d at 101 (emphasis in original). If defendants establish an absence of price impact by a preponderance, "*Basic*'s fraud-on-the-market theory does not apply," "common reliance . . . cannot be presumed," and the action cannot "be certified and proceed as a class action (with all that entails)[.]" *Halliburton II*, 573 U.S. at 281.

a)   Plaintiffs are Entitled to *Basic*'s Presumption of Reliance

As noted, *Basic* holds that when a stock trades in an efficient market and with the defendant's alleged material misrepresentations publicly known, the Court can presume that the misrepresentation affected the stock price, and that the plaintiff bought the stock in reliance on the defendant's misrepresentation. *Id.* at 279.

---

[5]      While materiality is also a "predicate" of *Basic*'s fraud-on-the-market theory, it does not need to be proved at the class certification stage and therefore has no bearing here. *Amgen*, 568 U.S. at 467 & n.4.

Defendants do not dispute that Plaintiffs have satisfied *Basic*'s publicity, market timing, and market efficiency prerequisites. Therefore, in assessing whether Plaintiff has carried its initial burden, the Court will be brief in addressing *Basic*'s three prerequisites.

As to publicity, Plaintiffs assert that Defendants made material misrepresentations and omissions in various public statements to investors that artificially maintained the market price of BlackBerry's stock. (*See* SAC ¶¶ 75-146; Feinstein Rep. ¶¶ 30-38.)

As to market timing, Plaintiffs allege that they bought BlackBerry stock during the Class Period and suffered losses when the artificial inflation was removed from the stock price as the truth was disclosed. (SAC ¶ 208.)

And as to market efficiency, the Court looks to the *Cammer* and *Krogman* factors, the prevailing tests for market efficiency,[6] which are so named after *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001). The five *Cammer* factors are: (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price. *See Waggoner*, 875 F.3d at 94 (quoting *Bombardier*, 546 F.3d at 200) (alterations omitted). The three *Krogman* factors are: (1) the market capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders. *Waggoner*, 875 F.3d at 95 (quoting *Krogman*, 202 F.R.D. at 474).

---

[6]     While the Second Circuit "has not adopted a test for market efficiency of stocks or bonds[,]" *In re Petrobras*, 862 F.3d at 276 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) [hereinafter *Bombardier*]), it (as well as various district courts in this Circuit) have used the *Cammer* factors to assess market efficiency.  *See In re Petrobras*, 862 F.3d at 276–79 (applying *Cammer* factors); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (noting that Second Circuit has "nodded approvingly" at *Cammer* factors and proceeding to apply them (citing *Waggoner*, 875 F.3d at 94–95)).

Applying those factors here, the Court concludes that BlackBerry stock traded in an efficient market:

***Cammer* One:** BlackBerry common stock experienced a high average weekly trading volume during the Class Period. *Compare In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) ("Average weekly trading volume of 2% or more of outstanding securities justifies a strong presumption of an efficient market for that security.") *with* Feinstein Rep. ¶ 130 (BlackBerry stock's average weekly trading volume was 25.7%).

***Cammer* Two:** Numerous financial analysts covered and reported on BlackBerry during the Class Period. *Compare Winstar*, 290 F.R.D. at 446 (market efficiency where three analysts followed the security) *with* Feinstein Rep. ¶¶ 133, 137 (BlackBerry stock was covered by at least 58 analyst firms during the Class Period, and at least 336 analyst reports were issued and at least 6,369 news articles were published about BlackBerry).

***Cammer* Three:** BlackBerry common stock (i) traded on the NASDAQ; (ii) had 167 market makers during the class period; and (iii) was held by at least 490 major investment institutions. (Feinstein Rep. ¶¶ 136, 141, 143.)

***Cammer* Four:** Since BlackBerry is a Canadian company listed on a U.S. exchange, it is subject to F-10 registration rather than S-3 registration, which applies to domestic companies. (*Id.* ¶ 144.) BlackBerry was eligible for F-10 registration throughout the Class Period, with an average float of $5.44 billion. This far exceeds both the original and amended S-3 float requirements of $150 million and $75 million, respectively. (*Id.* ¶¶ 145-49.)

