**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
             :
MARVIN PEARLSTEIN, Individually And On  :
Behalf of All Others Similarly Situated,    :
             :
         Plaintiff,    :
             :
     -against-       :
             :
BLACKBERRY LIMITED (formerly known as  :
RESEARCH IN MOTION LIMITED), THORSTEN  :
HEINS, BRIAN BIDULKA, and STEVE    :
ZIPPERSTEIN,           :
             :
         Defendants.  :
---------------------------------------------------------- X

ECF CASE

No. 13 Civ. 7060 (CM) (KHP)
(Consolidated)

Oral Argument Requested

**DEFENDANTS' MEMORANDUM OF LAW**
**<u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

MORRISON & FOERSTER LLP

Dan Marmalefsky (admitted *pro hac vice*)
707 Wilshire Boulevard
Los Angeles, California 90017
(213) 892-5200

James J. Beha II
Steven T. Rappoport
250 West 55th Street
New York, New York 10019
(212) 468-8000

*Attorneys for Defendants BlackBerry*
*Limited, Thorsten Heins, Brian Bidulka, and*
*Steve Zipperstein*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

PROCEDURAL BACKGROUND..........................................................................1

UNDISPUTED FACTS ..........................................................................................3

    A.     BlackBerry's Announcements of Financial Results .............................4

          1.     March 28, 2013:  BlackBerry Announces Fiscal Year 2013 Results.........4

          2.     June 28, 2013: BlackBerry Announces Q1FY14 Results..........................5

          3.     September 20, 2013:  BlackBerry Pre-Announces Q2FY14 Results.........5

    B.     BlackBerry Responds to the Detwiler Report on April 11 and 12, 2013 and Mr. Heins Comments on the Response on April 29, 2013....................6

    C.     BlackBerry's Revenue Accounting.......................................................9

ARGUMENT..........................................................................................................10

I.     THE STATUTE OF REPOSE BARS CLAIMS FIRST ASSERTED IN PLAINTIFFS' EXPERT REPORTS IN 2020 ...............................................10

II.    THERE IS NO EVIDENCE OF ANY MATERIAL MISSTATEMENT OF FACT ......12

    A.     BlackBerry's Statements About The Prospects for and Progress of the Launch Were Not Material Misstatements of Fact ...............................12

          1.     Generic Positive Statements Are Immaterial Puffery ............................12

          2.     The Safe Harbor Protects Forward-Looking Statements  About the BlackBerry 10 Launch..........................................................................13

          3.     BlackBerry's Statements Were Not Misleading in Context ...................14

          4.     No Evidence That Statements About the Prospects for or Results of the Launch Were False When Made ......................................................16

    B.     Statements Responding to Media Reports about the Detwiler Report Were True .....................................................................................................24

    C.     No Evidence of Any Misleading Omission........................................27

III.   THERE IS NO EVIDENCE BLACKBERRY'S ACCOUNTING JUDGMENTS WERE MISLEADING OPINIONS UNDER *OMNICARE*...........................................28

    A.     No Evidence Inventory Judgments Were Misleading Opinions.........................29

    B.     BlackBerry Sincerely Believed Its Revenue Accounting Judgments.................29

    C.     No Omission of Material Fact Rendering Revenue Judgments Misleading ........30

V.    THERE IS NO EVIDENCE OF SCIENTER ................................................30

    A.     No Evidence Any Individual Defendant Acted With Scienter...........................30

# TABLE OF CONTENTS

**Page**

B.    No Evidence of BlackBerry's Corporate Scienter ...............................................33

IV.    PLAINTIFFS CANNOT PROVE LOSS CAUSATION ................................................33

A.    None of the Three Alleged Corrective Disclosures Was Corrective ...................34

B.    Correction of "Prior Perception" Does Not Establish Loss Causation ...............35

C.    BlackBerry's Revenue Recognition Judgments Were Never "Corrected" .........35

V.    THE COURT SHOULD ENTER JUDGMENT ON THE SECTION 20(A) CLAIMS ..............................................................................................................................35

APPENDIX A - ALLEGED MISSTATEMENTS AND OMISSIONS AS TO WHICH DEFENDANTS SEEK SUMMARY JUDGMENT.................................................... A-1

APPENDIX B - RISK FACTORS AND OTHER CAUTIONARY STATEMENTS IN MARCH 28 AND JUNE 28, 2013 ANNOUNCEMENTS ..........................................B-1

## TABLE OF AUTHORITIES

**Case**                                                                                          **Page(s)**

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samru-Kazyna JSC*,
    477 F. Supp. 3d 88 (S.D.N.Y. 2020) ................................................................ 34, 35

*Beleson v. Schwartz*,
    599 F. Supp. 2d 519 (S.D.N.Y. 2009) ............................................................. 14, 15

*Born v. Quad/Graphics, Inc.*,
    2021 WL 736839 (S.D.N.Y. Feb. 25, 2021) ........................................................ 35

*Coronel v. Quanta Cap. Holdings Ltd.*,
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ........................................................ 22

*Cox v. BlackBerry Ltd.*,
    660 F. App'x 23 (2d Cir. 2016) .......................................................................... 2

*CTS Corp. v. Waldburger*,
    573 U.S. 1 (2014) .............................................................................................. 10

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014) ......................................................................... 25, 27

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................. 33, 34, 35

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ......................................................................... 34, 35

*Freedman v. Value Health, Inc.*,
    135 F. Supp. 2d 317 (D. Conn. 2001) ........................................................... 23, 25

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007) ................................................................ 35

*In re Barclays Bank PLC Sec. Litig.*,
    2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017) ................................................... 34

*In re Bausch & Lomb, Inc. Sec. Litig.*,
    592 F. Supp. 2d 323 (W.D.N.Y. 2008) .............................................................. 33

*In re Deutsche Bank AG Sec. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017) ................................................... 27

*In re Fannie Mae Sec., Deriv., & ERISA Litig.*,
    898 F. Supp. 2d 176 (D.D.C. 2012) ................................................................... 32

## TABLE OF AUTHORITIES

**Case**                                                                        **Page(s)**

*In re Initial Public Offering Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)....................................................................35

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    939 F. Supp. 2d 360 (S.D.N.Y. 2013)....................................................................11

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)......................................................................19

*In re Northern Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)....................................................................33

*In re Omnicom Group, Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008)..............................................................34, 35

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................................................31, 32

*In re Rhodia S.A. Sec. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007)....................................................................35

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ..................................................................................12

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ......................................................................................27

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).......................................................31

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ..................................................................................11

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ..................................................................................34

*Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..............................................................................................33

*McCarthy v. Dun & Bradstreet Corp.*,
    372 F. Supp. 2d 694 (D. Conn. 2005), *aff'd*, 482 F.3d 184 (2d Cir. 2007)...........12

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010) ..............................................................................................10

# TABLE OF AUTHORITIES

**Case**                                                                                                  **Page(s)**

*Moshell v. Sasol Ltd.*,
  481 F. Supp. 3d 280 (S.D.N.Y. 2020) ...................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................*passim*

*Pearlstein v. BlackBerry Ltd.*,
  93 F. Supp. 3d 233 (S.D.N.Y. 2015) ............................................... 2, 12, 14, 28

*Plymouth Cnty. Ret. Ass'n v. Advisory Bd. Co.*,
  370 F. Supp. 3d 60 (D.D.C. 2019) .......................................................................21

*Ret. Sys. v. MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010) ................................................................................13

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019) ........................................................... 10, 11

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) .......................................................................... 13, 14

*Strougo v. Barclays PLC*,
  334 F. Supp. 3d 591 (S.D.N.Y. 2018) .................................................................30

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008) ................................................................................33

*Weinstock* v. *Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000) .....................................................................................1

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ................................................................................26

*Woolgar v. Kingstone Cos., Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) .................................................................31

**Statutes**

28 U.S.C. § 1658(b) ...................................................................................................10

## INTRODUCTION

After the Court dismissed Plaintiffs' First Amended Complaint, resolution of Defendants' motions to dismiss the Second Amended Complaint ("SAC") turned on two new allegations about a negative research report issued by Detwiler Fenton (the "Detwiler Report") on April 11, 2013 and Defendants' denial of the Detwiler Report on April 12, 2013. Based solely on an eight-minute call with James Dunham, an executive of Wireless Zone, a regional wireless retailer, Detwiler wrote that "key retail partners have seen a significant increase in [BlackBerry] Z10 returns to the point where, in several cases, returns are now exceeding sales, a phenomenon we have never seen before." Plaintiffs allege that (a) the Detwiler Report was based on truthful real-time data, and (b) Defendants possessed that same data when they asserted that Detwiler's claim about return rates was false. Moving to dismiss, Defendants argued they did not possess any such data. In response, the Court held: "These are arguments better left for summary judgment, and the Court does not address their merits at the motion to dismiss stage." (ECF No. 115, at 7.)

We are now at summary judgment. Plaintiffs' "unsupported allegations" no longer suffice. *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Plaintiffs need <u>evidence</u> to "create a material issue of fact." *Id.* Undisputed facts show that (a) Mr. Dunham had no information at all about BlackBerry's "key retail partners" and provided no such information to the Detwiler analyst; and (b) no one at BlackBerry had any Wireless Zone sales or returns information at all. Without those new, demonstrably untrue allegations, the SAC is otherwise identical to the complaint that Judge Griesa dismissed with prejudice six years ago. The Court should enter summary judgment in Defendants' favor.

## PROCEDURAL BACKGROUND

In 2013, BlackBerry launched BlackBerry 10 ("BB10")—a new smartphone operating system and an accompanying new line of smartphones. After an encouraging start, the launch

did not succeed.  In September 2013, BlackBerry announced disappointing quarterly earnings for

Q2FY14, accounting changes, and layoffs.  The stock price dropped.  Plaintiffs sued BlackBerry,

its former CEO Thorsten Heins, and its former CFO Brian Bidulka, attempting to transform

business challenges into securities fraud.  In their Amended Complaint, Plaintiffs alleged that:

- Various positive statements BlackBerry and Mr. Heins made about the BlackBerry 10 launch between March 28 and September 20, 2013 (including statements that customers were "happy" and "loved" the product and that wireless carriers were "excited") were fraudulent;

- BlackBerry and Mr. Heins made false statements in an April 12, 2013 press release refuting the April 11, 2013 Detwiler Report, which stated that BlackBerry's "key retail partners" were experiencing unusually high rates of returns of BB10 devices;

- BlackBerry's reported inventory valuations for Q4FY13 and Q1FY14 were fraudulent because BlackBerry announced an inventory charge during Q2FY14; and

- BlackBerry's Q4FY13 and Q1FY14 revenue accounting was fraudulent because BlackBerry announced it would be deferring revenue on BB10 devices shipped to customers during Q2FY14.

The Court (the late Judge Griesa) dismissed Plaintiffs' complaint with prejudice.

*Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015).  The Court correctly

concluded that most of the alleged misstatements were either routine puffery or protected

forward-looking statements and that the remaining ones had not been shown to be false.  *Id.* at

240-41.  The Court found that the challenged accounting was based on subjective judgments and

that Plaintiffs failed to show BlackBerry did not believe its opinions.  *Id.* at 243.  The Court also

found that Plaintiffs failed to plead scienter.  *Id.* at 246-47.  The Second Circuit affirmed the

judgment of dismissal, but it remanded for the Court to re-consider Plaintiffs' request for leave to

amend.  *Cox v. BlackBerry Ltd.*, 660 F. App'x 23 (2d Cir. 2016).

With discovery now concluded, the new allegations that permitted this case to proceed

(and purportedly provided the basis to add Mr. Zipperstein as a defendant) have been proven

false.  Undisputed evidence establishes: the information Mr. Dunham gave Detwiler did <u>not</u>

2

support the statements in the Detwiler Report; neither BlackBerry nor Wireless Zone considered Wireless Zone one of BlackBerry's "key retail partners"; Mr. Dunham had no data concerning sales or returns of any of BlackBerry's "key retail partners"; BlackBerry did <u>not</u> have Wireless Zone return data; and the information BlackBerry's senior executives <u>did</u> have, including internal information and data from BlackBerry's <u>actual</u> "key retail partners," showed key retail partners were <u>not</u> experiencing significant returns as of April 10, 2013. Thus, the allegations allowing this case to proceed were false, and Plaintiffs' basis for proving scienter has evaporated.

All that remains are the fraud-by-hindsight allegations Judge Griesa rightly rejected years ago: Unsupported theories that Defendants committed fraud by making positive statements about a new product and being optimistic about its prospects, and that accounting charges and changes in accounting treatment rendered earlier accounting judgments fraudulent. These allegations do not support a fraud claim.[1]  Discovery produced no evidence of fraud. This case should end.

## UNDISPUTED FACTS

The defendants are BlackBerry, former BlackBerry CEO Thorsten Heins, former CFO Brian Bidulka, and former chief legal officer Steven Zipperstein. (56.1 Stmt ¶¶ 5, 13, 20.)

In early 2013, BlackBerry introduced its new BB10 operating system and two BB10 smartphone devices, Z10 and Q10. (*Id.* ¶¶ 62, 77.) The Z10 was an all-touch device, intended to compete in the growing market for all-touch devices with larger screens. The Q10 was the first BB10 device with BlackBerry's iconic physical keyboard, intended as the first step in converting BlackBerry's approximately 70 million existing subscribers to BB10. (*Id.* ¶ 63.)

---

[1] Appendix A lists the alleged misstatements and omissions and assigns them each a number. For ease of reference, we refer to the alleged misstatements by the numbers assigned in Appendix A. Appendix B is a compilation of BlackBerry's disclosure of relevant risk factors and other cautionary statements. References to "56.1 Stmt" are to the accompanying statement of undisputed facts submitted pursuant to Local Rule 56.1. References to exhibits are to the exhibits to the accompanying declaration of James J. Beha II.

