**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARVIN PEARLSTEIN, Individually And
On Behalf of All Others Similarly Situated,

Plaintiffs,

   -against-

BLACKBERRY LIMITED (F/K/A RESEARCH
IN MOTION LIMITED), THORSTEN HEINS,
BRIAN BIDULKA, and STEVE ZIPPERSTEIN,

Defendants.

No. 13 Civ. 7060 (CM)

---

## ORDER GRANTING IN PART AND DENYING IN PART PARTIES' *DAUBERT* MOTIONS

McMahon, J.:

This is a securities fraud class action lawsuit brought by investors of BlackBerry, who allege that the company fraudulently accounted for revenue from sales of certain devices in the fourth quarter of fiscal year 2013. Currently before the Court are four motions to exclude the opinions and potential testimony of four expert witnesses – two Plaintiffs' witnesses: Professors Thomas Lys and Tülin Erdem; and two Defense witnesses: Philip Schimmel and Professor Itamar Simonson. The motions are granted in part and denied in part in accordance with this opinion.

### I.      Background

The Court presumes the parties' familiarity with the facts of this case, which have been recounted in previous opinions. *See, e.g., Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060 (CM), 2018 WL 1444401 (S.D.N.Y. Mar. 19, 2018) (denying motion to dismiss Second Amended Complaint); *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) (certifying class).

Plaintiffs bring a securities class action on behalf of purchasers of BlackBerry common stock between March 28, 2013 and September 20, 2013. Plaintiffs allege that the BlackBerry Defendants (the company and several individual defendants) made a series of materially false and misleading statements and omissions concerning the company's new BlackBerry 10 smartphones ("BB10s") – in particular the Z10 and Q10 devices – during the class period. Plaintiffs allege that the BlackBerry Defendants made misrepresentations to attempt to conceal these devices' poor sales performance, and that Defendants violated Generally Accepted Accounting Principles ("GAAP") by accounting for revenue from the devices once the BB10s were shipped to carriers rather than when they were sold to end consumers – in accounting terms, by recognizing revenue "Sell-In" rather than "Sell-Through."

In short, Plaintiffs allege that Defendants (i) made false and misleading statements about the success of BlackBerry and the BB10s (SAC ¶¶ 75–91); and (ii) issued false and misleading financial statements regarding the same (*id.* ¶¶ 92–146). This defrauded investors who bought BlackBerry stock during the class period because they did so at inflated prices, higher than what the stock was truly worth.

The Court denied BlackBerry's motion to dismiss the Second Amended Complaint on March 19, 2018 and certified a class of plaintiffs on January 26, 2021.

Each side has offered expert testimony from an accounting expert and a marketing expert. Each side has also filed motions to exclude the opinions and potential testimony of the opposing side's experts. These motions are currently before the Court. All four witnesses will be permitted to testify, but with certain caveats in accordance with this opinion.

## II.   Discussion

### A.  *Daubert* **Standard**

Under the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)

and Rule 702 of the Federal Rules of Evidence, district courts act as "gatekeepers" in determining

whether an expert witness really qualifies as one. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

"The Second Circuit has 'distilled Rule 702's requirements into three broad criteria: (1)

qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact.' " *In re Aluminum*

*Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (quoting *In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018)).

The party proffering the expert's opinions "has the burden to establish the [Rule 702]

admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the

'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *In re*

*Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *United States v. Williams*, 506

F.3d 151, 160 (2d Cir. 2017)). The court does not need to "admit opinion evidence that is connected

to the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply

too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*,

522 U.S. 136, 146 (1997). In its evaluation, "the district court must focus on the principles and

methodology employed by the expert, without regard to the conclusions the expert has reached or

the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

But the *Daubert* standard is ultimately a "flexible one," *Daubert*, 509 U.S. at 594, "and will necessarily vary from case to case," *Amorgianos*, 303 F.3d at 266. District courts have "broad discretion in the matter of the admission or exclusion of expert evidence." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)). Even if an expert is qualified, the court must still consider whether the probative value of the testimony is "substantially outweighed by a danger of . . . unfair prejudice" or likelihood of confusing or misleading the jury. Fed. R. Evid. 403; *see also United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002).

**B. Application**

1. Thomas Lys

Thomas Lys, Ph.D. is Plaintiffs' accounting expert. The motion to exclude his opinions is granted in part and denied in part.

