UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____          │
│ DATE FILED: 1/3/2022             │
└─────────────────────────────────┘
```

MARVIN PEARLSTEIN, Individually And On
Behalf of All Others Similarly Situated,

                                    Plaintiff,

        -against-

BLACKBERRY LIMITED (formerly known as
RESEARCH IN MOTION LIMITED),
THORSTEN HEINS, BRIAN BIDULKA, and
STEVE ZIPPERSTEIN,
                                    Defendants.

No. 13 Civ. 7060 (CM) (KHP)
(Consolidated)

## MEMORANDUM AND ORDER DENYING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND DENYING DEFENDANTS' MOTION TO STRIKE

McMahon, J.:

In early 2013, BlackBerry Limited ("BlackBerry" or the "Company") launched its new BlackBerry 10 ("BB10") operating system and accompanying line of smartphones, the Z10 and Q10. The launch flopped, resulting in disappointing Company earnings and layoffs, which was disclosed in September that year. Following the revelation of the business failure and accompanying stock price drop, this lawsuit was filed.

Lead Plaintiffs Todd Cox and Mary Dinzik ("Plaintiffs") bring this federal securities class action on behalf of purchasers of BlackBerry common stock between March 28 and September 20, 2013 (the "Class Period") against Blackberry, its former Chief Executive Officer Thorstein Heins ("Heins"), its former Chief Financial Officer Brian Bidulka ("Bidulka"), and its Chief Legal Officer Steve Zipperstein ("Zipperstein," together "Defendants").

In Plaintiffs' Second Amended Complaint ("SAC"), filed September 29, 2017, Plaintiffs allege that the Defendants made false and misleading statements about the success of BlackBerry

and the BB10s and issued false and misleading financial statements regarding the same. They allege Defendants made misrepresentations to attempt to conceal these devices' poor sales performance, and that Defendants violated Generally Accepted Accounting Principles ("GAAP") by accounting for revenue from the devices once the BB10s were shipped to carriers rather than when they were sold to end consumers – in accounting terms, by recognizing revenue "Sell-In" rather than "Sell-Through." Plaintiffs claim these alleged misstatements, omissions, and improper accounting treatment defrauded investors who bought BlackBerry stock during the Class Period because they did so at inflated prices, higher than what the stock was truly worth. The SAC asserts two counts for (1) violations of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 against all defendants and (2) violations of §20(a) of the Exchange Act against individual defendants Heins and Bidulka.

The Court denied BlackBerry's motion to dismiss the Second Amended Complaint on March 19, 2018, and certified a plaintiff class on January 26, 2021.

Defendants now move for summary judgment on all claims. (Dkt. No. 506). Defendants also moves to strike all of Plaintiffs' responses and objections to Defendants' Rule 56.1 statement of undisputed facts and asks that the Court deem its own facts admitted. (Dkt. No. 557).

For the reasons outlined below, Defendant's motion to strike Plaintiffs' responses and objections to their statement of undisputed material facts is DENIED, and Defendants' motion for summary judgment is DENIED.

## BACKGROUND[1]

Before we dive into the facts, the reader needs to be informed about the meaning of the terms "sell-through" accounting and "sell-in" accounting. "Sell-in" accounting means recognizing

---

[1] The Court presumes the parties' familiarity with the facts of this case, which have been recounted in previous opinions. *See, e.g., Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060 (CM), 2018 WL 1444401 (S.D.N.Y. Mar. 19, 2018)

revenue for sales upon shipment of the product; "sell-through" means recognizing revenue upon the sale of the product to the end consumer. The essence of this case is whether Blackberry was justified in recognizing revenue on a sell-in basis, rather than a sell-through basis, given allegedly known issues with its product.

Plaintiffs charge that if BlackBerry had appropriately applied sell-through revenue recognition methods – instead of sell-in revenue recognition – to report BB10 revenues in the Class Period, BlackBerry would have conveyed to the investing public an entirely different picture about the success and profitability of the BB10 devices than was actually portrayed. Between March 28 and September 20, 2013, the Company maintained its use of sell-in accounting and stated, *inter alia*, that "Customers love the [BB10] device and the user experience," there was "strong initial support and demand" for the devices, "two-thirds to three-quarters" of the BB10s had already "sold through," and the Company had "returned to profitability" and "ha[d] a strong balance sheet." The Company categorically denied a report that revealed the BB10 devices were being returned at high rates. But Plaintiffs allege – and some evidence suggests – that the BB10 devices were disliked by consumers, were not selling, and were being returned when they were sold. They allege that Blackberry's rosy public statements concealed a far less rosy truth about the product. And while this is not a case about difference of opinion about accounting methods – it is, rather, a case about whether Blackberry concealed the truth about the success of its products – plaintiffs do contend that using sell-through accounting rather than sell-in accounting would have revealed the truth to

---

(denying motion to dismiss Second Amended Complaint); *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060 (CM), 2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) (certifying class). For the purposes of the motions currently before this Court, facts are drawn from the Defendants' Rule 56.1 statement of undisputed facts and Plaintiffs' counter statement, as well as the evidence submitted in connection with the Defendants' summary judgment motion. (*See* Dkt. Nos. 508, 547). The facts have been construed in the light most favorable to Plaintiffs, and conflicts in the evidence have been resolved in their favor. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 80 (2d Cir. 2018).

