UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVIN PEARLSTEIN, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> BLACKBERRY LIMITED (formerly known as RESEARCH IN MOTION LIMITED), THORSTEN HEINS, BRIAN BIDULKA, and STEVE ZIPPERSTEIN, <br><br> Defendants. | CASE NO. 1:13-CV-7060-CM |

### DECLARATION OF LUIGGY SEGURA IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS DISTRIBUTION ORDER

I, LUIGGY SEGURA, hereby declare as follows:

1. I am a Vice President at JND Legal Administration ("JND"). Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice of Settlement, dated on June 14, 2022 (the "Preliminary Approval Order") (Dkt. No. 818), JND was appointed to act as the Claims Administrator in connection with the above-captioned class action (the "Class Action").[1] I am over 21 years of age and am not a party to the Class Action. The following statements are based on my personal knowledge and information provided to me by other experienced JND employees. If called as a witness, I could and would testify competently thereto. On September 29, 2022, the court entered the Memorandum and Order Approving the Class Action Settlement (the "Final Approval Order") (Dkt. No. 836). Pursuant to the Settlement $165,000,000

---

[1] All capitalized terms used in this declaration that are not otherwise defined herein shall have the meanings as used in the Stipulation of Settlement, dated June 7, 2022 (the "Stipulation") (ECF No. 817).

1

was deposited into an interest-bearing Escrow Account (the Settlement Fund"). The Effective date of the Settlement has occurred, Class Members' claims have been processed, and the Net Settlement Fund may be distributed to Authorized Claimants pursuant to Order of this Court. *See* Stipulation at ¶¶ 5.4-5.9.

2. As Claims Administrator JND has, among other things: (a) emailed a link to the Summary Notice of Proposed Settlement ("Summary Notice")and Proof of Claim and Release Form ("Claim Form") to each Class Member whose last-known email address could be identified with reasonable effort, within fourteen (14) days after entry of the Preliminary Approval Order and where a last-know email address was not available, cause a copy of the Postcard Notice to be mailed to Class Members by first class mail to potential Class Members and brokers and other nominees; (b) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (c) designed, implemented, and launched the Settlement Website ("Website") (www.BlackBerryUSSecuritiesLitigation.com.), which includes the claim-filing deadline and copies of the Stipulation, Preliminary Approval Order, Notice, and Claim Form; (d) published the Summary Notice; (e) provided, upon request, additional copies of the Summary Notice and Claim Form, ("the "Claim Form", and together with the Summary Notice, the "Notice Packet") to potential Class Members, brokers, and other nominees; (f) received and processed Claim Forms submitted in connection with the Settlement; (g) reviewed submitted Claim Forms for accuracy and completeness and to ensure that they were supported by sufficient documentary evidence; (h) provided notice to Claimants whose Claims were deficient or rejected; (i) worked with Claimants to help cure deficient Claims; and (j) calculated Claimants' recognized loss ("Recognized Claim"), pursuant to the Court-approved Plan of Allocation set forth in the Notice.

3. JND has completed processing all Claim Forms ("Claims") received through

February 15, 2023, in accordance with the terms of the Stipulation and the Court-approved Plan of Allocation, and hereby submits its administrative determinations accepting and rejecting the Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants. JND also presents this declaration in support of Plaintiffs' Motion for Class Distribution Order.

## PROCEDURES FOLLOWED IN PROCESSING CLAIMS

4. Under the terms of the Preliminary Approval Order and as set forth in the Notice, each Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to JND a properly executed Claim Form postmarked or submitted online no later than September 7, 2022, together with adequate supporting documentation for the transactions and holdings reported in the Claim Form. Through February 15, 2023, JND has received and fully processed 12,148 Claims (the "Presented Claims").

5. In preparation for receiving and processing Claims, JND: (a) conferred with Lead Counsel to define the guidelines for processing Claims; (b) created a unique database to store Claim details, images of Claims, and supporting documentation (the "Settlement Database"); (c) trained staff in the specifics of the Settlement so that Claims would be properly processed; (d) formulated a system so that telephone and email inquiries would be properly responded to; (e) developed various computer programs and screens for entry of Class Members' identifying information and their transactional information; and (f) developed a proprietary "calculation module" that would calculate Recognized Claims pursuant to the Court-approved Plan of Allocation.