***Krogman* One:** During the Class period, BlackBerry's market capitalization averaged $6.45 billion, making it larger than at least 90% of all publicly-traded companies in the United States (those listed on the NYSE, AMEX, NASDAQ, and ARCA). (*Id.* ¶ 151 & n.177.) This

number is certainly large enough to support a finding of market efficiency. *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (holding that quarterly market capitalization of ranging from $0.5 to $3.2 billion indicated market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (holding that market capitalization of $292 to $585 million supported market efficiency).

*Krogman* **Two:**  During the Class Period, the average bid-ask spread[7] for BlackBerry stock was 0.09%. (Feinstein Rep. ¶ 158.) By contrast, the average month-end bid-ask spread for all stocks in the Center for Research In Security Prices, LLC ("CRSP") database was 0.65% – many times larger. (*Id.*) BlackBerry stock's comparatively small bid-ask spread strongly indicates that the stock traded in an efficient market. *Krogman*, 202 F.R.D. at 478

*Krogman* **Three:**  During the Class Period, BlackBerry's float averaged $5.44 billion – larger than the total market capitalization of at least 80% of all other publicly-traded companies in the U.S. (Feinstein Rep. ¶ 153.) BlackBerry's average float comprised the overwhelming majority of BlackBerry's outstanding shares, meaning that there was a large proportion of BlackBerry shares that were available to non-insiders who could trade without restrictions and profit by trading on new information. On average, there were 442.2 million shares in BlackBerry's float and 524.2 million shares outstanding, resulting in an average float of 84.4% of shares outstanding. (*Id.* ¶ 154.) These figures weigh heavily in favor of a finding of market efficiency. *See McIntire*, 38 F. Supp. 3d at 433 (holding that a public float between 31% and 43% supported market efficiency).

The only factor that is subject to disagreement is *Cammer*'s fifth factor, *i.e.*, whether there was a "demonstration of a cause and effect relationship between [BlackBerry]'s unexpected,

---

[7]     A bid-ask spread is the amount by which the asking price for an asset exceeds its bid price. This percentage reflects the difference between the highest price a buyer is willing to pay for an asset and the lowest price that a seller is willing to accept. *Krogman*, 202 F.R.D. at 478. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Id.*

material disclosures and changes in stock price." *Waggoner*, 875 F.3d at 94 (alteration omitted) (quoting *Bombardier*, 546 F.3d at 200). As the Second Circuit noted in *Waggoner*, where the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency, a court can dispense with the fifth *Cammer* factor completely. 875 F.3d at 97–99.

Nevertheless, Plaintiffs also proffer direct evidence of price impact. Dr. Feinstein conducted two empirical tests of the efficiency of the market for BlackBerry stock: (1) an event study of whether BlackBerry stock reacted significantly on important news and announcement dates during the Class Period; and (2) collective studies of whether BlackBerry stock moved more on a set of high information flow dates (here, Dr. Feinstein used earnings announcement dates) as compared to on all other dates. (Feinstein Rep. ¶¶ 163-65.)

Defendants dispute price impact, not in the context of whether BlackBerry traded in an efficient market, but whether Plaintiffs can establish class-wide reliance under *Halliburton II*. Since Defendants elect to grapple with price impact under *Halliburton II* (which is to say, as a means of rebutting the *Basic* presumption of reliance), the Court will follow suit. The Court therefore finds that BlackBerry traded in an efficient market. Plaintiffs have demonstrated that the prerequisites for application of the *Basic* presumption are met. Accordingly, § 10(b)'s reliance requirement is presumptively satisfied. *Goldman II*, 955 F.3d at 270.

> b) Defendants Have Not Rebutted the *Basic* Presumption of Reliance By Establishing the Absence of Price Impact by a Preponderance of the Evidence

Because Plaintiffs are entitled to the *Basic* presumption, the burden shifts to Defendants to rebut the presumption by a preponderance of the evidence. *Id.* Although Plaintiffs need not prove price impact directly to invoke the *Basic* presumption, they may "present evidence of price impact to demonstrate the shortcomings of the defendant's rebuttal evidence." *Id.*

Rather than the traditional § 10(b) case in which the plaintiff alleges that the misstatement itself artificially inflated the corporation's stock, this is an inflation-maintenance case. Inflation-maintaining statements "have price impact not because they introduce inflation into a share price, but because they 'maintain' it." *Id.* at 264 (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 257 (2d Cir. 2016)). To proceed under this theory, the Court must find that the defendant's share price was inflated. *See Goldman II*, 955 F.3d at 265. "[I]f a court finds a disclosure caused a reduction in a defendant's share price, it can infer that the price was inflated by the amount of the reduction." *Id.* (citing *Vivendi*, 838 F.3d at 255).