BlackBerry began selling the Z10 in the United Kingdom on January 31, 2013, and in Canada on February 5, 2013.  (*Id.* ¶¶ 78, 81.)  Early results in the UK and Canada were strong, exceeding BlackBerry's expectation.  (*Id.* ¶¶ 78-85.)  BlackBerry released the Z10 in the United States in late-March.  AT&T began selling the Z10 on March 22, 2013; T-Mobile began on March 26, 2013; and Verizon on March 28, 2013.  (*Id.* ¶ 95.)

### A.    BlackBerry's Announcements of Financial Results

Each quarter, BlackBerry filed financial reports, announced its financial results in a press release, and held an earnings call with equity research analysts.  (*See id.* ¶ 128; SAC ¶¶ 86, 113.)

### 1.    March 28, 2013:  BlackBerry Announces Fiscal Year 2013 Results

On March 28, 2013, BlackBerry announced fiscal 2013 results (for the year ended March 2, 2013).  (56.1 Stmt ¶ 128.)

BlackBerry executives considered the early BB10 results positive.  But BlackBerry also provided robust risk disclosures, including cautioning investors as to the specific risks Plaintiffs claim were concealed:

- "Factors . . . largely within the control of network carriers . . . are important to the success of [BB10]… includ[ing] … the degree to which carriers . . . actively promote or subsidize [BB10 devices]";

- If "competitors offer their products . . . to the carriers . . . on more favorable . . . terms . . . or those products and services are . . . in higher demand by end users . . . there may be continued pressure on the Company to reduce the price of its products . . ., or those carriers . . . may stop carrying . . . or de-emphasize" BlackBerry devices;

- "Decisions by customers . . . are becoming increasingly based on the availability of top-rated third-party software applications. . . . The availability and development of these applications . . . will depend . . . on perceptions of . . . [app] developers of the relative benefits of developing software for [BlackBerry] products rather than or in addition to those of its competitors, which may be adversely affected by further losses of market share, delays in the [BB10] launch . . . and perceptions regarding the ability of [BB10] smartphones . . . to compete successfully."

(*See* App'x. B.)

Market analysts' reactions were generally negative or skeptical that the BB10 devices would turn around BlackBerry's fortunes. (56.1 Stmt ¶ 139.) Following BlackBerry's disclosures, a majority of analysts set price targets for Blackberry's stock below the closing price of the stock on March 28. (*Id.*) BlackBerry's stock price fell $.12 on March 28. (*Id.*)

### 2.     June 28, 2013: BlackBerry Announces Q1FY14 Results

On June 28, 2013, BlackBerry announced its financial results for the first quarter of its 2014 fiscal year (the three months ending June 1, 2013), filed its quarterly financial report with the SEC, and discussed BlackBerry's financial results on an earnings call. (SAC ¶¶ 86, 113.)

BlackBerry disclosed on the call that just 40% of the 6.8 million phones it shipped during Q1 2014 were BB10 devices. (56.1 Stmt ¶ 214.) BlackBerry again cautioned investors as to the precise risks that Plaintiffs claim were concealed, including the risks from "the Company's ability to promote . . . the development of an ecosystem of applications" for BB10. (Ex. 27, MD&A at 3.) Asked about the BB10 launch and for guidance for the next quarter, Mr. Heins responded:

> "It's a very competitive, very volatile market, so many dynamics going on here. So, it is really, really hard to predict, even with a three-month outlook where are we going to be. . . [I]t's really too early to say. . . [T]here's lots of work to do. . . It's not automatic. . . It is a very competitive market. . . This is a marathon, right?"

(Ex. 186 at 12, 14.) Analysts reacted negatively to the quarterly results, calling them "dismal" and "disappointing" and suggesting the market "has not embraced" BB10. (56.1 Stmt ¶¶ 218-23.) BlackBerry's stock price fell approximately 28%. (*Id* ¶ 224.)

### 3.     September 20, 2013:  BlackBerry Pre-Announces Q2FY14 Results

On September 20, 2013, BlackBerry "pre-announced" an approximately $930 million to $960 million charge against Z10 inventory and supply commitments, a week before its scheduled Q2 2014 results call. (*Id.* ¶¶ 253-254.) BlackBerry announced that it would (i) take a $72

million "restructuring charge" for Q2FY14; (2) "transition its future smartphone portfolio from six devices to four"; and (3) implement "a workforce reduction of approximately 4,500 positions or approximately 40% of the Company's global workforce." (*Id.* ¶ 254.) BlackBerry also announced that it would defer recognizing revenue on BB10 devices sold and shipped during Q2FY14 (*i.e.* after June 1, 2013) until carriers and distributors re-sold those devices to consumers. (*Id.*) BlackBerry's stock price fell from $10.52 to $8.73. (*Id.*)

**B.      BlackBerry Responds to the Detwiler Report on April 11 and 12, 2013 and Mr. Heins Comments on the Response on April 29, 2013**

On April 11, 2013, Detwiler issued a "report" that "key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are now exceeding sales, a phenomenon we have never seen before." (Ex. 160.) The report provoked substantial media coverage, including this Wall Street Journal reporter's tweet: "@wconnors: A Detwiler analyst thinks that returns of the #BlackBerryZ10 are actually outnumbering sales at #Verizon. Bad news for $BBRY if true." (Ex. 135; 56.1 Stmt ¶ 147.) BlackBerry's stock price declined significantly. (*Id.* ¶ 149.)

BlackBerry's key retail partners in fact were reporting a positive initial U.S. launch, directly contrary to what media reported Detwiler had said. (*Id.* ¶¶ 148, 158-67, 172-173.) A Morgan Stanley analyst emailed BlackBerry's head of investor relations, Paul Carpino, the morning of April 11 stating, "it behooves your marketing people to rebut these claims." (*Id.* ¶ 152.) BlackBerry employees felt it important that the company quickly issue a strong response and urged the company to do so. Mr. Zipperstein responded, "OK here but ONLY if 100% true." (Zipperstein Decl. ¶ 12; Ex. 158; 56.1 Stmt ¶¶ 151.)

BlackBerry initiated an investigation to ensure it understood the facts before responding. (56.1 Stmt ¶ 153.) Mr. Zipperstein asked John Powell, the senior executive responsible for

BlackBerry's Quality department, which maintained information about product returns, to investigate whether BlackBerry's key retail partners in fact were experiencing a significant increase in Z10 returns.  (*Id.* ¶¶ 155-56.)  Mr. Heins asked Kristian Tear, BlackBerry's COO, to whom the sales and product teams reported, to do the same.  (Zipperstein Decl. ¶¶ 16-17; Heins Decl. ¶ 34.)  BlackBerry employees, at the direction of Mr. Powell and Mr. Tear, collected relevant internal data and contacted sales, quality, and other senior executives at AT&T, Verizon Wireless and T-Mobile.  (Zipperstein Decl. ¶ 16-17; Heins Decl. ¶ 34; 56.1 Stmt ¶¶ 157-67.)  The information Mr. Powell and Mr. Tear collected and then relayed confirmed that the early launch was going well and did not support the assertion that BlackBerry's "key retail partners" in the U.S. had experienced unusually high returns.  (56.1 Stmt ¶¶ 157-67.)  BlackBerry asked Detwiler for a copy of its report and for information regarding the basis for its claim.  Detwiler rejected the requests.  (*Id.* ¶ 150.)

Before the close of trading on April 11, BlackBerry emailed reporters a response to the speculation that there had been abnormally high Z10 returns, stating "[t]his [is] absolutely false. Our data shows that return rates for BlackBerry Z10 devices both in the U.S. and on a global basis are in line with or better than our expectations and are consistent with return rates for other premium smartphones in the market today."  (Ex. 65.)

That afternoon, Detwiler analyst Jeff Johnston appeared on Canadian television and reiterated the statements in his report.  (56.1 Stmt ¶ 176.)  In light of those remarks, BlackBerry decided a further response was necessary.  (Heins Decl. ¶ 36; Zipperstein Decl. ¶ 23; 56.1 Stmt ¶ 177.)  Additional data provided to Mr. Powell and Mr. Tear continued to contradict Detwiler's accusation.  (*Id.* ¶ 178.)  Mr. Powell reported his belief that the Detwiler Report was "false" and that he had "not found anything to support the comment."  (Ex. 166.)

On April 12, BlackBerry issued a press release further responding to the media reports. (56.1 Stmt ¶ 179; Ex. 147.)  Numerous BlackBerry executives and employees—as well as an outside public relations consultant—reviewed and discussed the press release to ensure its truthfulness and accuracy before it was released.  (Zipperstein Decl. ¶¶ 24-25; Heins Decl. ¶ 37; 56.1 Stmt ¶ 180.)

As stated in its April 12 press release, BlackBerry contacted regulatory authorities in the U.S. and Canada; its outside counsel scheduled a May 2, 2013 meeting with the SEC, OSC, and FBI.  (Zipperstein ¶ 29-30.)  For use in a presentation to the regulators, BlackBerry continued collecting data from Verizon, T-Mobile, and AT&T regarding returns as of April 10. (Zipperstein Decl. ¶ 29; 56.1 Stmt ¶¶ 181, 183.)

Three days before that meeting, on April 29, 2013, a Bloomberg television host interviewed Mr. Heins.  (56.1 Stmt ¶ 192.)  She asked whether he felt the Detwiler analyst had made intentionally untrue statements to manipulate the stock price.  (*Id.*)  Mr. Heins responded, "we're in the middle of the process of working with the regulators, we're trying to collect the data that was basis for that statement, our data and also the Verizon data shows very clearly that we're totally in line within return rates."  (*Id.*)

Plaintiffs concede that, according to Detwiler analyst Jeff Johnston, the sole basis for his assertion that "key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are now exceeding sales," was his eight-minute April 10 telephone call with  Wireless Zone executive Dunham.  (SAC ¶ 24.)  Wireless Zone, an indirect Verizon retailer, had no direct relationship with BlackBerry.  (56.1 Stmt ¶ 188.)  It did not purchase devices from BlackBerry or Verizon.  (*Id.*)  BlackBerry never had access to or received any Wireless Zone data, on April 11 and 12 or otherwise.  (*Id.* ¶ 191.)  Neither BlackBerry nor

Mr. Dunham considered Wireless Zone a "key retail partner" of BlackBerry.  (*Id.* ¶¶ 190-191.)

Mr. Dunham had no information about sales or returns for BlackBerry's actual key retail partners

(AT&T, T-Mobile and Verizon).  (*Id.*; Zipperstein Decl. ¶ 31.)  In the first weeks of the launch,

Wireless Zone sold just a few hundred Z10 devices, while Verizon, AT&T, and T-Mobile

collectively sold tens of thousands.  (56.1 Stmt ¶ 189.)  Mr. Dunham did not tell Mr. Johnston

that he had seen a significant increase in Z10 returns or that returns outnumbered sales at

Wireless Zone, nor did he provide Mr. Johnston with any documentation of Wireless Zone sales

or returns.  (Ex. 9 at 43:16-46:25, 49:18-21; 64:12-70:18; 106:5-107:10.)

 **C.** **BlackBerry's Revenue Accounting**

 Three highly experienced BlackBerry revenue accountants (the "Senior Revenue

Accountants") were responsible for the company's revenue accounting judgments: Controller

James Yersh, Senior Director of Accounting Charles Kearns, and Senior Manager, Global

Revenue Tory Luelo.  (56.1 Stmt ¶¶ 27-28, 33-35, 36.)  All were either CPAs or CAs (the

Canadian equivalent), had significant accounting experience, and had worked at Big Four audit

firms and as corporate accountants at other large companies.  (*Id.*)  Each quarter, Ms. Luelo

gathered relevant data and drafted lengthy technical accounting memoranda reflecting her

analysis of the proper revenue recognition judgment for BB10 sales.  (*See*, *e.g.*, Ex. 41; 56.1

Stmt ¶ 44.)  Ms. Luelo, Mr. Kearns, and Mr. Yersh discussed the relevant judgment and

reviewed and revised the memorandum, until it was finalized.  (56.1 Stmt ¶ 44.)  Ultimately, Mr.

Yersh approved the judgments underlying BlackBerry's financial statements.  (*Id.*)  Mr. Heins as

CEO and Mr. Bidulka as CFO certified the financial statements in reliance on the Senior

Revenue Accountants' recommendations.  (Heins Dec. ¶ 30; Bidulka Dec. ¶ 18.)

 Ernst & Young Canada LLP ("EY") reviewed BlackBerry's quarterly financial

statements and audited its annual statements, performing specific audit procedures as to revenue

recognition.  (56.1 Stmt ¶¶ 57-59, 120, 197, 206, 233, 240.)  After reviewing the Senior Revenue

Accountants' revenue accounting memoranda and discussing their judgments with them, EY

concluded each quarter that BlackBerry's judgments complied with GAAP.  (*Id.* ¶¶ 124-126,

208, 212, 250-252.)  Finally, BlackBerry's Audit Committee reviewed the financial statements;

met with EY, Mr. Bidulka, and Mr. Yersh; and approved filing of the financial statements.[2]  (*Id.*

¶ 55; Stymiest Decl. ¶ 10.)

## ARGUMENT

## I.  THE STATUTE OF REPOSE BARS CLAIMS FIRST ASSERTED IN PLAINTIFFS' EXPERT REPORTS IN 2020 (Statement Nos. 9-14, 18-22)

On June 8, 2020, Plaintiffs identified for the first time that they purportedly assert claims

based on nine new statements and two new omissions.  (ECF No. 465 at 2-5; ECF No. 467-1 ¶¶

32; 34-37.)  The Exchange Act's five-year statute of repose bars these claims.  28 U.S.C. §

1658(b).  The Exchange Act's statute of repose is an "unqualified bar," providing "total repose"

five years after a statement is made.  *Merck & Co. v. Reynolds*, 559 U.S. 633, 650 (2010).  It

reflects "a judgment that defendants should be free from liability after the legislatively

determined period of time, beyond which the liability will no longer exist and will not be tolled

for any reason."  *CTS Corp. v. Waldburger*, 573 U.S. 1, 10 (2014) (emphasis added) (citation

omitted).  Nor is the repose period subject to relation-back under Rule 15(c).  *Sjunde AP-Fonden

v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 391 (S.D.N.Y. 2019).