Plaintiffs asked Lys to "opine on whether BlackBerry's accounting treatment of its [BB10] family of devices . . . complied with U.S. GAAP and the U.S. Securities and Exchange Commission ('SEC') disclosure requirements and whether those statements were misleading and material to investors." (Lys Rpt. at ¶ 18). In conducting his review, Lys reviewed deposition transcripts, corresponding exhibits and documents produced in this litigation, and BlackBerry's financial statements, earnings transcripts, and press releases. He arrived at four general conclusions – all of which Defendants seek to exclude:

- First, that BlackBerry's accounting related to the BB10 devices was "Inconsistent with GAAP's conceptual framework" because it "subordinated substance by manipulating the form of BB10 sales transactions to meet the criteria for the Sell-In Revenue Recognition Method." (*Id*. at ¶ 20).

- Second, that BlackBerry's "CEO [Thorsten] Heins made false statements concerning Q4FY13 Z10 shipments during a March 28, 2013 earnings call that are contradicted by BlackBerry's contemporaneous internal data." (*Ibid*.).

- Third, that "In Q4FY13 and Q1FY14, BlackBerry failed to meet the GAAP criteria for a fixed and determinable price when it used the Sell-In Revenue Recognition Method to report Z10 and Q10 sales to resellers as revenue." (*Ibid*.).

- Fourth, that "Had BlackBerry appropriately applied the Sell-Through Revenue Recognition Method to report BB10 revenues since its launch, BlackBerry would have conveyed different and less favorable information regarding the BB10 launch that was quantitively and qualitatively material." (*Ibid*.).

Based on the above, Lys found "that absent BlackBerry's outcome based reporting of BB10 sales, the Company would have been required [under GAAP] to use the Sell-Through Revenue Recognition Method for the sale of its BB10 devices beginning in Q4FY13." (*Id*. at ¶ 21). In other words, BlackBerry's use of the "Sell-In" method of accounting (where sales revenue is reported after a device was shipped to carriers) rather than the "Sell-Through" method (where revenue is reported after the device has been sold to an end consumer) was inappropriate under GAAP.

Defendants make several arguments against Lys's opinions.

First, they argue that none of Lys's opinions on revenue recognition can be admitted because he is not qualified to testify as an expert on revenue recognition under GAAP because he is not a CPA, has never worked as a corporate accountant or auditor, and has never published on the topic of revenue recognition.

It is hard to take this challenge to Lys's credentials seriously. Lys is a Professor Emeritus at the Kellogg School of Management at Northwestern University. Before becoming a Professor Emeritus in 2015, Lys held the Eric L. Kohler Chair in Accounting and Finance from 2006–2015 and had been on the Kellogg faculty since 1981. (*Id*. at ¶¶ 1–2). He has also held visiting academic positions at the graduate schools of business at the University of Chicago and Stanford. (*Id*. at ¶

3). He holds an M.S. in accounting and a Ph.D. in accounting and finance from the University of Rochester. (*Id*. at ¶ 4).

In other words, Professor Lys is an expert in accounting who *teaches* people who work as CPAs and accountants how to do their job. He has written numerous articles on various aspects of accounting, including corporate accounting reporting, discretionary accounting choices, and the economic consequences of alternate financial reporting standards and financial decisions. (*Id*. at ¶ 8). He is thus eminently qualified to offer opinions about BlackBerry's accounting practices. His lack of practical, as opposed to academic, experience is fodder for cross-examination; it is almost a given that when a professor testifies, opposing counsel will make a "those who can, do; those who can't, teach" argument. But that argument is not a basis to exclude the expert's opinions outright.

"[I]t is well-settled that, to be an expert, a person need not hold a particular degree or license." *Emig v. Electrolux Home Prods. Inc.*, No. 06-cv-4791 (KMK), 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008). Instead, "the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth," and "one may be an expert solely based on . . . one's formal education despite a lack of practical experience." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04-cv-7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (citation omitted). Under such principles, Professor Lys is certainly equipped to offer an opinion about whether BlackBerry's accounting practices complied with GAAP.

Defendants also argue that Lys's opinions should be excluded in full because he did not ground his opinions in the factual record. But I agree with Plaintiffs' view that this simply represents a difference of opinion over what the facts show (including what BlackBerry did or did

6

not consider in reaching the accounting conclusions that it did) and how the facts (as the jury will find them) should be interpreted. If Lys ignored important aspects of Plaintiffs' accounting memoranda or the work done by BlackBerry's outside accountants, that will come out on cross-examination or in the testimony of the opposing expert, Mr. Philip Schimmel. But this is not a basis upon which the entirety of his opinions must be excluded.