the market. That truth was ultimately revealed by the Company on September 20, 2013, when it announced that it was switching from sell-in to sell-through accounting for the pertinent products.

With this introduction in mind, let us turn to the facts.

## A. Parties

Defendant BlackBerry Limited is an Ontario corporation based in Waterloo, Ontario, Canada that during the relevant time period designed, manufactured, and marketed wireless solutions and developed integrated hardware, software, and services, including smartphones. (Dkt. 508, Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 1, 2, 62).

Defendant Thorsten Heins was BlackBerry's President and Chief Executive Officer and a company director from January 2012 until November 2013. (*Id.* ¶ 5).

Defendant Brian Bidulka was BlackBerry's Chief Financial Officer from December 2009 until November 25, 2013. (*Id.* ¶ 13).

Defendant Steven Zipperstein was BlackBerry's Chief Legal Officer between 2012 and August 31, 2018. (*Id.* ¶ 20). He also served as Corporate Secretary, Chief Compliance Officer and Chief Risk Officer. (*Id.*).

Lead Plaintiffs Todd Cox and Mary Dinzik each are purchasers of BlackBerry common stock and made such purchases during the Class Period. (SAC ¶¶ 66-69).

## B. BlackBerry's 2013 Launch of the Z10 and Q10 Smartphones in the U.S.

In early 2013, BlackBerry launched two new BB10 smartphones, the Z10 and Q10. (Defs.' 56.1, ¶ 62). BB10 was a new BlackBerry operating system (*id.*), the Z10 was a new all-touch device, and the Q10 was the first BB10 device with a keyboard. (*Id.* ¶ 63).

The product was first launched overseas. (*Id.* ¶¶78, 81). The parties disagree about whether the product's launch abroad was successful; Plaintiffs point to evidence that suggests it was not

successful, while Defendants point to other evidence suggesting the opposite. (*See e.g.*, Dkt. No. 547 ("Pls.' R.&O."), ¶¶78, 81). Construing the evidence most favorable to the non-moving party, Plaintiffs' evidence tends to show at least that, by the end of FY 2013, Z10 sell-through rates had been flagged as an issue abroad; there were drops in sales in UK and Canada and lack of sell-through due to the device's "lack of apps" and its being "difficult to use" and "worse than competition." (*Id.* ¶195 (quotations omitted); *see also id.* ¶¶85–89). Plaintiffs argue that Defendants knew perfectly well that there were issues with the product abroad, which should have alerted them to the possibility that there would be similar issues when the products launched in the U.S. Nonetheless, Defendants continued to recognize revenue for the BB10s on a sell-through basis instead of a sell-in basis when the devices launched in the U.S. (*Id.* ¶195).

The Z10 became available for consumer sales in the United States in late March 2013 (*id.* ¶¶ 90, 95), and the Q10 launched in the United States in June 2013. (Dkt. 521-186, at 8).

### C. BlackBerry's Accounting Treatment of BB10 Devices in the Class Period

i.   *Sell-In vs. Sell-Through Accounting*

Central to Plaintiffs' claims is the argument that Defendants should have accounted for revenue from the BB10 devices on a sell-in basis (once BB10s were shipped to carriers) rather than sell-through (when sold to end consumers) during the Class Period, which includes announcements of Fourth Quarter Fiscal 2013 ("Q4:2013") and First Quarter Fiscal 2014 ("Q1:2014") financial statements. Plaintiffs argue that record evidence demonstrates that Defendants ignored relevant and contrary facts in this period in violation of the GAAP in order to "prematurely recognize[] revenue" and to "conceal[] poor commercial performance of the devices

by obscuring weak sell through to end users and a high return rate." (Dkt. No. 545 ("Opp."), at 23).

Plaintiffs offer evidence and expert support that Defendants violated the GAAP by remaining on sell-in accounting even though its auditors, Ernst & Young, raised concerns and suggested that "BB10 sales should be on sell thru accounting." (*Id.* at 24). Defendants instead "order[ed]" their accounting and revenue recognition personnel to stay on sell-in and find ways to "justify" that accounting treatment. (*Id.* at 24).

Plaintiffs dispute BlackBerry's justifications for using sell-in methods and offer record evidence suggesting that BlackBerry used "stale and outmoded pricing studies to support its revenue recognition position." (*Id.* at 25). Plaintiffs argue that, in addition to evidence showing over-pricing on devices, the pricing studies did not actually support BlackBerry's accounting treatment because the studies recommended a lower price for the BB10s. (*Id.* at 25).

During the Class Period, Defendants refused to provide sell-through information to the market, even when expressly asked by analysts. (*See* Pls.' R.&O. ¶218; Opp., at App.7; Dkt. No. 488, at 37).