6. Class Members seeking to share in the Net Settlement Fund were directed in the Notice to submit their Claims online or to a post office box address specifically designated for the Settlement. Notice Packets returned by the United States Postal Service as undeliverable were reviewed for updated addresses and, where available, updated addresses were entered into the

database and Notice Packets were mailed to the updated addresses. Any correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

## PROCESSING CLAIMS

**A.  Paper Claims**

7.  Of the 12,148 Presented Claims, 496 are paper Claims and 1,263 are "online" Claims filed through the online filing component of the Settlement Website. Once received, the paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents. This manual task of preparing the paper Claims is extremely laborious and time-intensive. Once prepared, paper Claims were scanned into the Settlement Database together with all submitted documentation.

8.  Each Claim was assigned a unique Claim number. Once scanned, the information from each Claim (including the Claimant's name, address, account number/information from his, her, or its supporting documentation, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Claim) was entered into the Settlement Database. Once entered into the Settlement Database, Claims were reviewed to verify that all required information had been provided. The documentation provided by the Claimant in support of his, her, or its Claim was reviewed for authenticity and compared to the information provided in the Claim to verify the Claimant's identity and the purchase/acquisition transactions, sale transactions, and holdings listed on the Claim.

9.  To process the transactions detailed in the Claims, JND utilized internal messages to identify and classify deficiency or ineligibility conditions existing within those Claims. Appropriate messages were assigned to the Claims as they were processed. For example, where a Claim was submitted by a Claimant who did not have any eligible transactions in BBRY common

4

stock during the Class Period, that Claim would receive a "Claim-level" message that denoted ineligibility. Similar Claim-level ineligible messages were used to denote other ineligible conditions, such as duplicate Claims. These messages would indicate to JND that the Claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Claim unless the deficiency was cured in its entirety. Examples of Claim-level messages are as follows:

- Inadequate Documentation Submitted for Entire Claim
- No Supporting Documentation Submitted for Entire Claim
- No Purchase Transaction in the Class Period

10. Because a Claim may be deficient only in part, but otherwise acceptable, JND utilized messages that were applied only to specific transactions within a Claim. For example, if a Claimant submitted a Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a "transaction-level" message. The message indicated that although the transaction was deficient, the Claim was otherwise eligible for payment if other transactions in the Claim calculated to a Recognized Claim according to the Court-approved Plan of Allocation. Thus, even if the transaction-level deficiency was never cured, the Claim could still be partially accepted. Examples of transaction-level messages are as follows:

- No Supporting Documentation for Specific Transaction/Position
- Inadequate Documentation for Specific Transaction/Position
- Illegible Documentation for Specific Transaction/Position

**B.    Electronic Claims**

11. Of the 12,148 Presented Claims, 10,389 were filed electronically ("Electronic Claims" or "E-Claims"). Electronic Claims filers ("Electronic Claim Filers" or "E-Claim Filers") are typically banks, brokers, nominees and other-third party filers, who file claims on behalf of numerous claimants. Because E-Claim Filers typically submit a high volume (hundreds or thousands) of transactions during the Class Period on behalf of the beneficial owners, JND

provides E-Claim Filers with the opportunity to mail a computer disc or electronically submit a file containing all the transactions—rather than provide reams of paper requiring data entry—so that JND can upload all transactions to the Settlement Database.

12. JND maintains an electronic filing operations team to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the Electronic Filing Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with JND's required format and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, JND notified the E-Claim Filer. If the electronic file was deemed to be in an acceptable format, it was then loaded to the Settlement Database.

13. Once each electronic file was loaded, the Electronic Claims were coded with messages to denote any deficient or ineligible conditions that existed within them. These messages are similar to those applied to paper Claims. In lieu of manually applying messages, the Electronic Filing Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, price out-of-range issues, out-of-balance conditions, transactions outside the Class Period, etc.). The output was thoroughly verified and confirmed as accurate.

14. The review process also included message coding any Electronic Claims that were not accompanied by a signed Claim Form, which serves as a "Master Proof of Claim Form" for all Claims referenced on the electronic file submitted. This process was reviewed by JND's Electronic Filing Team and, when appropriate, JND contacted the E-Claim Filers whose submissions were missing information. This ensured that only fully completed Claims, submitted by properly authorized representatives of the Claimants, were considered eligible for payment from the Net Settlement Fund.