In accordance with Plaintiffs' inflation-maintenance theory, Dr. Feinstein examined price impact on the back-end – *i.e.*, at the time the misrepresentation or omission was corrected – rather than on the front-end – when the misrepresentation or omission was made. (Feinstein Rep. ¶¶ 238-255.) He concluded that the BlackBerry stock price fell significantly on three days when the alleged misrepresentations were corrected. (*Id.* ¶ 242.) Specifically, he observed that due to allegation-related disclosures, BlackBerry stock dropped: (i) 8.32%, or $1.17 per share (statistically significant at over the 97% confidence level) on April 11, 2013; (ii) 32.46%, or $4.01 per share (statistically significant at over the 99.99% confidence level) on June 28, 2013; and (iii) 18.51%, or $1.75 per share (statistically significant at over the 99.99% confidence level). (*Id.* ¶¶ 243-45.)

Defendants do not rebut Plaintiffs' expert's numerical analysis regarding the stock drops that accompanied each partial corrective disclosure. Rather, Defendants argue that the disclosures were not in fact "corrective" of any earlier alleged misstatements.

Plaintiffs argue that Defendants' "correctiveness" arguments are inappropriate at the Rule 23 stage. Plaintiffs are correct. "Loss causation [is a] common question[] that need not be

adjudicated before a class is certified." *Amgen*, 568 U.S. at 475 (internal citations omitted). However, the Court must nevertheless consider Defendants' evidence that "an 'alleged misrepresentation did not, for whatever reason, actually affect the market price' of defendant's stock." *Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 483 (2d Cir. 2018) [hereinafter *Goldman I*] (quoting *Halliburton II*, 573 U.S. at 269). Based on this reasoning, my colleague the Hon. Lorna G. Schofield recently found that, "an inquiry into correctiveness, like newness, is appropriate at the class certification stage." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-1580, 2020 WL 1329354, at *6 (S.D.N.Y. Mar. 23, 2020).

At this stage of the litigation – when Plaintiffs are *not* required to show loss causation – the alleged disclosure need only "relate[] to," "concern," or be "linked" to a specific alleged misrepresentation. *See id.* at *6–*7. Indeed, even at the merits stage, "proof of loss causation requires demonstrating that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Vivendi*, 838 F.3d at 261 (emphasis original) (internal quotation and citation omitted). "[T]here is no requirement that the corrective disclosure take a particular form or be of a particular quality," such that it be a "mirror image tantamount to a confession of fraud." *In re Vale S.A. Sec. Litig.*, No. 15-cv-9539, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017) (internal citations and quotations omitted). Nor must a disclosure take the form of a "flashing neon light," with an explicit message stating that it is intended to cure an earlier fraudulent statement, in order for it to qualify as corrective. *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013).

Applying those standards, all three partial disclosures were corrective of the alleged fraud.

**April 11, 2013: Detwiler and ITG Reports**

Plaintiffs contend that the reports issued by Detwiler and ITG on April 11, 2013 directly relate to Defendants' misrepresentations regarding the demand and sales of the Z10, carrier support, consumer sentiment toward the devices, and the success of its launch in the U.S. (*See* Pls.' Br. at 28-29 (citing Feinstein Rep. ¶¶ 269-71).)

*First*, Defendants argue that these analyst reports "merely raised questions and speculation by analysts and, as such, cannot serve as [] corrective disclosure[s]." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019), *appeal withdrawn sub nom. Pub. Emps. Ret. Sys. of Mississippi v. Signet Jewelers Ltd.*, No. 19-3837, 2020 WL 773018 (2d Cir. Jan. 16, 2020). This is clearly not the case, considering these reports were based on nonpublic BB10 sales and return data.