Because Section 10(b) claims arise from "specific 'statement[s] of a material fact' . . . the

statute of repose for such claims begins running from the time that each allegedly fraudulent

statement or omission is made."  *Sjunde AP*-Fonden, 417 F. Supp. 3d at 392.  Here, the repose

period commenced as to each statement when it was made during the Class Period (March 28,

---

[2] BlackBerry had a similarly robust quarterly inventory accounting process.  (*Id.* ¶¶ 47-49.)

2013 through September 20, 2013) and expired, at the very latest, on <u>September 20, 2018</u>.  Thus, the statute of repose bars any claims as to the statements and omissions Plaintiffs first placed at issue in their <u>June 8, 2020</u> class certification submissions.

Plaintiffs concede the SAC does not identify these statements as misstatements.  Plaintiffs instead argue they are "[n]ot [b]ound to the [m]isstatements [i]dentified in the Complaint."  (ECF No. 482 at 1.)  Regardless whether they are bound by their complaint, they are bound by the statute of repose.  And the repose period expired in September 2018, at the latest.  *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 379-80 (S.D.N.Y. 2013).

The court in *Sjunde AP-Fonden* squarely addressed—and rejected—Plaintiffs' argument.  There, after filing of an initial complaint, Sjunde AP-Fonden asserted timely new claims in a motion to intervene based on defendant's securities filings.  417 F. Supp. 3d at 392.  After being appointed lead plaintiff and after the repose period expired, Sjunde AP-Fonden filed a consolidated amended complaint identifying additional alleged misstatements in those same securities filings.  *See id.*  Sjunde AP-Fonden argued that its timely assertion of claims in its motion to intervene meant that "*any* claim based on *any* statement in those filings was timely made even if asserted for the first time in a later complaint after the statute of repose had run."  *Id.*  The court rejected that argument, holding that "a timely raised claim . . . does not somehow preserve other, as-yet-unpleaded claims based on different misleading statements."  *Id.*

It makes no difference that the plaintiffs in *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 242 n.11 (2d Cir. 2016), were permitted to pursue claims first raised in an expert report.  (ECF No. 482 at 1-2.)  Neither the district court nor the Second Circuit in *Vivendi* addressed the statute of repose.  Regardless whether the Reform Act's pleading requirements "'bind[ ] . . . plaintiffs to the precise set of alleged misstatements identified in their complaint throughout the entire course

11

of litigation'" (*id.* at 1), the Exchange Act obligates plaintiffs to raise claims as to any specific misstatement within five years. *Sjunde-AP Fonden*, 417 F. Supp. 3d at 391.

In addition, permitting Plaintiffs to proceed with their new claims would impose substantial prejudice on Defendants. By June 2020, it was too late to depose foreign witnesses as to unasserted claims about statements not placed at issue in the Complaint. Allowing untimely claims under these circumstances would be gravely prejudicial. *See McCarthy v. Dun & Bradstreet Corp.*, 372 F. Supp. 2d 694, 701 (D. Conn. 2005), *aff'd*, 482 F.3d 184 (2d Cir. 2007).

## II.  THERE IS NO EVIDENCE OF ANY MATERIAL MISSTATEMENT OF FACT

### A.  BlackBerry's Statements About The Prospects for and Progress of the Launch Were Not Material Misstatements of Fact (Statement Nos. 1-14)

#### 1.  Generic Positive Statements Are Immaterial Puffery (Statement Nos. 1, 4, 5, 6, 7, 8, 14)

Plaintiffs' claims are largely premised on routine statements of corporate optimism. For example, Plaintiffs argue that BlackBerry committed fraud when it told the market that: "Customers love the [Z10] and the user experience;" BlackBerry had "regained the confidence and excitement of our carrier distribution partners;" BlackBerry saw "very good first signs" in the first few days of Q10 sales in the UK; and the Z10 had been "an effective launch product" and customers "seem to be really happy." (SAC ¶¶ 78, 80; 86; ECF No. 467-1 ¶¶ 36(ii), 37(iv).)

Judge Griesa correctly recognized such "statements of optimism" fall "far short of being actionable false or misleading misrepresentations." *Pearlstein*, 93 F. Supp. 3d at 241. This is because "[v]ague positive statements" are "'too general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be inactionable.'" *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021). Discovery did not—and cannot—change the fact that these statements are immaterial as a matter of law.

Moreover, BlackBerry accurately conveyed sentiment about the launch based on information it had.  Notably, while BlackBerry initially described "love" for the Z10 based on positive early news, by June 28, BlackBerry executives made more tempered statements, focused on building the BB10 operating system into a success over time and more modestly describing the Z10 as "an effective launch product to showcase" the "BlackBerry 10 experience."  (App'x A at A-2.)  By August 12, now exploring a possible sale centered on the value of the company's technology, BlackBerry said nothing at all about specific devices, instead describing "long-term opportunities" and the Company's "exceptional technology."  (*Id.*)

Far from being misled, investors who sought to draw meaning from these immaterial statements saw executives who sincerely believed in BlackBerry's technology adjust expectations for its commercial prospects based on events as they occurred.

### 2.     The Safe Harbor Protects Forward-Looking Statements About the BlackBerry 10 Launch (Statement Nos. 1, 8, 13)

BlackBerry statements about "long-term opportunities," "expectations," and "the beginning of the organization's transition to becoming" a leader in mobile computing were forward-looking.  "To encourage disclosure of forward-looking information notwithstanding . . . the tendency of predictions to be embarrassed by the passage of time," the Reform Act established a safe harbor for such "forward-looking" statements.  *Iowa Pub. Empls.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141-42 (2d Cir. 2010).  Any such statement is exempt from liability if <u>either</u> (1) it is identified as a forward-looking statement, and accompanied by meaningful cautionary language (the "cautionary language prong") <u>or</u> (2) the plaintiffs fail to prove it was made by an "'officer with actual knowledge by that officer that the statement was false or misleading'" (the "actual knowledge" prong).  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 762 (2d Cir. 2010) (quoting 15 U.S.C. § 78u–5(c)).

13

Judge Griesa rightly held that Statement Nos.1 and 8—forward-looking statements in BlackBerry's SEC filings and earnings announcement—were "accompanied by cautionary language qualifying [them] for safe harbor." *Pearlstein*, 93 F. Supp. 3d at 241.

Statements not "accompanied by meaningful cautionary statements" are still immune from liability under the "actual knowledge prong" unless a plaintiff "prove[s] that the forward-looking statement . . . was . . . made or [approved by an executive officer] with actual knowledge by that officer that the statement was false or misleading." *Id.* at 240 (quoting 15 U.S.C. § 78u–5(c)(1)(A)-(B).)  The "actual knowledge" requirement is a "heightened" scienter standard that is "stricter" than the Reform Act scienter pleading standard.  *Slayton*, 604 F.3d at 773; *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020).  Thus, Statement No. 13, made in a media interview about expected future sales of the Q10 device, qualifies for safe harbor because, as shown below, Plaintiffs cannot prove that Mr. Heins had actual knowledge of its falsity.

### 3.      BlackBerry's Statements Were Not Misleading in Context

BlackBerry's annual and quarterly financial statements were "formal documents, filed with the SEC as a legal prerequisite for selling securities to the public." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).  Given their formal nature, "an investor reads each statement within such a document . . . in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Id.* Because a reasonable investor considers a company's statements in their full context, a statement characterized as misleading "when viewed in a vacuum may not [be] so once that statement is considered, as is appropriate, in a broader frame." *Id.*  Similarly, the fact that analysts issued mixed and negative reports following the March 28, 2013 announcement shows that the market was not misled about the possibility of the Z10's success.  (56.1 Stmt. ¶¶ 105-06, 139.)  In *Beleson v. Schwartz*, 599 F. Supp. 2d 519 (S.D.N.Y. 2009), for example, the plaintiffs alleged

14

that the defendant had misled the market about its continued viability by failing to disclose it was planning for bankruptcy while at the same time making certain positive statements to the market. *Id.* at 523-24. The court entered summary judgment for defendant, in part because negative analyst reports put investors on notice of a potential bankruptcy, and thus the court was not persuaded that "the market was misled as to [the company]'s viability." *Id.* at 525-26.

Similarly, no reasonable investor viewing BlackBerry's statements in context would have been misled about the challenges ahead. BlackBerry's March 28, 2013 annual report warned that BlackBerry competed in "an industry that is highly competitive and rapidly evolving" and faced "intense competition from a number of companies" and, thus, "[t]here can be no assurance that the Company will be able to compete successfully and withstand competitive pressures." (Ex. 24 at 55; 56.1 Stmt ¶ 136.) BlackBerry also specifically warned that the company's "future success continue[d] to be significantly dependent on its ability to successfully complete its transition to its next-generation of BlackBerry 10 smartphones" and that if "features of . . . BlackBerry 10 smartphones [ ] do not meet the expectations or achieve acceptance of its customers, the Company's business and prospects could be materially harmed." (Ex. 24 at 52-53.) Similarly, on the March 28 earnings call, Mr. Bidulka cautioned that Blackberry was transitioning "through a very competitive and dynamic environment." (Ex. 31 at 7.)

Analysts understood (and explained to investors) that success was not assured. On March 28, even those analysts who viewed the reported Q4FY13 results as reflecting "a moderately successful launch of the Z10," highlighted the challenges ahead. (Ex. 57 ("there is a long way to go and [we] believe they still have significant challenges"); 56.1 Stmt ¶ 105.) Similarly, after the June 28 announcement, analysts made clear BlackBerry's Q1FY14 results were a disappointment. (56.1 Stmt ¶¶ 219-23; *see also, e.g.* Ex. 52 ("the initial enthusiasm for

BB10 has waned"); Ex. 140 ("the market has not embraced BlackBerry 10"); Ex. 60 ("Global demand for BlackBerry products looks to be extremely weak, and is unlikely to improve").)

Finally, when BlackBerry announced on August 12 that it was exploring strategic alternatives (i.e. a potential sale of the company), the market understood it as an acknowledgment that results of the BB10 launch had fallen short.  (56.1 Stmt ¶¶ 226-30; Ex. 182 ("We maintain our SELL rating . . . consistent with our belief BlackBerry would ultimately end up selling the company due to the difficult competitive smartphone market and low probability BlackBerry 10 could return BlackBerry to sustained profitability.").)

### 4. No Evidence That Statements About the Prospects for or Results of the Launch Were False When Made (Statement Nos. 1-14)

The SAC alleges that BlackBerry and Mr. Heins made eight misstatements about the prospects for or results of the BB10 launch.  (Statement Nos. 1-8.)  Plaintiffs identified six additional purported misstatements in their June 2020 class certification filings.  (Statement Nos. 9-14.)  None of those statements was false when made.

**Statement No. 1**: "The launch of BlackBerry 10 in January 2013 marked the beginning of the organization's transition to becoming a leading mobile computing organization."

Plaintiffs quote out of context BlackBerry's March 28 statement about "beginning . . . [a] transition to becoming a leading mobile computing" company.  Under the heading "**Strategy**" in its annual report, BlackBerry expressed its "vision" "to be a leader in mobile computing," noting that the success of the strategy "will be driven by," among other things, "successfully transitioning to BlackBerry 10."  (Ex. 24 at 17.)  The statement is both immaterial puffery and an inactionable forward-looking statement protected by the safe harbor.  And as shown above, BlackBerry executives had reason for optimism that a successful BB10 launch could help advance the company's strategy.  (56.1 Stmt ¶¶ 78-99.)

16

**Statement No. 2:** "We have implemented numerous changes at BlackBerry over the past year and those changes have resulted in the Company returning to profitability in the fourth quarter."

This March 28 statement accurately described the financial results BlackBerry announced that day.  BlackBerry reported a profit in the fourth quarter.  The financial statements filed with the SEC reflected total operating income of $94 million.  (Ex. 24, MD&A at 41.)  Plaintiffs argue that BlackBerry's accurate statement was misleading because (according to Plaintiffs) BlackBerry should have deferred revenue from Z10 devices and (according to Plaintiffs' accounting expert Dr. Thomas Lys) BlackBerry would not have reported a profit if it had accounted for all Z10 revenue on "sell-through."  (SAC ¶ 79; Ex. 22 ¶ 322.)

However, recognizing Z10 revenue on "sell-in" did <u>not</u> make the difference between a profit and a loss.  Dr. Lys argues that BlackBerry should have reported $50 million less Z10 income in Q4FY13.  (Ex. 22 ¶ 322).)  But that only makes a difference between a profit and a loss in Dr. Lys's analysis because he got the numbers wrong:  He erroneously based his analysis on reported operating income of <u>$17 million</u> rather than BlackBerry's actual reported profit of <u>$94 million</u>.  (The $17 million number came from a third-party financial data firm, not BlackBerry.  (*Id.* ¶ 320.)  It is unclear why Dr. Lys did not simply look to BlackBerry's actual financial reports as the definitive source for the financial results that "BlackBerry reported."[3])  In other words, to argue that BlackBerry's use of sell-in accounting turned a $33 million loss into a profit, Dr. Lys had to understate BlackBerry's actual profit by $77 million.  Thus, even if one accepts Dr. Lys's personal view that BlackBerry should only have recognized Z10 revenue when

---

[3] Faced with his error, Dr. Lys testified he used an alternate non-GAAP income measure—which BlackBerry did not report—to remove items from GAAP operating income.  (Ex. 15 at 100:6-25, 102:24-105:24.)  Thus, Plaintiffs argue that BlackBerry misled investors because its announced profit would have been a loss if BlackBerry had subtracted <u>both</u> $50 million to adopt Plaintiffs' preferred accounting <u>and an additional $77 million</u> to convert BlackBerry's GAAP operating income into an alternate non-GAAP figure that BlackBerry never reported.

devices sold-through, that would merely reduce BlackBerry's Q4 profit from $94 million to $44 million, which would not negate BlackBerry's "return[ ] to profitability."