However, there are several aspects of Lys's report from which he may not offer any opinion. In particular, Lys may not testify about whether BlackBerry's disclosures complied with SEC disclosure requirements or whether they were misleading and material to investors. (*See id*. at ¶ 18). The Court and the Court alone will instruct the jury on the law, and the jury will decide whether the statements complied with the law. There is no need for expert testimony on that score. The jury may learn from other witnesses that the SEC looked into BlackBerry's accounting with regard to these products and did not take any administrative action; that is a fact relevant to the only issue to be tried.

Defendants next argue that BlackBerry's recognition of revenue via Sell-In (rather than Sell-Through) "potentially increas[ed] incentive compensation" payable to CEO [Thorsten] Heins and CFO [Brian] Bidulka" must be excluded. (*Id*. at pg. 139). The Court agrees. Whether BlackBerry's actions did or did not increase incentive compensation for these executives is a question of fact that does not require expert testimony to answer. This is especially true given that Lys's opinion is simply that BlackBerry's actions "potentially" increased compensation. In other words, the suggestion that recognition of revenue via Sell-In during Q4FY13 "potentially" affected the thinking of the Compensation Committee is nothing more than unsupported speculation on Lys's part, which is inadmissible under *Daubert*. Lys is not a psychologist, and his "opinion" on this score is nothing more than a statement that BlackBerry's executives had an incentive to

pressure its accountants to exercise their judgment erroneously. This opinion is not based on his accounting qualifications or any other expert qualifications he possesses.

However, this conclusion does not mean that the issue of whether BlackBerry's accounting methods increased executive compensation is out of this case. In his report, Lys points to evidence from BlackBerry's internal documents tending to show that its executives may have been trying to find ways to avoid employing the Sell-Through accounting method. Plaintiffs can argue from these documents (which will undoubtedly be admitted into evidence) that they should prevail on the "*Omnicare*" issue – that the Defendants omitted "material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and [that] those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). If BlackBerry's internal documents tend to show that its executives were seeking ways to avoid employing a certain accounting method so that they could earn more, that would be probative of whether there has been a violation of federal securities law. But the jury does not need Professor Lys to interpret these documents for them. The words say what they say, and it is for the people who made the statements and their lawyers to argue about what the words mean. Having an expert offer an "opinion" about what they mean – or what they might mean to someone he has never met – imbues Plaintiffs' argument with an impermissible gloss of correctness.

Finally, Lys will not be permitted to opine on whether Blackberry's CEO made false statements during a March 28, 2013 earnings call. (*See id*. at ¶ 20). The jury will make this determination, and no expert for either side will be permitted to testify to this ultimate issue. I agree with Defendants that Lys is not acting as an expert on this issue but is simply noting a difference between BlackBerry's public statements and its internal data. Lys can report his

observation of the difference between the two numbers in his testimony if he relied on that difference to reach any opinion to which he is permitted to testify. But he can do no more than that. He cannot characterize BlackBerry's public statement as "false," since that does nothing more than tell the jury what result to reach. BlackBerry will likely argue to the jury that its public statement was nothing more than a rounding up;[1] the jury will decide whether that made the statement "false" or "misleading." That is not something beyond the ken of a lay juror or for which they require an expert's assistance.

### 2. Philip Schimmel

Philip Schimmel is Defendants' accounting expert, and he offers opinions that directly contradict those of Professor Lys. Plaintiffs' motion to exclude his opinions and potential testimony is denied in full.

BlackBerry asked Schimmel to evaluate the opinions of Professor Lys, and he concluded that Lys's opinions were incorrect on all fronts. For example, Schimmel concluded, from the evidence he evaluated, "that the substance of the BB10 sales transactions" did not "differ[] from their form," and that BlackBerry's revenue recognition did not "fail[] to meet the GAAP criteria." (Schimmel Rpt. at ¶ 9). Since GAAP "requires the application of considerable professional judgment," Schimmel outlines why he believes Professor Lys "inappropriately substitutes his judgment for the professional judgments exercised and documented by BlackBerry and its independent auditor." (*Ibid*.). Thus, at first glance, it appears that Schimmel's opinions versus

---

[1]   The allegedly false statements that BlackBerry's CEO Thorsten Heins is accused of making during the earnings call is that "BlackBerry 10 made a strong entry into the high-end of these markets, with approximately 1 million BlackBerry 10 units." (Lys Rpt. at ¶ 119). According to Lys, BlackBerry's internal documents showed that it had only shipped 0.861 million Z10 devices and recognized revenue on shipments of only 0.730 million devices in that previous quarter (Q4FY13). (*Ibid*.).