Instead of sell-in accounting, Plaintiffs argue that "several factors . . . militated towards sell through treatment" in Q4:2013 and Q1:2014 of the Class Period – including "poor NPS" (or "net promoter score," an indicator of client satisfaction with the product and a "performance indicator of the success of the device" (*see* Pls.' R.&O. at p. 34 n. 10)), and high rates of "remorse returns." (Opp., at 25-26). But it was not until the end of the Class Period – on September 20, 2013, when BlackBerry announced its Second Quarter Fiscal 2014 ("Q2:2014") financial results – that BlackBerry switched from sell-in to sell-through accounting for the BB10 devices. The reasons BlackBerry gave for the switch included both poor NPS and high returns. (*Id.* at 26).

ii.   *Profitability/ Revenue Recognition*

Plaintiffs claim Defendants prematurely recognized revenue for BB10 devices throughout the Class Period in order to keep its stock price inflated. For example, Plaintiffs offer expert testimony and evidence that BlackBerry would have recorded an operating loss for Q4:2013 had Defendants properly recognized revenue for the BB10s on a sell-through basis, and its operating profit income would have been negative (an operating loss of $33 million) had Blackberry reported its income on a sell-through basis. (Pls.' Ex. 24 at ¶¶320-22; Pls.' R.&O. ¶¶133-134). Instead, BlackBerry announced it had "returned to profitability" in Q4:2013. (Defs.' 56.1, at ¶134). Plaintiffs also point to internal documents from just prior to the Q4:2013 in which Defendants suggest it was key to "impl[y] earnings were going up" so "the stock would be strong . . . If the story doesn't introduce a profitability component, investors won't be supportive." (Pl. Ex. 267).

iii.   *Inventory Assessments*

Another thing that Plaintiffs claim was materially misleading was BlackBerry's inventory assessment of its BB10 devices. While Defendants stated that "[i]nventory purchases and purchase commitments are based upon . . . forecasts of future demand," Plaintiffs introduced evidence "that BlackBerry's BB10 inventory and purchase commitments were based on market share aspirations and 'executive overrides' . . . that far exceeded the actual demand for the BB10s." (Opp., at 27). Again, Plaintiffs point to evidence suggesting auditors highlighted the problems associated with such "executive overrides," including fraud risk. (*Id.*). Plaintiffs posits that BlackBerry's own policy for inventory assessment was that inventory would be estimated by forecasting "future demand" not overrides; thus, Plaintiffs proffer that the inventory assessments were misleading. (*Id.* at 27-28).

Defendants offer their own accounting expert testimony and contest the conclusions Plaintiffs draw from the evidence, putting forth their own arguments as to what the evidence produced in discovery tends to show about each of the accounting decisions that were made.

**D. Alleged Misstatements During the Class Period**

    *i.    BlackBerry's Release of Its Fourth Quarter 2013 Financials on March 28, 2013*

On March 28, 2013, the first day of the Class Period, BlackBerry announced its Fiscal Year ("FY") 2013 financial results in its annual financial report on SEC Form 40-F and in an earnings release, and it held an earnings call with analysts. (Defs.' 56.1, ¶ 128).

The Form 40-F touted a successful transition to the BlackBerry 10 platform and described the BB10 launch as "the beginning of the organization's transition to becoming a leading mobile computing organization." (SAC ¶ 76). The Form 40-F stated that BlackBerry had "shipped 1 million [BB10] devices." (*Id.* ¶111). It also recognized revenue on a sell-in basis and did not record a charge for supply commitments. (*Id.* ¶¶ 30-32). Plaintiffs allege this violated GAAP and misled investors due to the uncertain sale price of the Z10 – the first of two BB10 models released during the Class Period – based on excess inventory in the distribution channel, larger than expected returns, and the likelihood of price concessions, among other reasons. (*Id.* ¶¶ 30, 103-112).

In the March 28 press release, Defendant Heins said the Company had "return[ed] to profitability in the fourth quarter," and that "Customers love the [BB10] device and the user experience." (SAC ¶ 78).

On the March 28 earnings call, Defendant Heins stated that the Company had "regained the confidence and excitement of our carrier distribution partners" with the BB10 launch. He also stated that, "The initial early global demand for the 10 has been better than anticipated, and our recent announcement of the largest single purchase order in our history, for 1 million units, is also

indicative of a strong initial support and demand." (SAC ¶ 80). Heins represented that "two-thirds to three-quarters" of the BB10s had already "sold through." (*Id.* ¶¶ 111-12).

Plaintiffs point to evidence they claim show that these statements materially misled investors. For example, Plaintiffs' evidence suggests that, despite its glowing statements, the launch of the BB10 was not a success, returns were high, customers were not satisfied with the devices, and "BlackBerry knew sell through was not meeting its internal expectations, nor that of its carrier and retail partners" and that "the poor sell through trend was not slowing down domestically nor abroad." (Pls.' R.&O. ¶195).