15. Finally, at the end of the process, JND performed various targeted reviews of Electronic Claims. Specifically, JND used criteria such as the calculated Recognized Claim amounts and other identified criteria to message code and reach out to a number of E-Claim Filers and request that various sample purchases, sales, and holdings selected by JND be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews helped to ensure that electronic data supplied by Claimants did not contain inaccurate information.

### C. Additional Complexities Encountered in Processing Claims

16. JND received a total of 12,148 Claims. Approximately 9,182, or about 75.6 %, of the 12,148 Claims received through February 15, 2023, were partially or wholly ineligible for one or more reasons, and therefore, were subjected to the additional processing, correspondence and telephonic communications described in the section below entitled "The Deficiency Process."

17. During the processing of Claim Forms, JND encountered "non-conforming" Claim Forms, which, in general, require significantly more work than standard Claim Forms because of the information contained in or missing from the Claim Form, or because of the manner in which the Claim Form was completed. Non-conforming Claims include, among other conditions, missing pages, no name or address, Claim Forms that are blank, but submitted with documentation for JND to complete, and Claim Forms that are so materially deficient as to make what is being claimed unrecognizable. A significant amount of time and resources was required to hand review those Claims.

18. While performing the targeted reviews on the electronically filed submissions there were significant time delays. The third- party filers had difficulty obtaining their clients' supporting documentation for the specific transactions requested, since the Class Period dates back beyond 7 years, which is beyond typical retention periods.

**EXCLUDED PERSONS**

19. JND also reviewed all Claims to ensure that they were not submitted by, or on behalf of, "Excluded Persons," to the extent that the identities of such persons or entities were known to JND through the list of Defendants and other excluded persons and entities set forth in the Stipulation and the Notice and from the Claimants' certifications on the Claim Forms. JND also reviewed all Claims against the list of persons who were excluded from the Settlement pursuant to request.

**THE DEFICIENCY PROCESS**

A. **Paper Claim and Online Claims**

20. Approximately 56.2% of the paper and online Claims (*i.e.*, 988 of the 1,759 paper and online Claims) were incomplete or had one or more defects or conditions of ineligibility, such as the Claim not being signed, not being properly documented, or indicating no eligible transactions in BBRY common stock during the Class Period. The "Deficiency Process," which primarily involved mailing letters to Claimants and responding to communications from Claimants by email and/or telephone, was intended to assist Claimants in properly completing their otherwise deficient submissions so that they could be eligible to participate in the Settlement.

21. If paper or online Claims were determined to be defective, a Notice of Deficient and/or Ineligible Claim ("Deficiency Notice") was sent to the Claimants describing the defect(s) in the Claims and what, if anything, was necessary to cure the defect(s) in these Claims. The Deficiency Notice advised Claimants that submission of appropriate information and/or documentary evidence to complete the Claim had to be sent within twenty (20) days from the date of the Deficiency Notice, or the Claim would be recommended for rejection to the extent that the deficiency or condition of ineligibility was not cured. The Deficiency Notice also advised Claimants that to contest these administrative determinations, they were required to submit written

statements to JND requesting Court review of their Claims and setting forth the basis for such requests. JND sent a total of 998 Deficiency Notices to Claimants who filed paper or online Claims that JND determined to be ineligible or defective. Attached hereto as **Exhibit A** are examples of Deficiency Notices.

22. Claimants' responses to Deficiency Notices were scanned into the Settlement Database and associated with the corresponding Claims. The responses were then carefully reviewed and evaluated by JND's team of processors. If a Claimant's response corrected the defect(s), JND manually updated the Settlement Database to reflect the changes in the status of the Claim.

### B. Electronic Claims

23. Approximately 78.9% of the E-Claims (*i.e.*, 8,194 of the 10,389 E-Claims) were incomplete or had one or more defects or conditions of ineligibility. These 8,194 deficient E-Claims were filed by a total of 35 E-Claim filers. JND informed each of these 35 E-Claim Filers of the deficiencies by sending an email ("Deficiency Email") to the email address included with the respective E-Claim Filers' Claim Form with an attached report containing detailed information associated with the Claims and indicating which of those Claims within the filing were deficient and/or rejected ("Deficiency Spreadsheet"). Attached hereto as **Exhibit B** are examples of the Deficiency Email and Deficiency Spreadsheet.