*Second*, Defendants claim that the "facts" revealed by the Detwiler and ITG reports related to the launch of the Z10 at Verizon and AT&T, which occurred on or a few days prior to March 28 – the date of Defendants' first alleged misstatements. They argue that Defendants said nothing about the launches at Verizon or AT&T on March 28 such that the reports could not "correct" Defendants' March 28 statements. Defendants' expert, Dr. Lucy P. Allen, adds that the Detwiler and ITG reports only revealed information about sales in the U.S. that occurred on or after March 28. Thus, they do not reveal any new information about the Z10's performance overseas as of Q4 FY 2013 or March 28, 2013. (Lucy P. Allen, Expert Report (Aug. 10, 2020) ("Allen Rep.") ¶ 103, Dkt. No. 478-3.) This argument fails.

This Court is not persuaded by arguments that "this disclosure only mentioned [one thing]; discussion of that one thing in no way indicates or reveals a problem with this other thing []; ergo, no revelation of fraud." *Signet*, 2019 WL 3001084, at *14. Disclosures need not be a "mirror image

tantamount to a confession of fraud." *See Vale*, 2017 WL 1102666, at *29. Here, Plaintiffs contend

that the reports partially reveal what Defendants' *concealed* – omitted to disclose – from the market

in their March 28 representations about the BB10 launch: weak demand and carrier support, poor

consumer reception, a significant return risk, and too high pricing. Each of these factors undercut

stock value based on strong sell-in sales. (*See* Feinstein Rep. ¶¶ 269-274.) Moreover, these are the

same issues that plagued the BB10 launch abroad. (*See* SAC ¶ 77.) The April 11 revelations are

sufficiently related to – and are partially corrective of – Defendants' alleged misstatements *and*

*omissions* on March 28. *See Chi. Bridge & Iron*, 2020 WL 1329354, at *6.

*Third*, Dr. Allen states that only 2 of 43 analysts covering BlackBerry issued reports in the

week following the Detwiler and ITG reports. (Allen Rep. ¶ 105.) However, that is hardly

surprising or indicative of the impact of those reports when they were made. After all, BlackBerry

promptly denounced the Detwiler report as "materially false and misleading." (*See* SAC ¶¶ 84.)

That alone indicates that the report got some attention where it mattered.

Defendants have failed to rebut the presumption of reliance as to the April 11 partial

corrective disclosure.

### June 28, 2013: BlackBerry's Q1 Earnings Announcement

On June 28, 2013, BlackBerry posted a surprise loss for the quarter and reported the

shipment of only 2.7 million new BB10 devices. The BB10 sales fell short of what the market

expected – even on a sell-in basis – which informed analysts and investors that demand was far

weaker than they had previously been led to believe. (*See* Feinstein Rep. ¶¶ 283-85, 289.)

Defendants argue there is no link between BlackBerry's Q1 2014 earnings and Defendants'

March 28 or April 12 alleged misrepresentations.

*First*, Defendants claim that BlackBerry's Q1 2014 financial results do not reveal anything about its announcement on March 28 of its Q4 2013 financial results because they are beyond both the "temporal" and "topical" limitations of the disclosure itself. *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 149 (S.D.N.Y. 2010). (*See* Allen Rep. ¶¶ 107-112.) Dr. Allen observes that the June 28 announcements did not reveal any information about the Z10's performance overseas or any non-compliance with GAAP by recognizing revenue on a "sell-in" rather than a "sell-through" basis. (*Id.* ¶¶ 109-110.)

Defendants' reliance on *IMAX* is misplaced. That case involved an SEC investigation into a particular revenue recognition policy during a specific subset of the class period that was distinct from other allegedly fraudulent policies utilized throughout the class period. *See IMAX*, 272 F.R.D. at 144–46. Here, Plaintiffs allege BlackBerry used the same "sell-in" accounting policy – *i.e.*, improperly recognized revenue upon shipment – in both March and June 2013. (*See* SAC ¶¶ 95-96.)

Dr. Allen applies the improper "mirror image" principle to particular shipments of Z10s, while Dr. Feinstein expressly connects the poor financial results to the previously concealed issues of low demand, poor customer acceptance, weakening carrier support, high product return rates, and too-high pricing. (*See* Feinstein Rep. ¶¶ 289-292.)

*Second*, Dr. Allen notes that BlackBerry's disappointing Q1 sales results were within the range of what analysts expected. (*See* Allen Rep. ¶¶ 111-12.) Defendants also assert that analysts did not specifically link the June 28 announcement to a correction of any March 28 or April 12 statement. (*See id.* ¶ 113.)