> **Statement No. 3**: "The initial early global demand for [the Z10] has been better than anticipated, and our recent announcement of the largest single purchase order in our history for one million units is also indicative of a strong initial support in demand.   As a result of this better-than-expected demand, production was increased in the latter part of the fourth quarter."

These statements were all true.  "The initial early global demand" for the Z10 was better than anticipated.  (56.1 Stmt ¶¶ 78-99.)  A large distributor (Brightstar) had recently ordered 1 million units.  (*Id.* ¶¶ 82.)  To meet demand, BlackBerry increased Z10 production "in the latter part of the fourth quarter."  (*Id.* ¶¶ 79.)

> **Statement No. 4**: "Customers love the device [Z10] and the user experience, and our teams and partners are now focused on getting those devices into the hands of BlackBerry consumer and enterprise customers."

> **Statement No. 5**: "Over the past year, we [BlackBerry] have also regained the confidence and excitement of our carrier distribution partners, with the introduction of the amazing BB10 platform for consumers and enterprises."

A corporate executive's statements about "love" and "excitement" for an "amazing" new product are classic examples of immaterial puffery.  *See supra* § II.A.1.  Even if these statements could be read to convey any actual factual content, information known to BlackBerry and to Mr. Heins on March 28 strongly supported them.

In less than two months selling the Z10 in Canada and the U.K. and with just days of U.S. sales, the Z10 received an enthusiastic response.  In Canada, February 5 was "the best day ever . . . for a launch of a new BlackBerry smartphone . . . more than 50% better than any other launch day" in BlackBerry's history.  (56.1 Stmt. ¶ 81.)  Z10 customer satisfaction was 8.5 of 10.  (*Id.*)  Market share increased from 14% to 27%, moving BlackBerry to second place behind Apple.  (*Id.* ¶ 81.)  In the U.K., "first week [ ] sales" were "close to three times [BlackBerry's prior] best performance ever."  (*Id.* ¶ 80.)  In the U.S., T-Mobile was "pleasantly surprised" by the number

of February Z10 pre-registrations and reported March pre-registrations "keep climbing"; Verizon

reported "promising" pre-orders. (*Id.* ¶¶ 92-94.) When sales began on March 26, T-Mobile was

"really pleased" to meet 85% of its week-one sales forecast on the first day. (*Id.* ¶ 97.)

Carriers also expressed "excitement." Mr. Heins, COO Kristian Tear, CMO Frank

Boulben, EVP of Global Sales Rick Costanzo, and EVP of Product Carlo Chiarello had recently

completed a successful "world tour," visiting senior executives of more than 42 major wireless

carriers in at least 30 countries. (56.1 Stmt ¶¶ 65-66.) Feedback from the tour and other

indicators from carriers gave BlackBerry reason to believe carriers were excited. (*Id.*)

> **Statement No. 6:** "The BlackBerry Z10 has been an effective launch product to showcase the renewed and reengineered BlackBerry 10 experience to both consumers and Enterprises."

> **Statement No. 7:** "Today, if you look at BlackBerry, we are a leaner, more efficient Company that has brought BlackBerry 10, BES 10, cross-platform BBM, and mobile computing products like software update Management for automotive to the market. Let's remember one year ago, none of these products existed, and today, they are just launching and are being well received because of the performance and qualities of BlackBerry 10."

Statements that the Z10 had been an "effective" product "to showcase" the "BlackBerry

10 experience" and that a group of new products were "being well received" are inactionable

puffery. At most, these statements were precisely the "'[r]osy predictions,' or statements that are

loosely optimistic" that are "too vague and general to be actionable." *In re Lululemon Sec.*

*Litig.*, 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014). Neither statement reflected anything about

sales volumes or revenues or profits, or otherwise communicated financial success. When

viewed in the context that BlackBerry had just announced that 60% of the devices sold in

Q1FY14 were older BB 6 and 7 devices and that Mr. Heins stressed that the market remained

"very competitive, very volatile market," analysts and investors understood the overall BB10

launch was not yet translating into financial success. (56.1 Stmt ¶¶ 218-224.)

**Statement No. 8:** "We continue to see compelling long-term opportunities for BlackBerry 10, we have exceptional technology that customers are embracing, we have a strong balance sheet and we are pleased with the progress that has been made in our transition."

In the face of weak sales in the second quarter of its fiscal 2014, BlackBerry's Board formed a Special Committee, assisted by financial advisors, to consider a range of possible transactions, including sale of the entire company.  (56.1 Stmt ¶ 225.)  Within the context of BlackBerry's August 12, 2013 announcement, BlackBerry's focus on its valuable technology and strong balance sheet was not misleading.  BlackBerry, in fact, had "a strong balance sheet," including more than $1.5 billion in cash.  (Ex. 26 at 3.)  Analysts valuing the company saw its value coming principally from its "strong balance sheet" and its intellectual property portfolio: "BlackBerry's value . . . comes down to the obvious items: cash [and] patents . . ." (Ex. 138; 56.1 Stmt. ¶¶ 226-230.)  Eleven of thirteen analysts who valued BlackBerry based on the "sum-of-its-parts," assigned little-to-no value to the handheld units.  (*Id.* ¶ 226.)  In a release announcing possible sale of BlackBerry, Mr. Heins' statement echoed the analysts:  its value consisted of "exceptional technology" and a "strong balance sheet."  Mr. Heins also accurately expressed the forward-looking view that BlackBerry saw "long-term opportunities for BlackBerry 10."

**Statement No. 9**: "We've just started selling in the US, and the launch is meeting our early expectations."

After just a few days of U.S. sales, information available to BlackBerry confirmed the Z10 launch in the U.S. was "meeting [BlackBerry's] early expectations."  (56.1 Stmt. ¶¶ 95-99.)

**Statement No. 10:** "Shipments of 6 million smartphones, including approximately 1 million BlackBerry 10 units."

When BlackBerry announced its FY 2013 results, the company accurately reported that it had shipped "approximately 1 million BlackBerry 10 units" in Q4.  There is no dispute

BlackBerry, in fact, shipped 943,000 BB10 units.  (56.1 Stmt ¶ 133.)  Plaintiffs merely argue that 943,000 is not "approximately 1 million," based on an "expert" opinion that 943,000 should round down to 900,000.  (Ex. 15 at 82:18-25.)  No reasonable investor "would alter his or her decision based on what was essentially a rounding error."  *Plymouth Cnty. Ret. Ass'n v. Advisory Bd. Co.*, 370 F. Supp. 3d 60, 77 n. 10 (D.D.C. 2019).

Unable to offer evidence that this statement was false when made, Plaintiffs attempt to re-write it, asserting that BlackBerry stated that it "<u>recognized revenue for</u> shipments of 'approximately 1 million BlackBerry 10 units.'"  (ECF No. 467-1 ¶ 32(i).)  BlackBerry said nothing about recognizing revenue on all units it shipped.  BlackBerry recognized revenue on sell-in for some shipments and on sell-through for others.  (56.1 Stmt ¶ 42.)  (This was true both for the Z10 and for other devices.  (*Id.* ¶¶ 109-110.))  Given the newness of the product, some of the devices were shipped for marketing purposes, *e.g.*, as "seeding devices."  (*Id.* ¶ 133.)  There is no evidence that BlackBerry intended its accurate report of the number of BB10 units shipped to be construed as a statement about revenue recognized in that quarter.

> **Statement No. 11:** "we are in early days actually, so there's a huge dynamic in the market, what is flowing in, what is already flowing out, so don't take it really like a clear number but what we see roughly is that, from what we have shipped into the markets, two-thirds to three-quarters already have sold through."

During the March 28 earnings call, an analyst asked Mr. Heins for "an indication of how Z-10 sell-through was in the quarter."  (Ex. 31 at 14.)  He responded that it was "early days" and "a huge dynamic in the market," and cautioned listeners "don't take it really like a clear number but what we see roughly is that, from what we have shipped into markets, two-thirds to three-quarters already have sold through."  (*Id.*)  The analyst followed-up, asking for clarification whether the number was "as of February or is that more a sense as of now," Mr. Bidulka responded that it was a current number: "it's more of a, it's a recent data point that we got on the

sell-through we've been just monitoring." (*Id.*)

The percentage of Z10 devices shipped in the fourth quarter that had sold through as of March 28 was not a metric BlackBerry included in its filings or in prepared remarks. BlackBerry relied on activation data to measure when devices sold-through. (56.1 Stmt ¶¶ 64, 87-89, 158.) Canada and the UK were the initial Z10 launch markets. (*Id.* ¶ 74.) Canada and EMEA (not just the UK, but all of Europe, Middle East, and Africa) represented nearly 83% of fourth quarter sales. (*Id.* ¶ 86.) As of March 28, activation rates for Z10 devices shipped in the fourth quarter reflected over 75% in Canada, 62% in EMEA (not just the UK, but all of Europe, Middle East, and Africa), and 65% in the two regions combined. (*Id.* ¶¶ 86-89.)

Leading up to the analyst call, Mr. Heins received information from BlackBerry's investor relations and communications groups and from operational leaders to prepare for potential questions from analysts. (*Id.* ¶¶ 129-131.) Mr. Heins' statement—expressly offered as "rough[ ]" while cautioning "don't take it really like a clear number"—was a reasonable estimate based on "recent data" BlackBerry executives had "been just monitoring." (Ex. 31 at 14.)

Reasonable investors understand context. Mr. Heins' admittedly "rough" figure of 2/3 to 3/4 sell-through, accompanied by appropriate hedges, would not have not misled a reasonable investor about the facts known to BlackBerry. In addition, Mr. Heins repeatedly "bespoke caution," stressing that it was "early days" and "dynamic," that the number he provided was "rough" and that investors should not "take it really like a clear number." Reasonable investors are not misled by such statements. *See Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *17 (S.D.N.Y. Jan. 26, 2009) ("preliminary" estimate accompanied by cautionary language immaterial and "bespeaks caution").

> **Statement No. 12**: "Recent data shows that 55% of the Z10 customers globally are coming from platforms other than BlackBerry, more than half."

There is no dispute that BlackBerry, in fact, had such "recent data" showing that 55% of Z10 purchasers were coming from other platforms. (56.1 Stmt ¶ 96.) *See also Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317, 330 (D. Conn. 2001) (statements "supported by data that was available at the time" were "not [ ] misstatement[s]").

> **Statement No. 13**:  "I mean we have very, very good signs already with the launch in the UK, we've launched in Canada, this is going into the installed phase of more than seventy million Blackberry users, so we have quite some expectations against this device and we are ready from a production perspective but expectations are high against the installed phase so we expect several tens of millions of units."

This was a forward-looking statement. During an April 29, 2013 television interview, Mr. Heins discussed Blackberry's "high expectations against the Q10 with the keyboard that people are really waiting for." (56.1 Stmt ¶ 194.) BlackBerry had an existing subscriber base of approximately 70 million users, almost all of whom used BlackBerry's iconic keyboard devices. (*Id.* ¶¶ 63, 193.) BlackBerry understood many subscribers viewed the keyboard as a differentiator and were highly loyal to BlackBerry for that reason. (*Id.*) Because the Q10 had a physical keyboard, Mr. Heins and others reasonably expected a large percentage of the 70 million existing users to upgrade to the Q10 and its future BB10 keyboard devices. (*Id.*)

> **Statement No. 14**: "We're focusing on driving the sell-through so our customers get the devices in their hands, and when they get them in their hands, they seem to be really happy with what they see and what they can experience with the new user experience on BlackBerry."

This June 28, 2013 statement, that customers "seem to be really happy," is inactionable puffery. And far from touting positive sales or increasing revenues, this statement was entirely consistent with the challenging reality. BlackBerry was "focused on driving sell-through," underscoring that BlackBerry's carrier customers needed assistance re-selling to their customers the devices they had purchased from BlackBerry. Defendants did not commit fraud by describing BlackBerry's plans to help its carrier partners. And Mr. Heins focused again on "the

23

new user experience on BlackBerry," *i.e.* BB10 <u>but not</u> on sales or revenues or profits.  As the full context of the remarks and analyst reception on June 28 revealed, sales were disappointing and below consensus expectations.  (56.1 Stmt. ¶¶ 214-224; Heins Decl. ¶¶ 50-52.)  Reasonable investors were not misled:  BlackBerry's share price declined 28% that day.  (SAC ¶ 148.)

### B.    Statements Responding to Media Reports about the Detwiler Report Were True (Statement Nos. 15-20)

The Second Amended Complaint alleges the following misstatements on <u>April 12, 2013</u>:

<u>Statement No. 15</u>: "Sales of the BlackBerry® Z10 are meeting expectations and data we have collected from our retail and carrier partners demonstrates that customers are satisfied with their devices."

<u>Statement No. 16</u>: "Return rate statistics show that we are at or below our forecasts and right in line with the industry.  To suggest otherwise is either a gross misreading of the data or a willful manipulation.  Such a conclusion is absolutely without basis and BlackBerry will not leave it unchallenged."

<u>Statement No. 17</u>: "These materially false and misleading comments about device return rates in the United States harm BlackBerry and our shareholders, and we call upon the appropriate authorities in Canada and the United States to conduct an immediate investigation.  Everyone is entitled to their opinion about the merits of the many competing products in the smartphone industry, but when false statements of material fact are deliberately purveyed for the purpose of influencing the markets a red line has been crossed."

Before responding to the Detwiler Report, BlackBerry went to great lengths to collect available internal Z10 return data and any information available from its "key retail partners," particularly BlackBerry's two largest customers, Verizon and AT&T.  BlackBerry's statements were all well-supported by information BlackBerry collected.

- Verizon and AT&T confirmed Z10 sales were "meeting expectations" as of April 11. (56.1 Stmt ¶¶ 142, 145, 160, 164-165, 167.)

- Verizon, AT&T, and T-Mobile customer satisfaction data did, in fact, show "customers [were] satisfied with the devices."  (*Id.* ¶¶ 142, 145, 167, 174.)