Lys's presents the quintessential "battle of the experts" that should be the basis of cross-examination at trial – not *Daubert* motions.

Plaintiffs argue that Schimmel's opinions should be excluded because he is unqualified and provides no reliable methodology for analyzing his accounting opinions. But Schimmel is every bit as qualified as Professor Lys to offer the opinions in his report. Schimmel worked as an auditor for KPMG for over forty years, including thirty-one years as a partner at the firm. (*Id*. at ¶ 1). His work responsibilities included planning, supervising, and executing the audits of public and private companies, and he has served as an audit partner for some of the largest corporations in the world. This work makes him intimately familiar with GAAP accounting principles as well as the "professional judgment" of someone who would be qualified as an expert to testify on such matters. (*Id*. at ¶¶ 2–4).

Plaintiffs point to the fact that Schimmel has never testified as an expert in the past, but I am utterly unimpressed by this fact. It simply means that he, unlike Professor Lys, cannot be characterized by counsel as a "hired gun." He plainly has superior knowledge, education, experience, and skill in the subject matter of his testimony, which is revenue recognition judgments under GAAP. He made such judgments repeatedly in a four-decade career as an accountant.

Plaintiffs also claim that Schimmel does not employ a reliable methodology, one that fully refutes Professor Lys's opinions, and that his report is simply an "uncritical acceptance of BlackBerry's accounting determinations" – in essence, a deferral to BlackBerry's judgment without any further analysis. (Dkt. No. 515 at 4). But this characterization is inaccurate. Schimmel notes that GAAP involves the application of considerable professional judgment, something with which Professor Lys readily agrees. (*See* Lys Rebuttal at ¶ 11, noting that his expert report is "an application of 'considerable professional' judgment"). Thus, in this Court's view, Schimmel's

opinion is that BlackBerry recognized its revenue under GAAP by making decisions based on its professional judgment and the professional judgment of its accountants. There is no indication from the report that Schimmel simply deferred to BlackBerry's claims without question or skepticism. In fact, the first sixty-eight pages of his 131-page report describe Schimmel's expertise and opinions that bear on his assessment of BlackBerry's accounting decisions – every one of which, he concludes, can be justified under GAAP and standard accounting practices.

To take one example, Schimmel's decision to survey BlackBerry's competitors to see what revenue accounting practices they employed is a standard tactic for experts; and the fact that it shows that eight of the nine competitors who accounted for their revenue under GAAP recorded revenues on a Sell-In as opposed to a Sell-Through basis is salient to his opinion that BlackBerry and its auditors did nothing wrong. (Schimmel Rpt. at ¶ 149).

Finally, beginning at page 69, Schimmel begins his critique of Professor Lys's report – again, a standard reason to call an expert to testify in a case like this one. Plaintiffs argue that portions of this testimony are inadmissible – specifically those portions in which Mr. Schimmel argues that Lys impermissibly substitutes his judgment for that of BlackBerry's accountants. I agree that this statement is infelicitously phrased. Lys did not "substitute his judgment" for that of BlackBerry's accountants; he disagreed with those judgments and concluded that other judgments should have been made. But when you read his report, here is what it essentially says: in the first half of my report, I reviewed BlackBerry's accounting judgments and concluded that they were perfectly appropriate exercises of judgment under GAAP; that being so, Lys is incorrect when he disagrees with those judgments. *That* is an opinion Mr. Schimmel is eminently qualified to give. In the second half of his report, Schimmel reiterates his reasons for agreeing with BlackBerry's accountants and disagreeing with Lys. To that extent his report is unnecessarily redundant, but it

is not excludable. Schimmel criticizes conclusions that Lys reached, ranging from his characterization of certain accounting literature to his interpretation of various facts. This is the sort of "dueling expert" testimony with which courts deal all the time. And this motion is the exact sort of, " 'That expert's testimony hurts our case, so let's try to disqualify the expert' use of *Daubert*" that this Court especially dislikes – and which are routinely denied. *In re Namenda Indirect Purchaser Antitrust Litig*., — F. Supp. 3d —, No. 15-cv-6549 (CM) (RWL), 2021 WL 509988, at *9 (S.D.N.Y. Feb. 11, 2021). Whatever issues Plaintiffs have with Schimmel's opinions can be adequately explored during cross-examination.