ii.    *Detwiler Fenton's Release of Its Report on April 11, 2013 and BlackBerry's Alleged Misstatements in Response*

On April 11, 2013, the equity research firm Detwiler Fenton ("Detwiler") issued a report which discussed returns of the Z10 device (the "Detwiler Report"). (Defs.' 56.1, ¶ 140). In this report, Detwiler stated, "We believe key retail partners have seen a significant increase in Z10 returns to the point where, in several cases, returns are now exceeding sales, a phenomenon we have never seen before." (*Id.*; Dkt. 521-159, at BBPearlstein_01735606). The Detwiler Report partially revealed the truth. (Dkt. No. 466-1, ¶¶ 70-74).

On April 12, 2013, Defendants issued a press release with a full-throated denial of the claims in the Detwiler Report and challenged the accuracy of the data contained therein. (SAC ¶¶18, 84). In that press release, Defendant Heins told investors the Detwiler Report was "materially false and misleading" and "absolutely without basis." (*Id.* ¶18). Defendants insisted that "[s]ales of the BlackBerry Z10 are meeting expectations and that data we have collected from our retailers and carrier partners demonstrates that customers are satisfied . . . Return rate statistics show that we are at or below our forecasts and right in line with the industry." (*Id.*).

But this was not true. The criminal prosecution of James Dunham, Jr. – a former executive at one of six exclusive national Verizon retailers selling Zl0s – revealed that the Detwiler Report was based on accurate, real-time data from Wireless Zone's approximately 400 stores, which confirmed the veracity of the facts underlying the Detwiler report. (SAC ¶¶9-29). Plaintiffs allege that Defendants were in possession of the same data that Dunham and Detwiler had. (*Id.* ¶27-29). Plaintiffs also point to evidence produced in discovery showing that by the time of the denials, BlackBerry had received reports of high return rates from retailers in the U.S. and abroad, were well-aware of the returns problem, and the individual defendants were warned that the individual defendants did not have data to defend a denial of the Detwiler report. (*See* Pls.' R.&O., at ¶¶142, 168; Opp., at 13-19). And Plaintiffs argue that Defendants admitted, in BlackBerry's Fiscal 2013 Form 40-F, that the Defendants actively monitored demand requirements, collected data from retailers and partners like Wireless Zone, monitored and reviewed negative financial data like the data underlying the Detwiler Report, and so had no reasonable basis to issue its denial. (SAC ¶18-19).

Therefore, Plaintiffs contend, Blackberry's denial of the Detwiler Report was a material misrepresentation.

   *iii.* *BlackBerry's Release of Its First Quarter 2014 Financial Results on June 28, 2013*

On June 28, 2013, BlackBerry released its Q1:2014 financial results and held an analyst call. (Pls.' R.&O. ¶ 215). Plaintiffs assert that the June 28, 2013 6-K was a partial disclosure in that it revealed (i) a loss for the quarter; (ii) the shipment of only 2.7 million new BB10s; and (iii) that BB10s made up only 40% of BlackBerry's total smartphone shipments for that period. (SAC

¶ 147). However, it concealed poor demand and sell-through for BB10s and materially overstated revenue by improperly recording revenue from BB10s on a sell-in basis. (*Id.* ¶¶ 118-19.)

On a June 28, 2013 earnings call, Defendant Heins called the BB10 "an effective launch product," and stated that the BB10s "have been well-received." (*Id.* ¶ 86). He stated that when "customers get the devices in their hands . . . they seem to be really happy with what they see, and what they can experience with the new user experience on BlackBerry." (*Id.* ¶ 149; *see* Opp., at 19-20). Also on this analyst call, Defendant Bidulka was asked to provide sell-through data but refused to provide that information, an omission that Plaintiffs claim was materially misleading. (*See* Pls.' R.&O. ¶218; Opp., at 20-21).

Following the analysts call, many analysts expressed concern and speculated that the BB10 was in fact a bust – in part due to Defendant Bidulka's refusal to deliver sell-through data. Blackberry's share price suffered a 32% drop at that time. (*See* Pls.' R.&O. ¶¶219-225).

   iv.    *BlackBerry's August 12, 2013 Press Release*

On August 12, 2013, BlackBerry issued a press release in which it continued to insist it "continue[d] to see compelling long-term opportunities for BlackBerry 10," that "customers are embracing" the BB10's "exceptional technology" and "we have a strong balance sheet." (SAC ¶88; Pls.' R.&O. ¶226). BlackBerry also informed the public that the Board had formed a "Special Committee" to "to enhance value and increase scale" for BB10s. (Pls.' R.&O. ¶226).

As Defendants rallied around the BB10 publicly, internal documents prior to this public disclosure indicate the opposite of confidence. (Opp., at 21). In one such document, Defendant Zipperstein recognized "a sizeable operating loss in Q2," noted that "Our share price will remain under enormous pressure," "our BB10 devices are not selling well," and that "We are on the verge of launching additional BB10 devices, but with no line of sight to profitability for those products." (*Id.*).

v.    *BlackBerry's September 20, 2013 Corrective Disclosure*

On September 20, 2013, BlackBerry pre-released is Q2:14 financial results. (Pls.' R.&O. ¶254). Plaintiffs assert that this disclosure revealed the full truth. (SAC ¶ 190).