24. The Deficiency Email sent to the email address of record provided with the Claim Form:

(a) Notified the E-Claim Filer that any Claims with deficiencies not corrected within twenty (20) days from the date of the email may be rejected;

(b) Advised the E-Claim Filer of his, her, or its right to contest the rejection of the Claim(s) and request this Court's review of JND's administrative determination within twenty (20) days from the date of the Deficiency

Email; and

(c) Provided instructions for how to submit corrections.

25. The Deficiency Spreadsheet attached to the Deficiency Email identified each of the individual Claims that were found to be deficient or ineligible and the basis for that deficiency or condition of ineligibility.

26. The E-Claim Filers' responses were reviewed, scanned and/or loaded into JND's database, and associated with the corresponding Electronic Claims. If a response corrected the defect(s) or affected an Electronic Claim's status, JND manually and/or programmatically updated the database to reflect such change in status of the Electronic Claim.

### C. **Outreach Campaign to Claimants Who Did Not Cure Deficiencies**

27. JND also emailed and/or called Claimants with still-deficient Claims to provide them with a final opportunity to cure the deficiencies in their Claims. JND contacted the still-deficient claims prior to their deficiency response due deadline to remind the Claimants/filers of their needed response.

28. During this outreach campaign, JND notified Claimants that the Claim they submitted was still deficient and advised the Claimant of the steps required to cure the deficiency. JND aided Claimants where possible, depending on the nature of the deficiency. For example, if a Claimant needed additional supporting documentation, JND explained the types of documentation that would render the Claim eligible, and how the Claimant could obtain the necessary documentation. JND also provided some Claimants with direct phone numbers and email addresses so that Claimants could receive continued personalized attention and assistance.

29. JND reached out to Claimants via email if a valid email address was provided with their Claim submission. If an email address was not provided, JND called Claimants directly. If JND could not reach a Claimant to speak one-on-one, JND left a voice message, when possible,

requesting a return call. JND explained in the voice message it was calling to assist the Claimant in remedying outstanding deficiencies in his, her or its Claim.

30. If, in response to a telephone call or email, a Claimant cured the deficiency in his, her or its Claim by providing the appropriate information and/or supporting documentation, JND updated the Settlement Database to reflect the change in the status of the Claim.

## DISPUTED CLAIMS

31. Claimants were advised they had the right to contest JND's administrative determination of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, Claimants were advised in the deficiency notice that, if they disputed JND's determination, they had to provide a statement of reasons indicating the grounds for contesting the determination, along with supporting documentation, and if the dispute concerning the Claim could not otherwise be resolved, Lead Counsel would thereafter present the request for review to the Court for a final determination. Three (3) requests for court review were received, and all three (3) were resolved because of JND's explanation and discussions with the Claimants. Currently there are no disputes that requires Court review.

## LATE BUT OTHERWISE ELIGIBLE CLAIMS

32. Of the Presented Claims, 143 were received or postmarked after the September 7, 2022 claim submission deadline established by the Court. JND processed all late Claims received through February 15, 2023 and 54 have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). JND has not rejected any Claim received through February 15, 2023, solely based on its late submission. It is typical, and in fact the norm, for courts to accept late filed claims in securities cases. Therefore, to the extent these claims are eligible, but for the fact that they were late, they are recommended for payment by JND, subject to the Court's

determination.

33. However, there must be a final cut-off date after which no more Claims will be accepted so that there may be a proportional allocation of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Claims or responses to notices of deficiency received during the finalization of the administration and the preparation of this application would necessarily require a delay in the distribution. Accordingly, JND respectfully requests that this Court order that no received Claim after February 15, 2023, be eligible for payment for any reason whatsoever. Lead Counsel approves of this Claim cut-off date.