However, Dr. Feinstein presents persuasive evidence that analysts were in fact surprised by the results and immediately raised concerns about sell-through numbers obscured by

Defendants' sell-in revenue recognition – one of Plaintiffs' core allegations of fraud. (*See* Feinstein Rep. ¶¶ 284-289.)

*Third*, Defendants argue there is no connection between the June 28 disclosure and BlackBerry's April 12 press release responding to the Detwiler and ITG reports about return rates during the first two weeks of U.S. sales, because "BlackBerry said nothing about that topic on June 28." (Opp'n at 15.) As mentioned above, the Court is not persuaded by this, especially when, contrary to Defendants' assertions, Plaintiffs connect the results disclosed on June 28 to ongoing high returns, poor carrier support and customer satisfaction – all of which Defendants (allegedly, falsely) claimed did not exist on April 12. (*See* Feinstein Rep. ¶¶ 288-291.)

At this preliminary, class certification stage, Defendants have not met their burden to establish that the June 28 disclosure was not corrective and fail to rebut the presumption of reliance by a preponderance of the evidence.

### September 20, 2013: BlackBerry's Q2 2014 Earnings Announcement

On September 20, 2013, BlackBerry pre-announced its Q2 2014 earnings, including a $930-960 million charge against inventory and supply commitments attributable to the Z10s, the reduction of its smartphone portfolio from six devices to four, and a 40% workforce reduction. (SAC ¶ 151.) BlackBerry reported an expected loss of $1.6 billion. It disclosed that a majority of the units sold that quarter were BlackBerry 7s, not BB10s. It announced that it would switch to sell-through accounting for certain BB10 devices and revealed that it had burned through $500 million in cash – *i.e.*, demand was so weak for BB10s that cash flow was negative – as well as further details regarding the true level of demand for the BB10s. (Feinstein Rep. ¶¶ 303, 309.)

Defendants repeat the same arguments they raised in opposition to the other corrective disclosures: analysts did not view the announcement as a correction of earlier statements; results

for Q2 2014 do not establish that misstatements about a different time period (Q1 2014 (June 28 results) or Q4 2013 or FY 2013 (March 28 results)) based on *IMAX*, 272 F.R.D. at 149–50; and the announcement did not correct Defendants' "immaterial" August 12 statement about customers embracing BB10 technology. (*See* Opp'n at 16.)

Here, as above, Dr. Feinstein has presented substantial evidence that analysts had indeed been misled by Defendants' prior misrepresentations and obfuscation of poor customer acceptance, high returns, sales and demand with sell-in revenue recognition. This prevented analysts from accurately accounting for the *negative* value of the BB10 project prior to the September 20 announcement. (Feinstein Rep. ¶¶ 298-308.) The Q2 2014 results surprised analysts, revealed the extent of BlackBerry's sell-through problems, and led analysts to properly assign a negative value to BlackBerry's handset business. (*Id.* ¶¶ 310-312.)

Dr. Allen's analysis of the September 20 disclosure again applies the improper "mirror image" standard. With respect to whether the Q2 2014 results revealed the alleged fraud of the Q4 2013 / FY 2013 results, Dr. Allen repeats her argument that the Q2 2014 results did not reveal new information about BB10 performance overseas. With respect to the August 12 denial of the Detwiler and ITG reports, Dr. Allen repeats her argument that the disclosure did not reveal any information about return rates to be corrective of the August 12 misstatement. For the same reasons discussed above, these arguments fail.

With respect to the Company's former use of sell-through revenue recognition, Dr. Allen observes that the decision to switch to sell-through revenue recognition was consistent and contemporaneous with a negative free cash flow in Q2 2014; BlackBerry did not correct or restate its prior financial results; analysts understood the impact of "sell-in" revenue recognition; analysts

were not under the impression the BB10s were a success; and analysts understood that the change in accounting decreased revenue for that quarter. (Allen Rep. ¶¶ 115-126.)

This Court will not adopt a rule that a corrective disclosure needs to take the form of a "flashing neon light," with an explicit message stating that it is intended to cure an earlier fraudulent statement, in order for it to qualify as "corrective." *See Van Dongen*, 951 F. Supp. 2d at 477. The fact that BlackBerry did not restate its previous financial results is unpersuasive. Compliance with GAAP does not mean that there was no securities fraud. *See Signet*, 2019 WL 3001084, at *14. Similarly, Dr. Allen's assertion that analysts understand the difference between sell-in and sell-through revenue recognition does not render the September 20 disclosure not "corrective." Plaintiffs persuasively argue that Defendants' refusal to provide sell-through information – even when expressly asked by analysts (Feinstein Rep. ¶ 285) – concealed issues with consumer demand and satisfaction that were revealed on September 20 by the write-down of inventory of and supply commitments for Z10s, and the low revenue from BB10s caused by BlackBerry's switch to sell-through accounting.