- BlackBerry's internal data as of April 11 showed return rates "at or below forecasts and right in line with the industry."  (*Id.* ¶¶ 158-159, 162, 167, 178, 181.)

- Verizon, AT&T, and Genco (AT&T's returns logistics company) confirmed that their data likewise showed return rates "at or below forecasts and right in line with the industry." (*Id.* ¶¶ 142, 145, 148, 159, 161, 163-167, 173, 178, 181, 183-185.) (After BlackBerry issued its statement, one of the BlackBerry employees gathering returns data was forwarded a T-Mobile email that stated returns were "w/in an acceptable range." (*Id.* ¶ 168.))

- Given these facts and BlackBerry's understanding that Detwiler was associated with short-sellers seeking to profit from a drop in BlackBerry's share price, BlackBerry believed the Detwiler Report "deliberately purveyed" false information "for the purpose of influencing the markets." (*Id.* ¶¶ 141, 154; Zipperstein Dec. ¶ 26; Heins Dec. ¶ 34.)

BlackBerry's statements about Detwiler were "supported by data that was available at the time and [were], therefore, not [ ] misstatement[s]." *Freedman*, 135 F. Supp. 2d at 330; *Dalberth v. Xerox Corp.*, 766 F.3d 172, 184 (2d Cir. 2014).

Plaintiffs later asserted claims based on these statements not alleged as false in the SAC:

**Statement No. 18**:   "BlackBerry wishes to respond to media coverage today regarding speculation that there have been abnormally high levels of returns of BlackBerry Z10 devices.  This is absolutely false. Our data shows that return rates for BlackBerry Z10 devices both in the U.S. and on a global basis are in line with or better than our expectations and are consistent with return rates for other premium smartphones in the market today."

After learning of the Detwiler Report early in the morning on April 11, BlackBerry did not respond until shortly before 4 p.m. that afternoon because it took the time to ensure that its statement was consistent with available data.  BlackBerry's data, in fact, did show that return rates for Z10s were "in line with or better than [BlackBerry's] expectations" and "consistent with return rates for" other devices.  (Rule 56.1 Stmt ¶¶ 142, 145, 148, 158-167, 173, 178-185.)

**Statement No. 19**: "BlackBerry and Verizon Wireless, the largest U.S. carrier, on Thursday refuted claims from research and investment firm Detwiler Fenton that BlackBerry Z10 devices were being returned in unusually high numbers."

Verizon released a public statement that "[a]fter the first 14 days, quality performance of the Z10 has been in line with similar devices we've launched."  (Ex. 124; Rule 56.1 Stmt ¶¶ 169-170.)  Plaintiffs apparently argue that BlackBerry's statement that Verizon "refuted" reports of "unusually high return numbers" was misleading because Verizon's statement did not expressly

25

refer to "unusually high return numbers."  This argument fails for several reasons:

First, there is no dispute that Verizon "refuted" the Detwiler Report.  In conversations with BlackBerry, senior Verizon executives expressly refuted the Detwiler Report.  Among many others, Verizon's COO confirmed, "the return rate [for the Z10] was similar to other products at launch" on April 11.  (Ex. 90; 56.1 Stmt. ¶ 173.)  Second, both Verizon and BlackBerry understood "quality performance" to address the returns issue and, thus, that Verizon's public statement "refuted" claims about unusually high return rates.  (56.1 Stmt. ¶¶ 170, 172.)  Verizon reported to BlackBerry that it had been as "aggressive" as it could be publicly because Verizon "never comment[s] on partner-related issues" and could not "speak directly to the returns question."  (Ex. 135; 56.1 Stmt ¶ 171.)  Finally, no one could be misled by BlackBerry's characterization of Verizon's public statement: investors could read the statement for themselves.  *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("the market is not misled when" the facts "are fully disclosed").

> **Statement No. 20**: "So, we're in the middle of the process of working with the regulators, we're trying to collect the data that was the basis for that statement, our data and also the Verizon data shows very clearly that we're totally in line within return rates. . . .  It varies from carrier to carrier the way they count it but we're in line with the—with the industry, actually better than earlier BlackBerry launches were, so the quality speaks for itself.  So, we're in the middle of the process, can't comment on it now."

Mr. Heins' statements—made during an April 29, 2013 television interview—were in response to specific questions; those questions (omitted by Plaintiffs) addressed the Detwiler Report and provide necessary context that makes clear that Mr. Heins gave accurate responses about what transpired on April 11.  The interviewer stated:

> Detwiler Fenton made a comment saying that the Z10 smartphone, that customers were giving them back to the point where returns were now exceeding sales in some cases.  That comment really irked you to the point where you asked the SEC to go ahead and investigate.

(56.1 Stmt. ¶ 192.)  The interviewer then asked:

> You're sort of saying that this analyst intentionally said something that was untrue, trying to manipulate the stock price.  Is that how you feel?  Is that what you think happened?

(*Id.*)  Mr. Heins responded by explaining, "we're trying to collect ***the data that was basis for***

***that statement***, our data and also the Verizon data shows very clearly that we're totally in line

within return rates." (*Id.*)  Plaintiffs seek to re-engineer Mr. Heins' statement into a specific

representation about the current state of returns.  But the full context demonstrated that he was

speaking about the process of collecting data relevant to refuting Detwiler's April 11 statement.

### C.     No Evidence of Any Misleading Omission  (Statement Nos. 21 and 22)

"[A]n omission is actionable under the securities laws only when the corporation is

subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259,

267 (2d Cir. 1993).  To prove a misleading omission absent a duty to disclose, Plaintiffs must

"identify . . . existing statements" that were "rendered misleading" by the alleged omission.  *In re*

*Deutsche Bank AG Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017).  The mere

"wish to have known more" is not a basis for liability.  *Dalberth*, 766 F.3d at 183.  Plaintiffs

raise two omissions claims but fail to identify any duty to disclose the supposedly omitted

information or any affirmative statement the supposed omission rendered misleading.

First, Plaintiffs argue that BlackBerry "concealed" that the Company "justified the initial

prices of the BlackBerry 10 devices using outmoded pricing studies that did not factor in the

delayed launch of BlackBerry 10."  BlackBerry had no duty to disclose the data it considered

when setting the price it charged carriers for BB10 devices.  In any event, Plaintiffs have the

facts wrong.  BlackBerry compiled a comprehensive global pricing study—which supported the

reasonableness of the Z10 pricing—in <u>February 2013—when the launch began.</u>  (56.1 Stmt ¶¶

72, 123.)  BlackBerry did not set the prices at which carriers sold BlackBerry devices to their

27

customers.  (*Id.* ¶ 71.)  And BlackBerry received powerful, tangible evidence the prices it charged carriers were appropriate: carriers paid BlackBerry hundreds of millions of dollars to purchase BB10 devices.  (*Id.* ¶ 73.)

Second, Mr. Bidulka declined to provide sell-through data in response to an analyst's question during the June 28, 2013 earnings call.  Again, there was no duty to disclose and no affirmative statement the omission rendered misleading.  In advance of earnings calls, BlackBerry prepared a press release that disclosed information about the company's financial performance during the preceding period, which never provided sell-through information for specific smartphone models.  (Bidulka Decl. ¶ 28; 56.1 Stmt ¶¶ 133, 217.)  Consistent with its ordinary practices and revenue recognition judgments at the time, BlackBerry had no legal obligation to provide that information.  Nor did omission of the requested information render any "existing statement" misleading.  BlackBerry disclosed that only 40% of smartphones shipped that quarter were BB10 devices.  (*Id.* ¶ 214.)  Per Plaintiffs' expert Dr. Feinstein, Mr. Bidulka's refusal to answer "sent a negative signal about sales and demand."  Analysts "concluded it was bad news."  (*Id.* ¶¶ 217-224.)  No one was misled.

## III.   THERE IS NO EVIDENCE BLACKBERRY'S ACCOUNTING JUDGMENTS WERE MISLEADING OPINIONS UNDER *OMNICARE* (Statement Nos. 23-26)

The parties agree (and the Court has already determined) that the Supreme Court's decision in *Omnicare* governs Plaintiffs' claims based on BlackBerry's accounting judgments. (*See* SAC ¶ 8 ("Defendants' choices of accounting treatments are statements of opinion."); *Pearlstein*, 93 F. Supp. 3d at 243 (BlackBerry accounting "involve[d] subjective judgments").)

*Omnicare* recognizes that the securities laws' prohibition on untrue statements of fact "limited as it is to factual statements, does not allow investors to second-guess inherently subjective and uncertain assessments."  *Omnicare*, 575 U.S. at 186.  Section 10(b) provides

28

protection from fraud, not "an invitation to Monday morning quarterback an issuer's opinions."
*Id.*  For this reason, a plaintiff can only prove a statement of opinion to be "false" by proving that
the speaker did not sincerely hold the stated belief.  *Id.* at 185-86.

Omnicare also explains when an opinion can give rise to a claim based on a <u>misleading</u>
<u>omission</u>.  While acknowledging there is "more than a kernel of truth" to the argument that an
omission claim based on a sincerely held opinion "is just not possible," the Court concluded that
a plaintiff could establish a misleading omission if it could "identify particular (and material)
facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not
conduct or the knowledge it did or did not have—whose omission makes the opinion statement
at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* at
187, 194.  Doing so is "no small task."  *Id.* at 194.

### A.    No Evidence Inventory Judgments Were Misleading Opinions.

Plaintiffs alleged that BlackBerry should have taken the inventory charge it announced on
September 20, 2013 in an earlier reporting period.  (SAC ¶¶ 31, 33.)  After discovery, however,
Plaintiffs' accounting expert offered no opinion as to BlackBerry's inventory accounting, with
good reason:  There is no evidence BlackBerry did not sincerely hold its opinions as to the value
of its inventory or that it omitted any facts rendering those opinions misleading.  And, as EY
confirmed, BlackBerry's inventory accounting was correct.  (56.1 Stmt ¶¶ 125-127, 209-213.)

### B.    BlackBerry Sincerely Believed Its Revenue Accounting Judgments

There is no evidence either the Senior Revenue Accountants (who made the relevant
accounting judgments) or Mr. Heins and Mr. Bidulka (who certified BlackBerry financial
statements) did not sincerely believe BlackBerry's accounting judgments.  *Omnicare*, 575 U.S. at
186 ("a sincere statement of pure opinion is not an 'untrue statement of material fact'").

BlackBerry's Senior Revenue Accountants engaged in a thorough process each quarter to

analyze relevant facts in light of applicable accounting principles.  They memorialized their judgments in detailed technical memoranda shared with EY.  (56.1 Stmt ¶¶ 40, 43-44, 46, 59, 61, 108, 122-124, 199, 206, 209-211, 234, 237, 240, 245-246, 249.)  The company's reported revenue reflected the Senior Revenue Accountants' professional judgment.  (*Id.*)  No one pressured them to reach a particular result.  (*Id.*)  They sincerely believed their judgments at the time and still do today.  (*Id.*)  EY likewise agreed with the revenue judgments when they were made, issued clean audit reports in both 2013 and 2014, and stands by those judgments today.  (*Id.*)  Mr. Heins and Mr. Bidulka reasonably followed the recommendation of the professionals employed to make the judgments.  (Heins Decl. ¶ 30; Bidulka Decl. ¶¶ 18, 22.)  There is no evidence these judgments were "untrue statements of fact."

### C.      No Omission of Material Fact Rendering Revenue Judgments Misleading

*Omnicare*'s omission prong directs the Court to "consider[ ] the foundation [a reasonable investor] would expect an issuer to have before making the statement," and "affords a cause of action <u>only when an issuer's failure to include a material fact has rendered a published statement misleading</u>." 575 U.S. at 194 (emphasis added).  BlackBerry's judgments rested on a solid foundation.  Plaintiffs' expert concedes BlackBerry addressed each relevant factor under GAAP. (Ex. 15 at 236:5-14.)  While Plaintiffs' expert disagrees with the judgments, *Omnicare* precludes liability based on mere disagreement with a subjective opinion.  575 U.S. at 194.

## V.      THERE IS NO EVIDENCE OF SCIENTER

### A.      No Evidence Any Individual Defendant Acted With Scienter

"'On a motion for summary judgment . . . the issue is whether the evidence, taken as a whole, could support a finding by a reasonable juror that defendants acted with the intent to deceive, manipulate, or defraud investors.'"  *Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 596 (S.D.N.Y. 2018).  There is no evidence supporting such a finding here.  To the contrary, the

evidence reflects the lengths BlackBerry went to ensure its public statements were accurate. BlackBerry followed a lengthy and robust process for preparing its earnings announcements and confirming that any information Mr. Heins or Mr. Bidulka provided to investors was accurate. (*See* 56.1 Stmt ¶¶ 129-131.)  Similarly, BlackBerry followed an extensive revenue accounting process.  Mr. Bidulka reviewed the Senior Revenue Accountants' technical accounting memoranda, discussed the matter with Mr. Yersh (the Corporate Controller), and reasonably relied on their accounting judgments.  (*Id.* ¶¶ 17-19, 50, 60; Bidulka Decl. ¶¶ 15, 18-21.)

Given BlackBerry's size and the scope of Mr. Heins' responsibilities as CEO, he reasonably relied on experts in various areas of BlackBerry's business, and their teams, to provide him with accurate information regarding the business.  (Heins Decl. ¶¶ 10.)  It was likewise eminently reasonable for Mr. Bidulka to rely on the Senior Revenue Accountants and on EY, each of whom had the technical accounting expertise to make appropriate accounting judgments.  *See In re REMEC Inc. Sec. Litig.,* 702 F. Supp. 2d 1202, 1251 (S.D. Cal. 2010) (no scienter where CFO "relied on accountants for 'technical accounting expertise'").

BlackBerry's transparent communications with EY, EY's clean audit opinions, and the lack of any restatement further negate a conclusion that Mr. Bidulka or Mr. Heins believed revenue was misstated.  *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 238 (S.D.N.Y. 2020); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) (that independent auditor "did not require a restatement … significantly undercuts" scienter); *REMEC*, 702 F. Supp. 2d at 1246 ("transparency" with auditor negates scienter).