Significantly, Mr. Schimmel does not include in his report any of the improper testimony that can be found in Professor Lys's report. He does not offer his opinions about ultimate legal conclusions such as whether BlackBerry complied with SEC requirements, nor does he offer opinions about factual matters that are for the jury to decide, such as whether particular statements made by BlackBerry's CEO were false or material. Accordingly, the Court concludes that his testimony is admissible in full.

3. Tülin Erdem

Professor Tülin Erdem, Ph.D. is Plaintiffs' marketing expert. The motion to strike her testimony is granted in part and denied in part.

Plaintiffs asked Professor Erdem "to evaluate from a strategic marketing perspective the circumstances and factors influencing the commercial performance of BlackBerry's [BB10] devices in the smartphone market," and also "to consider the Z10 and Q10 devices' general competitiveness, consumers' contemporaneous perceptions, and the broader smartphone market leading up to and during the relevant time period." (Erdem Rpt. at ¶ 9). She concluded that BlackBerry's BB10 devices "were not competitive" after considering a variety of factors,

including "the devices' flagship-status pricing, consumers' issues with the unintuitive [operating

system], and an Application ('App') ecosystem that lacked crucial Apps at the time of launch."

(*Id*. at ¶ 17). She also noted how the "one-year delay of the launch of the Z10 in the US resulted

in a launch of a stale product in a far more competitive marketplace in which top-of-the-line specs

had progressed compared to the time when the Z10 was intended to launch." (*Ibid*.). Other factors

for the BB10s lack of commercial success included "lack of promotion . . . by [mobile] carriers,"

"failure to achieve the important and industry-specific 'Hero Status' with a single carrier in the

U.S.," and "poor sales at launch." (*Id*. at ¶ 19). She summarized as follows: "Taken together, these

indicators – declining NPS, lower than forecasted sales at launch, high levels of customer returns,

and accumulating inventory at the carriers – reflected the Z10 and Q10's failure to satisfy

consumers' preferences and expectations, and resulted in the commercial failure of these BB10

devices." (*Id*. at ¶ 22).

Defendants do not challenge Erdem's credentials, which is understandable. She is the

Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern

School of Business at NYU, and she is eminently qualified to opine on marketing matters.  Instead,

Defendants argue primarily that it is unusual to have a marketing expert testify in what is

essentially an accounting case. Put otherwise, while Defendants couch their arguments against

Professor Erdem in terms of her failure to employ a sound methodology in order to reach her

opinions, what they are really saying is that Erdem's opinions on marketing and consumer

perceptions are irrelevant in a securities fraud class action case.

But the core issue in this case is an unusual one, in which expert opinion about marketing

is warranted. The Second Circuit affirmed dismissal of the original complaint, which alleged, in

essence, that BlackBerry's accountants selected the wrong accounting methodology. It is thus the

13

law of the case that mere misjudgment about accounting methodology, without more, is insufficient to support a verdict for the Plaintiffs.

Instead, the issue to be decided is whether the evidence shows that BlackBerry's disclosures "omit[] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" (in this case, statements regarding revenue accounting) which "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189. This makes the marketing issues about which Professor Erdem offers opinions relevant. An acknowledged expert in strategic marketing, she has been asked to opine about the circumstances and factors that would influence the commercial performance of BlackBerry's BB10 devices in the smartphone market, as well as the devices' competitiveness and consumer perceptions about them. Both accounting experts have opined that BlackBerry's assessment of how those devices would perform in the marketplace necessarily factored into its accounting decisions. A marketing expert could very well have something relevant to say about how BlackBerry and its consumers perceived the product. Defendants' motion to exclude Professor Erdem's opinions as irrelevant is, for that reason, denied.

Defendants next criticize Professor Erdem's testimony as simply a summary of the record evidence – mere *ipse dixit* – which would be impermissible as expert testimony. However, as part of her assignment, Erdem needed to summarize some background information about the smartphone industry and developments therein, as well as BlackBerry's history in that industry, in order to offer opinions about the competitiveness of BlackBerry's products. Aspects of her report that fit into this category include her opinion on how the smartphone industry was dominated by only a few main players just prior to the launch of the BB10s (*Id*. at ¶¶ 43–44), and that

Blackberry's inability to develop a viable App ecosystem to compete with these established brands doomed its products (*Id*. at ¶¶ 45–50).