In that release, BlackBerry reported a $930-960 million charge against Z10 inventory, the abandonment of two devices from its planned BB10 portfolio, a 40% workforce reduction, and a $72 million restructuring charge. (*Id.* at ¶¶150-151, 255; Pl. Ex. 23 at ¶¶298-315). The press release revealed that BlackBerry had switched to sell-through accounting for the BB10 devices; that a majority of handhelds sold in the quarter were legacy BB7s, not BB10s; that BlackBerry expected to recognize revenue of just $1.6 billion, and an adjusted loss per share of $0.47 to $0.51; that BlackBerry could not recognize revenue for certain BB10s because the devices had yet to be sold to actual end customers; and that BlackBerry "burned roughly $500 million of cash, or $1 per share." (Dkt. No. 466-1, ¶¶98-99.)

Plaintiffs argue that the concealed issues with consumer demand and satisfaction and the low revenue from BB10s were revealed by this corrective disclosure, coupled with Blackberry's write-down of inventory of and supply commitments for Z10s and its switch to sell-through accounting. (Opp., at 34; Dkt. No. 488, at 38). Following the announcement, the company's stock price dropped. (*Id.*).

Plaintiffs' expert opines that this disclosure finally corrected Defendants' alleged Class Period misrepresentations and omissions. (Opp. at 33). Defendants do not attribute the stock price decline to any other identifiable factor. (*See id.* at 34).

Following the disclosure, this suit was filed. Its extensive procedural history has been recounted in numerous earlier opinions and will not be repeated here. (*See* Dkt. No. 488, at 4-8).

## LEGAL STANDARD

Presently before the court is Blackberry's motion for summary judgment, accompanied by a motion to strike Plaintiffs' Rule 56.1 Responses and Objections.

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

Once the movants meet that burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To survive summary judgment, the non-movants must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001).

As should be obvious from the foregoing discussion, if defendants' motion to strike is denied, there are numerous genuine issues of material fact that would preclude summary judgment in their favor. I thus turn to it first.

## I.   DEFENDANTS' MOTION TO STRIKE IS DENIED

Local Rule 56.1(a) requires the moving party on summary judgment to submit "a separate, short and concise statement" setting forth material facts as to which there is no genuine issue to be

tried. *See* Local Rule 56.1. It also requires that the opposing party to submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." *Id.* In responding, "If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention." *Rodriguez v. Schneider*, No. 95 CIV. 4083(RPP), 1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999) (emphasis in original).

The "purpose of Local Rule 56.1 is to assist the Court in understanding the scope of the summary judgment motion by highlighting those facts which the parties contend are in dispute." *Id.* Thus, a plaintiff's responsive exercise goes to "the heart of the Court's consideration of the summary judgment motion" which "is its careful analysis of the evidence cited by a non-moving party in an effort to determine whether a fact which the non-moving party asserts is in dispute is, in reality, undisputed." *Id.* "*Rule 56.1 statements are not argument.*" *Id.* (emphasis in original).

Defendants filed a Rule 56.1 statement in this case (*see* Defs.' 56.1), and Plaintiffs filed their responsive paragraph-by-paragraph contention, citing evidence, of the facts in dispute. (*See* Pls.' R.&O.). At times, Plaintiffs admittedly stray into improper legal argument in their "factual" recitations. But Plaintiff's version of the facts – and the evidence supporting that view of the facts – is perfectly apparent from reading the Rule 56.1 statement.

Defendants move to strike Plaintiffs' responses in whole and "deem Defendants' undisputed facts admitted." (Dkt. No. 558-1, at 2). This is a silly and pointless motion, one obviously (and desperately) made because, unless the Rule 56.1 statement is stricken, the record is replete with disputed facts. It is denied.

"Motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Kehr ex rel. Kehr v. Yamaha Motor Corp.,*

*U.S.A.*, 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). A motion to strike is particularly disfavored in the Rule 56.1 context. "A party seeking to strike a Rule 56.1 statement 'bears a heavy burden . . .'" *Christians of Cal., Inc. v. Clive Christian N.Y., LLP*, No. 13-cv-275, 2014 WL 3407108, at *2 (S.D.N.Y. July 7, 2014). Some courts have even called them "improper" in this context, as "Rule 56, which governs summary judgment, does not provide a 'motion to strike' as a tool in the summary judgment process." *Cummings v. Bradley*, No. 11-cv-0751, 2013 WL 1149985, at *2-3 (D. Conn. Mar. 19, 2013) (citations omitted); *see also* 11 MOORE'S FEDERAL PRACTICE – CIVIL § 56.91 (2021) ("Prior to 2010, motions to strike were often used to object to defective supporting materials. However, this is no longer the proper procedure."). As Plaintiffs point out, the 2010 Amendments to Rule 56 specifically state in the Committee Notes that "[t]here is no need to make a separate motion to strike" in conjunction with a summary judgment motion. (Dkt. No. 561, at 5).