## QUALITY ASSURANCE

34. An integral part of the claim's administration process is the Quality Assurance review. Throughout the administration process, JND's Quality Assurance personnel worked to verify that Claims were processed properly by ensuring that information was entered correctly into the database, deficiency and/or rejection message codes were assigned accurately, and deficiency and/or rejection notification letters were sent appropriately. After all Claims were processed, deficiency and/or rejection letters were mailed, and Claimants' responses to the deficiency and/or rejection letters were reviewed and processed, JND's Quality Assurance personnel performed additional Quality Assurance reviews. These final Quality Assurance reviews further ensured the correctness and completeness of all Claims processed prior to preparing this declaration and all JND's final documents in support of distribution of the Net Settlement Fund. As part of the Quality Assurance reviews, JND:

(a) Verified that Claim Forms had signatures of authorized individuals;
(b) Verified that true duplicate Claims were identified, verified, and rejected;
(c) Verified that persons and entities excluded from the Settlement did not file Claims or their Claims were rejected upon review;
(d) Performed a final Quality Assurance audit of Claims and all supporting

> documentation to ensure completeness of Claims;

(e) Performed an audit of deficient Claims;

(f) Performed additional review of Claims with high Recognized Claim amounts;

(g) Audited Claims that were designated invalid;

(h) Audited Claims with a Recognized Claim amount equal to zero;

(i) Performed other auditing based on Claims completion requirements and the approved calculation specifications based on the Court-approved Plan of Allocation; and

(j) Re-tested the accuracy of the Recognized Claim amount calculation program.

35. In support of the work described above, JND's computer staff designed and implemented, and the project team tested, the following programs for this administration: (a) data entry screens that store Claim information (including all transactional data included on each Claim) and attach messages and, where necessary, text to denote conditions existing within the Claim; (b) programs to load and analyze transactional data submitted electronically for all Electronic Claims; (c) a program to compare the claimed transaction prices against the reported market prices to confirm that the claimed transactions were within an acceptable range of the reported market prices; (d) a calculation program to analyze the transactional data for all Claims, and calculate each Claimant's Recognized Claim based on the Court-approved Plan of Allocation; and (e) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible Claims.

36. JND also used a variety of fraud protection controls throughout the administration process to identify potential fraudulent Claims. Duplicate Claim searches, high value reviews, spot reviews and other standard audit reports that examined the information in a variety of ways were used during the Claim review process.

37. As part of its due diligence in processing the Claims, JND reviewed and compared

the entire settlement database against a "watch list" of known questionable filers that JND has developed throughout its years of experiences as a Claim Administrator. JND has worked closely with law enforcement to update that watch list with the latest information available. JND performs searches based on names, aliases, addresses, and city/zip codes. In addition, JND's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including claims submitted by Claimants not previously captured in the "watch list." Processors are instructed to message code any claim that matches to a record on the "watch list" and escalate them to management for review. JND's Fraud Protection procedures identified three (3) potentially fraudulent Claims which were subject to further review and verification. Each of these three (3) claims have been vetted and are being recommended for rejection.

### RECOMMENDATIONS FOR APPROVAL AND REJECTION

38. As noted above, we received a total of 12,148 Claims.

#### A. Timely Submitted and Valid Claims

39. A total of 12,005 Claims were received or postmarked on or before the Court-approved Claim submission deadline of September 7, 2022, of which 3,197 were determined by JND to be eligible and are recommended for approval ("Timely Eligible Claims"). The total Recognized Claim amount for these Claims is $104,894,402.07. A list with the timely Eligible Claims showing each Claimant's Recognized Claim is attached hereto as **Exhibit C**.

#### B. Late But Otherwise Eligible Claims

40. A total of 143 Claims were received or postmarked after the Court-approved Claim submission deadline of September 7, 2022, but received on or before February 15, 2023. Of those, 54 were determined by JND to be otherwise eligible and are recommended for approval ("Late But Otherwise Eligible Claims"). The total Recognized Claim amount for these Claims is $9,770,478.57. A list with the Late But Otherwise Eligible Claims showing each Claimant's

Recognized Claim is attached hereto as **Exhibit D**.

### C.     Rejected Claims

41.     After the responses to notices of deficiencies were processed, a total of 8,897 Claims remain recommended for rejection by the Court ("Rejected Claims") for the following reasons:

a.     2,710 Claims Did Not Result in a Recognized Claim;
b.     3,193 Claims Did Not Fit Definition of the Class;
c.     2,872 Deficient Claims Never Cured;
d.     27 Duplicate Claims; and
e.     95 Claims Withdrawn