### Zipperstein's Additional Arguments

Defendant Zipperstein presents three additional arguments, peculiar to him, that Plaintiffs cannot prove price impact as to his alleged misstatement on April 12, 2013. None persuades.

*First*, Zipperstein argues that his statement could not have affected BlackBerry's stock price because it simply repeated information released to the market the previous day. The Second Circuit rejected a similar argument in an inflation maintenance case like this one. *See Vivendi*, 838 F.3d at 257–59. A repetitive affirmative misstatement "does not simply *maintain* the inflation, but indeed *prevents* the preexisting inflation in a stock price from dissipating." *Id.* at 257–58. (emphasis original) (internal quotations and alterations omitted).

*Second*, Zipperstein, like his fellow Defendants, argues that Plaintiffs have not shown that the June 28 or September 20 disclosures were "corrective" of Zipperstein's misstatement because they do not say anything about return rates experienced by key retail partners in the U.S. as of April 11, 2013. However, as explained above, the June 28 and September 20 disclosures announced poor BB10 performance, poor sales, a massive charge against inventory, and the switch to sell-through accounting. Plaintiffs credibly argue that these disclosures constructively revealed the falsity of Zipperstein's misstatements because the truth about BB10 returns affected BlackBerry's BB10 sales and revenue. These announcements are sufficiently related to Zipperstein's misstatements about device return rates.

*Third*, Zipperstein argues that Plaintiffs cannot prove that his statement had price impact because Dr. Feinstein evaluated the effect of the fraud holistically. This argument does not track Plaintiff's inflation maintenance theory of liability – *i.e.*, that back-end price movement reveals the inflation propped up by Defendants' series of misstatements. Moreover, "*Basic* places the burden of untangling these events on the defendant." *Goldman II*, 955 F.3d at 270 n.18.

Zipperstein has not rebutted the *Basic* presumption.

In sum, Plaintiffs' theory, as supported by Dr. Feinstein's analysis, is that "BlackBerry shareholders were harmed when statements that maintained the impression that the BB10s (and their resulting impact on BlackBerry's financial condition) were meeting expectations . . . were revealed to be false or misleading, causing substantial drops in the share price." (Pls.' Reply to Zipperstein Opp'n at 9, Dkt. No. 483; *see* Feinstein Rep., ¶¶ 15-20, 316-51.) Having considered Defendants' arguments and expert analysis of analyst reactions, this Court is not satisfied that Defendants have established that any corrective disclosure was not in fact "corrective." Indeed, "the presence or absence of analyst commentary, while of interest, is not a scientifically accepted

method of demonstrating price impact or its absence." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-01580, 2019 WL 5287980, at *36 (S.D.N.Y. Oct. 18, 2019), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020). Defendants have failed to demonstrate an absence of price impact by a preponderance of the evidence, and, therefore, have failed to rebut the *Basic* presumption of reliance. Plaintiffs have established that common issues of law and fact concerning "reliance" predominate.

ii.   *Economic Loss*

In *Comcast*, the Supreme Court held that, "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case[,]" and that "courts must conduct a rigorous analysis to determine whether that is so." 569 U.S. at 35 (internal quotation and citations omitted); *accord Waggoner*, 875 F.3d at 106. The Second Circuit has interpreted *Comcast* to require plaintiffs to "be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (internal quotation marks and citation omitted); *accord Roach*, 778 F.3d at 407.

Here, Plaintiffs claim that BlackBerry shareholders were harmed when Defendants statements maintaining that the BB10 project was successful were shown to be false and misleading, thereby exposing previously concealed weak sell-through sales, customer demand, customer satisfaction, and carrier support, and causing a substantial drop in share price on three corrective disclosure dates.