There is no evidence Mr. Heins or Mr. Bidulka ever believed (or that anyone else ever told them) that BlackBerry's accounting judgments were misleading.  Neither Mr. Heins nor Mr. Bidulka ever interfered in the accounting process or pressured anyone to reach any particular

31

accounting result.  (56.1 Stmt ¶¶ 9-12, 17-19, 45, 50, 60.)  As an engineer, Mr. Heins reasonably

deferred to those with accounting expertise.  *See REMEC*, 702 F. Supp. 2d at 1251 (CEO, "an

electrical engineer" with "no accounting education," reasonably relied on accountants).  So too

did Mr. Bidulka, who advised Blackberry's Senior Revenue Accountants "to get the right

decision."  (Ex. 13 at 175:20-176:15.)  This record reflects "overwhelming evidence of [ ] good

faith."  *In re Fannie Mae Sec., Deriv., & ERISA Litig.*, 898 F. Supp. 2d 176, 182 (D.D.C. 2012).

Similarly, the facts surrounding BlackBerry's response to the Detwiler Report negate

scienter.  Because BlackBerry investor relations employees understood Detwiler had ties to

short-sellers, BlackBerry believed the Detwiler Report was an attempt to manipulate

BlackBerry's stock price to benefit short sellers.  (Zipperstein Decl. ¶¶ 14-15; 56.1 Stmt ¶¶ 141,

154.)  Faced with harmful reports of unusually high returns of an important new product—a

claim people throughout the company believed to be untrue—Mr. Heins and Mr. Zipperstein

ensured that company executives collected relevant information before responding.  (Heins Decl.

¶¶ 35-44; Zipperstein Decl. ¶¶ 18-32; 56.1 Stmt ¶¶ 151-157.)  And Mr. Zipperstein insisted that

the company could respond, "ONLY if 100% true."  (Zipperstein Decl. ¶ 12; Ex. 158.)  It would

be completely illogical for Mr. Heins and Mr. Zipperstein to wait hours while Mr. Powell and

Mr. Tear gathered relevant facts, only to disregard the facts and intentionally mislead investors.

The claim against Mr. Zipperstein relates <u>only</u> to the statement attributed to him in the

April 12 release.  As noted, Mr. Zipperstein expressly wrote that the company could comment on

the Detwiler Report "ONLY if 100% true."  (Ex. 158.)  And it would be unreasonable to find

that Mr. Zipperstein—who had recently joined BlackBerry after a long, distinguished career as a

federal prosecutor and senior in-house lawyer (Zipperstein Decl. ¶¶ 4-6)—would have called on

regulators "to conduct an immediate investigation" (Ex. 147) if he believed his statements were

32

false or misleading. *See In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 342-43

(W.D.N.Y. 2008) (no scienter where company "voluntarily reported the matter to the SEC").

Nor did any individual defendant have anything "to gain from making the alleged

misrepresentations," *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y.

2000), as none sold any stock during the Class Period.  (56.1 Stmt. ¶ 258.)  "The absence of

stock sales . . . or any other evidence of pecuniary gain . . . is inconsistent with an intent to

defraud."  *N. Telecom*, 116 F. Supp. 2d at 462; *cf. Matsushita Elec. Ind. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 596-97 (1986) ("Lack of motive bears on the range of permissible

conclusions that might be drawn from ambiguous evidence: if petitioners had no rational

economic motive to conspire, and if their conduct is consistent with other, equally plausible

explanations, the conduct does not give rise to an inference of conspiracy.")

### B.      No Evidence of BlackBerry's Corporate Scienter

"To prove liability against a corporation, of course, a plaintiff must prove that an agent of

the corporation committed a culpable act with the requisite scienter, and that the act (and

accompanying mental state) are attributable to the corporation."  *Teamsters Local 445 Freight

Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  There is no evidence

any individual defendant acted with scienter, and Plaintiffs have never asserted that any other

BlackBerry employee "committed a culpable act with the requisite scienter."  *Id.*

## IV.     PLAINTIFFS CANNOT PROVE LOSS CAUSATION

When a stock price falls, the "lower price may reflect, not the earlier misrepresentation,

but changed economic circumstances, changed investor expectations, new industry-specific or

firm-specific facts, conditions, or other events . . . ."  *Dura Pharms., Inc. v. Broudo*, 544 U.S.

336, 343 (2005).  Plaintiffs may not recover for losses caused by changed circumstances; rather,

they must prove that misstatements "concealed something from the market that, when disclosed,

negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samru-Kazyna JSC*, 477 F. Supp. 3d 88, 111 (S.D.N.Y. 2020) ("Plaintiffs must 'disaggregate' … 'disclosures of the truth' … from losses caused by other factors") (citation omitted).  It is not enough to point to disclosures "'somehow connected with the misstatement.'"  *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at * 21 (S.D.N.Y. Sept. 13, 2017) (citation omitted).  To be "corrective," the disclosure must "reveal some aspect of the alleged fraud." *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008).  Failure to prove a corrective disclosure is "fatal." *Lentell*, 396 F.3d at 175 n.4.

### A.    None of the Three Alleged Corrective Disclosures Was Corrective

**April 11**:  Plaintiffs argue that the April 11, 2013 release of the Detwiler Report and another report (the "ITG Report") "partially corrected" BlackBerry's alleged March 28 misstatements.  (ECF No. 467-1 ¶¶ 70-74.)  The March 28 statements—days after the Z10 went on sale in the U.S.—relate to BlackBerry's fourth quarter and the early "global" launch.  (App'x A, Statement Nos. 1-5, 9-12.)  In contrast, the April 11 Reports concerned later Z10 results in the U.S, that is, "new . . . firm-specific facts, conditions, [and] events."[4] *Dura*, 544 U.S. at 343.

**June 28 and September 20:** BlackBerry's announcements of Q1 and Q2FY14 results on June 28 and September 20 did not "reveal the falsity of" financial results from earlier periods. *Janbay v. Canadian* Solar, 2012 WL 1080306, at *14-15 (S.D.N.Y. Mar. 30, 2012).  Nor did either address U.S. return rates as of April 10, the subject of the responses to the Detwiler Report.  Indeed, the September 20 announcement expressly stated it was based on events during Q2FY14 (56.1 Stmt. ¶¶ 253-254), *i.e.*, new "firm-specific facts, conditions, [and] events."  *Dura*,

---

[4]*See Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (plaintiffs cannot establish loss causation "if the loss was caused by an intervening event").

544 U.S. at 343; *see also Atlantica*, 477 F. Supp. 3d at 111; *Emergent Cap.*, 343 F.3d at 197.

### B. Correction of "Prior Perception" Does Not Establish Loss Causation

Dr. Feinstein opines that the "market's prior perception" was "influenced" by alleged misrepresentations and that the disclosures "corrected" "prior perception." (ECF No. 467-1 ¶¶ 267, 270, 282, 289, 298, 307, 312.)  That theory does not establish loss causation.  *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("[d]isclosure of financial losses generally—<u>even if those financial losses are a result of the specific concealed fact</u>—is not sufficient") (emphasis added); *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (if alleged fraud causes unrealistic expectations, "a failure to meet [expectations] has a <u>negative</u> effect on stock prices, but not a <u>corrective</u> effect."); *Born v. Quad/Graphics, Inc.*, 2021 WL 736839, *16 (S.D.N.Y. Feb. 25, 2021) ("revelation of poor financial results and concomitant market dissatisfaction" is "simply not enough").

### C. BlackBerry's Revenue Recognition Judgments Were Never "Corrected"

Because BlackBerry never restated its revenue and EY provided clean audit opinions (56.1 Stmt ¶¶ 127, 256-257), Plaintiffs cannot establish loss causation on the accounting claims. *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) (absent restatement, plaintiffs failed to show audit opinion was "subject of a corrective disclosure"); *Omnicare*, 583 F.3d at 945 (no loss causation given lack of  restatement).

## V. THE COURT SHOULD ENTER JUDGMENT ON THE SECTION 20(A) CLAIMS

Because Plaintiffs fail to establish a Section 10(b) violation, Mr. Heins and Mr. Bidulka are entitled to judgment on the Section 20(a) claim.  *In re Omnicom*, 541 F. Supp. 2d at 554.

## CONCLUSION

The Court should enter judgment dismissing all claims with prejudice.

Dated:  April 19, 2021                          /s/ James J. Beha II
        New York, New York


                                        MORRISON & FOERSTER LLP

                                        Dan Marmalefsky (admitted *pro hac vice*)
                                        707 Wilshire Boulevard
                                        Los Angeles, California 90017
                                        (213) 892-5200

                                        James J. Beha II
                                        Steven Rappoport
                                        250 West 55th Street
                                        New York, New York 10019
                                        (212) 468-8000

                                        *Attorneys for Defendants BlackBerry Limited, Thorsten*
                                        *Heins, Brian Bidulka, and Steven Zipperstein*

# Appendix A

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment**

| Alleged Misstatements Concerning BB10 Launch Identified in Second Amended Complaint | | | | |
|---|---|---|---|---|
| No. | Date | Alleged Misstatement or Omission | Speaker | Basis for Summary Judgment |
| 1 | 3/28/13 | "The launch of BlackBerry 10 in January 2013 marked the beginning of the organization's transition to becoming a leading mobile computing organization." | BlackBerry | Forward-Looking Immaterial/Puffery No Misstatement No Scienter Not Misleading in Context |
| 2 | 3/28/13 | "We have implemented numerous changes at BlackBerry over the past year and those changes have resulted in the Company returning to profitability in the fourth quarter." | BlackBerry Heins | No Misstatement No Scienter |
| 3 | 3/28/13 | "The initial early global demand for BES 10 has been better than anticipated, and our recent announcement of the largest single purchase order in our history for one million units is also indicative of a strong initial support in demand. As a result of this better-than-expected demand, production was increased in the latter part of the fourth quarter." | BlackBerry Heins | No Misstatement No Scienter |
| 4 | 3/28/13 | "Customers love the device [Z10] and the user experience, and our teams and partners are now focused on getting those devices into the hands of BlackBerry consumer and enterprise customers." | BlackBerry Heins | Immaterial/Puffery No Misstatement No Scienter |
| 5 | 3/28/13 | "Over the past year, we [BlackBerry] have also regained the confidence and excitement of our carrier distribution partners, with the introduction of the amazing BlackBerry 10 platform for consumers and enterprises." | BlackBerry Heins | Immaterial/Puffery No Misstatement No Scienter |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment**

| No. | Date | Alleged Misstatement or Omission | Speaker | Basis for Summary Judgment |
|---|---|---|---|---|
| | | **Alleged Misstatements Concerning BB10 Launch Identified in Second Amended Complaint** | | |
| 6 | 6/28/13 | "The BlackBerry Z10 has been an effective launch product to showcase the renewed and reengineered BlackBerry 10 experience to both consumers and Enterprises." | BlackBerry Heins | Immaterial/Puffery No Misstatement No Scienter |
| 7 | 6/28/13 | "Today, if you look at BlackBerry, we are a leaner, more efficient Company that has brought BlackBerry 10, BES 10, cross-platform BBM, and mobile computing products like software update Management for automotive to the market.  Let's remember one year ago, none of these products existed, and today, they are just launching and are being well received because of the performance and qualities of BlackBerry 10." | BlackBerry Heins | Immaterial/Puffery No Misstatement No Scienter |
| 8 | 8/12/13 | "We continue to see compelling long-term opportunities for BlackBerry 10, we have exceptional technology that customers are embracing, we have a strong balance sheet and we are pleased with the progress that has been made in our transition." | BlackBerry Heins | Forward-Looking Immaterial/Puffery No Misstatement No Scienter Not Misleading in Context |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment**

| Alleged Misstatements Concerning BB10 Launch <u>Not</u> Identified in Second Amended Complaint | | | | |
|---|---|---|---|---|
| No. | Date | Alleged Misstatement or Omission | Speaker | Basis for Summary Judgment |
| 9 | 3/28/13 | "We've just started selling in the US, and the launch is meeting our early expectations." | BlackBerry Heins | No Misstatement No Scienter Statute of Repose |
| 10 | 3/28/13 | "Shipments of 6 million smartphones, including approximately 1 million BlackBerry 10 units." | BlackBerry | No Misstatement No Scienter Statute of Repose |
| 11 | 3/28/13 | ". . . we are in early days actually, so there's a huge dynamic in the market, what is flowing in, what is already flowing out, so don't take it really like a clear number but what we see roughly is that, from what we have shipped into the markets, two-thirds to three-quarters already have sold through." | BlackBerry Heins | No Misstatement No Scienter Not Misleading in Context Statute of Repose |
| 12 | 3/28/13 | "Recent data shows that 55% of the Z10 customers globally are coming from platforms other than BlackBerry, more than half." | BlackBerry Heins | No Misstatement No Scienter Statute of Repose |
| 13 | 4/29/13 | "I mean we have very, very good signs already with the launch in the UK, we've launched in Canada, this is going into the installed phase of more than seventy million Blackberry users, so we have quite some expectations against this device and we are ready from a production perspective but expectations are high against the installed phase so we expect several tens of millions of units." | BlackBerry Heins | Forward-looking No Misstatement No Scienter Statute of Repose |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment**

| | | Alleged Misstatements Concerning BB10 Launch <u>Not</u> Identified in Second Amended Complaint | | |
|---|---|---|---|---|
| **No.** | **Date** | **Alleged Misstatement or Omission** | **Speaker** | **Basis for Summary Judgment** |
| 14 | 6/28/13 | "We're focusing on driving the sell-through so our customers get the devices in their hands, and when they get them in their hands, they seem to be really happy with what they see and what they can experience with the new user experience on BlackBerry." | BlackBerry Heins | Immaterial/Puffery No Misstatement No Scienter Not Misleading in Context Statute of Repose |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment**