Although her report is littered with references to content she gleaned from "news sources" and "tech genre reviewers," Professor Erdem emphasizes that internal BlackBerry documents show that BlackBerry executives were aware of consumers' criticisms of their products.[2] A critically important statement in her report, for example, is where she opines that "in advance of the launch of future BB10 devices, the market failure of the PlayBook [tablet] provided BlackBerry the opportunity to understand how consumer preferences had shifted to mobile devices with rich App ecosystems and intuitive user interfaces." (*Id*. at ¶ 42). Much of the background information in Erdem's report addresses this statement – and properly so, since, in creating her "case study," she relies on the very information and types of information that were conveyed to BlackBerry employees by its consultants during the development of the contested products. The fact that she did not conduct a consumer survey in 2020 about a product that hit the market in 2013 does not render her opinions inadmissible. Her reliance on survey evidence and consulting advice that were actually obtained by BlackBerry prior to and contemporaneous with the launch of the product is entirely appropriate. To the extent that Defendants believe she overlooked critical historical evidence in developing her opinions (that she "cherry picked" the evidence), that can be addressed on cross-examination and goes to the weight of her testimony – not her ability to offer it.

However, in other parts of her report, Professor Erdem does go on at great length in the manner of a "summary witness," simply explicating items of record evidence. Those statements are neither necessary nor permissible. To take but one example: beginning at paragraph 51, Erdem

---

[2]   Professor Erdem will not be permitted to testify about the contents of particular "reviews" and "news stories" though she may note that the press covered the failure of, say, the PlayBook (a tablet) and the reasons it failed, in order to highlight the fact that these facts were out in the marketplace and were well known to BlackBerry.

delivers what is essentially a lawyer's summation about the decision that BlackBerry made to launch its product. Some of what she says is perfectly permissible. She may, for example, testify that, from a strategic marketing perspective, BlackBerry's BB10s were at a "competitive disadvantage" because they launched "with a limited selection of the Apps competitors offered." (*Id*. at ¶ 53). That is the province of a marketing expert – someone who understands what is popular in the marketplace. Similarly, she may opine that a delay in BlackBerry's launch of the BB10s meant that it was coming into a changed marketplace – one that included a behemoth product, the iPhone – and jeopardized its ability to attain "hero status" among mobile carriers for its new products. (*Id*. at 58).

But she may not cast her testimony in the argumentative form in which it is couched in her report. She may not introduce timelines about the various delays that occurred during the product launch; her expertise is limited to the fact that the marketplace had changed due to delay. Neither may she summarize BlackBerry's internal email traffic about the App development issue. (*See, e.g. id.* at ¶ 52). That is the province of counsel in closing argument.

Professor Erdem also may not testify about what BlackBerry executives "understood." (*See, e.g. id.* at ¶ 54). She is not qualified to testify to the subjective understandings or beliefs of BlackBerry employees. Anything of that sort is excluded.

In sum, Professor Erdem is qualified to testify about marketing issues – what makes a product successful, why things like App capacity or launch timing are critically important to a product's success – and to observe whether information about such matters was available to BlackBerry at or prior to the time when accounting decisions of import to this case were being made.

4. Itamar Simonson

Professor Itamar Simonson is the Defendants' rebuttal marketing expert, who is asked to counter the testimony of Professor Erdem. Plaintiffs' motion to strike his testimony is granted in substantial part.

Professor Simonson is the Sebastian S. Kresge Professor of Marketing at Stanford's Graduate School of Business and is a frequent expert witness in securities litigations. Plaintiffs do not challenge his credentials, and one would generally think him well equipped to criticize Professor Erdem's opinions.

But Professor Simonson's report is, to say the least, problematic.

Professor Simonson devotes several pages in his report to criticizing *any* postmortem or post-hoc case study created in the context of litigation. (*See* Simonson Rpt. at ¶¶ 16–26). He claims never before to have encountered one – a conclusion that renders the rest of his testimony highly suspect, since I have read a number of them, and I suspect most other federal judges have as well.

Simonson's essential argument boils down to this: what is useful in the business school classroom as a teaching tool is inappropriate in the context of a legal dispute, because in that context such studies are susceptible to obvious biases and the "cherry picking" of evidence, which "may be susceptible to influence by the attorneys on whose behalf the report is prepared and their previously filed Complaint." (*Id*. at ¶ 26). For example, he notes that postmortem case studies can be guilty of engaging in "20/20 hindsight," using information that was not available to decisionmakers at the time the critical decisions were made to view matters in light of how things actually turned out. (*Id*. at ¶ 13).