Accordingly, "courts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and simply disregard any improper assertions." *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410 (KAM), 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012), *R.R. adopted* 2013 WL 1334271 (Mar. 28, 2013); *see In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 WL 6606629, at *1 (S.D.N.Y. Dec. 20, 2017) (disregarding improper legal argument in 56.1 statement). For example, in *Christians of Cal., Inc. v. Clive Christian N.Y., LLP*, the court found that the "inclusion" of argument in a Rule 56.1 statement did not "comes close to contravening the requirements or the purposes of Rule 56.1 such that it should be struck" and denied the motion to strike, acknowledging that it simply would not consider the improper argument. 2014 WL 3407108, at *2.

So too here. Plaintiffs' responses and objections, which dispute Defendants' facts and cite to evidence that rebuts Defendants' statement of facts, does not contravene Rule 56.1. Rather, it is Defendants' motion to strike that is procedurally improper. To the extent that Plaintiffs incorporate legal argument into their responses and objections – and they do – this Court will simply  not consider those statements.  Likewise, to the extent there is improper legal argument in Defendants' original Rule 56.1 statement, this Court does not consider that either.

Finally, Plaintiffs point out that the "vast majority of Defendants' 'objections'" in their motion to strike "ask the Court to call balls and strikes on the credibility or persuasiveness of each party's evidence." As they correctly point out, "This a job for the jury at trial, not the Court on summary judgment, much less a motion to strike." (*See* Dkt. No. 561, at 2).  Insofar as Defendants' motion to strike seeks to challenge the sufficiency or credibility of the evidence and factual assertions to which Plaintiffs cite, a trial, not a motion to strike, is the proper vehicle for resolving those disputes. *See, e.g., Claude v. Wells Fargo Bank, N.A.*, No.13-cv-0535, 2015 WL 5797007, at *5-6 (D. Conn. Sept. 30, 2015) ("a motion to strike is not an appropriate vehicle for challenging evidence presented in support of, or in opposition to a motion for summary judgment . . . "). "[I]t is well established in this Circuit that at the summary judgment stage, the Court 'may not make credibility determinations or weigh the evidence' because '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Castro v. City of N.Y.*, No. 16-cv-8147, 2020 WL 6782000, at *13 n.10 (S.D.N.Y. Nov. 18, 2020) (*quoting Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015)). If Defendants wish to contest the evidence – which admittedly by their motion they seem to wish to do – they may do that at trial.

The motion to strike Plaintiffs' Rule 56.1 Responses and Objections is denied.

## II.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE GRANTING EITHER SIDE SUMMARY JUDGMENT

Defendants have moved for summary judgment dismissal of all of Plaintiffs' claims on the basis that Plaintiffs have failed to raise a triable issue of fact as to whether Defendants made any false statements or omissions within the Class Period.

The court has already concluded, in its ruling on the parties' *Daubert* motions, that there are genuine issues of material fact in this case. (*See* Dkt. No. 567). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find in favor of Plaintiffs on evidence provided.

The central triable issue is the issue of whether BlackBerry misrepresented the success and profitability of its BB10 products to the investing public. While the Second Circuit has already held, in this very case, that mere alleged misjudgments about accounting methodology, without more, would be insufficient to support a verdict for the Plaintiffs (*see Cox v. Blackberry Limited*, 660 Fed.Appx. 23, 25 (2d Cir. 2016)), there remains an *Omnicare* issue as to whether BlackBerry's disclosures "omit[] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" (in this case, statements about revenue accounting) that "conflict with what a reasonable investor would take from the statement itself." (*See* Dkt. No. 567, at 12-13). On this issue, factual questions abound. (*Id.* at 14, 22). Plaintiffs point to record evidence demonstrating that BlackBerry's internal accountants were ordered by Defendants to remain on sell-in accounting and ignored relevant and contrary facts under GAAP to report profits where there were none, all of which Defendants withheld from their auditors. (*See* Opp. at 22-28). Construing the evidence most favorably for the Plaintiffs, a jury could find Defendants' public statements were materially misleading and made with

scienter and do not simply reflect a difference of opinion about what accounting method should be followed.

The record is also replete with classic "battle-of-the-experts" issues that preclude summary judgment. *See In re Celestica*, No. 07 Civ. 0312, 2014 WL 4160216, at *13 n.16 (S.D.N.Y. Aug. 20, 2014) ("courts should not grant summary judgment when the parties produce competing expert analyses."). Summary judgment is inappropriate "when there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute." *Realtime Data, LLC v. Stanley*, 897 F. Supp.2d 146, 153 (S.D.N.Y. 2012). Here, the testimony of Philip Schimmel, Defendants' accounting expert, is directly contradicted by the opinions of Plaintiffs' expert, Professor Lys. Similarly, the testimony of Plaintiffs' marketing expert Tülin Erdem is rebutted by Defendants' marketing expert Professor Simonson. The Court can only submit this battle to the jury for resolution.[2]

Plaintiffs and Defendants both quarrel over what the facts show (including what BlackBerry did or did not consider in deciding how to account for the BB10 products) and disagree about how the facts should be interpreted. Such fact-intensive inquiries are always reserved for the jury. *See e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) ("resolving . . . a fact-intensive inquiry is not appropriate at the summary judgment stage"). The fact-intensive disputes over falsity, materiality, and scienter will likewise be decided by the jury. *See Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 392 (S.D.N.Y. 2018) (falsity is a "quintessential jury

---

[2] As detailed in the Court's September 10, 2021 order granting in part and denying in part the parties' four Daubert motions (Dkt. No. 567), all four experts are permitted to testify with certain caveats. Generally, they are not permitted to offer opinions about legal conclusions; cast argument better reserved to counsel; give opinions about factual matters that are for the jury to decide; proffer testimony on the subjective understandings or beliefs of BlackBerry employees or non-parties; and may not testify in generalities. The defense expert Professor Simonson is only permitted to testify as to "the case study method used by [Plaintiffs' expert] Professor Erdem, and to be cross-examined about whether he has ever, in his extensive history as an expert witness, employed it . . ." but not about anything else contained but unsupported in his report; this Court has noted, "his testimony should be brief indeed." (*Id.* at 22).