42.     A list of the Rejected Claims with the reasons for rejection is attached hereto as **Exhibit E**.

### CLAIM THAT DID NOT FIT THE DEFINITION OF THE CLASS

43.     Of the 12,148 Presented Claims, JND recommends a total of 8,897 Claims for rejection by the Court ("Rejected Claims"). Of these 8,897 Rejected Claims, 3,193 are recommended for rejection because they did not fit the definition of the Class. This is either because the Claim did not have purchases in the Class Period, or the security claimed was not BlackBerry common stock traded on a US exchange. The majority of Claims that did not fit the definition of the Class, a total of 2,614, were submitted by 18 electronic filers across 68 unique submissions. Of these 2,614 E-file claims 2,530 had no purchases in the Class Period. The top 10 E-file submissions with the greatest number of claims with no purchases in the Class were filed by five (5) E-Filers. The claims in these submissions make up 87% of the total E-file claims that have no purchases in the Class (*i.e.*, 2,202 of 2,530 E-file claims with no purchases in the Class).Of the 1,756 claims submitted as paper and Online claims, 579 claims did not fit the definition of the Class; 575 of those had no purchases in the Class Period. In addition, 98 E-file claims did not

purchase Blackberry common stock on a US exchange. These claims were filed by 5 filers and 6 unique submissions.

### CLAIMS THAT DID NOT CALCULATE TO A RECOGNIZED CLAIM

44. Of the 8,897 rejected claims, 2,710 claims did not calculate to a Recognized Claim per the Court-approved Plan of Allocation. Specifically, the Plan of Allocation provides a formula for calculation of Recognized Amounts for purchases of Blackberry common stock. In order to have a Recognized Claim Claimants needed to have held Blackberry common stock through one of the corrective disclosure periods. For losses to be compensable damages under the federal securities laws, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of the security. In this case, Plaintiffs allege that Defendants made false statements and omitted material facts from March 28, 2013 through September 20, 2013, inclusive, that inflated the price of BlackBerry common stock. Plaintiffs argue that multiple corrective disclosures released to the market between April 11, 2013 and September 20, 2013 revealed the allegedly misrepresented information, impacted the market price of BlackBerry common stock, and partially removed alleged artificial inflation from the BlackBerry common stock price on April 11, 2013, June 28, 2013, and September 20, 2013. Of the 2,710 claims that did not calculate to a loss, 516 Claims had transactions which were not held through the disclosure period, and 642 claims sold the shares short.

### CLAIMS THAT DID NOT CURE THEIR DEFICIENCIES

45. Of the 8,897 rejected claims, 2,872 claims did not cure one or more of their deficiencies. The majority of these claims are due to the E-filer submitting Claims with unexplained transfers. In addition, there were 5 filers with 6 unique submissions that were unable to provide required documentation to verify the data submitted was accurate, necessitating the rejection of the related claims. Accordingly, 103 claims across these 6 submissions are

16

recommended for rejection.

## FEES AND DISBURSEMENTS

46. JND agreed to be the Claims Administrator in exchange for payment of its fees and out-of-pocket expenses. JND's total fees and expenses for this matter through January 2023, are $320,383.12. *See* **Exhibit F** (copies of all JND invoices for this matter). In addition, the brokerage firm and nominees charged JND $29,228.18 for their work related to this matter. To date, JND has been reimbursed the amount of $92,490.80. JND has incurred additional fees and expenses for the month February 2023 of $14,273.75 which has not been invoiced yet. JND respectfully requests payment of $271,394.25 for the remaining balance for fees, expenses and broker fees, and $29,984.79 in anticipation of the fees and expenses that will be incurred in making the initial distribution. If the anticipated fees and expenses to conduct the Initial Distribution is greater than the actual cost to conduct the distribution, the excess will be returned to the Net Settlement Fund.

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

47. Should the Court concur with JND's determinations concerning the provisionally accepted and rejected Claims, including the Late But Otherwise Eligible Claims, JND recommends the following distribution plan (the "Distribution Plan"):

(a) JND will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Fund, after deducting all payments approved by the Court, and after payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, while maintaining a 10% reserve to address any tax liability and claims administration-related contingencies that may arise, as follows:

  a. JND will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Fund were to be distributed now. In accordance with the Court-approved Plan of Allocation, JND will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund in accordance with the Court-approved Plan of Allocation.

  b. JND will, pursuant to the terms of the Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose *pro*

    *rata* share calculates to less than $20.00.

  c. After eliminating claimants who would receive less than $20.00, JND will recalculate the *pro rata* distribution payments for Authorized Claimants who would receive $20.00 or more (their "Distribution Amount").