Plaintiffs' damages model directly measures the harm alleged by examining the drop in price that occurred when the April 11 Detwiler and ITG reports and Defendants' corrective announcements on June 28 and September 20 exposed the ongoing problems related to the BB10 project. Specifically, Plaintiffs' expert Dr. Feinstein used an event study to establish that

BlackBerry's stock fell in reaction to company-specific information on each corrective disclosure date, considered any company-specific non-fraud-related information disseminated on those dates, and removed any negative valuation effect of the adverse confounding information from the valuation effect of the corrective disclosures. (Feinstein Rep. ¶ 319.) Next, he constructed an artificial inflation ribbon. (*Id.* ¶¶ 344-346, Ex. 10). Lastly, Dr. Feinstein calculated a per share damages formula. The inputs to this formula are two easily ascertainable data points: the purchase date and sale date of BlackBerry stock. (*Id.* ¶¶ 347-351.)

Other courts in this district have accepted Dr. Feinstein's three-step method of calculating per share damages. *See Wilson*, 2018 WL 3913115, at *16; *see also In re JPMorgan Chase*, 2015 WL 10433433, at *7. Plaintiffs' "proposed measure for damages is directly linked with their underlying theory of classwide liability and is therefore in accord with the Supreme Court's decision in *Comcast*." *Waggoner*, 875 F.3d at 106 (ellipses omitted) (quoting *U.S. Foodservice*, 729 F.3d at 123 n.8).

Defendants argue that Dr. Feinstein's model does not attempt to measure "only damages attributable to [Plaintiffs'] theory," *see Comcast*, 569 U.S. at 35, because Dr. Feinstein has admitted that his model does not disaggregate the amount of stock price inflation attributable to each statement. This argument fails to persuade.

In *Comcast*, the plaintiffs had originally advanced four distinct theories of antitrust impact that caused four distinct market distortions. The district court concluded that only one of these theories (overbuilder competition) was amenable to class-wide proof, and rejected the other three. *See id.* at 31. Nevertheless, the plaintiffs' expert's proffered model calculated damages resulting from all four distortions as a whole. *See id.* at 36–37. The Supreme Court reversed class

certification because the damages model incorporated all four market distortions as opposed to the single distortion the district court had accepted. *See id.* at 38.

Here, Defendants extrapolate from the Supreme Court's reasoning that a damages model must not include rejected theories of liability to argue that a damages model must isolate the amount of price impact attributable to each specific misstatement.

There is no legal basis for this expansion of *Comcast*. Rather, the Second Circuit has:

> interpreted *Comcast* as precluding class certification "only ... because the sole theory of liability that the district court determined was common in that antitrust action, overbuilder competition, was a theory of liability that the plaintiffs' model indisputably failed to measure when determining the damages for that injury." In other words, we have stated that *Comcast* "held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."

*Waggoner*, 875 F.3d at 105–06 (quoting *Sykes*, 780 F.3d at 88; *Roach*, 778 F.3d at 407).

Defendants do not argue that Plaintiffs' damages model fails to disaggregate (a) distinct theories of liability, as in *Comcast*; (b) different "frauds," *cf. Signet*, 2019 WL 3001084, at *1, *19, in which plaintiffs alleged that defendants misrepresented the health of Signet's credit portfolio and, unrelatedly, concealed sexual harassment liability; or even (c) confounding – *i.e.*, non-fraud related – information. Rather, Defendants argue that Plaintiffs fail to disaggregate the effects of the misstatements alleged in the SAC from the effects of the additional misstatements identified in the Feinstein Report. But the additional misstatements in the Feinstein Report clearly relate to the same theory of liability (here, inflation maintenance) and the same concealed and misrepresented information that is alleged in the SAC (*i.e.*, successful BB10 launch, sales and sell-through, customer acceptance, return rates, and price concessions (*see* Opp'n at A1-A7; Reply at App. 1-5, Dkt. No. 482)) during the same period of time (the Class Period, March 28, 2013 – September 20, 2013 (*see* Opp'n at A1-A7)). They are all within the alleged harm the Plaintiffs

allegedly suffered as a result of BlackBerry's alleged misstatements and nondisclosures over a period of six months. The failure to disaggregate harm attributable to statements that are newly identified as false or misleading does not preclude class certification. *See Waggoner*, 875 F.3d at 106.