| Alleged Misstatements Concerning Detwiler Report Identified in Second Amended Complaint | | | | |
|---|---|---|---|---|
| No. | Date | Alleged Misstatement or Misleading Omission | Speaker | Basis for Judgment |
| 15 | 4/12/13 | "Sales of the BlackBerry® Z10 are meeting expectations and the data we have collected from our retail and carrier partners demonstrates that customers are satisfied with their devices." | BlackBerry Heins | No Misstatement No Scienter |
| 16 | 4/12/13 | "Return rate statistics show that we are at or below our forecasts and right in line with the industry.  To suggest otherwise is either a gross misreading of the data or a willful manipulation.  Such a conclusion is absolutely without basis and BlackBerry will not leave it unchallenged." | BlackBerry Heins | No Misstatement No Scienter |
| 17 | 4/12/13 | "These materially false and misleading comments about device return rates in the United States harm BlackBerry and our shareholders, and we call upon the appropriate authorities in Canada and the United States to conduct an immediate investigation.  Everyone is entitled to their opinion about the merits of the many competing products in the smartphone industry, but when false statements of material fact are deliberately purveyed for the purpose of influencing the markets a red line has been crossed." | BlackBerry Zipperstein | No Misstatement No Scienter |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment**

| | | Statements Concerning Detwiler Report <u>Not</u> Identified in Second Amended Complaint | | |
|---|---|---|---|---|
| No. | Date | Alleged Misstatement or Misleading Omission | Speaker | Basis for Summary Judgment |
| 18 | 4/11/13 | "BlackBerry wishes to respond to media coverage today regarding speculation that there have been abnormally high levels of returns of BlackBerry Z10 devices.  This is absolutely false. Our data shows that return rates for BlackBerry Z10 devices both in the U.S. and on a global basis are in line with or better than our expectations and are consistent with return rates for other premium smartphones in the market today." | BlackBerry | No Misstatement No Scienter Statute of Repose |
| 19 | 4/12/13 | "BlackBerry and Verizon Wireless, the largest U.S. carrier, on Thursday refuted claims from research and investment firm Detwiler Fenton that BlackBerry Z10 devices were being returned in unusually high numbers." | BlackBerry | No Misstatement No Scienter Statute of Repose |
| 20 | 4/29/13 | "So, we're in the middle of the process of working with the regulators, we're trying to collect the data that was basis for that statement, our data and also the Verizon data shows very clearly that we're totally in line within return rates. . . . It varies from carrier to carrier the way they count it but we're in line with the—with the industry, actually better than earlier Blackberry launches were, so the quality speaks for itself.  So, we're in the middle of the process, can't comment on it now." | BlackBerry Heins | No Misstatement No Scienter Statute of Repose |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment**

| No. | Date | Alleged Misstatement or Omission | Speaker | Basis for Summary Judgment |
|---|---|---|---|---|
| **Alleged Misleading Omissions Concerning BB10 Launch (<u>Not</u> Identified in Second Amended Complaint)** | | | | |
| 21 | 3/28/13 | Plaintiffs' expert Dr. Feinstein: "BlackBerry concealed that the Company had justified the initial prices of the BlackBerry 10 devices using outmoded pricing studies that did not factor in the delayed launch of BlackBerry 10." | BlackBerry | Immaterial<br>No Duty to Disclose<br>Not Misleading<br>No Scienter<br>Statute of Repose |
| 22 | 6/28/13 | Plaintiffs' expert Dr. Feinstein: When Mr. Bidulka declined to provide additional detail about BB10 device sell-through, "Defendants again concealed poor demand and sell-through for BlackBerry 10 devices . . . ." | BlackBerry<br>Bidulka | Immaterial<br>No Duty to Disclose<br>Not Misleading<br>No Scienter<br>Statute of Repose |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment**

| Alleged Misleading Accounting Opinions | | | | |
|---|---|---|---|---|
| No. | Date | Alleged Misstatement or Omission | Speaker | Basis for Summary Judgment |
| 23 | 3/28/13 | Plaintiffs allege that BlackBerry's "March 28, 2013 Form 40-F also set forth the Company's financial results, which were essentially the same as those contained in press release issued on the same day, and disclosed that it held $603 million in inventory, after 'including the determination of obsolete or excess inventory . . . .' The foregoing statement regarding inventory was materially false and misleading because Defendants knew or recklessly disregarded that carriers and distribution partners were not achieving the expected sell-through on the Z10, resulting in extraordinarily high levels of excess inventory, thus requiring a charge to income to reduce the value of the inventory." | BlackBerry Heins Bidulka | Sincerely Held Not Misleading No Omission No Scienter |
| 24 | 6/28/13 | Plaintiffs allege that "[o]n June 28, 2013, the Company filed a Form 6-K with BlackBerry's consolidated financial statements for the first quarter fiscal 2014, setting forth the Company's financial results, which were essentially the same as those contained in the press release issued on the same day. The Company disclosed that it held $887 million in inventory, after 'including the determination of obsolete or excess inventory . . . .' The foregoing statements regarding inventory were materially false and misleading because Defendants did not take a charge to income for the Z10 even though they knew or recklessly disregarded that carriers and distribution partners were not selling-through on the Z10, resulting in high levels of excess inventory, and, as a result, requiring an appropriate charge to income to reduce the value of the inventory." | BlackBerry Heins Bidulka | Sincerely Held Not Misleading No Omission No Scienter |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix A to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

### Alleged Misstatements and Misleading Omissions as to Which Defendants Seek Summary Judgment

| | | **Alleged Misleading Accounting Opinions** | | |
|---|---|---|---|---|
| **No.** | **Date** | **Alleged Misstatement or Omission** | **Speaker** | **Basis for Summary Judgment** |
| 25 | 3/28/13 | Plaintiffs' allege that BlackBerry's "March 28, 2013 statements regarding revenues and earnings were materially false and misleading when made because Defendants knowingly and/or recklessly disregarded that Blackberry was recognizing revenues at the time of shipment, despite the Company's inability to reasonably and reliably estimate price concessions to carriers and retailers, and thus the price was neither fixed nor determinable." | BlackBerry Heins Bidulka | Sincerely Held Not Misleading No Omission No Scienter |
| 26 | 6/28/13 | Plaintiffs' allege that BlackBerry's "first quarter fiscal 2014 report of revenues and earnings was likewise materially false and misleading when made because Defendants knowingly and/or recklessly disregarded that BlackBerry was recognizing revenues at the time of shipment despite the Company's inability to reasonably and reliably estimate price concessions to carriers and retailers, and thus the price was neither fixed nor determinable." | BlackBerry Heins Bidulka | Sincerely Held Not Misleading No Omission No Scienter |