This could be a valid criticism, if the expert making the criticism backed it up with examples of such errors that infected the report under review. But it is here that Professor Simonson's report is conspicuously lacking.

One way of backing up the criticism Simonson levels would be to cite statements in Professor Erdem's report that tend to show that her postmortem case study relied on information that was not available to BlackBerry's decisionmakers at the time they made certain decisions, but which only became apparent later, after the BB10 devices had launched and failed. But Simonson does not do this; and as I read Professor Erdem's report, she relied substantially if not exclusively on information that was contemporaneously available to BlackBerry decisionmakers, either (1) because that information was public (i.e., the state of the competitive marketplace), or (2) because it was actually presented to BlackBerry by its consultants and discussed by its employees in internal documents. Professor Erdem does not base her testimony on what BlackBerry executives "might" have known, or "should have known." She predicates her analysis on what they indisputably *did* know about the prospects and problems with their product, based on the contents of the company's own files.

Professor Simonson offers no reason why expert testimony about marketing conditions and decisions that is predicated on what was actually known by decisionmakers at the time the decisions were made qualifies as "biased" postmortem analysis that should be excluded as unreliable. In fact, he acknowledges that my reading is correct, and that Professor Erdem "did summarize some of the pertinent facts" using contemporaneously available material. (*Id*. at ¶ 27).

And as for allegations of "cherry picking," rather than pointing out instances in which Erdem relied on improper information, or pointing to specific pieces of evidence that she eliminated from her analysis because it ran counter to the conclusions her client hired her to reach,

Simonson's report is replete with vague generalities and statements, such as "without going over other facts that were widely known and that were highlighted in the Erdem Report . . ." (*Id*. at ¶ 32) or noting no need to "engage in the kind of post-mortem analysis that characterizes the Erdem Report" (*Id*. at ¶ 39). A rebuttal expert actually needs to be quite precise about the aspects of an expert's report with which he takes issue. If he criticizes an expert for "cherry picking," he is required to identify the salient facts that were omitted. In my view, what Simonson identifies as "cherry picking" is anything but.

For example, Simonson alleges that Erdem ignored the fact that carriers pre-purchased thousands of units of BlackBerry's BB10s, and thus "invested" in BlackBerry, such that it demonstrates the carriers' belief that the BB10 products would succeed. (*Id*. at ¶ 58). But Erdem did not ignore this fact at all. It is noted in her report – although perhaps not as explicitly as Simonson would like. For example, Erdem observed that, shortly after the BB10s' launch, "poor actual sales, and higher than industry standard returns, resulted in carriers and retailers quickly building up a backlog of Z10 inventory." (Erdem Rpt. at ¶ 110). Later in the same paragraph, she said that a Verizon executive "accused BlackBerry of 'push[ing]' Verizon to increase Z10 orders" and how "Verizon 'trusted [BlackBerry's] guidance' " on the issue, but that – due to the poor sales of the BB10 devices – "its 'trust in [BlackBerry's] guidance had evaporated.' " (*Ibid*.). The clear implication of these statements is that carriers that pre-purchased BB10 devices to sell them to consumers were invested in the success of the products from the beginning. So Erdem did not "ignore" the allegedly omitted fact about carriers being invested in BlackBerry devices.

Rather, she did not think that was terribly important. She thought that BlackBerry's awareness about potential problems with *consumer* acceptance was more important than carrier/distributor acceptance, so she does not emphasize the purchases by distributors to the

degree that BlackBerry does in its presentation. This is not "cherry picking" facts that support one side's view of the evidence. Differences of opinion about what is important among evidentiary facts go to the weight of the expert's opinion, not an expert's ability to offer that opinion.

Professor Simonson identifies three other conclusions that Professor Erdem allegedly justified by "cherry picking" facts to match her conclusion. First, he argues that many initial reviews of the BB10 devices were favorable, and that Erdem's report ignores this positive feedback. (Simonson Rpt. at ¶ 59). Second, he claims that "Blackberry was in the best position to become the third mobile device ecosystem" for developing Apps given the market share that it enjoyed at the time – something that Erdem discounts in her assessment. (*Id*. at ¶ 61). Third, he claims that the PlayBook tablet situation did not lend itself to teaching BlackBerry executives anything useful about the very different products at issue with regard to the BB10s. (*Id*. at ¶ 66).