question"); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) ("Materiality is an inherently fact-specific finding") (quotation omitted); *In re Celestica Inc. Sec. Litig.*, 2014 WL 4160216, at *10 ("The fact-intensive nature of a scienter inquiry often militates against granting judgment as a matter of law"). Defendants contest nearly all of the conclusions Plaintiffs draw from the evidence and proffer their own conclusions as to what the evidence produced in discovery tends to show about materiality, falsity, and scienter.

Defendants' motion for summary judgment is, accordingly, denied.

## III.   THE STATUTE OF REPOSE BARS STATEMENTS FROM 2020 EXPERT REPORTS

However, Defendants are entitled to a ruling on an issue that was deferred at the time of class certification: whether claims that eleven of twenty-six allegedly misleading statements during the class period – all of which were identified by Blackberry's expert in his June 2020 Report – should be stricken from the case, because they were not specifically identified as misleading until the Exchange Act's five-year statute of repose had expired. *See* 28 U.S.C. §1658(b).

The Court agrees that claims based on misstatements that are not identified in the SAC – which was filed well within the limitations period – are barred by the statute of repose. However, I do not agree that all eleven statements identified by Defendants are not pleaded in the SAC.

A statute of repose "'acts to define temporally the right to initiate suit against a defendant after a legislatively determined time period.'" *In re Longtop Financial Technologies Ltd. Securities Litigation*, 939 F.Supp.2d 360, 378 (S.D.N.Y. Apr. 8, 2013) (quoting *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102–103 (2d Cir.2004)). It begins to run from the time an allegedly fraudulent representation is made. *Id.*

In support of their argument, Defendants rely on my colleague Judge Furman's decision on a motion to dismiss in *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379 (S.D.N.Y. 2019). In *Sjunde AP-Fonden*, seven complaints were filed against the defendant in 2017, regarding

alleged misstatements made in 2013. These various complaints were consolidated into an operative complaint in 2018, which asserted claims for violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. *Id.* at 389. Sjunde AP-Fonden was appointed lead plaintiff in the consolidated cases. After the statute of repose expired, plaintiffs filed new consolidated amended complaints, in which they identified many additional misstatements in support of their securities fraud claims. *Id.* The defendant moved to dismiss the last such amended complaint, arguing that Sjunde AP-Fonde could not assert that statements made more than five years earlier, and not previously identified in any pleading, were false and fraudulent, because the repose period expired. *Id.* Sjunde AP-Fonden countered that the new statements could serve as the basis of securities fraud claims, because they were based on the allegedly false filings that were identified in its own earlier motion to intervene, which was made before the repose period expired. Sjunde AP-Fonden argued that it was allowed to assert "*any* claim based on *any* statement in those [securities] filings . . . even if asserted for the first time in a later complaint after the statute of repose had run." *Id.* The court rejected that argument, holding that "a timely raised claim . . . does not somehow preserve other, as-yet-unpleaded claims based on different misleading statements." *Id.* The court pointed out that the newly-asserted statements could have been identified in either a timely-filed complaint or in the timely motion to intervene – but they were not. As a result, the five-year statute of repose barred adding them to the case.

The Court is persuaded by the reasoning of *Sjunde AP-Fonden*. The statute of repose gives a plaintiff five years to identify any and every basis for suit. After that, the plaintiff may not identify additional statements that are allegedly misleading. In this case, the Plaintiffs could and should have acted affirmatively to eliminate the repose problem prior to expiration of the five-year period, by identifying allegedly false statements and omissions in the SAC, and by moving for leave to

amend the SAC if they discovered any additional statements on which they wished to rest their argument. The fact that their expert believes that additional statements are misleading, and has identified them in 2020, does not somehow resurrect the limitations period.

Plaintiffs rely on *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) for the argument that the statute of repose does not bar Plaintiffs' new statements. However, the Second Circuit in *Vivendi* did not mention the statute of repose at all. There may have been a statute of repose problem in *Vivendi* – the class action suit against Vivendi commenced in 2002 and concerned misstatements made during the period 2000-2002, while the challenged misstatements in that case were added during discovery in 2007, possibly after the statute of repose expired. (*Id.* at 232, 242 n.11). But the limitations question does not appear to have been raised, and it certainly was not addressed – quite possibly because there was no such issue.[3] Instead, *Vivendi* addressed the question of whether plaintiffs were "confine[d] . . . to the precise set of alleged misstatements identified in their complaint throughout the entire course of litigation." *Id.* That is not what defendants are arguing here; they are arguing limitations. Since *Vivendi* says nothing about that issue, I do not find it persuasive precedent.