  d. Authorized Claimants whose Distribution Amount calculates to less that $200 will be paid their full Distribution Amount in the Initial Distribution ("Claims Paid in Full"). These Authorized Claimants will receive no additional funds in subsequent Distributions.

  e. After deducting the payments to the Claims Paid in Full, 90% of the remaining balance of the Net Settlement Fund will be distributed *pro rata* to Authorized Claimants whose Distribution Amount calculates to $200 or more. The remaining 10% of the Net Settlement Fund will be held in reserve (the "Reserve") to address any tax liability and claims administration-related contingencies that may arise following the Initial Distribution. To the extent the Reserve is not depleted, the remainder will be distributed in the "Second Distribution" described in subparagraph (d) below.

  f. JND will then conduct the Initial Distribution of the Net Settlement Fund in accordance with the Court's order.

(b) In order to encourage Authorized Claimants to promptly deposit their payments, all distribution checks will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY 90 DAYS AFTER ISSUE DATE."[2]

(c) Authorized Claimants who do not cash their Initial Distribution checks

---

[2] For Authorized Claimants whose checks are returned as undeliverable, JND will endeavor to locate new addresses by running the undeliverable addresses through address-lookup services. Where a new address is located, JND will update the database accordingly and reissue a distribution check to the Authorized Claimant at the new address. In the event an Authorized Claimant loses or damages his, her, or its check, or otherwise requires a new check, JND will issue replacements. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, JND will void the initial payment prior to reissuing a payment. In order not to delay further distributions to Authorized Claimants who have timely cashed their checks, JND's outreach program, described in the preceding sentences, shall end 30 days after the initial void date. Authorized Claimants will be informed that, if they do not cash their Initial Distribution checks within 90 days of the mail date, or they do not cash reissued checks within 30 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than 45 days prior to the next planned distribution. Requests for reissued checks in connection with any subsequent distributions (should

    within the time allotted or on the conditions set forth in footnote 2 will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available to be redistributed to other Authorized Claimants, if Lead Counsel, in consultation with JND, determine that it is cost-effective to conduct a second distribution. Similarly, Authorized Claimants who do not cash their second or subsequent distribution checks (should such distributions occur) within the time allotted or on the conditions set forth in footnote 4 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d) Consistent with the Court-approved Plan of Allocation, after JND has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, which efforts shall consist of the follow-up efforts described in footnote 2, but not earlier than six (6) months after the Initial Distribution, JND will, if Lead Counsel, in consultation with JND, determine that it is cost-effective to do so, conduct a second distribution of the Net Settlement Fund (the "Second Distribution"). Any amounts remaining in the Net Settlement Fund after the Initial Distribution (the funds for all void stale-dated checks), after paying any amounts mistakenly omitted from the initial disbursement, after deducting JND's fees and expenses incurred in connection with administering the Settlement for which it has not yet been paid (including JND's estimated costs of the Second Distribution), and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be distributed to all Authorized Claimants in the Initial Distribution who cashed their first distribution check and who would receive at least $20.00 from such distribution based on their *pro rata* share of the remaining funds. Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur until Lead Counsel, in consultation with JND, determine that further distribution is not cost-effective.

(e) At such time as Lead Counsel, in consultation with JND, determines that further distribution of the funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance of the Net Settlement Fund, after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, Plaintiffs will propose to the Court for its approval an appropriate 501(C)(3) non-profit organization(s) beneficiary

(f) No new Claims may be accepted after February 15, 2023, and no further adjustments to Claims received on or before February 15, 2023, may be made for any reason after February 15, 2023.

(g) Unless otherwise ordered by the Court, one year after the Second

---

such distributions occur) will be handled in the same manner.

(h) Distribution, JND may destroy the paper copies of the Claims and all supporting documentation, and one year after all funds have been distributed, JND may destroy electronic copies of the same.

## CONCLUSION

48. JND respectfully requests that the Court enter an Order approving its administrative determinations accepting and rejecting the Claims submitted in the Action and approving the proposed Distribution Plan. JND further respectfully submits that its fees and expenses, as reflected on the invoices attached hereto as Exhibit F, should be approved for payment from the Settlement Fund.

I declare under the penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

Executed this 23rd day of February 2023.

*/s/ Luiggy Segura*
Luiggy Segura