Relatedly, Zipperstein argues that Plaintiffs failed to carry their burden under *Comcast* because their model does not measure damages specifically attributable to his specific statement. But Zipperstein offers neither case law nor reason to impose such a burden on Plaintiffs at the class certification stage. Plaintiffs' proposed damages model tracks their single theory of liability based on Defendants' misrepresentations about the BB10s and their impact on BlackBerry's financial conditions. Zipperstein's misstatement is part of this single theory.

Because Plaintiffs have provided a class-wide model for calculating damages arising from its theory of liability, they have met their burden under *Comcast*.

Based upon the foregoing, Plaintiffs have established that common questions of law and fact will predominate in this case.

### 2.   Plaintiffs Have Established that a Class Action is Superior

Under Rule 23(b)(3), a court may not certify a class unless it finds that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts consider: (A) the class members' interest in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . .class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(D). "[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobras Sec.*, 862 F.3d at 268 (internal citation omitted).

Plaintiffs have established that adjudicating this case as a class action will promote judicial efficiency and provide relief to those with claims too small to justify individual lawsuits. Defendants do not contest that any of the above factors weigh against class certification.

The Court therefore concludes that class certification is the superior method for adjudicating this case.

### c. Class Period

The Class Period proposed by Plaintiffs begins on March 28, 2013, the day of the first alleged misrepresentation about the BB10 launch and revenues therefrom, and ends on September 20, 2013, the day BlackBerry announced its nearly $1 billion charge against inventory and supply commitments attributable to the Z10s, that most of its 3.7 million sales for the quarter were not BB10s, and that the Company had burned $500 million of cash.

### 1.  The Full Truth was not Disseminated to the Market Until September 20, 2013

Defendants argue that the market was fully cured as of August 28, 2013 – the day when the market reacted swiftly and negatively to BlackBerry's surprise loss for the quarter and shipment of only 2.7 million BB10s. Accordingly, they contend that the Class Period should not extend beyond that date. (*See* Opp'n at 24.)

"In the case of a securities fraud class action, courts are required to cut off the class period on the date of a statement or event that cures the market." *Carpenters*, 310 F.R.D. at 97 (internal quotations and alterations omitted). Thus, the "class period ends when the truth has been disseminated to the market." *Id.*

Defendants argue that no reasonable investor would have relied on the success of the BB10 launch after June 28, 2013, because that announcement informed the market that demand for BB10 devices and the future prospects for BB10s were far weaker than expected. However, at this point, the "full truth" had not yet been disclosed to the market. *See Pirnik*, 327 F.R.D. at 48. Notably, on

June 28, Defendants continued to tout customer satisfaction and expressly declined to provide sell-through data for BB10s versus older BlackBerry models. (SAC ¶ 149.)

Moreover, as discussed above, Plaintiffs "offered substantial evidence that the market was misled throughout the class period." *See In re Virtus Inv. Partners*, 2017 WL 2062985, at *7. Specifically, the market continued to overestimate BB10 performance and overvalue the BB10 project after June 28. (*See* Feinstein Rep. ¶¶ 298-307.) The September 20 announcement finally revealed the sell-through issues with the BB10s. The market reacted with a significant stock drop and analysts commented on how the disclosure revealed their valuations had been too high. (*See id.* ¶¶ 309-314.)

Accordingly, the "full truth" was not disseminated to the market until September 20, 2013, marking the end of the Class Period.

### 2.   In-and-Out Traders are Excluded from the Class Definition

Defendants also argue that the class definition must exclude "in-and-out" traders who both purchased and sold BlackBerry stock before any corrective disclosure. *See Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 59 (S.D.N.Y. 2019). Plaintiffs do not respond to this argument in their reply brief, and Dr. Feinstein's own damages model reflects that shares purchased from March 28, 2013 through April 10, 2013 and sold prior to April 11, 2013 – the date of the first corrective disclosure – have per share damages of $0. (Feinstein Rep. ¶ 348.) Thus, there is no reason not to exclude these individuals from the class. The class definition is modified to exclude any person who purchased BlackBerry from March 28 through April 10, 2013 and who sold all of their position prior to April 11, 2013.

**CONCLUSION**

Plaintiffs' motion to certify a class, appoint class representatives, and appoint class counsel is granted in accordance with this opinion. The class is modified to exclude true in-and-out traders as stated above.

The Clerk of Court is respectfully directed to close Dkt. No. 463.


Dated:  January 26, 2021
      New York, New York

_____
Chief Judge

BY ECF TO ALL PARTIES