# Appendix B

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

**Summary of Risk Factors and Other Cautionary Statements in March 28 and June 28, 2013 Announcements**

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
|---|---|
| **Statement** | **Source** |
| "The Company has encountered challenges adapting to the BYOD movement as some IT departments that previously required employees to use the BlackBerry wireless solution because of its emphasis on security and reliability are permitting employees to choose devices offered by the Company's competitors, who are increasingly promoting the merits of their own security and reliability. To capitalize on this market, the Company has introduced products to take advantage of this market shift including BlackBerry 10 smartphones with BlackBerry." | Ex. 24 at 12. |
| "The Company is engaged in an industry that is highly competitive and rapidly evolving and, to date, no technology has been exclusively or commercially adopted as the industry standard for wireless data communication. Accordingly, both the nature of competition and the scope of the business opportunities afforded by this market are currently evolving, uncertain and highly competitive. … the Company has seen its global market share decline over the past several years relative to companies such as Apple with its iOS ecosystem, and companies that build smartphones based on the Android ecosystem, such as Samsung. In the United States, the Company has experienced a substantial decline in its largest market and experienced a net decrease in its subscriber base.  This decline is due to a variety of factors including consumer preferences for devices with access to the broadest number of applications, such as those available in the iOS and Android environments. Market share has also been impacted by the significant number of new Android-based competitors that have entered the market, and a growing trend in enterprises to support multiple devices. In addition, the increased desire by carriers to sell devices that operate on LTE networks has also impacted the Company's market share, as these networks feature faster download speeds and allow carriers to offer higher-value data plans." | Ex. 24 at 26. |
| "In particular, the Company's future success continues to be significantly dependent on its ability to successfully complete its transition to its next-generation of BlackBerry 10 smartphones." | Ex. 24 at 44. |
| "[I]f the Company fails to accurately predict emerging technological trends and the changing needs of customers and end users, or the features of its new products and services, including its BlackBerry 10 smartphones, do not meet the expectations or achieve acceptance of its customers, the Company's business and prospects could be materially harmed." | Ex. 24 at 44 – 45. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
| --- | --- |
| **Statement** | **Source** |
| "The Company has encountered delays relating to new product introductions over the past two years, and delivering new products on a timely basis has proven more challenging than the Company had anticipated. For example, in fiscal 2013, the introduction of the Company's first BlackBerry 10 smartphones were delayed, in part, because of complexities in the development and integration of a completely new technology platform, which contributed to lower than expected unit shipments as customers worked through inventory and awaited the launch of the new BlackBerry 10 smartphones. If the Company experiences further delays relating to the launch of its BlackBerry 10 smartphones or other products or services, such delays could have a material adverse affect on the Company's business, results of operations, financial condition and future prospects." | Ex. 24 at 45. |
| "[T]here cannot be any assurance that the technologies and related hardware or software products and services that the Company develops will be brought to market by it or network operators as quickly as anticipated or that they will achieve broad customer acceptance among operators or end users.  In the case of the Company's BlackBerry 10 smartphones, there can be no assurance that the Company's existing BlackBerry 6 and BlackBerry 7 customers will migrate to the new BlackBerry 10 devices, which are offered for sale at a higher price point than many of the Company's older devices." | Ex. 24 at 45. |
| "[BlackBerry is] engaged in an industry that is highly competitive and rapidly evolving, and has experienced, and expects to continue to experience, intense competition from a number of companies. [As a result], [t]here can be no assurance that the Company will be able to compete successfully and withstand competitive pressures." | Ex. 24 at 47. |
| "The intensely competitive market in which the Company conducts its business and the current economic uncertainty may require it to continue to reduce its prices.... [T]he Company has been, and in the future may be, required to lower prices on its products or services or offer other favorable terms to compete successfully. Such changes can result in reduced margins and reduced cash generation, may require the Company to record further inventory provisions, and could adversely affect the Company's results of operation and financial condition. The Company's entry into the consumer market has already had an impact on its pricing and this risk may further intensify due to the broader choice of smartphones, tablets and other devices, products and services offered by multiple vendors in this market segment and the BYOD strategies currently being utilized or considered by some of the Company's enterprise customers." | Ex. 24 at 48. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
| --- | --- |
| Statement | Source |
| "There can be no assurance that these new product offerings, including the launch of BlackBerry 10 smartphones, will strengthen its position in the BYOD enterprise segment." | Ex. 24 at 48. |
| "In order to drive demand for BlackBerry products and services in the United States prior to and following the launch of the BlackBerry 10 smartphones, the Company continues to run a comprehensive marketing and promotional program. There can be no assurance that such promotional activities will be successful." | Ex. 24 at 49. |
| "There can be no assurance that the Company will be successful in establishing new relationships, or maintaining or advancing its existing relationships, with network carriers or distributors. Non-performance by the Company under its contracts with network carriers or distributors may have significant adverse consequences that may involve penalties to be paid by the Company for non-performance. If any significant customer discontinues its relationship with the Company for any reason, or reduces or postpones current or expected purchase commitments for products and services, the Company's business, results of operations and financial condition could be materially adversely affected." | Ex. 24 at 49. |
| "Factors, some of which are largely within the control of network carriers and distributors, that are important to the success of the BlackBerry wireless solution,… , include: … the degree to which carriers and distributors actively promote or subsidize the Company's products and the size of the subscriber base to which these efforts are directed; the extent to which carriers and distributors offer and promote competitive products and services; … significant numbers of new activations of BlackBerry subscriber accounts, as well as retention of existing ones;…" | Ex. 24 at 49 – 50. |
| "If the Company's competitors offer their products and services to the carriers and distributors on more favorable contractual or business terms, have more products and services available, or those products and services are, or are perceived to be, in higher demand by end users, or are more lucrative for the carriers and distributors, there may be continued pressure on the Company to reduce the price of its products and services, or those carriers and distributors may stop carrying the Company's products or de-emphasize the sale of its products and services in favor of the Company's competitors, which would have a material adverse effect on the Company's business, results of operations and financial condition.  There can be no assurance that the network carriers and distributors will act in a manner that will promote the success of the Company's products and services." | Ex. 24 at 50. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
| --- | --- |
| Statement | Source |
| "If any significant customer discontinues its relationship with the Company for any reason, or reduces or postpones current or expected purchase commitments for the Company's products and services, it could have a material adverse effect on the Company's business, results of operations and financial condition." | Ex. 24 at 50. |
| "[I]f the Company fails to accurately predict emerging technological trends and the changing needs of customers and end users, or the features of its new products and services, including its BlackBerry 10 smartphones, do not meet the expectations or achieve acceptance of its customers, its cash flow, liquidity and financial condition could be materially harmed. The Company believes that its liquidity position will be strongly influenced by end user adoption of its BlackBerry 10 smartphones, by the Company's ability to sustain the benefits and cost savings achieved through its CORE program and by its ability to mitigate declining revenues from infrastructure access fees;" | Ex. 24 at 53. |
| "Decisions by customers to purchase the Company's products are becoming increasingly based on the availability of top-rated third-party software applications.  The Company is dependent on third-party software developers to provide access to and develop content, including applications, and services to enhance the user experience and maintain competitiveness and differentiation of BlackBerry products in the marketplace. The availability and development of these applications and services will depend, in part, on perceptions of the third-party software developers of the relative benefits of developing software for the Company's products rather than or in addition to those of its competitors, which may be adversely affected by further losses of market share, delays in the launch of BlackBerry 10 smartphones in additional markets, and perceptions regarding the ability of the BlackBerry 10 smartphones and related products to compete successfully in the wireless communications industry. … Some developers who have significant relationships with the Company's competitors may be unwilling to develop applications for BlackBerry products without valuable incentives from the Company, or at all. … If the Company is unable to successfully expand and manage the BlackBerry World applications catalogue, the success of the Company's BlackBerry 10 smartphones and future products and services may be materially and adversely affected." | Ex. 24 at 58. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
|---|---|
| **Statement** | **Source** |
| "The Company faces substantial inventory and other asset risk. ... The Company's financial condition and results of operations could be materially and adversely affected in the future by the Company's ability to manage its inventory levels and respond to short-term shifts in customer demand patterns.  No assurance can be given that the Company will not incur additional related charges with respect to its existing or future products given the rapid and unpredictable pace of product obsolescence in the industries in which the Company competes." | Ex. 24 at 60. |
| "Because the Company's markets are volatile, competitive and subject to rapid technology and price changes, there is a risk the Company will forecast incorrectly and order or produce excess or insufficient inventories of components or products. The BlackBerry 10 launch in particular has required the Company to significantly increase its component orders in order to meet the estimated anticipated demand for the new smartphones. Additional complexity and uncertainty exists with the forecasting of the BlackBerry 10 product launch, which is based on the introduction of a new technology platform." | Ex. 24 at 60. |
| "The Company generally uses rolling forecasts based on anticipated product orders to determine component requirements. Lead times for materials and components vary significantly and depend on factors such as specific supplier requirements, contract terms, rapid changes in technology, and current market demand for particular components. If the Company overestimates its component requirements based on anticipated demand for its products, it may result in excess inventory, which would increase the risk of obsolescence, and financial penalties based on minimum volume commitments, which would increase the manufacturing costs per unit of the Company's products…Any of these occurrences could have a material adverse effect on the Company's business, results of operations and financial condition." | Ex. 24 at 61-62. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
| --- | --- |
| **Statement** | **Source** |
| "In the case of volume based pricing arrangements, the Company may experience higher than anticipated costs if current volume-based purchase projections are not met. Some contracts have minimum purchase commitments and the Company may incur large financial penalties or increased production costs if these commitments are not met. The BlackBerry 10 launch in particular has required the Company to significantly increase its component orders in order to meet the estimated anticipated demand for the new smartphones. Additional complexity and uncertainty exists with the forecasting of the BlackBerry 10 product launch, which is based on the introduction of a new technology platform. The Company may also have unused production capacity if its current volume projections are not met, increasing the Company's production cost per unit. In addition, some contracts require the Company to agree to a flat fee regardless of volumes, which can result in higher unit costs than anticipated if demand is lower than anticipated…Any of these outcomes may result in the Company's products being more costly to manufacture and less competitive, which could have a material adverse effect on the Company's business, results of operations and financial condition." | Ex. 24 at 62. |
| "The North American market, particularly the United States, has become increasingly competitive and the Company intends to continue to pursue international market growth opportunities, such that international sales are likely to continue, at least in the near future, to account for a significant portion of the Company's revenue." | Ex. 24 at 63. |
| "The Company also plans to make significant investments in marketing in cooperation with its U.S. carrier partners and its other global customers to promote and support the launch of BlackBerry 10. The "BlackBerry" brand may be negatively impacted by a number of factors, including service outages, product malfunctions, product performance not meeting expectations, a user experience which does not compare to that of the Company's competitors, data privacy and security issues, and perceptions of the value and future success of the Company's products and services." | Ex. 24 at 63. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
|---|---|
| Statement | Source |
| "Given the dynamics of the wireless communications industry, the Company's financial results may not follow any past trends. … Additionally, many of the Company's products are, among other things, subject to long development, new product approval and certification, and sales cycles. In addition, the Company is engaged in an industry that is highly competitive and rapidly evolving, and has experienced, and expects to continue to experience, intense competition from a number of companies. As a result, if expected revenues are not realized as anticipated, if new product introductions are delayed or are not as well received by the market as anticipated, or if operating expenses are higher than expected, the Company's actual financial results could be materially adversely affected. These factors can make it difficult to predict the Company's financial results. Consequently, actual results may differ materially from those expressed or implied by the Company's forward-looking statements and may not meet the expectations of analysts or investors, which can contribute to the volatility of the market price of the Company's common shares." | Ex. 24 at 69. |
| "[M]any of the Company's products are subject to long sales cycles. As a result, if expected revenues are not realized as anticipated, or if operating expenses are higher than expected, the Company's financial results could be materially adversely affected. These factors can make it difficult to predict the Company's financial results. Difficulties forecasting financial results over longer periods increase significantly given the rapid technological changes, evolving industry standards, intense competition and short product life cycles that characterize the wireless communications industry." | Ex. 24 at 77. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
|---|---|
| **Statement** | **Source** |
| "The Company's policy for the valuation of inventory, including the determination of obsolete or excess inventory, requires management to estimate the future demand for the Company's products within specific time horizons. Inventory purchases and purchase commitments are based upon such forecasts of future demand and scheduled rollout of new products. The business environment in which the Company operates is subject to rapid changes in technology and customer demand. The Company performs an assessment of inventory during each reporting period, which includes a review of, among other factors, demand requirements, component part purchase commitments of the Company and certain key suppliers, product life cycle and development plans, component cost trends, product pricing and quality issues. If customer demand subsequently differs from the Company's forecasts, requirements for inventory write-offs that differ from the Company's estimates could become necessary. If management believes that demand no longer allows the Company to sell inventories above cost or at all, such inventory is written down to net realizable value or excess inventory is written off." | Ex. 24, MD&A at 18. |
| "Many factors could cause BlackBerry's actual results, performance or achievements to differ materially from those expressed or implied by the forward-looking statements, including, … BlackBerry's ability to expand and manage its BlackBerry World applications catalogue; … BlackBerry's ability to manage inventory and asset risk; … and difficulties in forecasting BlackBerry's financial results given the rapid technological changes, evolving industry standards, intense competition and short product life cycles that characterize the wireless communications industry. These risk factors and others relating to BlackBerry are discussed in greater detail in the "Risk Factors" section of BlackBerry's Annual Information Form, which is included in its Annual Report on Form 40-F and the "Cautionary Note Regarding Forward-Looking Statements" section of BlackBerry's MD&A (copies of which filings may be obtained at www.sedar.com or www.sec.gov)." | Ex. 27 at 9. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in March 28, 2013 Announcement | |
|---|---|
| **Statement** | **Source** |
| "All forward-looking statements reflect our current views with respect to future events, and are subject to risks and uncertainties and assumptions we have made. Many factors could cause our actual results, performance or achievements to be materially different from those expressed or implied by our forward-looking statements, including our ability to enhance our current products and develop new products and services, risks related to the anticipated decline in our service fees and our ability to generate service revenue through new offerings, risks related to intense competition, our reliance on carrier partners and distributors, risks relating to network disruptions and other business interruptions, our ability to realize the benefits of our core program and similar strategies, our ability to maintain or increase our cash balance, security risk, our ability to retain and attract key personnel, intellectual property risk, difficulties in forecasting financial results given the rapid technological changes, evolving industry standards, intense competition, and short product life cycles that characterize our industry and other factors set forth in the risk factors and MD&A section in RIM's filings with the SEC and Canadian securities regulators." | Ex. 31 at 3. |
| "[W]e're starting the global roll-out of BlackBerry 10. We're in the middle of it, right? So we're all learning of how it does in what segment, so it's really early to kind of give clear data around this." | Ex. 31 at 10. |
| "[I]t's really hard to say what is sell-through and what is channel at the moment. We are in a very dynamic situation launching that product on a global scale." | Ex. 31 at 11. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in June 28, 2013 Announcement | |
|---|---|
| **Statement** | **Source** |
| "[Risk factors include:] the Company's ability to enhance its current products and services, or develop new products and services in a timely manner or at competitive prices, including risks related to new product introductions." | Ex. 26, MD&A at 2. |
| "[Risk factors include:] the Company's ability to expand and manage BlackBerry World™" | Ex. 26, MD&A at 3. |
| "[Risk factors include:]the Company's ability to manage inventory and asset risk" | Ex. 26, MD&A at 3. |
| "[Risk factors include:] reliance on strategic alliances and relationships with third-party network infrastructure developers, software platform vendors and service platform vendors, including the Company's ability to promote and advance the development of an ecosystem of applications and services for the BlackBerry 10 platform." | Ex. 26, MD&A at 3. |
| "The smartphone market remains highly competitive, making it difficult to estimate units, revenue and levels of profitability." | Ex. 26, MD&A at 10. |
| "Based on the competitive market dynamics and these investments, the Company anticipates it will generate an operating loss in the second quarter of fiscal 2014." | Ex. 26, MD&A at 10. |
| "Revenues in the United States have continued to decline and subscriber attrition has remained high due to the intense competition faced by the Company in this market." | Ex. 26, MD&A at 14. |
| "Intense competition is negatively impacting the Company's results in that market, as did the lack of an LTE product and high-end consumer offering prior to the launch of the first BlackBerry 10 smartphone in the United States on March 22, 2013.  The decline can also be attributed to consumer preferences for devices with access to the broadest number of applications, such as those available in the iOS and Android environments. Market share has also been impacted by the significant number of new Android-based competitors that have entered the market." | Ex. 26, MD&A at 15. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in June 28, 2013 Announcement | |
|---|---|
| **Statement** | **Source** |
| "All forward-looking statements reflect our current views with respect to future events and are subject to risks and uncertainties and assumptions we have made. Many factors could cause our actual results, performance, or achievements to be materially different from those expressed or implied by our forward-looking statements, including … risks related to intense competition, our reliance on carrier partners and distributors, … difficulties in forecasting financial results given the rapid technological changes, evolving industry standards, intense competition, and short product life cycles that characterize our industry and other factors set forth in the Risk Factors in MD&A sections in RIM's filings with the SEC and Canadian securities regulations." | Ex. 186 at 3. |
| "BlackBerry 10 is still in the early stages of its transition" and "[t]he BlackBerry 10 smartphone portfolio is just starting to fill out." | Ex. 186 at 3. |
| "We are still early in our launch cycle and have yet to see all BlackBerry 10 products and full deployment of BES 10 contribute to revenue." | Ex. 186 at 5. |
| "The industry remains highly competitive so we are responding with additional Sales and Marketing investment this year to establish the BlackBerry 10 platform and to provide BES 10 with the appropriate support to drive broad-based deployment and future unit growth and service revenue opportunities. We expect our increased investment during this transition, combined with a more competitive environment, will generate operating losses in the second quarter, but we believe our strong financial position allows us to make these investments." | Ex. 186 at 5. |
| "[R]esults are very difficult to estimate during this transition in what remains a highly competitive Smartphone environment. … We anticipate an operating loss in the second quarter." | Ex. 186 at 7. |
| "…Q10 isn't even available in all Markets yet. We just went to the US last week so I think it's really early to say. …Also, it is a very competitive market so yet we have to take the measures that we have to take to be successful. But, all-in all, I think it's pretty early days still as we still haven't even completed the entire portfolio." | Ex. 186 at 8. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in June 28, 2013 Announcement | |
| --- | --- |
| **Statement** | **Source** |
| "One more element of this by the way is that we are just launching BES 10 into the market, and as you know there's the correlation between BES 10 -- numbers of BES 10s out there, then testing in Enterprises, then purchasing the devices. So, from that perspective, I think that it's too early to really say there is some sort of stable, predictive way of predicting the future." | Ex. 186 at 9. |
| "It's a very competitive, very volatile market, so many dynamics going on here. So it is really, really hard to predict, even with a three month outlook, where we're going to be." | Ex. 186 at 12. |
| "To the second question of how do we feel about BlackBerry 10 and the launch. I think I've said this in my script. We're doing what we said we would do, right? We are launching BES 10, Q10, Q5, more to come. We're in the middle of it, right? So, it's really too early to say. We're building a portfolio right now against what my expectation was in Q1. We are performing, and from that perspective, I'm confident in the future of BlackBerry 10. But, there's lots of work to do. There's lots of new products to be built. There's lots of new product to be launched. There's lots of marketing campaigns to be generated so it's going to be ongoing effort. It's not automatic. I know sometimes you look at where is this one product that kills everything else. I tell you it's not out there. It is a very competitive market. It has several players, and you've got to be on your tippy toes all the time to perform, and that's what we're doing. But, we're not ignoring competition either, and what we have done with BlackBerry 10 is just built a fantastic, differentiated user experiences that users now latch on to and that doesn't happen from one week to the other. It doesn't happen from one month to the other, and it actually doesn't happen from one quarter to the other. This is a marathon, right?" | Ex. 186 at 14. |
| The smartphone market remains highly competitive, making it difficult to estimate units, revenue and levels of profitability….Based on the competitive market dynamics and these investments, the company anticipates it will generate an operating loss in the second quarter." | Ex. 50 at 2. |

Pearlstein v. BlackBerry Limited, No. 13 Civ. 7060 (CM) (KHP)
Appendix B to Defendants' Memorandum of Law in Support of Their Motions for Summary Judgment

| Risk Factors and Other Cautionary Statements in June 28, 2013 Announcement | |
| --- | --- |
| **Statement** | **Source** |
| "Many factors could cause BlackBerry's actual results, performance or achievements to differ materially from those expressed or implied by the forward-looking statements, including, … intense competition, rapid change and significant strategic alliances within BlackBerry's industry; BlackBerry's reliance on carrier partners and distributors; … BlackBerry's ability to expand and manage BlackBerry® World™; … BlackBerry's ability to manage inventory and asset risk; … and difficulties in forecasting BlackBerry's financial results given the rapid technological changes, evolving industry standards, intense competition and short product life cycles that characterize the wireless communications industry. These risk factors and others relating to BlackBerry are discussed in greater detail in the "Risk Factors" section of BlackBerry's Annual Information Form, which is included in its Annual Report on Form 40-F and the "Cautionary Note Regarding Forward-Looking Statements" section of BlackBerry's MD&A (copies of which filings may be obtained at www.sedar.com or www.sec.gov)." | Ex. 50 at 2. |