But once again, these facts were not ignored, but were discussed in Erdem's report. The fact that they were mentioned in passing and were not the subject of her focus does not suggest that Professor Erdem "cherry picked" facts. Her points of emphasis offer prime fodder for cross-examination, and I am sure Defendants will ask the appropriate questions if Professor Erdem testifies at trial.

So, while I have no issue with Professor Simonson's testifying that Professor Erdem emphasized the wrong facts and de-emphasized the important ones – and he certainly has the credentials to give such testimony – he must identify specific wrongly emphasized facts and may not testify in generalities.

My principal problem with Simonson's report is that it is replete with assertions of fact that are unsupported by a citation to a single piece of record evidence, any contemporaneous document, or any authoritative text in the field of marketing. To take one glaring example: in criticizing

Erdem's analysis of the competitive environment facing the BB10s at launch, Simonson says "my understanding is that *many analysts and managers* believed that there was room for a third ecosystem alongside iOS and Android." (*Id*. at ¶ 29 (emphasis added)). But Simonson's report is devoid of evidence showing exactly what analysts and managers believed about BlackBerry's chances in developing a third App ecosystem at the time. In other words, this statement – unlike the statements in Erdem's report – is unsupported by a citation to the evidence that gave rise to Simonson's "understanding." Why he should be allowed to testify to this as though it were a fact is beyond me. And I will not allow it.

Professor Simonson's report makes numerous other statements that suffer from the same defect. (*See* Dkt. No. 513 at 10). Some of his statements are quite shocking, such as his utterly unsupported assertion that "many sophisticated market participants, including Microsoft and Nokia . . . apparently believed it was possible for a third ecosystem [App] ecosystem to develop." (Simonson Rpt. at ¶ 61). Simonson does not identify the basis for his views about *Microsoft's* and *Nokia's* "apparent belief" anywhere in his report.  They appear to have been pulled out of thin air.

There are other, similar statements in Simonson's report that discuss the "belief" of companies that are not a party to this case. No evidence that would justify Simonson's cavalier statement that this or that company "believed' something is cited. (*See e.g., id*. at ¶¶ 65, 75). This goes well beyond expert *ipse dixit*. For a witness who repeatedly criticizes Professor Erdem for daring to get into the heads of BlackBerry executives (something she rarely does, to my reading of her report, and then only on the basis of information they indisputably possessed), it is quite bold to assert, without support, that executives from non-party companies "apparently believed" anything. These statements are not admissible.

Professor Simonson's report also suffers from the practice of setting up "straw men" of Erdem's supposed opinions that are nowhere to be found in her report. Erdem did not opine that there was a generally accepted standard or test in the marketing field for when managers should "give up" on a new project; she did not opine that Blackberry should have "given up" on the BB10s. (*Id*. at ¶ 41). This case is not about whether BlackBerry should not have launched the BB 10 devices, although you would never know that from reading Professor Simonson's report. It is about whether BlackBerry omitted to disclose to the investing public material facts about its decision to use Sell-In instead of Sell-Through revenue recognition during the earliest quarters when the product was on the market, and whether those omissions conflicted with what a reasonable investor would take from the statement.

I am prepared to allow Professor Simonson to criticize the case study method used by Professor Erdem, and to be cross-examined about whether he has ever, in his extensive history as an expert witness, employed it. I am prepared to allow him to take issue with specifically identified decisions by Professor Erdem to emphasize or de-emphasize particular points in her report – but only to the extent that he has cited or footnoted, *in his current report*, the evidentiary basis for his disagreement with her points of emphasis and de-emphasis. But that is all the testimony I am prepared to accept from him. Professor Simonson is not permitted to testify about his (unsupported) views and conclusions on the state of the smartphone industry, market-wide changes, or what any specific company did or did not believe. Based on the report he has submitted, his testimony should be brief indeed.

## CONCLUSION

The motions to exclude the opinions and potential testimony of Professor Thomas Lys, Philip Schimmel, Professor Tülin Erdem, and Professor Itamar Simonson are granted in part and denied in part in accordance with this opinion.

The Clerk of Court is respectfully directed to close Dkt. Nos. 498, 500, 512, and 514.

Dated:  September 10, 2021
    New York, New York

_____
United States District Judge

BY ECF TO ALL PARTIES