Having said that the statute of repose precludes the jury from entertaining any alleged misstatements that were not identified within five years of their being made, Plaintiffs point out – correctly – that four of the eleven allegedly unpleaded misstatements were in fact alleged in the SAC prior to the expiration of the statute of repose. (*See* Opp., at 32-33, App. 1-7). These statements were indeed pleaded in the SAC and thus are not barred:

---

[3] When the Vivendi case went to trial in October 2009, the jury was presented with fifty-seven arguable misstatements, some of which were not pleaded in the complaint or, apparently raised in the lawsuit until sometime in 2007. But if the later-added statements were made at a moment during 2002 that was within five years of their first being raised – somethings I cannot ascertain from reading the Second Circuit's opinion – it would certainly explain the absence of any statute of repose discussion in *Vivendi*, as well as why the issue was framed as a pleading issue rather than a limitations issue.

| Date of Statement | "New" Statement | Statement in SAC |
|---|---|---|
| 3/28/2013 | " . . . from what we have shipped into the markets, two-thirds to three-quarters already have sold through." (Dkt. No. 507, at A-3) | "[O]n the 4th Quarter Fiscal 2013 Earnings Call, Defendant Heins represented that 'two-thirds to three-quarters already have sold through.'" (SAC at ¶ 111; *see also* SAC ¶ 112) |
| 3/28/2013 | "Shipments of 6 million smartphones, including approximately 1 million BlackBerry 10 units." (Dkt. No. 507, at A-3) | "In the fourth quarter fiscal 2013 financial report filed on Form 40F on March 28, 2013, BlackBerry disclosed that it had shipped 1 million Blackberry 10 units." (SAC ¶ 111)<br><br>"During the quarter, BlackBerry shipped approximately 6 million BlackBerry smartphones . . . " (SAC ¶115). |
| 6/28/2013 | "We're focusing on driving the sell-through so our customers get the devices in their hands, and when they get them in their hands, they seem to be really happy with what they see and what they can experience with the new user experience on BlackBerry." (Dkt. No. 507, at A-4). | "[w]e're focusing on driving the sell-through so our customers get the devices in their hands. And when they get them in their hands, they seem to be really happy with what they see, and what they can experience with the new user experience on BlackBerry." (SAC ¶54). |
| 6/28/2013 | ". . . Mr. Bidulka declined to provide additional detail about BB10 device sell-through . . ." (Dkt. No. 507, at A-7). | "when an analyst asked if the Company 'could give us what you sold through of BlackBerry 10,' Defendant Bidulka refused, . . ." (SAC ¶149) |

The other seven statements that Defendants claim are newly asserted will not be submitted to the jury for consideration.

That said, I must note that there is considerable overlap between these seven newly-asserted statements and statements that are identified as misleading in the SAC. For example, Defendants move to bar the jury from considering whether a March 28, 2013 statement to the effect that " . . . the launch is meeting our early expectations" is misleading; but the SAC pleads that a nearly identical statement made on April 12, 2013, "Sales of the BlackBerry® Z10 are

22

meeting expectations . . . " is false, and the jury will be asked to consider whether that statement is materially misleading. (*Cf.* Dkt. No. 507, at A-3 *with* SAC ¶84). Similarly, Defendants seek to bar jury consideration of a statement made on April 29, 2013 ("we are in line with the industry") that is nearly identical to a statement made two weeks earlier, on April 12, 2013, that is pleaded in the SAC ("Return rate statistics show that we are . . . right in line with the industry."). (*Cf.* Dkt. No. 507, at A-6 *with* SAC ¶ 84). The same is true of allegedly material misstatements about the Detwiler Report that were made on April 11 and 29, 2013; they are essentially duplicative of an April 12, 2013 misstatement that is alleged in the SAC. (*Cf.* Dkt. No. 507, at A-6 *with* SAC ¶84). So while the jury will only be asked about the nineteen alleged misstatements that were identified as false prior to the expiration of the statute of repose, what this ruling gets Defendant in terms of pruning issues from the case is negligible to non-existent.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to strike is DENIED, and Defendants' motion for summary judgment is DENIED. The parties will be contacted by the court when a trial date is assigned; how long we will continue on centralized scheduling is a function of pandemic-related developments. Criminal trials must and will take precedence as long as the court has to request trial dates from the Clerk; and criminal cases will continue to take precedence even after the court is able to resume control over its calendar. Because of the age of the case, once I get control of my own trial calendar, I will prioritize finding a place for it; but right now, my best guess is that this case will go to trial in September or October of 2022.

This constitutes the opinion and order of the court. It is a written opinion. The Clerk is directed to close the motions at Docket Numbers 506 and 557.

Dated: January 3, 2022

_____

U.S.D.J.

BY ECF TO ALL COUNSEL